# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
## MOTION INFORMATION STATEMENT

Caption [use short title]

**Docket Number(s):** 13-3088 (L)

**Motion for:** Stay pending appeal

**David Floyd, et al.,**

Plaintiffs-Appellees,

**-against-**

**City of New York**

**Set forth below precise, complete statement of relief sought:**

A stay pending appeal of the District Court's August 12, 2013 remedial order, and leave to file this oversized motion.

Defendant-Appellant.

**MOVING PARTY:** City of New York et al.

☐ Plaintiff  ☒ Defendant
☒ Appellant/Petitioner  ☐ Appellee/Respondent

**OPPOSING PARTY:** Plaintiffs-Appellees
**David Floyd, et al.**

**MOVING ATTORNEY:** **Michael A. Cardozo,**
**Corporation Counsel, City of N.Y.**

[name of attorney, with firm, address, phone number, and email]

**New York City Law Department**
**Office of the Corporation Counsel**
**100 Church St.**
**New York, NY 10007**

**By: Celeste L. Koeleveld**
**212-356-2300**
**ckoeleve@law.nyc.gov**

**OPPOSING ATTORNEY:**

[name of attorney, with firm, address, phone number, and email]

**Darius Charney**
**666 Broadway**
**7th Floor**
**New York, NY 10012**
**212-614-6464**
**DCharney@ccrjustice.org**

Court-Judge/Agency appealed from: **United States District Court for the Southern District of New York (Scheindlin, D.J.)**

**Please check appropriate boxes:**

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS:**
**AND INJUNCTIONS PENDING APPEAL:**

Has **consent** of opposing counsel:
  A.  been sought?  ☒ Yes  ☐ No

  B.  been obtained  ☐ Yes  ☒ No

Has request for relief been made **below**?  ☒ Yes  ☐ No

Has this relief been previously sought in this Court?  ☐ Yes  ☒ No

**Plaintiffs plan to submit an opposition.**

Is **oral argument** requested?  ☒ Yes  ☐ No
(requests for oral argument will not necessarily be granted)

Requested returned date and explanation of emergency:

Has **argument** date of appeal been **set**:  ☐ Yes  ☒ No

If yes, enter date

**Signature of Moving Attorney:**

**Date:** 9/23/2013    Has **service** been effected?  ☒ Yes  ☐ No
[Attach proof of service] via ECF

## ORDER

Leave this space blank.
**IT IS HEREBY ORDERED that the motion is:**  ☐ **granted**  ☐ **denied.**

**FOR THE COURT:**

CATHERINE O'HAGAN WOLFE, Clerk

Date:    By:

**Form T-1080** (Revised 12/12/01)

**RULES OF THE UNITED STATES COURT OF APPEALS FOR THE 2ND CIRCUIT**

supplementing
**Federal Rules of Appellate Procedure**

**INSTRUCTIONS**

**INTERIM LOCAL RULE 27.**

(a)    **Form of Motion and Supporting Papers for Motion and Opposition Statement.**

    1.    Form of Motion.  A motion must be in writing, unless the court otherwise directs, and must conform to paragraphs (A) through (C) below.

        (A)    The front page of the motion must follow the form of the Motion Information Statement approved by the Court (T-1080 revised as of 12/12/01 and printed on the reverse side) and contain all information required by the form.

        (B)    The body of the motion, following the Motion Information Statement, must set forth the information and legal argument necessary to support the motion, and, if emergency relief is sought, an explanation of the emergency.

        (C)    Formal requirements.

            (i)    8-½ x 11 inch paper;

            (ii)    Text  double spaced, except for quotations, headings and footnotes;

            (iii)    Margins of one inch on all sides;

            (iv)    Pages sequentially numbered (page numbers may be placed in the margins);

            (v)    Bound or stapled in a secure manner that does not obscure text;

            (vi)    Length: no more than 20 pages, not including attachments and the Motion Information Statement;

            (vii)    Number of copies: original plus four copies;

            (viii)    Required attachments to motion:

                a.    An affidavit (containing only statements of fact, not legal argument);
                b.    If the motion seeks substantive relief, a copy of lower court opinion or agency decision;
                c.    Any exhibits necessary to determine the motion;
                d.    Affidavit of service.

    2.    Non-Compliance Sanctions.  If the moving party has not complied with this rule, the motion may be dismissed by the clerk without prejudice to renew upon proper papers. If application is promptly made, the action of the clerk may be reviewed by a single judge.  The court may impose costs and an appropriate fine against either party for failure to comply with this rule.

---

## MOTION INFORMATION FORM

---

### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

| **Floyd v. City of New York** | **DOCKET NO.  13-3088** |
| --- | --- |

**Michael A. Cardozo**
**Attorney for Defendants-Appellants**

**Office & Post Office Address & Telephone Number:**    **New York City Law Department**
**Office of the Corporation Counsel**
**100 Church St., New York, NY 10007**
**212-356-2300**

**Form T-1080** (Revised 12/12/01)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
— — — — — — — — — — — — — — — — — — — — — — — — — — — X
DAVID FLOYD, et al.,

                              Plaintiffs-Appellees,     **Docket No.  13-3088 (L)**

                    -against-                           **DECLARATION      IN
                                                        SUPPORT**

THE CITY OF NEW YORK,

                              Defendant-Appellant.

— — — — — — — — — — — — — — — — — — — — — — — — — — X

  **CELESTE KOELEVELD**, declares under penalty of perjury, pursuant to

28 U.S.C. §1746, that the following is true and correct:

  1. I am the Executive Assistant for Public Safety in the office of Michael

A. Cardozo, Corporation Counsel of the City of New York, attorney for

defendants-appellants the City of New York, et al. ("the City"), in the above-

captioned appeal.

  2. This declaration, the annexed memorandum of law, and the exhibits

annexed hereto are submitted in support of the City's motion for an order staying

the Remedial Order issued in this action pending a decision on appeal.

  3. For all the reasons set forth herein, an expeditious resolution of this

application will serve the public interest.  The City respectfully proposes the

following schedule: plaintiffs to respond by October 3, 2013; the City's reply to be

submitted by October 8, 2013, and oral argument to be scheduled during the week

of October 13, 2013.

4.      Annexed hereto as Exhibit A is the District Court's Remedial Order, entered August 12, 2013.

5.      Annexed hereto as Exhibit B is the District Court's decision and order entered August 12, 2013, finding the City liable for a pattern and practice of violating the plaintiffs' Fourth and Fourteenth Amendment rights.

6.      Annexed hereto as Exhibit C is the order of the District Court for the Southern District of New York (Scheindlin, U.S.D.J.), entered September 17, 2013, denying the City's motion to stay the Remedial Order.

7.      Annexed hereto as Exhibit D is the transcript of the trial testimony of Cornelius McDonald.

8.      Annexed hereto as Exhibit E is the declaration of James P. Hall, Chief of Patrol Services for the New York City Police Department.

9.      Annexed hereto as Exhibit F is the declaration of James O'Keefe, the Deputy Commissioner for Training for the New York City Police Department.

## CONCLUSION

For the reasons set forth herein, the Court should grant the relief requested.

_____
CELESTE L. KOELEVELD

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
− − − − − − − − − − − − − − − − − − − − − − − − − − X

DAVID FLOYD, et al.,

                    Plaintiffs-Appellees,

                                              **Docket Nos.  13-3088**

         -against-

                                              **MEMORANDUM    OF
                                              LAW IN SUPPORT OF
                                              MOTION FOR A STAY**

THE CITY OF NEW YORK, et al.,

                    Defendants-Appellants.

− − − − − − − − − − − − − − − − − − − − − − − − − X

          Defendants-appellants ("the City") seek to stay an injunctive order

that requires the New York City Police Department ("NYPD") to change its

standards for conducting *Terry* stops "as soon as [is] practicable."  The Injunction

is anchored in a fundamentally flawed legal finding of a widespread pattern of

unconstitutional stops.  Statistically, of the 4.4 million stops conducted over more

than seven years, 94% could not be challenged by plaintiffs' expert.  Anecdotally,

only 12 plaintiffs came forward at trial with tales of 19 assertedly illegal stops.

Only 9 of those stops were found to lack reasonable suspicion; and only one was

held to illustrate the District Court's novel theory of "indirect racial profiling," on

the flimsiest of proof.  Yet the Court did not hesitate to impose §1983 liability on

the City for plaintiffs' wide-ranging and unsupportable claims.

          Without justification, the Injunction imposes the will of the federal

judiciary in matters of local law enforcement.  It requires the wearing of body

cameras by patrol officers, relief which was never litigated or even sought by

plaintiffs.  It dictates unfounded changes to police training, inevitably leading to

considerable confusion among the rank and file, and mandates the creation of substantial police paperwork.  It throws doubt on traditional components of reasonable suspicion endorsed by this Court and the Supreme Court.  It has already resulted in the appointment of a federal Court Monitor, whose work is now underway; a Facilitator, to continue public second-guessing of policies properly entrusted to the Police Commissioner; and an "Academic Advisory Council" of legal scholars far removed from the realities of everyday policing, to further encroach on the Commissioner's purview in areas of crime control and deterrence.

As the District Court has obliquely acknowledged, its orders have already caused substantial disruption in the practices of the NYPD.  Unless the Injunction is stayed pending appeal, this disruption will continue to mount, jeopardizing officer safety and putting the people of this City at risk of increased crime.  Accordingly, and because the City has a strong likelihood of success on appeal, the stay should be granted.

## BACKGROUND

This is a class action filed pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments.  Plaintiffs-appellees are a class of persons who allege that the NYPD has engaged in a pattern or practice of stopping and/or frisking them without reasonable suspicion as defined in *Terry v. Ohio,* 392 U.S. 1 (1968) and its progeny.  The plaintiff class also includes a subclass of blacks and Latinos whose stops were purportedly based on their race or national origin.  *See Floyd v. City of New York*, 283 F.R.D. 153, 160 (S.D.N.Y. 2012).

After a nine-week trial, the District Court for the Southern District of New York (Schiendlin, U.S.D.J.) found the City liable for violating the plaintiffs' Fourth and Fourteenth Amendment rights.  In a 198-page opinion, the Court found that the City engaged in a widespread pattern or practice of conducting stops and frisks without reasonable suspicion, and operated under a policy of "indirect racial profiling" in violation of the Equal Protection Clause.  The Court also found that the City was "deliberately indifferent" to such practices.

The City appeals from the District Court's Remedial Order, entered August 12, 2013, annexed hereto as Exhibit A (the "Injunction" or "Remedial Order").  The appeal also brings up for review the supporting decision imposing liability on the City, also entered August 12, 2013 (the "Liability Order"), annexed hereto as Exhibit B.[1]

### Terms of the Injunction

In the Remedial Order, the Court delineated specified measures to address NYPD policies and practices deemed unconstitutional in the liability decision.  The Court appointed Peter Zimroth as Court Monitor to oversee these reforms to City stop-and-frisk policies, including amended training, supervision, monitoring, and discipline.  The Injunction requires both "Immediate Reforms," to

---

[1]    This Court has jurisdiction over this interlocutory appeal from the Injunction under 28 U.S.C. § 1292(a)(1).  The liability ruling, which purports to provide the legal basis for the Injunction, is also properly before this Court, because it is "necessary to ensure meaningful review of" and "inextricably intertwined with" the appealable order.  *Lamar Adver. of Penn., LLC v. Town of Orchard Park*, 356 F.3d 365, 371 (2d Cir. 2004); *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 268-269 (2d Cir. 1999).

be developed in the short-term and implemented "as soon as practicable," as well as "Joint Process Reforms," which involve a longer process (Exh. A, at 12).

1. **Immediate Reforms**. Details of the Immediate Reforms are to be devised by the Monitor in conjunction with the parties, and implemented upon the Court's approval. Although some details are left to be worked out, the following reforms must be implemented "as soon as practicable:"

(a) The NYPD must transmit a FINEST message summarizing the standards set forth in the Liability Order "in simple and clear terms," and order all NYPD personnel to comply with those standards "immediately." Exh. A, at 25.

(b) The NYPD must institute a pilot program for use of body-worn cameras, which shall be worn for one year by all patrol officers in one precinct per borough where the greatest number of stops occurred in 2012. Exh. A, at 25-28.

(c) The NYPD must amend its method of documenting stop-and-frisk activity, especially the "UF-250" form used to document stops and frisks. These amendments shall include the addition of a narrative, as well as a "tear-off" section that is to be provided to the subject at the end of any stop. Exh. A, at 18-23.

(d) The NYPD must revise its policies regarding both stop-and-frisk and racial profiling to accord with the interpretation of federal and state law as set forth in the Liability Order. Training, supervision, monitoring, and discipline must be similarly amended. Exh. A, at 14-17; 23-25.

2. **Joint Remedial Process Reforms**. The Injunction also sets forth a Joint Remedial Process for developing supplemental reforms. These reforms

contemplate community input, to be overseen by a Facilitator in conjunction with the Monitor. Along with the parties, a wide array of individuals and entities will be granted a say in the reform process, including members of the communities where stops most often take place; representatives of religious, advocacy, and grassroots organizations; representatives of the NYPD and other police organizations; District Attorneys' offices; local elected officials; community leaders; the Department of Justice, Communities United for Police Reform; and the Black, Latino, and Asian Caucus of the City Council. Exh. A, at 28-32.

### Subsequent Developments

Since entry of the disputed orders, the Court Monitor has begun meeting with the parties as the first step toward developing his recommendation. On September 4, 2013, the District Court appointed Nicholas Turner of the Vera Institute to serve as Facilitator (ECF #384). On September 18, 2013, the District Court appointed an "Academic Advisory Council," consisting of law professors from area law schools, to aid in overhauling the NYPD's practices (ECF #403).

### Application for a Stay in the District Court

On August 27, 2013, the City moved to stay the Remedial Order in the District Court (ECF #372). Plaintiffs opposed the motion by letter dated September 6, 2013 (ECF #385), and the City submitted a reply dated September 12, 2013 (ECF #399). By order dated September 17, 2013, the District Court denied the City's motion (appended hereto as Exhibit C).

In denying the stay, the Court noted that even the relief characterized as "immediate" will not take effect until the Monitor makes a recommendation, which would likely require "several months" (Exh. C, at 6-7). Next, the Court ruled that the City had not shown a likelihood of success on the merits, and, largely for that reason, also rejected its arguments as to irreparable harm (*id*., at 5-8). Finally, the Court opined that a stay would encourage the NYPD to return to its "former" stop-and-frisk practices, and would send a "signal" that those practices "were justified and based on constitutional police practices" (*id*., at 10-12).[2]

## POINT I

### THIS COURT SHOULD STAY THE INJUNCTIVE ORDER PENDING APPEAL.

A party seeking a stay must demonstrate (1) a likelihood of success on the merits, (2) irreparable harm to the applicant absent a stay, (3) no substantial injury to the other parties, and (4) furtherance of the public interest. *E.g., Nken v. Holder*, 129 S. Ct. 1749, 1761 (2009); *In re World Trade Center Disaster Site Litig*., 503 F.3d 167, 170 (2d Cir. 2007). In this Circuit, "the degree to which a factor must be present varies with the strength of the other factors, meaning that more of one factor excuses less of the other." *Id*. (citations and internal punctuation omitted). Here, each factor supports the issuance of a stay.

---

[2]   On September 19, 2013, this Court denied the City's motion for an order granting expedited briefing and review of the appeal.

**(A)**

## Success on the Merits

An injunction is subject to reversal where the District Court abused its discretion, including application of an incorrect legal standard or reliance on clearly erroneous findings of fact. *Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003). The District Court's imposition of *Monell* liability on the City resulted from both forms of error.

*(1)*

### Equal Protection Pattern or Practice

The District Court's ruling of widespread Fourteenth Amendment violations represents a misapprehension of governing legal principles. Indeed, the Court's ruling on its face definitively undermines any conclusion that the NYPD discriminates against its citizens through "indirect racial profiling."

Only intentional discrimination violates the Equal Protection Clause. *Washington v. Davis*, 426 U.S. 229, 240 (1976). Discriminatory purpose requires evidence that a decision-maker undertook a course of action "because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (internal punctuation omitted), quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The District Court found that the NYPD "has an unwritten policy of targeting racially defined groups for stops, *based on the appearance of members of those groups in crime suspect data*" (Exh. B, at 58, emphasis added). In light of *Iqbal*, the fallacy in this ruling is apparent: the City's stop-and-frisk activities fall

heavily on minorities primarily because contemporaneous suspect data identifies members of racial minorities as being responsible for specified criminal conduct. That is the very definition of a policy undertaken "in spite of," rather than "because of," its effect on these groups.

Thus, since that the 9/11 attacks were perpetrated by Arab Muslims, it is unsurprising that "a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims." *Iqbal*, 556 U.S. at 682. Under the District Court's approach, the plaintiff in *Iqbal* set forth a compelling equal protection claim, yet the Supreme Court dismissed the complaint on its face. *Id.*

In large part, the District Court reached the contrary conclusion here by dismissing the significance of an unpleasant reality: during the period at issue, approximately 83% of all reported crime suspects were black or Hispanic, as were roughly 90% of all violent crime suspects (Exh. B, at 51-52).[3] Social scientists may differ over the reasons for those overwhelming statistics, but it is uncontested that they are derived from arrest and complaint report data, not racial stereotypes. That the NYPD stops members of those minority groups in close correlation to these rates (*id.*) invalidates any rational conclusion that the stops furthered a policy of targeting racial minorities *because of* their race.

---

[3]    Tellingly, in the "executive summary" at the beginning of its opinion, the District Court set forth certain uncontested statistical facts regarding the NYPD's stop-and-frisk activity, heavily emphasizing its racial breakdown (Exh. B, at 7).  The Court made no mention of statistics of suspect description by race until much later (*id.*, at 51), even though they are also undisputed.

Of course, not every report of a crime is accompanied by a suspect description.  Still, the race of the perpetrator is described in roughly 63% of all crimes, as reflected in crime reports and arrest data, climbing sharply to 98% for weapons crimes, 86% for violent felony crimes, and 99% for drug offenses (Exh. B, at 58, n.193).  The fact that this data is incomplete is not a rational reason to disregard it.  Indeed, the RAND report commissioned by the City in 2007 to evaluate stop and frisk practices on minorities found it essential to take such data into account, and "found little evidence of pervasive racial profiling in the NYPD's pedestrian stop and frisk activity" (*id*., at 115).

Eliminating gender from the statistical picture of suspect data highlights the illogic of the approach sanctioned by the Court.  Roughly 90% of NYPD stops focus on male subjects, but that figure hardly evidences invidious discrimination against men; rather, it reflects the fact that the vast majority crime is reportedly perpetrated by men.  If women were to embark on a significant crime spree, NYPD data would undoubtedly lead to a gender distribution of stops more closely resembling the general population.  Short of that, it makes little sense from a constitutional or policy perspective to require officers to stop women more often. The same is true of racial and ethnic groups.[4]

---

[4]    In the District Court's view, "[i]f the police are stopping people in a race-neutral way, then the racial composition of innocent people stopped should more or less mirror the racial composition of the areas where they are stopped…" (Exh. B, at 52).  This ruling is not only legally infirm, but raises a serious concern as to the duration of the Remedial Order, which is to remain in effect until the Court is satisfied that the City has ended its ostensibly discriminatory practices (Exh. A, at 11-13).  Apparently, the Court intends to keep the NYPD under federal monitorship until its stop rates reflect census data by neighborhood.

Puzzlingly, the District Court found crime suspect rates to lack probative value largely because a high percentage of stop subjects prove to be innocent of any crime (Exh. B, at 51-54). It is beyond question that police officers may stop, frisk, and even arrest innocent people without offending the fundamental rights guaranteed by the Fourth Amendment, because the compelling governmental interest in protecting citizens from crime balances the degree of incursion. *Illinois v. Wardlow,* 528 U.S. 119, 126 (2000). Likewise, innocence alone cannot provide a valid equal protection claim. *See Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir. 2000) (targeted stops of young black male subjects were not discriminatory although "[t]he actions of the police were understandably upsetting to the innocent plaintiffs who were stopped…").

Compounding its error, the District Court next held that plaintiffs' *Monell* claims for "indirect racial profiling" are viable even insofar as City policy requires that reasonable suspicion must support a stop, applying a theory of selective enforcement (Exh. B, at 185-86 and n.767; 191-92). But plaintiffs never framed their claim as one of selective enforcement. Nor did plaintiffs adduce proof that officers ever chose to stop only Black or Latino individuals despite knowing of similarly situated non-minority individuals at the same time and location. *E.g., United States v. Armstrong,* 517 U.S. 456, 465 (1996). *See* p. 13, *infra*. Indeed, the plaintiff class of minorities was certified as a subclass of those individuals whose stops were not supported by reasonable suspicion (*Floyd*, 283 F.R.D. at 160), and the Court thus ruled at summary judgment that plaintiffs' equal

protection claim could not survive a finding of reasonable suspicion. *Floyd v. City of New York*, 813 F. Supp. 2d 417, 444 (S.D.N.Y. 2011). The Court clearly erred when it held to the contrary at trial.

In light of the nature of plaintiffs' subclass, the Court also fatally overlooked the necessary element of causation in refusing to allow the City to rely on reasonable suspicion as a defense. *Monell* liability may not be imposed unless the complained-of City policy was the "moving force" that "actually caused" any given violation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Absent a valid selective enforcement theory, any subject whose description and/or conduct warranted an investigative stop or pat-down cannot possibly demonstrate that a City policy of "indirect racial profiling," even if actionable, was "the moving force" behind his stop. *Cf. Hartman v. Moore,* 547 U.S. 250, 259 (2006).

Similarly, the Court's finding of a facially race-based classification does not withstand analysis (Exh. B, at 185-88). The Court reasoned that police officers who rely on crime report data in focusing on subjects of a certain race employ a facially "suspect classification," in part because suspect descriptions that include only race, gender and approximate age do not amount to reasonable suspicion (*id*., at 186, n. 767). However incomplete, such data does not originate with the government, but with victims of and witnesses to criminal activity. *City of Oneonta*, 221 F.3d at 338. And while a given factor may not be enough to establish reasonable suspicion, "officers are not required to ignore" that factor "in

11

determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124.

Further, plaintiffs utterly failed to support their statistical evidence with a scintilla of anecdotal proof demonstrating racial animus.  Indeed, the Court found that *only one* of the incidents plaintiffs presented at trial, the stop and frisk of Cornelius McDonald, illustrated the purportedly widespread practice of "indirect racial profiling" (Exh. B, at 188-89, n. 772).  But this Court has held that a single incident, even if suggestive that the police gave too much weight to a suspect's race, is insufficient to establish a municipality's intentionally discriminatory practice.  *City of Oneonta*, 221 F.3d at 339.

That aside, McDonald's testimony was plainly insufficient to establish racial motivation even as to his own stop.  The entirety of that testimony is appended hereto as Exhibit D for this Court's review.  The sole reason McDonald gave to support the assertion that his stop was motivated by his race was that the officers who stopped him did not stop other people on the street who, he said, "*could have been* Asian, white" (emphasis added) (Exh. D, at 3688-89).  There was no evidence that the officers were even aware of those people.  It is on this slender anecdotal reed that the NYPD's liability for "indirect racial profiling" rests.[5]

---

[5]    Furthermore, as McDonald is not a named plaintiff in this action, it is questionable whether plaintiffs even adequately established the fundamental issue of standing for their equal protection claim.  *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Cent. States Southeast v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005) (collecting cases).

*(2)*

*Fourth Amendment Pattern or Practice*

The District Court found a widespread pattern of unconstitutional stops and frisks by allowing plaintiffs to sidestep fundamental mandates of Fourth Amendment law.  The Supreme Court has frequently reiterated that the validity of any stop may only be determined upon consideration of "the totality of the circumstances – the whole picture," which cannot be "readily, or even usefully, reduced to a neat set of legal rules."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989 (internal quotation marks omitted), quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981), and *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  Under a proper Fourth Amendment analysis, "no template is likely to produce sounder results than examining the totality of circumstances in a given case[,]" because "it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones."  *United States v. Banks*, 540 U.S. 31, 36 (2003).  Accordingly, "rigid rules, bright-line tests, and mechanistic inquiries" must be rejected "in favor of a more flexible, all-things-considered approach."  *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013).

These axioms fell by the wayside in this action, at the City's expense. All the statistical data put forth by plaintiffs derived from a single double-sided NYPD form known as a "UF-250," which contains a series of checkboxes in which an officer who conducted a stop and/or frisk indicates general categories of factors giving rise to the encounter.  The UF-250 includes such groupings as "Suspicious

Bulge;" "Actions Indicative of Casing Behavior;" "Furtive Movements;" "High Crime Area;" "Inappropriate Attire, Possibly Concealing Weapon;" and "Evasive, False or Inconsistent Response to Officer's Questions," all useful starting points for determining the legality of a stop.  But a full judicial analysis necessarily includes reviewing a wealth of information that cannot be captured in documentary evidence alone, much less checkboxes.  *See, e.g*., *United States v. Arvizu,* 534 U.S. 266, 273 (2002); *Ohio v. Robinette,* 519 U.S. 33, 39 (1996); *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).  Police paperwork is not intended to capture such nuances. To carry the burden of proof in a legal action – particularly where such grave allegations are at stake – it cannot substitute for live testimony.

The Court even rejected plaintiffs' expert's concession that checkmarks for "Furtive Movements," "High Crime Area," and "Suspicious Bulge" together could indicate a stop supported by reasonable suspicion.  Due to the absence of a narrative explaining the officers' reliance on what the Court termed "vague" and "subjective" categories, the Court chose to presume that such stops should be counted as unconstitutional (Exh. B, at 8, 41; 47-48).

Either the Court erroneously held that officers may no longer rely upon such time-honored building blocks for reasonable suspicion, or it wrongly construed the brevity of the form as evidence of a widespread pattern of unconstitutionality for which the City should bear *Monell* liability (*id*., at 8).[6]  But

---

[6]    Oddly, after excoriating these categories as "vague" and "subjective," the District Court suggested in the remedial order that the form should be amended to contain *even fewer categories* of conduct, not just an elaboration of specifics (Exh. A, at 21).  It thus appears that the Court would foreclose any reliance on those categories it found to be wanting, despite

no constitutional imperative requires police documentation, standing alone, to establish the constitutionality of police conduct. It was plaintiffs who bore the burden of proof, and it was they who chose to rely on data derived from the UF-250. The dearth of probative evidence should not have been held against the City.

Indeed, the District Court recognized the failings of cold statistical evidence derived from dry paperwork, especially in evaluating 4.4 million stops (Exh. B, at 7; 40). Yet the Court allowed it, on the theory that it was the only efficient way to entertain plaintiffs' wide-ranging claims (*id.*). However, efficiency cannot displace necessary legal analysis, especially where it results in prejudice to one party. *Cf. Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011). Plaintiffs' attempt to challenge millions of discretionary determinations over the better part of a decade, each of which was based on its own particular circumstances, does not vitiate the need for a totality-of-the-circumstances analysis for each scenario. Absent evidence or stipulation that each encounter was materially identical – far from the case here – plaintiffs' class action should have failed on the merits. *Cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 35-36 (2000); *see Brown v. State of New York*, 45 A.D.3d 15, 24 (3d Dep't), *lv. denied*, 9 N.Y.3d 815 (2007).[7]

---

voluminous precedent recognizing their legitimacy and value in ferreting out crime. *E.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984); *United States v. Williams*, 2013 U.S. App. LEXIS 11140 (2d Cir. 2013); *People v. Perry*, 133 A.D.2d 380, 382 (2d Dep't 1987). Nor would the addition of a few lines of narrative allow full review of the totality of circumstances.

[7]    Given the need for a particularized inquiry, the City has maintained from the start that the instant case fails the commonality requirement for a class action. Plaintiffs simply cannot demonstrate that common issues of fact or law applied to all, or even most, of 4.4 million stops.

Further, the Court erred in concluding that "[t]he central flaws in this database all skew toward underestimating the number of unconstitutional stops that occur" (Exh. B, at 7). A fully developed record for each encounter may have established reasonable suspicion even where the brief form did not. Absent such a record, however, it simply cannot be said that plaintiffs met their burden of proof.

Live testimony is indispensible because a court must consider an officer's "experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *Arvizu,* 534 U.S. at 273 (citation and internal quotation marks omitted); *accord, United States v. Singh*, 415 F.3d 288, 295 (2d Cir. 2005). Also, reasonable suspicion must be "weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418. Here, the Court effectively made a negative credibility determination for each officer who checked certain boxes, without considering any of the foregoing factors (*e.g.*, Exh. B, at 41). The Court might have been less skeptical about officers' reliance on "vague and subjective" categories after hearing testimony about all the details of each encounter, as is often the case in criminal trials.[8]

---

*Wal-Mart*, 131 S. Ct. at 2553-56; *Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008). And their anecdotal showing was far "too weak to raise any inference that all the individual, discretionary" decisions to stop and frisk uniformly resulted from an unconstitutional City policy. *Wal-Mart*, 131 S. Ct. at 2556.

[8]  *E.g., United States v. Wiggan*, 2013 U.S. App. LEXIS 14616, 10-11 (2d Cir. 2013); *United States v. Williams,* 2013 U.S. App. LEXIS 11140, 3-4 (2d Cir. 2013); *United States v. Herring,* 373 Fed. Appx. 131, 133 (2d Cir. 2010); *People v. Allen*, 42 A.D.3d 331, 332 (1st Dep't 2007), *aff'd,* 9 N.Y.3d 1013 (2008); *United States v. Thomas*, 184 Fed. Appx. 91, 91-92 (2d Cir. 2006);

Tellingly, to the limited extent that live testimony was presented, the Court found that reasonable suspicion supported 10 out of 19 of the stops plaintiffs put forth (Exh. B, at 117-77).  In two of the remaining cases, the Court was admittedly presented with a "close" question in determining the legality of the stop (*id.*, at 136, 153).  Presumably, plaintiffs chose to present the 19 encounters they believed most compelling to further their cause.  If the NYPD were truly engaging in a pattern of suspicionless stops over the better part of a decade, it should have been a simple matter for plaintiffs to adduce far more examples of it.[9]

In fact, even crediting the statistical evidence relied upon by the Court, it did not amount to a widespread practice of unconstitutional stop activity, especially given that plaintiffs, not the City, bore the burden of proof.  Plaintiffs' expert conceded that, based on the UF-250 data, at least 88% of the stops and frisks conducted between January 2004 and June 2012 were likely supported by reasonable suspicion, while an additional 6% were "ungeneralizable" without further information.  Only 6% were "apparently unjustified" (Exh. B, at 41).

Thus, at the end of the day, plaintiffs framed a plainly insufficient challenge to the constitutionality of 94% of the City's stops.  A 94% success rate is hardly sufficient to establish a widespread municipal pattern or practice.  *See Mortimer v. Baca*, 594 F.3d 714, 722 (9th Cir. 2010).  The Court's imposition of

---

*United States v. Paulino*, 850 F.2d 93, 98 (2d Cir. 1988); *People v. Benjamin*, 51 N.Y.2d 267 (1980); *People v. Garcia*, 96 A.D.3d 481, 481-482 (1st Dep't 2012); *People v. Bonilla*, 81 A.D.3d 555, 556 (1st Dep't), *lv. denied*, 17 N.Y.3d 792 (2011).

[9]    The District Court allowed Class Counsel to send thousands of direct mailings to seek involvement of potential class members months before trial.

liability is tantamount to *respondeat superior*, which is unavailable under § 1983. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978).

Nor does the hard number of stops support a different conclusion. Under plaintiffs' assessment, based on nothing more than a form, perhaps 200,000 stops lacked a sufficient basis during a seven-and-a-half-year period (Exh. B, at 41), which reduces to about 26,500 per year.  As the NYPD currently employs some 34,500 police officers, nearly 19,800 of whom are on patrol (*see* O'Keefe affidavit), this rate could easily be attributable to individual lapses in judgment. *See Mortimer v. Baca*, 594 F.3d 714, 722 (9th Cir. 2010).  One such lapse for every 20 stops is hardly a widespread pattern of unlawful conduct.  And if those "apparently" unsupported stops were tested by live testimony and reduced by more than 50%, as was the case with plaintiffs' anecdotal evidence, the NYPD's record would set the standard for law enforcement nationwide.[10]

To be sure, the Court concluded that plaintiffs' expert was too conservative in his estimates, and also believed that there was no way to know how many more unconstitutional stops had taken place, based in part on its belief that a reasonable person would never feel free to walk away when an officer poses accusatory questions or seeks consent to perform a search (Exh. B, at 40-41; Exh. A, at 14-15).  The Court therefore concluded that "at least" 200,000 illegal stops or frisks had been undertaken during the relevant period (Exh. B, at 41).   This

---

[10]   Insofar as the District Court appears to believe that the NYPD has been overusing the *Terry* stop in general, without regard to whether they conform to federal law, that is a policy question more properly addressed through the political process, not by the award of wide-ranging equitable relief.  *See Rahman*, 530 F.3d at 627.

conclusion was based in part on the Court's overbroad definition of a stop (*see* Memorandum of Law in Support of a Stay Pending Appeal in *Ligon v. City of New York,* Docket 13-3123, filed herewith), and in part on sheer speculation.  In any case, since plaintiffs' proof failed to quantify the higher number, the Court necessarily and wrongly ruled that plaintiffs' estimate was sufficient to impose *Monell* liability (*id*.).

The Court also erred in deeming the NYPD's "hit rate" – that is, its rate of success in effectuating arrests after a stop, or recovering weapons and other contraband during frisks – to be too low (Exh. B, at 33-37; 48; 53-54).  Reasonable suspicion is a "minimal" standard of proof, even lower than probable cause, which is in turn lower than a preponderance of the evidence.  *Wardlow*, 528 U.S. at 123. It may arise from conduct that is "as consistent with innocence as with guilt[.]" *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008).  More importantly, reasoning backward from negative "hits" to find unconstitutionality is just as fallacious as deciding that a search was constitutional merely because it successfully recovered contraband.  *See People v. Rivera*, 14 N.Y.2d 441, 447 (1964), *cert. denied* 379 U.S. 978 (1965) ("[t]he question is not what was ultimately found, but whether there was a right to find anything.").[11]

---

[11]    This reasoning, too, is particularly troubling vis-à-vis the scope of the remedial order, as the District Court seems to believe that the constitutionality of police conduct can and should be mathematically determined by its relative success in detecting criminality.  Nor does the Court's reasoning disclose the percentage of successful "hits" that would satisfy its conception of Fourth Amendment constraints.

*(3)*

*Deliberate Indifference*

Also legally insupportable is the Court's conclusion that plaintiffs proved the City's "deliberate indifference" to Fourth or Fourteenth Amendment infringements. The Court inferred that, in focusing its officers on "the right people, at the right time, in the right location," the NYPD created an environment where racial crime suspect data alone would be used to justify stops (Exh. B, at 82-86). But if that were true, the policy would focus only on "the right people" and omit any reference to particularly telling times and locations – a clear reference to areas with recent spikes in crime, and to reasonably suspicious conduct.

In this respect, the Court's treatment of one type of evidence is instructive. Plaintiffs introduced a secretly taped annual evaluation by an NYPD supervisor discussing a grand larceny and robbery pattern in Mott Haven, which was reportedly being perpetrated by male blacks, aged 14-21, and questioning what enforcement action the officer had taken to address this crime condition (Exh. B, at 84). The tape contained no suggestion of stopping all young male blacks. In the same exchange, the supervisor elaborated that stopping "a 48-year-old lady [who] was walking through St. Mary's Park when it was closed" was not likely to be effective in curbing the crime pattern (*id.*). Crucially, although the Court interpreted this as evidence of racially discriminatory policing, the supervisor did not refer to this "lady's" race or ethnicity (*id.*). Other evidence confirmed that, while officers need not be willfully blind to race-specific suspect information, they

are instructed to stop only those individuals who exhibit reasonably suspicious behavior (*id*., at 83-85) (faulting Chief Esposito for stating that "at times" black and Hispanic youths were "the right people" to be stopped, but only where reasonable suspicion was present).

Any notion that constitutional concerns were eclipsed by "pressure" to make stops was largely rebutted by the survey of recently retired NYPD personnel introduced by plaintiffs. While NYPD decision-makers increasingly stressed the importance of measurable enforcement activity during the CompStat era (such as arrests, summonses and *Terry* stops), they also emphasized that legal constraints should not be forgotten. Indeed, 78% of recent retirees reported "high" or "medium" pressure from higher-ups to "obey legal and constitutional rules" during the current mayoral administration (*id*., at 70). The Court used the survey as evidence of deliberate indifference, in the mistaken belief that the emphasis placed on performance standards may be no greater than the quantum of weight given to legal concerns (*id*.). The Court thus lost sight of the stringent standard of fault, which requires proof that the municipality made a "conscious choice" to disregard a known or obvious consequence of the disputed action. *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

As to shortcomings in training, decision-makers can "hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights" without notice "that a course of training is deficient *in a particular respect*…." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)

(emphasis added). The circumstances giving rise to each stop here were varied and dissimilar: reports of crime in progress; anonymous tips; concerted responses to crime patterns in particular areas; officer observations during routine patrol; and infinite permutations of the like. Just as there is no commonality under *Wal-Mart*, there can be no notice specific enough to cover this scattershot theory of liability.

That aside, ample trial evidence demonstrated the NYPD's steps to ensure that stop-and-frisk activity was not unconstitutionally affecting members of minority groups. For example, in 2007, the City voluntarily commissioned a study from the well-respected RAND Corporation to look into its stop-and-frisk practices. As noted, the resulting report demonstrated that complaints of disproportionate effects on minorities were generally unfounded once suspect data was taken into account (Exh. B, at 115-16). Moreover, the City implemented most of the recommendations contained in the RAND report to improve its practices, including enhanced documentation, audits, training, and communication with persons stopped about the reasons for the stop. The City also went beyond the RAND recommendations by, *inter alia*, continuing existing and creating new audits of stop-related activity, re-issuing the NYPD policy prohibiting racial profiling, emphasizing and training on the need to detail stops in officer's activity logs, continuing to report stop data to the City Council and making it publicly available on the NYPD website, along with periodic crime enforcement data including suspect description data. The District Court's belief that these steps were so inadequate as to constitute deliberate indifference again reflects a

22

misapprehension of the applicable "stringent" standard of fault. *Jones*, 691 F.3d 72, 81 (2d Cir. 2012); *Reynolds v. Giuliani*, 506 F.3d 183, 192-193 (2d Cir. 2007).

## (B)

### Irreparable Harm

In denying the City's motion for a stay, the District Court reasoned that "it is unlikely that any orders will issue for several months," or until the Monitor finishes the process of arriving at recommendations for the final shape of the Immediate Reforms (Exh. C, at 6-7). However, it is virtually certain that this appeal cannot be briefed, argued and decided before the Monitor's recommendation is submitted. *Cf. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999). The City should not be forced to await the eve of implementation, only to rush back to this Court with an emergency motion in hand. Nor should this Court be faced with the burdens attendant to an emergency motion, particularly given the complex nature of the issues raised, and the fact that the precise contours of the implementing order will not change the perspective of the appeal as it stands right now or the need for a stay. The underlying basis for the contemplated reforms – most notably, the FINEST message[12] and all changes to the NYPD's policies, training, supervision, monitoring, and discipline – is dictated by and will be infected by the District Court's erroneous application of constitutional law.

---

[12] A "FINEST message" is typically a brief teletype announcement distributed Department-wide at rollcalls when promptness is necessary. The District Court apparently expects the essence of its 198-page ruling to be captured adequately in such a message, but it is difficult to conceive how that will be accomplished given the scope of the Court's ruling, the novelty of its "indirect racial profiling" theory, and the uncertainty the ruling throws on the NYPD's lawful stop-and-frisk practices.

Also, when it denied the City's stay motion, the District Court, while noting that the City was not yet required to change its practices, also stated that issuing a stay would encourage the NYPD to return to its "former" stop-and-frisk practices (Exh. C, at 10).  The Court thus indirectly recognized that the effects of its Liability Order are already reverberating through the NYPD's ranks, regardless of the literal terms of the Remedial Order.

The Monitor is already conducting meetings with the parties.  While he may take several months to make his recommendations, that does not change the fact that the Liability Order has strong potential for disruption in law enforcement today.  As detailed in the affidavit of James P. Hall, the NYPD's Chief of Patrol Services (annexed hereto as Exhibit E), the Liability Order throws considerable doubt on whether officers may continue to rely upon the traditional building blocks of reasonable suspicion, especially as to black and Hispanic subjects.  Insofar as the Court's decision undermines confidence in directives historically used by the NYPD, which are grounded in sound legal precedent, it will almost certainly cause second-guessing as to whether a given stop or frisk is now constitutional.  Indeed, the Court went so far as to declare, *sua sponte*, that New York's frisk statute is unconstitutional on its face (Exh. B, at 24, n.74).  Uncertainty breeds hesitation in fast-developing street encounters, which, in a high-stakes situation, may pose an immediate threat to the officer's safety.  It will also result in lost opportunities to apprehend criminals and to deter crime.

24

Further, the Remedial Order requires the NYPD to revise its policies and training materials regarding both stop-and-frisk and racial profiling to accord with the District Court's interpretation of federal and state law. As explained in the affidavit of James O'Keefe, the NYPD's Deputy Commissioner for Training (annexed hereto as Exhibit F), this directive will also lead to disruption, as officers will have to "unlearn" their previous training. Also, training cannot be effective unless it is based on clear principles, and the Court's decision sets no clear guideposts in its reinterpretation of constitutional precepts, especially as it introduces the novel concept of "indirect racial profiling" as a surrogate for intentional discrimination.

Moreover, if the City is ultimately successful in its appeal, a new round of re-education will be necessary, causing further confusion and increasing danger to officers on patrol. In either case, the need for new training is time-consuming and expensive, likely requiring officers to be removed from their ordinary duties. A serious depletion in the number of officers available to patrol crime-ridden areas may further compromise public safety.

A related harm is raised by the Court Monitor's consideration of the body-camera pilot project and revised stop-and-frisk forms. By necessity, NYPD patrol supervisors and other personnel will need to participate in that process, to ensure that real-world concerns are not overlooked. The District Court envisions this process lasting for months, diverting time and effort from the ordinary duties of running the day-to-day operations of the police force. Soon enough,

implementation will necessitate reassignment of the Training Bureau staff from their usual training duties, to develop specialized training that, ultimately, may not be used.  It is noteworthy in this respect that the body-camera issue was never meaningfully litigated in this action, and indeed was never suggested by plaintiffs as a form of relief (*see* Exh. A, at 25).

Due to the lack of a sound legal predicate, the remedial order also threatens the delicate balance of federalism, the fundamental constitutional principle that distributes authority between state, local and federal governments. Because it is on a par with a constitutional deprivation of an individual's rights, federal judicial intrusion into a locality's right to manage its own affairs without proper basis constitutes irreparable harm.  *See United States v. Bloomberg*, 2013 U.S. App. LEXIS 2792 (2d Cir. Feb. 7, 2013) (staying injunction where Monitor's intrusion on municipal hiring alone posed threat of irreparable harm).

Where the exercise of municipal authority is enjoined, "federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and the [locality]'s administration of its own law."  *Rizzo v. Goode,* 423 U.S. 362, 378 (1976) (citations and internal quotation marks omitted).  An improper finding of *Monell* liability under a failure-to-train theory, especially, "engage[s] the federal courts in an endless exercise of second-guessing municipal employee-training programs[,]" one which "the federal courts are ill suited to undertake," and which "implicate[s] serious questions of federalism."  *City of Canton*, 489 U.S. at 392.  Federalism concerns are also

heightened because the Injunction hampers the City's obligation to protect public safety. *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006); *Turner v. Safley*, 482 U.S. 78, 85 (1987). The Police Commissioner has the duty and necessary expertise to choose, in the exercise of his discretion, the best ways to protect public safety while obeying legal and constitutional restraints. Absent a legally supportable finding that he has abused that power, a federal judge may not intrude on the Commissioner's discretion without upsetting this delicate balance.

### (C)

### The Public Interest

For many of the same reasons, the public interest would be furthered by the grant of a stay. The people of the City are entitled to rely upon the Commissioner's discretion in deploying police officers and directing law enforcement policies where, as here, there is no basis for a finding that he has violated the law in making those judgments. The Commissioner should be permitted to continue to rely on suspect descriptions and complaint reports to determine where to deploy officers and how they may focus their attention. Moreover, to the extent that the Order constrains police enforcement activity that would otherwise be lawful, the public is at increased risk of harm.

Separation of powers principles further militate against judicially-imposed injunctions aimed at practices entrusted to the executive branch. *Rahman,* 530 F.3d 622, 626-28 (concluding that "improper arrests are best handled by individual suits for damages [and potentially through the exclusionary rule], not by a

structural injunction designed to make every error by the police an occasion for a petition to hold the officer [and perhaps the police department as a whole] in contempt of court"). Where damages are available to remedy individual wrongs and a body of precedent will curb unlawful behavior "in the normal way," the judiciary should exercise "modesty" rather than impose wide-ranging injunctive relief that encroaches upon duties and expertise of the executive. *Id*. That is especially the case where, as here, the lawfulness of a particular stop turns on a nuanced analysis of the totality of the circumstances, which does not readily translate into the terms of an injunction.

Furthermore, if the City prevails on this appeal but does not have the benefit of a stay, the NYPD will have squandered scarce public resources on many of the expenditures required under the Injunction, including payment of a Court Monitor, Facilitator, and an entire associated staff, to no purpose, not to mention the significant time and personnel that will be needed to engage in the various remedial processes envisioned by the District Court. These personnel will, of course, be diverted from their usual duties. Given the high likelihood of a reversal, taxpayer dollars and resources plainly would be better devoted to public safety. In the same vein, limited resources ordinarily devoted to training and patrol supervision will be diverted to participate in the Court Monitor's development of a detailed plan – all wasted should the City prevail on appeal.

Despite the District Court's belief, the balance of the equities weighs in favor of a stay now, and should not await completion of the Monitor's work. Recommendations as to details of the Immediate Reforms will not change the fact that the text of the FINEST Message, and the changes to the NYPD's training, supervision, discipline, and other policies, will certainly be infected by the District Court's legal errors. Waiting for court-ordered specifics as a prerequisite for a stay does nothing to change the perspective on the law as it stands right now; it merely wastes time, effort and resources. Most importantly, any time lag will continue to foster the inevitable confusion flowing from the highly publicized Liability Order, which casts doubt on long-held constitutionally valid factors creating reasonable suspicion, and introduces the novel concept of "indirect racial profiling" as a surrogate for intentional discrimination. The Injunction should be stayed pending appeal, so that the confusion caused by the Court's orders, and any chilling effect in lawful police activity that naturally arises from such confusion, are mitigated.

### (D)

### Harm to Plaintiffs

While denial of the stay would require the NYPD to accede to the District Court's novel and unsupportable interpretation of constitutional restraints, placing police officers and the public safety equally at risk, issuance of a stay would not harm plaintiffs. The most common and appropriate manner of redress for a § 1983 violation is a suit for damages. *See Rahman*, 530 F.3d at 626-27. A

stay of equitable remedies will not prevent any member of the plaintiff class who may be harmed by stop-and-frisk activity from bringing suit against the City.

The District Court wrongly dismissed this consideration largely in the belief that, since victims of illegal stops often do not know the basis for their stop, they cannot effectively bring suit (Exh. A, at 8, n.21; Exh. C, at 10, n.23). The City respectfully begs to differ. Municipalities from coast to coast are routinely faced with lawsuits brought by members of the public who assert that they have been harmed by stops, arrests, and prosecutions that were purportedly conducted without proper legal basis. Whether brought in state or federal courts, litigants are granted a panoply of procedural vehicles to discern the facts underlying the complained-of conduct. Moreover, fee-shifting statutes have been in place for decades, incentivizing the plaintiffs' bar to assist those who thus seek to assert their civil rights.

It is noteworthy in this respect that although the District Court granted a preliminary injunction to the plaintiff class in *Ligon* on January 8, 2013, the Court later stayed implementation of the *Ligon* remedies until the trial in this case could be completed, recognizing that a delay of several months would not irreparably harm plaintiffs but could lead to an unwieldy piecemeal remedial process. Now, the District Court has stated that the remedial order for both cases need not be implemented for several months, an argument endorsed whole-heartedly by plaintiffs. Given the District Court's estimation that time is not yet of the essence, it is difficult to see how plaintiffs will be irreparably harmed if the

order is stayed for the additional time necessary for this Court to review the momentous liability decision now at issue. *See Rodriguez*, 175 F.3d at 235.

## II

## LEAVE TO FILE AN OVERSIZED MOTION

Although this motion exceeds the ordinarily applicable page limit, the City respectfully requests that this Court accept it in light of the complexity and scope of the legal issues raised herein and the importance of the litigation. The City also requests that this motion be considered by the same panel that will decide the similar application that is being filed herewith in the related *Ligon* case.

## CONCLUSION

For the foregoing reasons, the Court should grant the relief requested herein, and stay the Injunction pending a resolution of the City's appeal.

> MICHAEL A. CARDOZO
> Corporation Counsel of the City of
>   New York
>
> _____
> By:  CELESTE L. KOELEVELD

# Exhibit "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

DAVID FLOYD, *et al.*,

         Plaintiffs,

    - against -

CITY OF NEW YORK,

         Defendant.

**OPINION AND ORDER**

**08 Civ. 1034 (SAS)**

------------------------------------------------------- X

JAENEAN LIGON, *et al.*,

         Plaintiffs,

    - against -

CITY OF NEW YORK, *et al.*,

         Defendants.

**12 Civ. 2274 (SAS)**

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/12/13

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    **INTRODUCTION**

        In an Opinion issued today I found the City of New York liable in the *Floyd* case

for violating the Fourth and Fourteenth Amendment rights of the plaintiff class because of the

way the New York City Police Department ("NYPD") has conducted stops and frisks over the

past decade (the "Liability Opinion"). In an Opinion issued in January 2013, I found that the

*Ligon* plaintiffs, representing a putative class of people stopped outside buildings participating in

1

the Trespass Affidavit Program ("TAP") in the Bronx, were entitled to preliminary injunctive relief based on violations of their Fourth Amendment rights.

 The purpose of this Opinion (the "Remedies Opinion") is to determine what remedies are appropriate in these cases. I address both cases in one Opinion because the remedies necessarily overlap. Each requires that the NYPD reform practices and policies related to stop and frisk to conform with the requirements of the United States Constitution. I stress, at the outset, that the remedies imposed in this Opinion are as narrow and targeted as possible. To be very clear: I am *not* ordering an end to the practice of stop and frisk. The purpose of the remedies addressed in this Opinion is to ensure that the practice is carried out in a manner that protects the rights and liberties of all New Yorkers, while still providing much needed police protection.

## II. REMEDIES IN *FLOYD*

### A. The Court Has the Power to Order Broad Equitable Relief

#### 1. Plaintiffs Satisfied the Requirements for a Permanent Injunction

 Plaintiffs seeking a permanent injunction must demonstrate: (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiffs and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[1] Plaintiffs may satisfy the first two factors by demonstrating that they are likely to be deprived of their constitutional rights in the future by the

---

[1] *See World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160–61 (2d Cir. 2012) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

acts they seek to have enjoined.[2]  The evidence discussed in the Liability Opinion shows that plaintiffs have suffered violations of their Fourth and Fourteenth Amendment rights, and that the prevalence of the practices leading to those violations creates a likelihood of future injury.[3] Thus, plaintiffs have satisfied the first two requirements for obtaining permanent injunctive relief.

The balance of hardships tilts strongly in favor of granting a permanent injunction in *Floyd*.  That is, the burden on the plaintiff class of continued unconstitutional stops and frisks far outweighs the administrative hardships that the NYPD will face in correcting its unconstitutional practices.[4]

> The right to physical liberty has long been at the core of our nation's commitment to respecting the autonomy and dignity of each person:  "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[5]

---

[2]  *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (deprivation of constitutional rights "cannot be compensated by money damages"); *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) (the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

[3]  *See* Liability Opinion at Part V (conclusions of law); *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) (citing *National Cong. for Puerto Rican Rights, by Perez v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) (later renamed *Daniels*)).  *See also Floyd*, 283 F.R.D. at 160, 178 (certifying plaintiffs' class).

[4]  *See Association of Surrogates & Supreme Court Reporters Within City of New York v. State of New York*, 966 F.2d 75, 79, *modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992) (noting that "state budgetary processes may not trump court-ordered measures necessary to undo a federal constitutional violation," provided that the equitable relief is proportional to the constitutional infraction).

[5]  *Floyd*, 283 F.R.D. at 158–59 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

3

Ensuring that people are not seized and searched by the police on the streets of New York City without a legal basis is an important interest meriting judicial protection.

Eliminating the threat that blacks and Hispanics will be targeted for stops and frisks is also an important interest. In addition to the significant intrusion on liberty that results from any stop, increased contact with the police leads to increased opportunities for arrest, even when the reason for the arrest was not the reason for the stop. As a result, targeting racially defined groups for stops — even when there is reasonable suspicion — perpetuates the stubborn racial disparities in our criminal justice system.[6] Although the costs of complying with the permanent injunction in *Floyd* will be significant, they are clearly outweighed by the urgent need to curb the constitutional abuses described in the Liability Opinion.

With regard to the public interest, the City has expressed concern that interference in the NYPD's stop and frisk practices may have a detrimental effect on crime control.[7] However, as previously noted, I am *not* ordering an end to stop and frisk. Moreover, it has been widely reported that as the number of recorded stops has decreased over the past year, the crime

---

[6]    *See, e.g.*, MICHELLE ALEXANDER, THE NEW JIM CROW 6–7 (2010) ("No other country in the world imprisons so many of its racial or ethnic minorities. . . . In Washington, D.C., . . . it is estimated that three out of four young black men (and nearly all those in the poorest neighborhoods) can expect to serve time in prison."). Another collateral consequence of stops was highlighted in the recently settled case of *Lino v. City of New York*, No. 106579/10, 2011 WL 2610501 (Sup. Ct. N.Y. Co. June 24, 2011), in which the NYPD agreed to purge personal information from its stop database. Plaintiffs — including named plaintiff Clive Lino — had alleged that the NYPD was using personal information from the stop database to conduct criminal investigations. *See* John Caher, *NYPD Agrees to Purge Stop-Frisk Databank*, N.Y. L.J., August 8, 2013.

[7]    *See* 4/11/13 Defendant['s] Memorandum of Law in Opposition to Plaintiffs' Requested Injunctive Relief ("Def. Inj. Mem.") at 17–18.

rate has continued to fall.[8]  The United States Department of Justice ("DOJ") has pointed out that "there is significant evidence that unlawfully aggressive police tactics are not only unnecessary for effective policing, but are in fact detrimental to the mission of crime reduction."[9]  By strictly adhering to the rule of law, the NYPD will achieve greater cooperation between police officers and the communities they serve.  Fostering trust in the police will "promote, rather than hinder, [the] NYPD's mission of safely and effectively fighting crime."[10]

Furthermore, as in *Ligon*, it is "'clear and plain'" that the public interest in liberty and dignity under the Fourth Amendment, and the public interest in equality under the Fourteenth Amendment, trumps whatever modicum of added safety might theoretically be gained by the NYPD making *unconstitutional* stops and frisks.[11]  This Opinion does not call for the NYPD to abandon proactive policing and return to an earlier era of less effective police practices.  Rather, the relief ordered below requires the NYPD to be *even more* proactive:

---

[8]  *See, e.g.*, Tamer El-Ghobashy & Michael Howard Saul, *New York Police Use of Stop-and-Frisk Drops: Plummet in Disputed Tactic Tracks Overall Decrease in Crime*, Wall St. J., May 6, 2013 (noting that UF-250s fell 51% in the first three months of 2013 compared to 2012, while crime fell 2.7% and murders fell 30% through April 28 compared to 2012).  I note, however, that the number of *unrecorded* stops may have increased over the same period as a result of misleading training at the NYPD's new stop and frisk refresher course at Rodman's Neck.  *See* Liability Opinion at Part IV.C.5 (citing, *inter alia*, 4/25 Trial Transcript ("Tr.") at 5119–5124 (Shea)); *Ligon v. City of New York,* No. 12 Civ. 2274, 2013 WL 628534, at *38 (S.D.N.Y. Feb. 14,  2013).

[9]  6/12/13 Statement of Interest of the United States ("DOJ Inj. Mem.") at 10.  *See id.* at 10–11 (collecting sources).

[10]  *Id.* at 10.  Even NYPD Commissioner Raymond Kelly has recognized that the misuse of stop and frisk can contribute to community mistrust.  In 2000, he criticized "dubious stop-and-frisk tactics" instituted after his first period as Police Commissioner that had "sowed new seeds of community mistrust."  Kevin Flynn, *Ex-Police Head Criticizes Strategies*, N.Y. Times, Apr. 5, 2000.

[11]  *Cf. Ligon*, 2013 WL 628534, at *40–41.

5

proactive not only about crime control and prevention, but also about protecting the constitutional rights of the people the NYPD serves.  The public interest will not be harmed by a permanent injunction requiring the NYPD to conform its practices to the Constitution.

### 2.    The Court's Broad Authority to Enter Injunctive Relief

"[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."[12]  At the same time, it is "'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by the violation.'"[13]  "Discretion to frame equitable relief is limited by considerations of federalism, and remedies that intrude unnecessarily on a state's governance of its own affairs should be avoided."[14]

Nevertheless, as the DOJ notes, "courts have long recognized — across a wide range of institutional settings — that equity often requires the implementation of injunctive relief to correct unconstitutional conduct, even where that relief relates to a state's administrative practices."[15]  "Courts . . . must not shrink from their obligation to enforce the constitutional

---

[12]    *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971).  *Accord Association of Surrogates*, 966 F.2d at 79 ("[F]ederal courts have broad discretion in fashioning equitable remedies for . . . constitutional violations.").

[13]    *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (quoting *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997)).

[14]    *Association of Surrogates*, 966 F.2d at 79.

[15]    DOJ Inj. Mem. at 7 (citing *Brown v. Plata*, 131 S. Ct. 1910 (2011); *Brown v. Board of Educ.*, 349 U.S. 294 (1955).  *See also id.* at 7 n.3 (criticizing the City's citation of inapposite cases "for the proposition that federal courts should decline to enter injunctive relief that requires operational changes to a State's institutions").

rights of all persons."[16]  This duty is not curtailed when constitutional violations arise in the

context of law enforcement.  Rather, where "there is a persistent pattern of police misconduct,

injunctive relief is appropriate."[17]

        I have always recognized the need for caution in ordering remedies that affect the

internal operations of the NYPD,[18] the nation's largest municipal police force and an

organization with over 35,000 members.[19]  I would have preferred that the City cooperate in a

joint undertaking to develop some of the remedies ordered in this Opinion.[20]  Instead, the City

declined to participate, and argued that "the NYPD systems already in place" — perhaps with

unspecified "minor adjustments" — would suffice to address any constitutional wrongs that

---

[16]     *Plata*, 131 S. Ct. at 1928 (citing *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (*per curiam*)) (quotation marks omitted).  *Accord Todaro v. Ward*, 565 F.2d 48, 53–54 (2d Cir. 1977) ("'[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.'" (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974))).

[17]     *Allee v. Medrano*, 416 U.S. 802, 815 (1974).  *Accord* DOJ Inj. Mem. at 8–9 (collecting cases and noting that pursuant to statutory authorities "the United States has itself sought and secured the implementation of remedial measures to reform police misconduct in dozens of law enforcement agencies," including measures that "directly address systemic deficiencies in the way officers conduct stops and searches").

[18]     *See, e.g.*, *Patrolmen's Benevolent Ass'n of City of New York, Inc. v. City of New York*, No. 97 Civ. 7895 (SAS), 2000 WL 1538608, at *3–4 (S.D.N.Y. Oct. 18, 2000) (declining to impose injunction on the NYPD where doing so would have been "an undue intrusion into a matter of state sovereignty").

[19]     *See* Def. Inj. Mem. at 1.

[20]     *See* 1/31 Tr. at 101; 1/28/13 Letter from Jonathan C. Moore et al., Counsel for Plaintiffs, to the Court (proposing collaborative procedure involving all the parties in *Floyd*, *Ligon*, and *Davis*, a court-appointed facilitator, and the views of major stakeholders).  The City rejected this proposal.  *See* 1/31 Tr. at 9–10.

might be found.[21]  I note that the City's refusal to engage in a joint attempt to craft remedies contrasts with the many municipalities that have reached settlement agreements or consent decrees when confronted with evidence of police misconduct.[22]

### B.    Equitable Relief

Federal Rule of Civil Procedure 65(d) requires that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required."[23]  These specificity provisions are "'no mere technical requirements,'" but were "'designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a

---

[21]      6/12/13 Defendant's Post-Trial Memorandum of Law ("Def. Mem.") at 24–25. *Accord* Def. Inj. Mem. at 7–18.  The City also argues that no remedy is required because improper stops can be addressed by individual suits for damages. *See* Def. Inj. Mem. at 6.  The DOJ counters that if individual suits were an effective remedy for police misconduct, courts would not have found it necessary to impose injunctive relief in so many police misconduct cases. *See* DOJ Inj. Mem. at 9 & n.5 (also citing arguments from Daryl J. Levinson, *Making Government Pay: Markets, Politics, and the Allocation of Constitutional Costs*, 67 U. CHI. L. REV. 345, 354–57 (2000)).  I note that individual suits for damages are particularly ineffective as a remedy for unconstitutional stops, where individuals often do not know what the basis for their stop was, and thus cannot know whether the stop lacked a legal basis or was influenced improperly by race.  In addition, while the indignity of an unconstitutional stop is a serious harm, few of those stopped will be motivated to dedicate their time and resources to filing a lawsuit — especially where the standard for recovery may require proof of *Monell* liability.

[22]      *See, e.g.*, *Bailey v. City of Philadelphia*, No. 10 Civ. 5952 (E.D. Pa. June 21, 2011) (consent decree in class action alleging unconstitutional stops and frisks of black and Hispanic men); DOJ Inj. Mem. at 9 (noting DOJ settlement agreements and consent decrees with dozens of law enforcement agencies nationwide).  The City's resistance to reform in this case may reflect a more general skepticism toward judicial interpretation of the Constitution and the limits it imposes on municipalities. *See, e.g.*, Jill Colvin, *Bloomberg Says Interpretation of Constitution Will "Have to Change" After Boston Bombing*, POLITICKER (Apr. 22, 2013).

[23]      Fed. R. Civ. P. 65(d)(1).

decree too vague to be understood.'"[24]  The specificity provisions also ensure "'that the appellate court knows precisely what it is reviewing.'"[25]

Compliance with the prohibition on the incorporation of extrinsic documents is "'essential,' unless the enjoined party acquiesces to the extrinsic reference."[26]  The City has not acquiesced to any extrinsic reference.  Thus, while the sections below refer to NYPD documents that must be revised, the ordered relief is contained entirely within the four corners of this Opinion.[27]

### 1.    Appointment of a Monitor to Oversee Reforms

Because of the complexity of the reforms that will be required to bring the NYPD's stop and frisk practices into compliance with the Constitution, it would be impractical for this Court to engage in direct oversight of the reforms.  As a more effective and flexible alternative, I am appointing an independent monitor (the "Monitor") to oversee the reform process.  I have chosen Peter L. Zimroth to serve as Monitor.

Mr. Zimroth, a partner in the New York office of Arnold & Porter, LLP, is a

---

[24]    *Mickalis Pawn Shop*, 645 F.3d at 143 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).

[25]    *Id.* at 144 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 241 (2d Cir. 2001)).

[26]    *Eyewonder, Inc. v. Abraham*, 293 Fed. App'x 818, 820 (2d Cir. 2008) (quoting *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000), and citing *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 809 (2d Cir. 1981)).  *Accord Petrello v. White*, 533 F.3d 110, 114 (2d Cir. 2008) ("Rule 65(d) 'is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden' or required." (quoting *Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.2d 427, 430 (2d Cir. 1993))).

[27]    The remedies ordered below are largely drawn from submissions by plaintiffs and the DOJ.

former Corporation Counsel of the City of New York, and the former Chief Assistant District

Attorney of New York County. In both of these roles, Mr. Zimroth worked closely with the

NYPD. A graduate of Columbia University and Yale Law School — where he served as Editor

in Chief of the Yale Law Journal — he also served as a law clerk on the Supreme Court of the

United States and a federal prosecutor. He taught criminal law and criminal procedure as a

tenured professor at the New York University School of Law.

Mr. Zimroth has also been appointed to many positions in public service. The

Chief Judge of the New York Court of Appeals appointed him as one of three directors of New

York's Capital Defender Office. He has also served on the Mayor's Committee on the Judiciary,

and on the boards of two schools for children with special needs. He has been a member of the

House of Delegates of the American Bar Association, the Executive Committee of the New York

City Bar Association, and the Board of Directors of the Legal Aid Society.

It is within the power of a district court to order the appointment of a monitor to

oversee judicially ordered reforms.[28] The DOJ recommended the appointment of a monitor in

this case, in the event that the Court found the City liable. Based on "decades of police reform

efforts across the country," the DOJ concluded that "the appointment of a monitor to guide

implementation of . . . injunctive relief may provide substantial assistance to the Court and the

parties and can reduce unnecessary delays and litigation over disputes regarding compliance."[29]

In addition, the DOJ noted:

---

[28]     *See, e.g.*, *United States v. City of New York*, 717 F.3d 72, 97 (2d Cir. 2013).

[29]     DOJ Inj. Mem. at 11. *Accord* 5/15 Tr. at 7435 (plaintiffs' remedies expert
Professor Samuel Walker testifying that if liability is found, the appointment of an independent
monitor is "necessary").

> [T]he experience of the United States in enforcing police reform injunctions teaches that the appointment of an independent monitor is a critically important asset to the court, the parties, and the community in cases involving patterns or practices of unlawful conduct by law enforcement officials. A court-appointed monitor in this case would help the Court ensure that . . . any pattern or practice . . . is effectively and sustainably remedied.[30]

The appointment of a monitor will serve the interests of all stakeholders, including the City, by facilitating the early and unbiased detection of non-compliance or barriers to compliance. By identifying problems promptly, the Monitor will save the City time and resources.[31]

I also note that the Monitor will have a distinct function from the other oversight entities identified by the City, such as the NYPD's Internal Affairs Bureau, federal prosecutors, the Civilian Complaint Review Board, and "the public electorate."[32] The Monitor will be specifically and narrowly focused on the City's compliance with reforming the NYPD's use of stop and frisk — although this will inevitably touch on issues of training, supervision, monitoring, and discipline. Finally, the Monitor will operate in close coordination with this

---

[30]     DOJ Inj. Mem. at 5.

[31]     *See id.* at 16 ("Without an independent monitor, the Court will be forced to depend on motions practice between the parties to assess progress; a costly, contentious, inefficient, and time-consuming process.").

[32]     *Id.* at 18 (citing Def. Inj. Mem. at 13). In particular, as the DOJ notes, "it is not realistic to ask 'the public electorate' to monitor the police department to ensure that the department's stop-and-frisk practices are consistent with the Constitution." *Id.* at 20 (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)). If it is true that 76% percent of black voters in New York City disapprove of stop and frisk, as found in a recent Quinnipiac University poll, then the persistence of this policy in heavily black communities might indicate the failure "of those political processes ordinarily to be relied upon to protect minorities," and thus might justify "more searching judicial inquiry." *Carolene Prods.*, 304 U.S. at 152 n.4; Quinnipiac University, *New Yorkers Back Ban on Take-Out Foam More Than 2-1*, at 8 (Feb. 28, 2013), http://www.quinnipiac.edu/images/polling/nyc/nyc02282013.pdf/ (19% of blacks approve and 76% disapprove of "a police practice known as stop and frisk, where police stop and question a person they suspect of wrongdoing and, if necessary, search that person").

Court, which retains jurisdiction to issue orders as necessary to remedy the constitutional violations described in the Liability Opinion.[33]

I now specify the Monitor's role and functions:

1.  The Monitor will be subject to the supervision and orders of the Court.

2.  The Monitor will not, and is not intended to, replace or assume the role or duties of any City or NYPD staff or officials, including the Commissioner. The Monitor's duties, responsibilities, and authority will be no broader than necessary to end the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion.

3.  The Monitor's initial responsibility will be to develop, based on consultation with the parties, a set of reforms of the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk. These reforms (the "Immediate Reforms") are outlined below in Part II.A.2. They will be developed as soon as practicable and implemented when they are approved by the Court.

4.  After the completion of the Joint Remedial Process, described below in Part II.A.4, the Monitor will work with the Facilitator and the parties to develop any further reforms necessary to ending the constitutional violations described in the Liability Opinion. These reforms ("Joint Process Reforms") will be implemented upon approval by the Court.

5.  The Monitor will inform the City of the milestones the City must achieve in order to demonstrate compliance and bring the monitoring process to an end.

6.  The Monitor will regularly conduct compliance and progress reviews to assess the extent

---

[33]     The Monitor's role will also be distinct from the broad advisory role of the NYPD Inspector General envisioned in N.Y. City Council Introductory No. 1079 of 2013.

to which the NYPD has implemented and complied with the Immediate and Joint Process Reforms.

7.  The Monitor will issue public reports every six months detailing the NYPD's compliance with the Immediate and Joint Process Reforms.  The Monitor will also file these reports with the Court.

8.  The Monitor will work with the parties to address any barriers to compliance.  To the extent possible, the Monitor should strive to develop a collaborative rather than adversarial relationship with the City.

9.  The Monitor may request the Court to modify the Immediate and Joint Process Reforms, if evidence shows that such modifications are warranted.

10. The Monitor may request technical assistance from outside experts.  He may also employ staff assistance as he finds reasonable and necessary.

11. The City will be responsible for the reasonable costs and fees of the Monitor, his staff, and any experts he retains.

12. The Monitor's position will come to an end when the City has achieved compliance with the Immediate and Joint Process Reforms.

### 2.  Immediate Reforms Regarding Stop and Frisk

Ending the constitutional violations inherent in the NYPD's current use of stop and frisk will require reforms to a number of NYPD policies and practices.  It would be unwise and impractical for this Court to impose such reforms at this time, prior to input from the Monitor and the participants in the Joint Remedial Process ordered below.[34]  Instead, as noted

---

[34]     In particular, the City has not yet provided input regarding specific reforms.  *See* Def. Inj. Mem. at 18 (declining to offer a remedy "other than to respectfully direct the Court to

above, the development of reforms will take place in two stages. *First*, the Monitor will develop, in consultation with the parties, an initial set of reforms to the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk (the "Immediate Reforms"). These reforms will be developed and submitted to the Court as soon as practicable, and implemented when they are approved. *Second*, the Facilitator will work with the parties and other stakeholders to develop, through the Joint Remedial Process, a more thorough set of reforms (the "Joint Process Reforms") to supplement, as necessary, the Immediate Reforms. The development of the Joint Process Reforms is discussed below in Part II.A.4.

If the parties, together with the Monitor, are unable to develop agreed-upon Immediate Reforms, the Court will order the parties to draft proposed revisions to specific policies and training materials, as the parties have already done quite effectively in *Ligon*.[35] Indeed, the remedies proposed in *Ligon* may provide a useful model for some aspects of the Immediate Reforms.[36]

Based on the liability and remedies evidence presented at trial, the Immediate Reforms must include the following elements:

### a. Revisions to Policies and Training Materials Relating to Stop and Frisk and to Racial Profiling

*First*, the NYPD should revise its policies and training regarding stop and frisk to adhere to constitutional standards as well as New York state law. The constitutional standards

---

the trial record for an assessment of the remedies evidence"); 6/12/13 Defendant's Post-Trial Memorandum of Law at 24–25 (declining to propose remedies).

[35]    *See* 7/8/13 Defendants' Proposed Remedial Relief ("*Ligon* Def. Rem.").

[36]    *See Ligon,* 2013 WL 628534, at *41–44.

14

include the standards for: what constitutes a stop, when a stop may be conducted, when a frisk may be conducted, and when a search into clothing or into any object found during a search may be conducted.[37]  Although the standards may sometimes require the informed use of discretion, they are not complicated and should be stated in policies and training as clearly and simply as possible.

To summarize: an encounter between a police officer and a civilian constitutes a stop whenever a reasonable person would *not feel free to disregard the officer and walk away*. The threat or use of force is not a necessary or even typical element of stops.  Encounters involving nothing more than commands or accusatory questions can and routinely do rise to the level of stops, provided that the commands and questions would lead a reasonable person to conclude that he was not free to terminate the encounter.[38]

In order to conduct a stop, an officer must have *individualized*, reasonable suspicion that the person stopped has committed, is committing, or is about to commit a crime. The officer must be able to articulate facts establishing a minimal level of *objective* justification

---

[37]    *See* Liability Opinion at Part III.B; *Ligon*, 2013 WL 628534, at *41–42.

[38]    There could be a simple way to ensure that officers do not unintentionally violate the Fourth Amendment rights of pedestrians by approaching them without reasonable suspicion and then inadvertently treating them in such a way that a reasonable person would not feel free to leave.  Officers could, for example, begin *De Bour* Level 1 and 2 encounters by informing the person that he or she is free to leave.  There is no constitutional requirement for officers to inform people that they are free to leave.  *Cf. Ohio v. Robinette*, 519 U.S. 33, 35 (1996) (holding that the Fourth Amendment does not require "that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").  Nevertheless, the Constitution does not prohibit a police department from adopting this policy or a court from ordering it as a *means* of avoiding unconstitutional stops, where — as here — officers have been incorrectly trained on the definition of a stop.

15

for making the stop, which means more than an inchoate and unparticularized suspicion or hunch.  "Furtive movements" are an insufficient basis for a stop or frisk if the officer cannot articulate anything more specific about the suspicious nature of the movement.  The same is true of merely being present in a "high crime area."  Moreover, no person may be stopped solely because he matches a vague or generalized description — such as young black male 18 to 24 — without further detail or indicia of reliability.

To proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is *armed and dangerous*.  The purpose of a frisk is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.  Thus, the frisk must be strictly limited to whatever is necessary to uncover weapons that could harm the officer or others nearby.  When an officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity as contraband *immediately apparent*, the officer may seize the contraband.  If an officer reasonably suspects that a felt object in the clothing of a suspect is a weapon, then the officer may take whatever action is necessary to examine the object and protect himself, including removing the object from the clothing of the stopped person.

The erroneous or misleading training materials identified in the Liability Opinion must be corrected, including the Police Student Guide's overbroad definition of "furtive behavior;" the misleading training on "unusual firearms" implying that the presence of a wallet, cell phone, or pen could justify a frisk, or search; the complete lack of training on the constitutional standard for a frisk — reasonable suspicion that a stopped person is "armed and dangerous;" and the failure to include self-initiated stops (which make up 78% of street stops) in

16

the role-playing at Rodman's Neck.[39]  These training reforms will be in addition to those discussed below in the section of this Opinion relating to *Ligon*.[40]

*Second*, the NYPD should revise its policies and training regarding racial profiling to make clear that targeting "the right people" for stops, as described in the Liability Opinion, is a form of racial profiling and violates the Constitution.[41]  Racially defined groups may not be targeted for stops in general simply because they appear more frequently in local crime suspect data.  Race may only be considered where the stop is based on a specific and reliable suspect description.  When an officer carries out a stop based on reasonable suspicion that a person fits such a description, the officer may consider the race of the suspect, just as the officer may consider the suspect's height or hair color.  When a stop is not based on a specific suspect description, however, race may not be either a motivation or a justification for the stop. In particular, officers must cease the targeting of young black and Hispanic males for stops based on the appearance of these groups in crime complaints.  It may also be appropriate to conduct training for officers on the effect of unconscious racial bias.

*Third*, it is unclear at this stage whether Operations Order 52 ("OO 52"), which describes the use of performance objectives to motivate officers, requires revision in order to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments.  The evidence at trial showed that OO 52's use of "performance goals" created pressure to carry out stops, without any system for monitoring the constitutionality of those

---

[39]     *See* Liability Opinion at Part IV.C.5.

[40]     *See infra* Part III.

[41]     *See* Liability Opinion at Parts IV.C.3, V.B.1.

stops.  However, the use of performance goals in relation to stops may be appropriate, once an effective system for ensuring constitutionality is in place.[42]  Because the perspective of police officers and police organizations will be particularly valuable to clarifying the role of performance goals in the reform of stop and frisk, these issues should be addressed as part of the Joint Remedial Process rather than the Immediate Reforms.

      Finally, I note that where legitimate uncertainty exists regarding the most efficient means of reform, and the parties have differing views, it may be feasible for the Monitor to test the alternatives by applying them in different precincts and studying the results. In some contexts, the size of the NYPD makes it possible, and desirable, to resolve practical disagreements through the rigorous testing and analysis of alternatives at the precinct level before applying these reforms to the department as a whole.

### b.  Changes to Stop and Frisk Documentation

      Both the trial record and the Liability Opinion document, in detail, the inadequacy of the NYPD's methods of recording *Terry* stops.  The UF-250, used by officers in the field to

---

[42]    Plaintiffs' policing expert Lou Reiter testified that "there are circumstances where productivity goals are consistent with generally accepted [police] practices."  4/24 Tr. at 4917. The City's policing expert, James K. Stewart, testified that performance goals are a necessary part of monitoring and supervision:

> In policing, there are disincentives to engaging in some activities, because they are dangerous, they are in unsterile conditions and chaotic conditions, and the officers may not engage in that but yet spend their time on random patrol.  They are not out there doing what the department wants them to do, but they do show up and they show up in uniform.  The reason that . . . you have to count the activities is to ensure that those officers do respond . . . to the calls for assistance of help, they do address the community issues . . . .

5/17 Tr. at 7756.

18

record the basis for stops, is flawed and must be revised.[43] Officers are also required to record

stop and frisk activity in memo books, otherwise known as activity logs. Quarterly audits of

these memo book entries have revealed significant deficiencies in record keeping practices in

virtually every precinct throughout the City.[44] The proper use of activity logs to record stop and

frisk activity must be emphasized in training, as well as enforced through supervision and

discipline. I first address the UF-250 and then the activity logs.

### i. UF-250

As described in the Liability Opinion, the current UF-250 consists mainly of

checkboxes that officers can and often do check by rote,[45] thus facilitating post-hoc justifications

for stops where none may have existed at the time of the stop. The UF-250 must be revised to

include a narrative section where the officer must record, in her own words, the basis for the

stop. The narrative will enable meaningful supervisory oversight of the officer's decision to

conduct the stop, as well as create a record for a later review of constitutionality.

As an independent monitor of the New Orleans Police Department ("NOPD")

recently noted, "the overwhelming belief of experts [is] that a narrative field in which the

officers describe the circumstances for each stop would be the best way to gather information

that will be used to analyze reasonable suspicion" and, relatedly, "prevent[] racially biased

---

[43]     *See* 5/16 Tr. at 7457 (Walker).

[44]     *See* Pl. Findings ¶ 197 (citing Plaintiffs' Trial Exhibit ("PX") 450; Defendant's
Trial Exhibit ("DX") G6).

[45]     *See, e.g.*, Liability Opinion at Part IV.B.2.

policing."[46]  The NOPD monitor noted that the City of Oakland recently revised its data collection system to include "a narrative field in which officers are required to state, in their own words, their basis for having reasonable suspicion for a stop."[47]  The Oakland Police Department added this narrative field "because it was the best way to evaluate whether individual officers possessed the requisite reasonable suspicion for a *Terry* stop."[48]  The Philadelphia Police Department has also included a narrative field in its stop form.[49]  Similarly, Professor Walker, a nationally recognized authority on police accountability, opined that a form for recording stops must contain a sufficiently detailed narrative that a reviewer can determine from the narrative alone whether the stop was based on reasonable suspicion.[50]

The UF-250 should also be revised to require a separate explanation of why a pat-down, frisk, or search was performed.  The evidence at trial revealed that people were routinely subjected to these intrusions when no objective facts supported reasonable suspicion that they were armed and dangerous.  It is apparent that some officers consider frisks to be a routine part of a stop.  Because this misconception is contrary to law, the revised UF-250 should include a separate section requiring officers to explain why the stopped person was suspected of being

---

[46]    SUSAN HUTSON, INDEPENDENT POLICE MONITOR, REVIEW OF THE NEW ORLEANS POLICE DEPARTMENT'S FIELD INTERVIEW POLICIES, PRACTICES, AND DATA: FINAL REPORT 45 (Mar. 12, 2013) (footnote omitted).

[47]    *Id.* at 46.

[48]    *Id.*

[49]    *See id.*

[50]    *See* 5/16 Tr. at 7456–7458 (Walker).  Professor Walker testified that a description of reasonable suspicion for a stop will generally require no more than three lines of text.  *See id.* at 7458.

20

armed and dangerous.

Furthermore, both the DOJ and plaintiffs recommend that the UF-250 contain a tear-off portion stating the reason for the stop, which can be given to each stopped person at the end of the encounter.[51] A 2007 RAND report, commissioned by the NYPD, similarly recommended that "[f]or a trial period in select precincts, the NYPD could require that officers give an information card to those stopped pedestrians who are neither arrested nor issued a summons."[52] Any form or card given to stopped persons should provide the stated reasons for the stop, the badge numbers of the stopping officers, and information on how to file a complaint.

Finally, the UF-250 should be revised to simplify and improve the checkbox system used to indicate common stop justifications. It may also be necessary to reduce the number of "stop factor" boxes in order to permit easier analyses of patterns in the constitutionality of stops.[53]

In addition to changing the UF-250, officers should be further trained in its use. As discussed in the Liability Opinion, some officers check certain boxes (or combinations of boxes) reflexively as part of "scripts," including "Furtive Movements" and "Area Has High

---

[51]  *See* Pl. Rem. Br. at 19 (citing Deborah Ramirez, Jack McDevitt & Amy Farrell, *A Resource Guide on Racial Profiling Data Collection Systems: Promising Practices and Lessons Learned* 38 (United States Department of Justice 2000), and noting that a tear-off form has been used in Great Britain for more than a decade).

[52]  GREG RIDGEWAY, RAND, ANALYSIS OF RACIAL DISPARITIES IN THE NEW YORK POLICE DEPARTMENT'S STOP, QUESTION, AND FRISK PRACTICES 44 (2007), DX K6.

[53]  *See* Report of Jeffrey Fagan, Ph.D. (Oct. 15, 2010), PX 411 ("Fagan Rpt.") at 49 (describing the analytical difficulties created by the number of possible combinations of stop factors and suspected crimes).

21

Incidence of Reported Offense of Type Under Investigation."[54]  Officers must understand that if

a stop is based on these factors, the officer must provide additional detail in the narrative field —

for example, what was the specific nature of the furtive movement, and why was it suspicious?

What was the geographic scope of the "high crime area," and what was the officer's specific

basis for believing it has a high incidence of the suspected crime?

### ii.  Activity Logs

All uniformed officers are required to provide narrative descriptions of stops in

their activity logs whenever a UF-250 is prepared.[55]  In practice, this does not take place.

Evidence at trial showed that throughout the class period, officers consistently failed to record

stops in their logs, or provided insufficient detail for a supervisor to meaningfully review the

constitutionality of the stop.  This problem is best addressed through training, supervision, and

monitoring.[56]

---

[54]    Suspicious Bulge is another factor — albeit less often used than Furtive Movements and High Crime Area — that should require greater specificity or a narrative description.

[55]    *See* Operations Order 44 (9/11/08), PX 96.  In addition, the Chief of Patrol recently directed all officers in the patrol borough to include nine categories of information in every activity log entry for a stop.  The categories include: the date, time and location of the stop; the name and pedigree of the person stopped; the suspected felony or penal law misdemeanor; an explanation of the suspicion that led to the stop (such as "*looking into windows*," or "*pulling on doorknobs*"); whether the suspect was frisked; the sprint or job number, if applicable; and the disposition of the stop.  The Chief of Patrol's memo also requires officers to elaborate the basis for a stop in the "Additional Circumstances/Factors" section of the UF-250, to photocopy every activity log entry for a stop, and to attach the photocopy to the UF-250 before submitting it to a supervisor.  *See* DX J13.

[56]    *See infra* Part II.B.2.c.  I recognize the risk of inefficiency if officers record the same information on UF-250s and in their activity logs.  Professor Walker argued in favor of requiring both, but also expressed concerns regarding inefficiencies.  *See* 5/16 Tr. at 7458, 7480. If the parties can agree upon an improved procedure during the Joint Remedial Process described below, those improvements can be included in the Joint Process Reforms.

### iii.    Specific Relief Ordered

The NYPD, with the assistance of the Monitor, is directed to revise the UF-250 to address the criticisms expressed in the Liability Opinion and the direction given in this Opinion, and to provide training with respect to the new form. The NYPD is further ordered, again with the assistance of the Monitor, to ensure that activity logs are completed with the required specificity, and to implement measures to adequately discipline officers who fail to comply with these requirements.

### c.    Changes to Supervision, Monitoring, and Discipline

An essential aspect of the Joint Process Reforms will be the development of an improved system for monitoring, supervision, and discipline. Professor Walker testified that comprehensive reforms may be necessary to ensure the constitutionality of stops, including revisions to written policies and training materials, improved documentation of stops and frisks, direct supervision and review of stop documentation by sergeants, indirect supervision and review by more senior supervisors and managers, improved citizen complaint procedures, improved disciplinary procedures, department-wide audits, and perhaps even an early intervention system based on a centralized source of information regarding officer misconduct. According to Professor Walker, "[a] comprehensive approach is absolutely essential, because if any one of the components is absent or weak and ineffective, the entire accountability system begins to collapse."[57]

---

[57]    5/15 Tr. at 7440. The National Institute of Justice, which the City's policing expert, James K. Stewart, directed from 1982 to 1990, notes that "the management and culture of a department are the most important factors influencing police behavior." National Institute of Justice, *Police Integrity*, *available at* http://www.nij.gov/topics/law-enforcement/legitimacy/integrity.htm#note2. Ultimately, ending unconstitutionality in stop and frisk may require changing the culture of the NYPD so that officials and officers view their

In light of the complexity of the supervision, monitoring, and disciplinary reforms that will be required to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments, it may be appropriate to incorporate these reforms into the Joint Remedial Process negotiations described below. However, to the extent that the Monitor can work with the parties to develop reforms that can be implemented immediately, the Monitor is encouraged to include those reforms in the proposed Immediate Reforms.

For example, based on the findings in the Liability Opinion, there is an urgent need for the NYPD to institute policies specifically requiring sergeants who witness, review, or discuss stops to address not only the effectiveness but also the *constitutionality* of those stops, and to do so in a thorough and comprehensive manner.[58] To the extent that Integrity Control Officers witness or review stops, they too must be instructed to review for constitutionality.[59] The Department Advocate's Office must improve its procedures for imposing discipline in response to the Civilian Complaint Review Board's ("CCRB") findings of substantiated misconduct during stops. This improvement must include increased deference to credibility determinations by the CCRB, an evidentiary standard that is neutral between the claims of complainants and officers, and no general requirement of corroborating physical evidence. Finally, the Office of the Chief of Department must begin tracking and investigating complaints

---

purpose not only as policing effectively, but policing constitutionally as well. If so, the NIJ's first recommendation for improving the integrity of a department is to "[a]ddress and discipline minor offenses so officers learn that major offenses will be disciplined too." *Id.*

[58]     *See* Liability Opinion at Part IV.C.4.b.

[59]     *See id.*

it receives related to racial profiling.[60]

### d.  FINEST Message

As soon as practicable, the NYPD should transmit a FINEST message explaining the outcome of the *Floyd* litigation and the need for the reforms described above.[61]  The FINEST message should summarize in simple and clear terms the basic constitutional standards governing stop and frisk, the constitutional standard prohibiting racial profiling, and the relation between these standards and New York state law.  The message should order all NYPD personnel to comply immediately with those standards.

### 3.  Body-Worn Cameras

The subject of police officers wearing "body-worn cameras" was inadvertently raised during the testimony of the City's policing expert, James K. Stewart.  The following discussion took place:

> A. . . . But what happens is the departments a lot of times may not have . . . expertise and they may need some technical assistance like body worn cameras is an example and how much technology and where you store the information and stuff like that.  They may not have it.  And there may be other issues like psychological ideas about —
> THE COURT: What do you think of body worn cameras?
> THE WITNESS: I think it's a good idea.  We recommended it in Las Vegas.  And we're doing it in Phoenix as well.
> THE COURT: Thank you.
> . . .
> A. But I have no opinion in this case with respect to body worn cameras.[62]

---

[60]  *See id.* at Part IV.C.6.

[61]  The NYPD's "FINEST" messaging system allows the transmission of legal directives to the NYPD's commands.  *See, e.g.*, 5/10/12 Finest Message Regarding Taxi/Livery Robbery Inspection Program, Ex. 1 to 7/24/13 Plaintiffs' Brief Concerning Defendants' Remedial Proposals ("*Ligon* Pl. Rem.").

[62]  5/17 Tr. at 7817–7818.

25

The use of body-worn cameras by NYPD officers would address a number of the issues raised in the Liability Opinion. In evaluating the constitutionality of individual stops, I explained the difficulty of judging in hindsight what happened during an encounter between a civilian and the police.[63] The only contemporaneous records of the stops in this case were UF-250s and short memo book entries — which were sometimes not prepared directly after a stop, and which are inherently one-sided. Thus, I was forced to analyze the constitutionality of the stops based on testimony given years after the encounter, at a time when the participants' memories were likely colored by their interest in the outcome of the case and the passage of time. The NYPD's duty to monitor stop and frisk activity is similarly hamstrung by supervisors' inability to review an objective representation of what occurred.[64]

Video recordings will serve a variety of useful functions. *First*, they will provide a contemporaneous, objective record of stops and frisks, allowing for the review of officer conduct by supervisors and the courts. The recordings may either confirm or refute the belief of some minorities that they have been stopped simply as a result of their race, or based on the clothes they wore, such as baggy pants or a hoodie.[65] *Second*, the knowledge that an exchange is being recorded will encourage lawful and respectful interactions on the part of both parties.[66] *Third*, the recordings will diminish the sense on the part of those who file complaints that it is

---

[63] *See* Liability Opinion at Part IV.D.

[64] *See id.* at Part IV.C.4.

[65] By creating an irrefutable record of what occurred during stops, video recordings may help lay to rest disagreements that would otherwise remain unresolved.

[66] If, in fact, the police do, on occasion, use offensive language — including racial slurs — or act with more force than necessary, the use of body-worn cameras will inevitably reduce such behavior.

their word against the police, and that the authorities are more likely to believe the police.[67]
Thus, the recordings should also alleviate some of the mistrust that has developed between the
police and the black and Hispanic communities, based on the belief that stops and frisks are
overwhelmingly and unjustifiably directed at members of these communities. Video recordings
will be equally helpful to members of the NYPD who are wrongly accused of inappropriate
behavior.

   Because body-worn cameras are uniquely suited to addressing the constitutional
harms at issue in this case, I am ordering the NYPD to institute a pilot project in which body-
worn cameras will be worn for a one-year period by officers on patrol in one precinct per
borough — specifically the precinct with the highest number of stops during 2012. The Monitor
will establish procedures for the review of stop recordings by supervisors and, as appropriate,
more senior managers. The Monitor will also establish procedures for the preservation of stop
recordings for use in verifying complaints in a manner that protects the privacy of those stopped.
Finally, the Monitor will establish procedures for measuring the effectiveness of body-worn
cameras in reducing unconstitutional stops and frisks. At the end of the year, the Monitor will
work with the parties to determine whether the benefits of the cameras outweigh their financial,
administrative, and other costs, and whether the program should be terminated or expanded. The
City will be responsible for the costs of the pilot project.

   It would have been preferable for this remedy to have originated with the NYPD,
which has been a leader and innovator in the application of technology to policing, as Compstat
illustrates. Nevertheless, there is reason to hope that not only civilians but also officers will

---

[67]  *See* Liability Opinion at Part IV.C.6.

benefit from the use of cameras. When a small police department in Rialto, California introduced body-worn cameras, "[t]he results from the first 12 months [were] striking. Even with only half of the 54 uniformed patrol officers wearing cameras at any given time, the department over all had an 88 percent decline in the number of complaints filed against officers, compared with the 12 months before the study."[68] While the logistical difficulties of using body-worn cameras will be greater in a larger police force, the potential for avoiding constitutional violations will be greater as well.

### 4. Joint Remedial Process for Developing Supplemental Reforms

A community input component is increasingly common in consent decrees and settlements directed at police reform.[69] The DOJ has recognized the importance of community input in its recent consent decrees and other agreements with police departments.[70] The landmark Collaborative Agreement approved in 2002 by Judge Susan J. Dlott of the Southern District of Ohio as the settlement of class claims against the Cincinnati Police Department has been widely recognized as a successful model for other police reform.[71]

Although the remedies in this Opinion are not issued on consent and do not arise

---

[68] Randall Stross, *Wearing a Badge, and a Video Camera*, N.Y. TIMES, Apr. 7, 2013, at BU4.

[69] *See* 5/16 Tr. at 7521 (Walker).

[70] *See* Memorandum of Law in Support of Plaintiffs' Request for Injunctive Relief ("Pl. Inj. Mem.") at 15 (collecting agreements).

[71] *See In re Cincinnati Policing*, 209 F.R.D. 395, 397 (S.D. Ohio 2002) (discussing development of Collaborative Agreement through a collaborative procedure); *Tyehimba v. City of Cincinnati*, No. C-1-99-317, 2001 WL 1842470 (S.D. Ohio May 3, 2001) ("Order Establishing Collaborative Procedure"); Pl. Inj. Mem. at 14; GREG RIDGEWAY ET AL., POLICE-COMMUNITY RELATIONS IN CINCINNATI (2009).

from a settlement, community input is perhaps an even more vital part of a sustainable remedy in this case. The communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms. No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety.

It is important that a wide array of stakeholders be offered the opportunity to be heard in the reform process: members of the communities where stops most often take place; representatives of religious, advocacy, and grassroots organizations; NYPD personnel and representatives of police organizations; the District Attorneys' offices; the CCRB; representatives of groups concerned with public schooling, public housing, and other local institutions; local elected officials and community leaders; representatives of the parties, such as the Mayor's office, the NYPD, and the lawyers in this case; and the non-parties that submitted briefs: the Civil Rights Division of the DOJ, Communities United for Police Reform, and the Black, Latino, and Asian Caucus of the New York City Council.

If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful.[72] Neither an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD's use of stop and frisk.[73] The 2007 RAND report, relied on by the City at

---

[72] *Cf.* 5/16 Tr. at 7522 (Professor Walker discussing the legitimacy of reforms). As a general matter, police departments "depend upon public confidence, public trust, and public cooperation." *Id.* at 7520. This principle applies no less in the context of stop and frisk.

[73] *Cf. United States v. City of Los Angeles*, 288 F.3d 391, 404 (9th Cir. 2002) (remanding to the district court for a hearing on the permissive intervention of community groups in a DOJ lawsuit against the Los Angeles Police Department, and emphasizing the importance of not "marginalizing those . . . who have some of the strongest interests in the

trial, recognized the importance of "ongoing communication and negotiation with the community about [stop and frisk] activities" to "maintaining good police-community relations."[74] It is surely in everyone's interest to prevent another round of protests, litigation, and divisive public conflicts over stop and frisk.

Drawing on this Court's broad equitable powers to remedy the wrongs in this case,[75] I am ordering that all parties participate in a joint remedial process, under the guidance of a Facilitator to be named by the Court. I hereby order the following specific relief:

1. All parties shall participate in the Joint Remedial Process for a period of six to nine months to develop proposed remedial measures (the "Joint Process Reforms") that will supplement the Immediate Reforms discussed above. The Joint Process Reforms must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments.

2. The Joint Remedial Process will be guided by the Facilitator, with such assistance as the Facilitator deems necessary and in consultation with the Monitor.

3. The initial responsibility of the Facilitator will be to work with the parties to develop a time line, ground rules, and concrete milestones for the Joint Remedial Process. The Cincinnati Collaborative Procedure and subsequent DOJ consent decrees and letters of

---

outcome").

[74]    RAND Report at 44.

[75]    The equitable power of district courts to order processes involving community input is well-established. *See, e.g.*, *United States v. Yonkers Bd. of Educ.*, 635 F. Supp. 1538, 1545 (S.D.N.Y. 1986), *aff'd*, 837 F.2d 1181 (2d Cir. 1987) (ordering the Yonkers public school system to organize "community meetings with minority groups and organizations to solicit support and assistance in the dissemination of magnet program availability"); Pl. Inj. Mem. at 11–13 (collecting cases and scholarship).

intent may be used as models.[76]

4.    At the center of the Joint Remedial Process will be input from those who are most affected by the NYPD's use of stop and frisk, including but not limited to the people and organizations noted above. Input from academic and other experts in police practices may also be requested.

5.    The Facilitator will convene "town hall" type meetings in each of the five boroughs in order to provide a forum in which all stakeholders may be heard. It may be necessary to hold multiple meetings in the larger boroughs in order to ensure that everyone will have an opportunity to participate. The Facilitator will endeavor to prepare an agenda for such meetings, through consultation with the various interested groups prior to the meeting. The Monitor will also attend these meetings to the extent possible.

6.    The NYPD will appoint a representative or representatives to serve as a liaison to the Facilitator during the Joint Remedial Process.

7.    The Facilitator may receive anonymous information from NYPD officers or officials, subject to procedures to be determined by the parties.

8.    When the parties and the Facilitator have finished drafting the Joint Process Reforms, they will be submitted to the Court and the Monitor. The Monitor will recommend that the Court consider those Reforms he deems appropriate, and will then oversee their implementation once approved by the Court.

---

[76]    *See Tyehimba*, 2001 WL 1842470; Pl. Inj. Mem. at 15. In the interests of conserving resources and speeding the development of the Joint Process Reforms, the Joint Remedial Process will not involve the development of an independent analysis by a panel of paid experts, as proposed by plaintiffs in Pl. Inj. Mem. at 10. The participants in the Joint Remedial Process may rely on any sources of facts deemed useful by the Facilitator, including this Court's findings in the Liability Opinion.

9.     In the event that the parties are unable to agree on Joint Process Reforms, the Facilitator will prepare a report stating the Facilitator's findings and recommendations based on the Joint Remedial Process, to be submitted to the parties, the Monitor, and the Court. The parties will have the opportunity to comment on the report and recommendations.

10.    The City will be responsible for the reasonable costs and fees of the Facilitator and the Joint Remedial Process.

## III.    REMEDIES IN *LIGON*

In a January 8, 2013 Opinion and Order, amended on February 14, 2013, I granted the *Ligon* plaintiffs' motion for a preliminary injunction, and proposed entering several forms of preliminary relief.[77]  I postponed ordering that relief until after a consolidated remedies hearing could be held in *Ligon* and *Floyd*.[78]  That hearing has now concluded.  The defendants in *Ligon* have submitted drafts of the documents discussed in the proposed relief section of the February 14 Opinion, the *Ligon* plaintiffs have proposed revisions to those drafts, and the defendants have responded to the proposed revisions.[79]

Having reviewed the parties' submissions, I am now imposing the final order of preliminary injunctive relief in *Ligon*.  The reasons for the ordered relief, which must be stated pursuant to Federal Rule of Civil Procedure 65(d)(1)(A), are the reasons stated in the February

---

[77]     *See Ligon*, 2013 WL 628534, at *41–44; *Ligon v. City of New York*, No. 12 Civ. 2274, 2013 WL 227654 (S.D.N.Y. Jan. 22, 2013) (staying the sole immediate relief ordered in the January 8 Opinion).

[78]     *See Ligon*, 2013 WL 628534, at *42.

[79]     *See* 7/8/13 Defendants' Proposed Remedial Relief ("*Ligon* Def. Rem."); *Ligon* Pl. Rem.; 8/2/13 Defendants' Reply Memorandum of Proposed Remedial Relief ("*Ligon* Def. Reply").

14 Opinion.

   As set forth in the February 14 Opinion, the relief falls into four categories: policies and procedures; supervision; training; and attorney's fees. Attorney's fees and costs will be rewarded as appropriate on application. With regard to policies and procedures, I am ordering the proposed relief from the February 14 Opinion as elaborated below.

   With regard to the remaining two categories of relief — supervision and training — I am ordering the proposed relief from the February 14 Opinion, as restated below, and I am also appointing the Monitor from *Floyd*, Mr. Zimroth, to oversee the detailed implementation of these orders. I am delegating the oversight of the *Ligon* remedies regarding supervision and training to the Monitor because there is substantial overlap between these remedies and the injunctive relief concerning supervision and training in *Floyd*. For example, both sets of remedies will require alterations to supervisory procedures for reviewing stops, as well as the revision of the NYPD Legal Bureau's slide show at Rodman's Neck.

   The purpose of consolidating the remedies hearings in *Ligon* and *Floyd* was to avoid inefficiencies, redundancies, and inconsistencies in the remedies process.[80] This purpose can best be fulfilled by placing both the preliminary injunctive relief in *Ligon* and the permanent injunctive relief in *Floyd* under the direction and supervision of the Monitor.

   For the foregoing reasons, the Monitor is directed to oversee the City's compliance with the following orders.

**A.  Policies and Procedures**

   *First*, as proposed in the February 14 Opinion, the NYPD is ordered to adopt a

---

[80]  *Ligon*, 2013 WL 227654, at *4.

33

formal written policy specifying the limited circumstances in which it is legally permissible to stop a person outside a TAP building on a suspicion of trespass. Specifically, the NYPD is ordered to amend Interim Order 22 of 2012 ("IO 22") by deleting the paragraph labeled "NOTE" on page 2 of IO 22,[81] and inserting the following paragraphs in its place:

> A uniformed member of the service may approach and ask questions of a person (that is, conduct a Level 1 request for information under _DeBour_) if the uniformed member has an objective credible reason to do so. However, mere presence in or outside a building enrolled in the Trespass Affidavit Program is not an "objective credible reason" to approach. A uniformed member of the service may _not_ approach a person merely because the person has entered or exited or is present near a building enrolled in the Trespass Affidavit Program.

> Under the Fourth Amendment to the United States Constitution, a person is _stopped_ (temporarily detained) if under the circumstances a reasonable person would not feel free to disregard the police and walk away. A uniformed member of the service may not stop a person on suspicion of trespass unless the uniformed member _reasonably suspects_ that the person was in or is in the building without authorization.

> Mere presence near, entry into, or exit out of a building enrolled in the Trespass Affidavit Program, without more, is _not_ sufficient to establish reasonable suspicion for a stop on suspicion of trespass.

The NYPD is ordered to draft a FINEST message explaining the revisions to IO 22 and the need for those revisions. The FINEST message attached as Exhibit 1 to the _Ligon_ Plaintiffs' Brief Concerning Defendants' Remedial Proposals will serve as a model. The draft will be provided to the Monitor and then to the Court for approval prior to transmission, with a copy to plaintiffs' counsel.

**B.     Remaining Relief**

The Monitor is directed to oversee the City's compliance with the remaining

---

[81]     _See_ Exhibit A to _Ligon_ Def. Rem.

orders discussed below.  Plaintiffs do not object to many of the draft revisions submitted by the City in response to the proposed orders.[82]  Where the parties disagree, the Monitor is authorized to resolve the dispute by submitting a proposed order for the Court's approval.

As a model for resolving the parties' disputes, the Monitor may use this Court's revision of IO 22, as presented above.[83]  In arriving at a compromise between the parties' proposed language, I aimed to articulate the relevant legal standards as *simply* and *clearly* as possible.  The goal must be to communicate the law to officers in a way that will be understood, remembered, and followed.  In general, plaintiffs' proposed revisions to the City's draft materials make the achievement of this goal more likely.[84]  I note that the Monitor may depart from the City's draft materials even when they do not contain legally erroneous language, if doing so would decrease the likelihood of constitutional violations.

### 1.    Supervision

*First*, the City is ordered to develop procedures for ensuring that UF-250s are completed for *every* trespass stop outside a TAP building in the Bronx.  A "stop" is defined as any police encounter in which a reasonable person would not feel free to terminate the encounter.

*Second*, the City is ordered to develop and implement a system for reviewing the constitutionality of stops outside TAP buildings in the Bronx.  Needless to say, any system

---

[82]    *See Ligon* Def. Rem. at Exs. B–F; *Ligon* Pl. Rem. at 4–16.

[83]    For the materials used in drafting the Court's revision, see *Ligon* Def. Rem. at Ex. A; *Ligon* Pl. Rem. at 1–4; *Ligon* Def. Reply at 2–4.

[84]    *See, e.g.*, *Ligon* Pl. Rem. at 7–8 (proposing revisions to the City's draft slide show for officer training at Rodman's Neck to emphasize the "free to leave" standard, where confusion might otherwise arise).

developed must not conflict with the supervisory reforms ordered in *Floyd*. To the extent that supervisory review reveals that a stop has not conformed with the revised version of IO 22 described above, the supervisor will ensure that the officer has a proper understanding of what constitutes a stop and when it is legitimate to make a stop. Copies of all reviewed UF-250s shall be provided to plaintiffs' counsel.

### 2. Training

The City is ordered to revise the NYPD's training materials and training programs to conform with the law as set forth in the February 14 Opinion. The instruction must be sufficient to uproot the longstanding misconceptions that have affected stops outside of TAP buildings in the Bronx. It must include, but need not be limited to, the following reforms: (1) The revised version of IO 22 described above must be distributed to each Bronx NYPD member, and then redistributed two additional times at six-month intervals. (2) The stop and frisk refresher course at Rodman's Neck must be altered to incorporate instruction specifically targeting the problem of unconstitutional trespass stops *outside* TAP buildings. Training regarding stops outside TAP buildings must also be provided to new recruits, as well as any officers who have already attended the Rodman's Neck refresher course and are not scheduled to do so again. (3) Chapter 16 of the Chief of Patrol Field Training Guide must be revised to reflect the formal written policy governing trespass stops outside TAP buildings described above. (4) SQF Training Video No. 5 must be revised to conform with the law set forth in the February 14 Opinion and must be coordinated with the relief ordered in *Floyd*. The revised video must state that the information contained in the earlier video was incorrect and explain why it was incorrect.

## IV.  CONCLUSION

The defendant in *Floyd* and the defendants in *Ligon* are ordered to comply with the remedial orders described above.  The Clerk of the Court is directed to close the *Ligon* defendants' motion regarding proposed remedies. [No. 12 Civ. 2274, Dkt. No. 112]

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       August 12, 2013
             New York, New York

37

**- Appearances -**

**For *Ligon* Plaintiffs:**

Christopher Dunn, Esq.
Alexis Karteron, Esq.
Taylor Pendergrass, Esq.
Daniel Mullkoff, Esq.
New York Civil Liberties Union
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

Mariana Kovel, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

John A. Nathanson, Esq.
Tiana Peterson, Esq.
Mayer Grashin, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

**For *Floyd* Plaintiffs:**

Darius Charney, Esq.
Sunita Patel, Esq.
Baher Azmy, Esq.
Rachel Lopez, Esq.
Ghita Schwarz, Esq.
Chauniqua Young, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

Philip I. Irwin, Esq.
Eric Hellerman, Esq.
Gretchen Hoff Varner, Esq.
Kasey Martini, Esq.
Bruce Corey, Jr., Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

Jonathan Moore, Esq.
Jenn Rolnick Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0900

**For *Ligon* and *Floyd* Defendants:**

Brenda Cooke
Linda Donahue
Heidi Grossman
Morgan Kunz
Joseph Marutollo
Suzanna Publicker
Lisa Richardson
Cecilia Silver
Judson Vickers
Richard Weingarten
Mark Zuckerman
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

DAVID FLOYD, LALIT CLARKSON, DEON
DENNIS, and DAVID OURLICHT, individually and
on behalf of a class of all others similarly situated,

                             **Plaintiffs,**

      - against -

THE CITY OF NEW YORK,

                       **Defendant.**

-------------------------------------------------------- X

**OPINION AND ORDER**

08 Civ. 1034 (SAS)



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/12/13

I.     INTRODUCTION ...................................................... 1

II.    EXECUTIVE SUMMARY ............................................. 4

III.   APPLICABLE LAW .................................................. 15
    A.     *Monell* Liability ................................................ 15
    B.     Stops, Frisks, and Searches Under the Fourth Amendment ............. 18
        1.    The Definition of a Stop ..................................... 19
        2.    Stops Must Be Based on Reasonable Suspicion ................. 22
        3.    Protective Frisks for Weapons ............................... 23
        4.    Searching into Clothing for Weapons ......................... 25
        5.    *De Bour* and the Fourth Amendment .......................... 26
    C.     Equal Protection Under the Fourteenth Amendment .................. 26

IV.   FINDINGS OF FACT .................................................. 30
    A.     Overview of Uncontested Statistics ................................ 30
    B.     Expert Testimony ................................................ 37
        1.    The Liability Experts ........................................ 37
        2.    The Fourth Amendment Claim ............................... 40
            a.    Overview of Key Issues ............................... 40
            b.    Dr. Fagan's Method of Classifying Stops ................ 41
            c.    Unreliable Stop Factors ............................... 43
            d.    Quantifying the Magnitude of Apparently Unjustified Stops
                Based on UF-250 Stop Factors ......................... 47
        3.    The Fourteenth Amendment Claim .......................... 48

i

   a. Overview of Key Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
   b. Competing Benchmarks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
   c. Findings Based on Dr. Fagan's Analyses. . . . . . . . . . . . . . . . . . 58
C. Institutional Evidence of Deliberate Indifference. . . . . . . . . . . . . . . . . . . . . . . 60
 1. Early Notice:  the 1999 AG Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
 2. Pressure to Increase Stops. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
  a. Compstat: Pressure on Commanders. . . . . . . . . . . . . . . . . . . . . 64
  b. Evidence of Pressure in Survey Data. . . . . . . . . . . . . . . . . . . . . 67
  c. Further Evidence of Pressure on Officers. . . . . . . . . . . . . . . . . 71
   i. Pressure Before the 2010 Quota Law. . . . . . . . . . . . . 71
   ii. Pressure After 2010 Quota Law. . . . . . . . . . . . . . . . . . 77
  d. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
 3. Targeting "the Right People". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
 4. Inadequate Monitoring and Supervision. . . . . . . . . . . . . . . . . . . . . . . . 89
  a. Inadequate Documentation and Document Review. . . . . . . . . 89
  b. Inadequate Supervision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
 5. Partially Inadequate Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
 6. Inadequate Discipline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
 7. Ongoing Notice of Constitutional Violations. . . . . . . . . . . . . . . . . . . 111
D. Individual Stops. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
 1. Unconstitutional Stop and Frisk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
  a. Leroy Downs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
   i. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
   ii. Mixed Findings of Fact and Law. . . . . . . . . . . . . . . . . 122
  b. Devin Almonor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
   i. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
   ii. Mixed Findings of Fact and Law. . . . . . . . . . . . . . . . . 127
  c. Cornelio McDonald. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
   i. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
   ii. Mixed Findings of Fact and Law. . . . . . . . . . . . . . . . . 132
  d. Nicholas Peart — August 5, 2006. . . . . . . . . . . . . . . . . . . . . . . 133
   i. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
   ii. Mixed Findings of Fact and Law. . . . . . . . . . . . . . . . . 136
  e. Nicholas Peart — April 13, 2011 Stop. . . . . . . . . . . . . . . . . . . . 138
   i. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
   ii. Mixed Findings of Fact and Law. . . . . . . . . . . . . . . . . 139
  f. Ian Provost. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
   i. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
   ii. Mixed Findings of Fact and Law. . . . . . . . . . . . . . . . . 144
  g. David Ourlicht — January 30, 2008 Stop. . . . . . . . . . . . . . . . . 145
   i. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
   ii. Mixed Findings of Fact and Law. . . . . . . . . . . . . . . . . 148
  h. Clive Lino — February 5, 2008 Stop. . . . . . . . . . . . . . . . . . . . . 149
   i. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
   ii. Mixed Findings of Fact and Law. . . . . . . . . . . . . . . . . 153

i.     **Lalit Clarkson.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **154**
        i.     **Findings of Fact.** . . . . . . . . . . . . . . . . . . . . . . . **154**
        ii.     **Mixed Findings of Fact and Law.** . . . . . . . . . . . . **156**
2.     **Unconstitutional Frisk Only.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **156**
     a.     **Dominique Sindayiganza.** . . . . . . . . . . . . . . . . . . . . . . . . . . **156**
        i.     **Findings of Fact.** . . . . . . . . . . . . . . . . . . . . . . . **157**
        ii.     **Mixed Findings of Law and Fact.** . . . . . . . . . . . . **160**
     b.     **David Floyd — April 20, 2007 Stop.** . . . . . . . . . . . . . . . . . . **161**
        i.     **Findings of Fact.** . . . . . . . . . . . . . . . . . . . . . . . **161**
        ii.     **Mixed Finding of Fact and Law.** . . . . . . . . . . . . . . **163**
     c.     **David Floyd — February 27, 2008 Stop.** . . . . . . . . . . . . . . . . **163**
        i.     **Findings of Fact.** . . . . . . . . . . . . . . . . . . . . . . . **163**
        ii.     **Mixed Findings of Fact and Law.** . . . . . . . . . . . . **166**
     d.     **Clive Lino — February 24, 2011 Stop.** . . . . . . . . . . . . . . . . . **167**
        i.     **Findings of Fact.** . . . . . . . . . . . . . . . . . . . . . . . **167**
        ii.     **Mixed Findings of Fact and Law.** . . . . . . . . . . . . **170**
     e.     **Deon Dennis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **171**
        i.     **Findings of Fact.** . . . . . . . . . . . . . . . . . . . . . . . **171**
        ii.     **Mixed Findings of Fact and Law.** . . . . . . . . . . . . **173**
3.     **Failure of Proof.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **174**
     a.     **John Doe Stops of Nicholas Peart in Spring 2008 and February 2010 and David Ourlicht in February and June 2008.** . . . . . . **174**
     b.     **Kristianna Acevedo Stop.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **175**
     c.     **Clive Lino — August 3, 2008.** . . . . . . . . . . . . . . . . . . . . . . . **177**

**V.**     **CONCLUSIONS OF LAW.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **177**
    **A.**     **The City Is Liable for Violations of Plaintiffs' Fourth Amendment Rights**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **177**
       1.     **Deliberate Indifference.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **178**
       2.     **Widespread Practice.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **180**
    **B.**     **The City Is Liable for Violations of Plaintiffs' Fourteenth Amendment Rights.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **181**
       1.     **Policy of Indirect Racial Profiling.** . . . . . . . . . . . . . . . . . . . . . **181**
          a.     **Intentionally Discriminatory Application of a Facially Neutral Policy**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **182**
          b.     **Express Classification.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **185**
          c.     **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **188**
       2.     **Deliberate Indifference.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **189**

**VI.**     **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **192**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

> Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.

> —    *Railway Express Agency v. People of State of New York*, 336 U.S. 106, 112–13 (1949) (Jackson, J., concurring)

> It is simply fantastic to urge that [a frisk] performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.'

> —    *Terry v. Ohio*, 392 U.S. 1, 16–17 (1968)

> Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you.  Such subjective, promiscuous appeals to an ineffable intuition should not be credited.

> —    *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (Posner, J.)

## I.    INTRODUCTION

New Yorkers are rightly proud of their city and seek to make it as safe as the largest city in America can be.  New Yorkers also treasure their liberty.  Countless individuals have come to New York in pursuit of that liberty.  The goals of liberty and safety may be in tension, but they can coexist — indeed the Constitution mandates it.

This case is about the tension between liberty and public safety in the use of a proactive policing tool called "stop and frisk."  The New York City Police Department ("NYPD") made 4.4 million stops between January 2004 and June 2012.  Over 80% of these 4.4 million stops were of blacks or Hispanics.  In each of these stops a person's life was interrupted. The person was detained and questioned, often on a public street.  More than half of the time the police subjected the person to a frisk.

Plaintiffs — blacks and Hispanics who were stopped — argue that the NYPD's

1

use of stop and frisk violated their constitutional rights in two ways: (1) they were stopped without a legal basis in violation of the Fourth Amendment, and (2) they were targeted for stops because of their race in violation of the Fourteenth Amendment. Plaintiffs do not seek to end the use of stop and frisk. Rather, they argue that it must be reformed to comply with constitutional limits. Two such limits are paramount here: *first*, that all stops be based on "reasonable suspicion" as defined by the Supreme Court of the United States;[1] and *second*, that stops be conducted in a racially neutral manner.[2]

I emphasize at the outset, as I have throughout the litigation, that this case is not about the effectiveness of stop and frisk in deterring or combating crime. This Court's mandate is solely to judge the *constitutionality* of police behavior, *not* its effectiveness as a law enforcement tool. Many police practices may be useful for fighting crime — preventive detention or coerced confessions, for example — but because they are unconstitutional they cannot be used, no matter how effective. "The enshrinement of constitutional rights necessarily takes certain policy choices off the table."[3]

This case is also not primarily about the nineteen individual stops that were the subject of testimony at trial.[4] Rather, this case is about whether the City has a *policy* or *custom*

---

[1]     *See generally* U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1 (1968).

[2]     *See generally* U.S. Const. amend. XIV § 1; *Whren v. United States*, 517 U.S. 806, 813 (1996).

[3]     *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

[4]     The law requires plaintiffs to produce evidence that at least some class members have been victims of unconstitutional stops. *See* U.S. Const. art. III.

2

of violating the Constitution by making unlawful stops and conducting unlawful frisks.[5]

The Supreme Court has recognized that "the degree of community resentment aroused by particular practices is clearly relevant to an assessment of the quality of the intrusion upon reasonable expectations of personal security."[6]  In light of the very active and public debate on the issues addressed in this Opinion — and the passionate positions taken by both sides — it is important to recognize the human toll of unconstitutional stops.  While it is true that any one stop is a limited intrusion in duration and deprivation of liberty, each stop is also a demeaning and humiliating experience.  No one should live in fear of being stopped whenever he leaves his home to go about the activities of daily life.  Those who are routinely subjected to stops are overwhelmingly people of color, and they are justifiably troubled to be singled out when many of them have done nothing to attract the unwanted attention.  Some plaintiffs testified that stops make them feel unwelcome in some parts of the City, and distrustful of the police.  This alienation cannot be good for the police, the community, or its leaders.  Fostering trust and confidence between the police and the community would be an improvement for everyone.

Plaintiffs requested that this case be tried to the Court without a jury.  Because plaintiffs seek only injunctive relief, not damages, the City had no right to demand a jury.  As a result, I must both find the facts and articulate the governing law.  I have endeavored to exercise my judgment faithfully and impartially in making my findings of fact and conclusions of law based on the nine-week trial held from March through May of this year.

---

[5]      *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (establishing the standards under 42 U.S.C. § 1983 for municipal liability for constitutional torts by employees).

[6]      *Terry*, 392 U.S. at 14 n.11.

3

I begin with an Executive Summary of the most important points in the Opinion. Next, I address the legal standards governing the ability of police to conduct stops and frisks. I provide a statistical overview of the 4.4 million stops made between January 2004 and June 2012, followed by a discussion of the expert analyses of those stops. I then address the question of whether the City had notice of allegations of racial profiling in the conduct of stops and frisks, and the institutional response to that notice in terms of monitoring, supervision, training, and discipline. After addressing these big picture issues, I make findings of fact with respect to each of the nineteen stops of the twelve class members who provided testimony at trial.

Finally, I present my conclusions of law based on my findings of fact. I will address the question of remedies in a separate opinion, because the remedies overlap with a different case involving stop and frisk in which I have already found that preliminary injunctive relief is warranted.[7]

It is important that this Opinion be read synergistically. Each section of the Opinion is only a piece of the overall picture. Some will quarrel with the findings in one section or another. But, when read as a whole, with an understanding of the interplay between each section, I hope that this Opinion will bring more clarity and less disagreement to this complex and sensitive issue.

## II. EXECUTIVE SUMMARY

Plaintiffs assert that the City, and its agent the NYPD, violated both the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. In order to hold a municipality liable for the violation of a constitutional right,

---

[7]    *See Ligon v. City of New York,* No. 12 Civ. 2274, 2013 WL 628534 (S.D.N.Y. Feb. 14, 2013).

4

plaintiffs "must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury."[8] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."[9]

The Fourth Amendment protects all individuals against unreasonable searches or seizures.[10] The Supreme Court has held that the Fourth Amendment permits the police to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."[11] "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant."[12] The test for whether a stop has taken place in the context of a police encounter is whether a reasonable person would have felt free to terminate the encounter.[13] "'[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.'"[14]

The Equal Protection Clause of the Fourteenth Amendment guarantees to every

---

[8]     *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1741 (2012) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)).

[9]     *Connick*, 131 S. Ct. at 1359.

[10]     *See infra* Part III.B.

[11]     *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (some quotation marks omitted).

[12]     *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

[13]     *See Florida v. Bostick*, 501 U.S. 429 (1991).

[14]     *United States v. Lopez*, 321 Fed. App'x 65, 67 (2d Cir. 2009) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)).

5

person the equal protection of the laws. It prohibits intentional discrimination based on race. Intentional discrimination can be proved in several ways, two of which are relevant here. A plaintiff can show: (1) that a facially neutral law or policy has been applied in an intentionally discriminatory manner; or (2) that a law or policy expressly classifies persons on the basis of race, and that the classification does not survive strict scrutiny. Because there is rarely direct proof of discriminatory intent, circumstantial evidence of such intent is permitted. "The impact of the official action — whether it bears more heavily on one race than another — may provide an important starting point."[15]

The following facts, discussed in greater detail below, are uncontested:[16]

- Between January 2004 and June 2012, the NYPD conducted over 4.4 million *Terry* stops.

- The number of stops per year rose sharply from 314,000 in 2004 to a high of 686,000 in 2011.

- 52% of all stops were followed by a protective frisk for weapons. A weapon was found after 1.5% of these frisks. In other words, in 98.5% of the 2.3 million frisks, no weapon was found.

- 8% of all stops led to a search into the stopped person's clothing, ostensibly based on the officer feeling an object during the frisk that he suspected to be a weapon, or immediately perceived to be contraband other than a weapon. In 9% of these searches, the felt object was in fact a weapon. 91% of the time, it was not. In 14% of these searches, the felt object was in fact contraband. 86% of the time it was not.

- 6% of all stops resulted in an arrest, and 6% resulted in a summons. The remaining 88% of the 4.4 million stops resulted in no further law enforcement action.

- In 52% of the 4.4 million stops, the person stopped was black, in 31% the person

---

[15]     *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010).

[16]     *See infra* Part IV.A.

6

was Hispanic, and in 10% the person was white.

• In 2010, New York City's resident population was roughly 23% black, 29% Hispanic, and 33% white.

• In 23% of the stops of blacks, and 24% of the stops of Hispanics, the officer recorded using force.  The number for whites was 17%.

• Weapons were seized in 1.0% of the stops of blacks, 1.1% of the stops of Hispanics, and 1.4% of the stops of whites.

• Contraband other than weapons was seized in 1.8% of the stops of blacks, 1.7% of the stops of Hispanics, and 2.3% of the stops of whites.

• Between 2004 and 2009, the percentage of stops where the officer failed to state a specific suspected crime rose from 1% to 36%.

Both parties provided extensive expert submissions and testimony that is also discussed in detail below.[17]  Based on that testimony and the uncontested facts, I have made the following findings with respect to the expert testimony.

With respect to plaintiffs' Fourth Amendment claim,[18] I begin by noting the inherent difficulty in making findings and conclusions regarding 4.4 million stops.  Because it is impossible to *individually* analyze each of those stops, plaintiffs' case was based on the imperfect information contained in the NYPD's database of forms ("UF-250s") that officers are required to prepare after each stop.  The central flaws in this database all skew toward underestimating the number of unconstitutional stops that occur: the database is incomplete, in that officers do not prepare a UF-250 for every stop they make; it is one-sided, in that the UF-250 only records the officer's version of the story; the UF-250 permits the officer to merely check a series of boxes, rather than requiring the officer to explain the basis for her suspicion;

---

[17]     *See infra* Part IV.B.

[18]     *See infra* Part IV.B.2.

7

and many of the boxes on the form are inherently subjective and vague (such as "furtive

movements").  Nonetheless, the analysis of the UF-250 database reveals that *at least* 200,000

stops were made without reasonable suspicion.

   The actual number of stops lacking reasonable suspicion was likely far higher,

based on the reasons stated above, and the following points: (1) Dr. Fagan was unnecessarily

conservative in classifying stops as "apparently unjustified."  For example, a UF-250 on which

the officer checked only Furtive Movements (used on roughly 42% of forms) and High Crime

Area (used on roughly 55% of forms) is not classified as "apparently unjustified."  The same is

true when only Furtive Movements and Suspicious Bulge (used on roughly 10% of forms) are

checked.  Finally, if an officer checked only the box marked "other" on either side of the form

(used on roughly 26% of forms), Dr. Fagan categorized this as "ungeneralizable" rather than

"apparently unjustified." (2) Many UF-250s did not identify *any* suspected crime (36% of all

UF-250s in 2009).  (3) The rate of arrests arising from stops is low (roughly 6%), and the yield

of seizures of guns or other contraband is even lower (roughly 0.1% and 1.8% respectively).  (4)

"Furtive Movements," "High Crime Area," and "Suspicious Bulge" are vague and subjective

terms.  Without an accompanying narrative explanation for the stop, these checkmarks cannot

reliably demonstrate individualized reasonable suspicion.

   With respect to plaintiffs' Fourteenth Amendment claim,[19] I reject the testimony

of the City's experts that the race of crime suspects is the appropriate benchmark for measuring

racial bias in stops.  The City and its highest officials believe that blacks and Hispanics should

be stopped at the same rate as their proportion of the local criminal suspect population.  But this

---

[19]  *See infra* Part IV.B.3.

8

reasoning is flawed because the stopped population is overwhelmingly innocent — not criminal. There is no basis for assuming that an innocent population shares the same characteristics as the criminal suspect population in the same area. Instead, I conclude that the benchmark used by plaintiffs' expert — a combination of local population demographics and local crime rates (to account for police deployment) is the most sensible.

Based on the expert testimony I find the following: (1) The NYPD carries out more stops where there are more black and Hispanic residents, even when other relevant variables are held constant. The racial composition of a precinct or census tract predicts the stop rate *above and beyond* the crime rate. (2) Blacks and Hispanics are more likely than whites to be stopped within precincts and census tracts, even after controlling for other relevant variables. This is so even in areas with low crime rates, racially heterogenous populations, or predominately white populations. (3) For the period 2004 through 2009, when any law enforcement action was taken following a stop, blacks were 30% more likely to be arrested (as opposed to receiving a summons) than whites, for the same suspected crime. (4) For the period 2004 through 2009, after controlling for suspected crime and precinct characteristics, blacks who were stopped were about 14% more likely — and Hispanics 9% more likely — than whites to be subjected to the use of force. (5) For the period 2004 through 2009, all else being equal, the odds of a stop resulting in any further enforcement action were 8% *lower* if the person stopped was black than if the person stopped was white. In addition, the greater the black population in a precinct, the less likely that a stop would result in a sanction. Together, these results show that blacks are likely targeted for stops based on a lesser degree of objectively founded suspicion than whites.

With respect to both the Fourth and Fourteenth Amendment claims, one way to

9

prove that the City has a custom of conducting unconstitutional stops and frisks is to show that it acted with deliberate indifference to constitutional deprivations caused by its employees — here, the NYPD. The evidence at trial revealed significant evidence that the NYPD acted with deliberate indifference.[20]

As early as 1999, a report from New York's Attorney General placed the City on notice that stops and frisks were being conducted in a racially skewed manner. Nothing was done in response. In the years following this report, pressure was placed on supervisors to increase the number of stops. Evidence at trial revealed that officers have been pressured to make a certain number of stops and risk negative consequences if they fail to achieve the goal.[21] Without a system to ensure that stops are justified, such pressure is a predictable formula for producing unconstitutional stops. As one high ranking police official noted in 2010, this pressure, without a comparable emphasis on ensuring that the activities are legally justified, "could result in an officer taking enforcement action for the purpose of meeting a quota rather than because a violation of the law has occurred."[22]

In addition, the evidence at trial revealed that the NYPD has an unwritten policy of targeting "the right people" for stops. In practice, the policy encourages the targeting of young black and Hispanic men based on their prevalence in local crime complaints.[23] This is a form of racial profiling. While a person's race may be important if it fits the description of a

---

[20]     *See infra* Part IV.C.

[21]     *See infra* Part IV.C.2.

[22]     2010 Memorandum of Chief of Patrol James Hall, Plaintiffs' Trial Exhibit ("PX") 290 at *0096.

[23]     *See infra* Part IV.C.3.

particular crime suspect, it is impermissible to subject all members of a racially defined group to heightened police enforcement because some members of that group are criminals.  The Equal Protection Clause does not permit race-based suspicion.

Much evidence was introduced regarding inadequate monitoring and supervision of unconstitutional stops.  Supervisors routinely review the *productivity* of officers, but do not review the facts of a stop to determine whether it was legally warranted.  Nor do supervisors ensure that an officer has made a proper record of a stop so that it can be reviewed for constitutionality.  Deficiencies were also shown in the training of officers with respect to stop and frisk and in the disciplining of officers when they were found to have made a bad stop or frisk.  Despite the mounting evidence that many bad stops were made, that officers failed to make adequate records of stops, and that discipline was spotty or non-existent, little has been done to improve the situation.

One example of poor training is particularly telling.  Two officers testified to their understanding of the term "furtive movements."  One explained that "furtive movement is a very broad concept," and could include a person "changing direction," "walking in a certain way," "[a]cting a little suspicious," "making a movement that is not regular," being "very fidgety," "going in and out of his pocket," "going in and out of a location," "looking back and forth constantly," "looking over their shoulder," "adjusting their hip or their belt," "moving in and out of a car too quickly," "[t]urning a part of their body away from you," "[g]rabbing at a certain pocket or something at their waist," "getting a little nervous, maybe shaking," and "*stutter*[*ing*]."[24]  Another officer explained that "usually" a furtive movement is someone

---

[24]        4/18 Trial Transcript ("Tr.") at 4047–4049 (emphasis added).

11

"hanging out in front of [a] building, sitting on the benches or something like that" and then making a "quick movement," such as "bending down and quickly standing back up," "going inside the lobby . . . and then quickly coming back out," or "all of a sudden becom[ing] very nervous, very aware."[25]  If officers believe that the behavior described above constitutes furtive movement that justifies a stop, then it is no surprise that stops so rarely produce evidence of criminal activity.

        I now summarize my findings with respect to the individual stops that were the subject of testimony at trial.[26]  Twelve plaintiffs testified regarding nineteen stops.  In twelve of those stops, both the plaintiffs and the officers testified.  In seven stops no officer testified, either because the officers could not be identified or because the officers dispute that the stop ever occurred.  I find that nine of the stops and frisks were unconstitutional — that is, they were not based on reasonable suspicion.  I also find that while five other stops were constitutional, the frisks following those stops were unconstitutional.  Finally, I find that plaintiffs have failed to prove an unconstitutional stop (or frisk) in five of the nineteen stops.  The individual stop testimony corroborated much of the evidence about the NYPD's policies and practices with respect to carrying out and monitoring stops and frisks.

        In making these decisions I note that evaluating a stop in hindsight is an imperfect procedure.  Because there is no contemporaneous recording of the stop (such as could be achieved through the use of a body-worn camera), I am relegated to finding facts based on the often conflicting testimony of eyewitnesses.  This task is not easy, as every witness has an

---

[25]    5/9 Tr. at 6431–6433.

[26]    *See infra* Part IV.D.

interest in the outcome of the case, which may consciously or unconsciously affect the veracity

of his or her testimony.  Nonetheless, a judge is tasked with making decisions and I judged the

evidence of each stop to the best of my ability.  I am also aware that a judge deciding whether a

stop is constitutional, with the time to reflect and consider all of the evidence, is in a far different

position than officers on the street who must make split-second decisions in situations that may

pose a danger to themselves or others.  I respect that police officers have chosen a profession of

public service involving dangers and challenges with few parallels in civilian life.[27]

        In conclusion, I find that the City is liable for violating plaintiffs' Fourth and

Fourteenth Amendment rights.  The City acted with deliberate indifference toward the NYPD's

practice of making unconstitutional stops and conducting unconstitutional frisks.  Even if the

City had not been deliberately indifferent, the NYPD's unconstitutional practices were

sufficiently widespread as to have the force of law.  In addition, the City adopted a policy of

indirect racial profiling by targeting racially defined groups for stops based on local crime

suspect data.  This has resulted in the disproportionate and discriminatory stopping of blacks and

Hispanics in violation of the Equal Protection Clause.  Both statistical and anecdotal evidence

showed that minorities are indeed treated differently than whites.  For example, once a stop is

made, blacks and Hispanics are more likely to be subjected to the use of force than whites,

despite the fact that whites are more likely to be found with weapons or contraband.  I also

conclude that the City's highest officials have turned a blind eye to the evidence that officers are

---

[27]     "Throughout the country, police work diligently every day trying to prevent crime, arrest those who are responsible, and protect victims from crimes that undermine their dignity and threaten their safety.  They work for relatively low pay for the risks that they take, and although in some communities their role is respected and admired, in other communities they are vilified and treated as outcasts."  CHARLES OGLETREE, THE PRESUMPTION OF GUILT 125 (2012).

conducting stops in a racially discriminatory manner. In their zeal to defend a policy that they believe to be effective, they have willfully ignored overwhelming proof that the policy of targeting "the right people" is racially discriminatory and therefore violates the United States Constitution. One NYPD official has even suggested that it is permissible to stop racially defined groups just to instill fear in them that they are subject to being stopped at any time for any reason — in the hope that this fear will deter them from carrying guns in the streets. The goal of deterring crime is laudable, but this method of doing so is unconstitutional.

I recognize that the police will deploy their limited resources to high crime areas. This benefits the communities where the need for policing is greatest. But the police are not permitted to target people for stops based on their race. Some may worry about the implications of this decision. They may wonder: if the police believe that a particular group of people is disproportionately responsible for crime in one area, why should the police *not* target that group with increased stops? Why should it matter if the group is defined in part by race?[28] Indeed, there are contexts in which the Constitution permits considerations of race in law enforcement operations.[29] What is clear, however, is that the Equal Protection Clause prohibits the practices described in *this* case. A police department may not target a racially defined group for stops *in general* — that is, for stops based on suspicions of general criminal wrongdoing — simply

---

[28]     I note again that based on the uncontested statistics, *see infra* Part IV.A, the NYPD's current use of stop and frisk has not been particularly successful in producing arrests or seizures of weapons or other contraband.

[29]     For example, as discussed at length in this Opinion, race is a permissible consideration where there is a specific suspect description that includes race. *See, e.g.*, *Brown v. City of Oneonta, New York*, 221 F.3d 329, 340 (2d Cir. 2000).

14

because members of that group appear frequently in the police department's suspect data.[30]  The Equal Protection Clause does not permit the police to target a racially defined group as a whole because of the misdeeds of some of its members.

      To address the violations that I have found, I shall order various remedies including, but not limited to, an immediate change to certain policies and activities of the NYPD, a trial program requiring the use of body-worn cameras in one precinct per borough, a community-based joint remedial process to be conducted by a court-appointed facilitator, and the appointment of an independent monitor to ensure that the NYPD's conduct of stops and frisks is carried out in accordance with the Constitution and the principles enunciated in this Opinion, and to monitor the NYPD's compliance with the ordered remedies.

## III.   APPLICABLE LAW

### A.   *Monell* Liability

      Section 1983 of Title 42 of the United States Code ("section 1983") creates "'a species of tort liability'" for, among other things, certain violations of constitutional rights.[31]  As the Supreme Court established in *Monell v. New York City Department of Social Services*,[32] in

---

[30]    *Cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 41–42 (2000) (holding that while suspicionless stops at a highway checkpoint may be constitutional under the Fourth Amendment when "designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety," highway stops that lack "some measure of individualized suspicion" and "whose primary purpose [is] to detect evidence of ordinary criminal wrongdoing" contravene the Fourth Amendment).

[31]    *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986)).

[32]    Interpreting the language of section 1983 and the legislative history surrounding its passage in the Civil Rights Act of 1871, the Court in *Monell* held that local governing bodies could be held liable either on the basis of formally approved policies or on the basis of "'customs'" or "'usages.'"  *Monell*, 436 U.S. 658, 690–91 (1978) (quoting *Adickes v. S. H. Kress*

15

order to have recourse against a municipality or other local government under section 1983,

plaintiffs "must prove that 'action pursuant to official municipal policy' caused the alleged

constitutional injury."[33]  "In other words, municipalities are 'responsible only for their own

illegal acts,' and cannot be held 'vicariously liable under § 1983 for their employees' actions.'"[34]

In general, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the

acts of its policymaking officials, and practices so persistent and widespread as to practically

have the force of law."[35]  Such policies "may be pronounced or tacit and reflected in either action

or inaction."[36]

One way to establish the existence of a municipal policy or custom is through a

showing of "deliberate indifference" by high-level officials.  "'[W]here a policymaking official

exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that

the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought

of as a city policy or custom that is actionable under § 1983.'"[37]  Deliberate indifference requires

---

*& Co.*, 398 U.S. 144, 167–68 (1970)).

[33]     *Cash*, 654 F.3d at 333 (quoting *Connick*, 131 S. Ct. at 1359, in turn quoting *Monell*, 436 U.S. at 691 (quotation marks omitted)).  Cases after *Monell* "considerably broadened the concept of official municipal action."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (Sotomayor, J.).

[34]     *Cash*, 654 F.3d at 333 (quoting *Connick*, 131 S. Ct. at 1359) (some quotation marks omitted).

[35]     *Connick*, 131 S. Ct. at 1359 (citing *Monell*, 436 U.S. at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986); *Adickes*, 398 U.S. at 167–68).

[36]     *Cash*, 654 F.3d at 334.

[37]     *Id.* (quoting *Amnesty*, 361 F.3d at 126).

"'proof that a municipal actor disregarded a known or obvious consequence of his action.'"[38] Recognizing that deliberate indifference is "a stringent standard of fault," the Second Circuit requires "that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'"[39]

A municipality may incur *Monell* liability based on deliberate indifference through its training and supervision practices. "[D]eliberate indifference may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs[.]'"[40] Although "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train,"[41] the Supreme Court has held that "[w]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."[42]

In *Walker v. City of New York*, the Second Circuit framed the deliberate indifference inquiry in three parts:

---

[38]     *Connick*, 131 S. Ct. at 1359 (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)).

[39]     *Cash*, 654 F.3d at 334 (quoting *Connick*, 131 S.Ct at 1360; *Amnesty*, 361 F.3d at 128).

[40]     *Id.* (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).

[41]     *Connick*, 131 S. Ct. at 1359 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion)).

[42]     *Id.* (citing *Bryan Cnty.*, 520 U.S. at 407).

17

> (1) [the] policymaker knows "to a moral certainty" that its employees will confront a given situation; (2) either [the] situation presents employees with [a] difficult choice that will be made less so by training or supervision, or there is a record of employees mishandling [the] situation; and (3) [a] wrong choice by employees will frequently cause [the] deprivation of constitutional rights.[43]

"Where the plaintiff establishes all three elements, then . . . the policymaker should have known that inadequate training or supervision was 'so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'"[44]  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."[45]

## B.  Stops, Frisks, and Searches Under the Fourth Amendment

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment,[46] states:  "The right of the people to be secure in their persons, houses, papers, and

---

[43]    *Cash*, 654 F.3d at 334 (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

[44]    *Walker*, 974 F.2d at 298 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).  In order to establish *Monell* liability based on the *Walker* test, plaintiffs must also, of course, show that the training or supervision was in fact inadequate and that this inadequacy caused plaintiffs' constitutional injuries.  *See Reynolds*, 506 F.3d at 193.

[45]    *Connick*, 131 S. Ct. at 1360 (quoting *Bryan Cnty.*, 520 U.S. at 409).  By contrast, "once a municipal *policy* is established, 'it requires only one application . . . to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.'"  *Pembaur*, 475 U.S. at 478 n.6 (quoting *Tuttle*, 471 U.S. at 822) (emphasis added).

[46]    *See Maryland v. Pringle*, 540 U.S. 366, 369 (2003) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

18

effects, against unreasonable searches and seizures, shall not be violated . . . ."[47]  The Supreme

Court of the United States has repeatedly affirmed that "the ultimate touchstone of the Fourth

Amendment is 'reasonableness.'"[48]  The Supreme Court has held that under the Fourth

Amendment, it is constitutionally reasonable for the police to "stop and briefly detain a person

for investigative purposes if the officer has a reasonable suspicion supported by articulable facts

that criminal activity 'may be afoot,' even if the officer lacks probable cause."[49]  This form of

investigative detention is now known as a *Terry* stop.[50]

### 1. The Definition of a Stop

As the Supreme Court reaffirmed in *Florida v. Bostick*, the test for determining

whether a *Terry* stop is taking place "is whether a reasonable person would feel free to decline

the officers' requests or otherwise terminate the encounter."[51]  Whether a stop has taken place

depends on "whether, taking into account all of the circumstances surrounding the encounter, the

---

[47]  U.S. CONST. amend. IV.

[48]  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  *Accord Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (per curiam) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" (quoting *Terry*, 392 U.S. at 19)).

[49]  *Swindle*, 407 F.3d at 566 (quoting *Sokolow*, 490 U.S. at 7) (some quotation marks omitted).

[50]  *See Davis v. City of New York*, 902 F. Supp. 2d 405, 411 (S.D.N.Y. 2012) (citing *Terry*, 392 U.S. at 88).

[51]  501 U.S. at 436.  The "free to terminate the encounter" standard is a more general formulation of Justice Potter Stewart's "free to leave" standard in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").  *See also Terry*, 392 U.S. at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"[52]

While the Supreme Court explicitly refrained from determining whether a seizure occurred in *Bostick*,[53] it noted several types of police encounters that were not necessarily stops.[54] However, the Court confirmed that even in these cases, the "free to terminate the encounter" standard applies: "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage — *as long as the police do not convey a message that compliance with their requests is required*."[55] The *Bostick* majority emphasized that police officers may not "demand of passengers their 'voluntary' cooperation" through "'an intimidating show of authority.'"[56]

---

[52]     *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). *Bostick* also notes that "the 'reasonable person' test presupposes an *innocent* person." *Id.* at 438. For a comprehensive summary of the "free to leave" test as it has been interpreted and applied, see 4 Wayne R. LaFave, Search & Seizure § 9.4(a) (5th ed. 2012) ("LaFave").

[53]     *See Bostick*, 501 U.S. at 437.

[54]     *See id.* at 434–35.

[55]     *Id.* (collecting cases) (emphasis added and citations omitted). *Accord INS v. Delgado*, 466 U.S. 210, 216 (1984) ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation . . . [u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." (emphasis added)). These cases confirm that the *manner* and *context* of police conduct are relevant to the inquiry into whether a reasonable person would have felt free to terminate the encounter. As the Second Circuit has noted, this inquiry is essentially "an objective assessment of the overall coercive effect of the police conduct." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) (citing *Chesternut*, 486 U.S. at 573–74).

[56]     *Bostick*, 501 U.S. at 438 (quoting *Bostick*, 501 U.S. at 447 (Marshall, J., dissenting)) (emphasis omitted).

The Second Circuit has held that the following factors are indicative of a

"seizure," a term that encompasses both *Terry* stops and arrests:

> the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.[57]

The following summarizes two examples of police encounters that the Second Circuit held to be

*Terry* stops, despite their arguably low level of coercion:

> The Second Circuit has held . . . that a stop took place where an officer twice ordered a person to "hold on a second," and after the second order the person stopped. The Second Circuit also held that a stop occurred where an officer pointing a spotlight at a person said, "What, are you stupid? Come here. I want to talk to you," and then told the person to show his hands.[58]

By contrast, the Second Circuit held that no *Terry* stop took place "where a person encountered

two officers in his dorm lobby, and the officers asked him to show them his hands."[59]

In sum, the test for whether a *Terry* stop has taken place in the context of a police

encounter is whether a reasonable person would have felt free to terminate the encounter. The

Second Circuit has further held: "[a] seizure occurs when (1) a person obeys a police officer's

---

[57]     *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (citing *Lee*, 916 F.2d at 819). *Accord United States v. Drayton*, 536 U.S. 194, 203–04 (2002) (concluding, under *Bostick* framework, that a reasonable passenger on a bus would feel free to leave, where "officers gave the passengers no reason to believe that they were required to answer the officers' questions," and the officer asking questions of passengers "did not brandish a weapon or make any intimidating movements," "left the aisle free so that respondents could exit," and "spoke to passengers one by one and in a polite, quiet voice").

[58]     *Ligon*, 2013 WL 628534, at *36 (citing *United States v. Simmons*, 560 F.3d 98, 101, 105–06 (2d Cir. 2009); *Brown*, 221 F.3d at 340).

[59]     *Id.* at *36 n.410 (citing *Brown*, 221 F.3d at 341).

21

order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained."[60]

### 2. Stops Must Be Based on Reasonable Suspicion

In order for a *Terry* stop to comply with the Fourth Amendment, it must be based on a reasonable suspicion that criminal activity "may be afoot."[61] That is, the police may make a *Terry* stop "when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity."[62] At minimum, "'[t]he officer [making a *Terry* stop] . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'"[63] That is, "[p]olice 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest].'"[64] "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant."[65]

---

[60] *Simmons*, 560 F.3d at 105 (citing *Swindle*, 407 F.3d at 572).

[61] *Terry*, 392 U.S. at 30.

[62] *United States v. Place*, 462 U.S. 696, 702 (1983) (citing *Terry*, 392 U.S. at 22). Although the Court in *Terry* did not explicitly refer to crimes that are "about to be" committed, the stop upheld in *Terry* was based on a police officer's suspicion that two men were about to carry out a "stick-up." *Terry*, 392 U.S. at 6. It has long been recognized that arrests may be based on probable cause to believe that a crime is about to be committed. The New York stop and frisk statute, New York Criminal Procedure Law ("CPL") § 140.50(1), allows stops when an officer "reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law."

[63] *Alabama v. White*, 496 U.S. 325, 329 (1990) (quoting *Sokolow*, 490 U.S. at 7) (some quotation marks omitted). Courts are divided over whether reasonable suspicion must be of a particular crime, or may be of criminality in general. *See* 4 LaFave § 9.5(c).

[64] *United States v. Elmore*, 482 F.3d 172, 178–79 (2d Cir. 2007) (quoting *Terry*, 392 U.S. at 21).

[65] *Bayless*, 201 F.3d at 133.

22

In general, reasonable suspicion requires an *individualized* suspicion of wrongdoing.[66] While the Supreme Court has recognized certain narrow exceptions to this requirement, there is no exception for stops of pedestrians for the general purpose of controlling crime.[67]

Courts reviewing stops for reasonable suspicion "must look at 'the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[68] "[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing."[69] "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."[70]

### 3. Protective Frisks for Weapons

The Supreme Court has recognized that a police officer making an investigatory

---

[66] *See Edmond*, 531 U.S. at 37 (citing *Chandler v. Miller*, 520 U.S. 305, 308 (1997)).

[67] *See id.* at 37–40 (summarizing exceptions); *id.* at 34, 41–44 (distinguishing between suspicionless stops at highway checkpoints "for the purposes of combating drunk driving and intercepting illegal immigrants," which are constitutional; and suspicionless stops at checkpoints that primarily aim to advance "'the general interest in crime control,'" which are unconstitutional (quoting *Delaware v. Prouse*, 440 U.S. 648, 659 n.18 (1979))).

[68] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

[69] *Lee*, 916 F.2d at 819.

[70] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

23

stop "should not be denied the opportunity to protect himself from attack by a hostile suspect."[71]

As a result, "a law enforcement officer, for his own protection and safety, may conduct a

patdown to find weapons that he reasonably believes or suspects are then in the possession of the

person he has accosted."[72]  "'[T]o proceed from a stop to a frisk, the police officer must

reasonably suspect that the person stopped is armed and dangerous.'"[73]  "The test is an objective

rather than a subjective one, . . . and thus it is not essential that the officer actually have been in

fear."[74]

      "The purpose of [a frisk for weapons] is not to discover evidence of crime, but to

---

[71]    *Adams v. Williams*, 407 U.S. 143, 146 (1972) (citing *Terry*, 392 U.S. at 24).

[72]    *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (citing *Adams*, 407 U.S. at 146).

[73]    *Lopez*, 321 Fed. App'x at 67 (quoting *Johnson*, 555 U.S. at 326–27 ) (holding that the following behavior provided reasonable suspicion that a suspect was carrying a weapon: "[w]hen [the suspect] saw [the officer] approaching him, [the suspect] transferred [a] cup from his right to his left hand and dropped his right hand to his right side").  *Accord* 4 LaFave § 9.6(a) (noting that "assuming a proper stopping for investigation, a protective search is permissible when, at the time the frisk itself is commenced, there is reason to believe that the suspect *may be* armed and dangerous").

[74]    4 LaFave § 9.6(a) (citing *United States v. Tharpe*, 536 F.2d 1098 (5th Cir. 1976)).  Trial courts "have been inclined to view the right to frisk as being 'automatic' whenever the suspect has been stopped upon the suspicion [of a criminal activity] for which the offender would likely be armed," such as "robbery, burglary, rape, assault with weapons, car theft, homicide, and dealing in large quantities of narcotics." *Id.*
      I note that the New York stop and frisk statute authorizes an officer to conduct a frisk whenever, after a stop, he "reasonably suspects that he is in danger of physical injury." CPL § 140.50(3).  This standard is not the constitutional standard.  It would allow an officer to conduct a frisk even when she lacks reasonable suspicion that the stopped person is *armed* and dangerous.  As the Supreme Court has made clear, New York "may not . . . authorize police conduct which trenches upon Fourth Amendment rights."  *Sibron v. New York*, 392 U.S. 40, 61 (1968).  The Fourth Amendment, and not New York law, establishes the requirements for a constitutional frisk in this case.

allow the officer to pursue his investigation without fear of violence."[75]  Thus, the frisk must be "limited in scope to this protective purpose,"[76] and "strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'"[77] However, when an officer "lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity [as contraband] *immediately* apparent," the officer may seize the contraband without a warrant.[78]  In sum, "[n]othing in *Terry* can be understood to allow a generalized  'cursory search for weapons' or indeed, any search whatever for anything but weapons."[79]

### 4.       Searching into Clothing for Weapons

Just as reasonableness is the touchstone for the Fourth Amendment generally, reasonable suspicion provides the standard at each stage of a *Terry* stop.  Once an officer has lawfully stopped someone based on reasonable suspicion of criminal activity, the officer may lawfully frisk the stopped person based on reasonable suspicion that the person is armed and dangerous.  If the frisk gives rise to reasonable suspicion that an object in the clothing of the stopped person is a weapon that could be used to harm the officer, then the officer may take whatever action is necessary to examine the object and protect himself — including removing

---

[75]        *Adams*, 407 U.S. at 146.

[76]        *Id.*

[77]        *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 26).

[78]        *Id.* at 375 (emphasis added).

[79]        *Ybarra*, 444 U.S. at 93–94.

25

the object from the clothing of the stopped person.[80]

### 5. *De Bour* and the Fourth Amendment

The NYPD's training materials place great importance on the New York state common law of stops, as articulated in *People v. De Bour* and its progeny.[81]  Because *De Bour* and the Fourth Amendment draw the line between permissible and impermissible police encounters in different ways, *De Bour* is in some respects more protective of liberty from governmental intrusion than the Fourth Amendment, and in other respects less.[82]  The Supreme Court has held that although states may impose greater restrictions on police conduct than those established by the Fourth Amendment, a state "may not . . . authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct."[83]  Thus, even where a police encounter would be permissible under *De Bour*, it remains unlawful if it violates the Fourth Amendment.

### C. Equal Protection Under the Fourteenth Amendment

---

[80]  *See People v. Collins*, 463 P.2d 403, 406 (Cal. 1970) (holding "that an officer who exceeds a pat-down without first discovering an object which feels reasonably like a knife, gun, or club must be able to point to specific and articulable facts which reasonably support a suspicion that the particular suspect is armed with an atypical weapon which would feel like the object felt during the pat-down").

[81]  *People v. De Bour*, 40 N.Y.2d 210 (1976).  *See, e.g.*, *Ligon*, 2013 WL 628534, at *35–39.  I note that the NYPD's policies and training materials also draw from New York's stop and frisk statute.  *Compare, e.g.*, Patrol Guide 212-11: Stop and Frisk, PX 98, at 1, *with* CPL § 140.50.  As noted earlier, the New York statutory standard for a frisk is not the Fourth Amendment standard as defined by the Supreme Court.

[82]  *See Davis v. City of New York*, No. 10 Civ. 0699, 2013 WL 1288176, at *6 n.75 (S.D.N.Y. Mar. 28, 2013).

[83]  *Sibron*, 392 U.S. at 61 (reversing conviction for failure to suppress evidence seized in an unlawful stop).

26

The Fourteenth Amendment's Equal Protection Clause declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."[84] The Clause "is essentially a direction that all persons similarly situated should be treated alike."[85] It prohibits intentional discrimination on the basis of race, but not government action that merely has a disproportionate racial impact.[86]

The Second Circuit has outlined "several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause."[87] *First*, "[a] plaintiff could point to a

---

[84]    U.S. Const. amend. XIV § 1.

[85]    *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

[86]    *See Washington v. Davis*, 426 U.S. 229, 239–40 (1976). I note that the parties sometimes use the phrase "pattern and practice" in referring to plaintiffs' constitutional claims. *See, e.g.*, 6/12/13 Post-Trial Memorandum of Law in Support of Plaintiffs' Claims ("Pl. Mem.") at i–ii; 6/12/13 Defendant's Post-Trial Memorandum of Law ("Def. Mem.") at 6 n.11. However, pattern or practice analysis does not govern equal protection claims. *See Chavez v. Illinois State Police*, 251 F.3d 612, 638 n.8 (7th Cir. 2001). Rather, the term "pattern or practice" appears in civil rights statutes such as Title VII of the Civil Rights Act of 1964, as well as several "statutes authorizing the Attorney General to bring suits to remedy discrimination." Marshall Miller, *Police Brutality*, 17 Yale L. & Pol'y Rev. 149–151, 169 & n.124 (1998) (discussing Title XXI of the Violent Crime Control and Law Enforcement Act of 1994, codified at 42 U.S.C. § 14141, which allows the Attorney General to sue law enforcement agencies that "engage in a pattern or practice" of unconstitutional conduct).

I also note that despite the occasional use of the terms "disparate treatment" and "disparate impact" by the parties' experts, *see infra* Part IV.B.3, these terms of art are generally applied to Title VII and other statutory claims, not equal protection claims. *See, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) ("Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."). The New York City Council recently passed a bill that would create a private right of action for claims of "bias-based profiling" based on discriminatory intent *or* disparate impact. *See* N.Y. City Council Introductory No. 1080 of 2013 § 2.

[87]    *Brown*, 221 F.3d at 337. *Accord Pyke v. Cuomo* ("*Pyke II*"), 567 F.3d 74, 76 (2d Cir. 2009) (citing *Pyke v. Cuomo* ("*Pyke I*"), 258 F.3d 107, 110 (2d Cir. 2001)).

law or policy that 'expressly classifies persons on the basis of race.'"[88]  *Second*, "a plaintiff

could identify a facially neutral law or policy that has been applied in an intentionally

discriminatory manner."[89]  *Third*, "[a] plaintiff could also allege that a facially neutral statute or

policy has an adverse effect and that it was motivated by discriminatory animus."[90]  In none of

these three cases is a plaintiff "obligated to show a better treated, similarly situated group of

individuals of a different race in order to establish a claim of denial of equal protection."[91]

    In order to show intentional discrimination under the second and third models of

pleading above, plaintiffs need not prove that the "'challenged action rested solely on racially

discriminatory purposes,'"[92] or even that a discriminatory purpose "was the 'dominant' or

---

[88]    *Brown*, 221 F.3d at 337 (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)).  An express racial classification is "subject to strict judicial scrutiny."  *Pyke II*, 567 F.3d at 77 (citing *Loving v. Virginia*, 388 U.S. 1, 11 (1967); *Johnson v. California*, 543 U.S. 499, 505 (2005) (holding that "*all* racial classification" imposed by government "must be analyzed by a reviewing court under strict scrutiny")).  *Accord Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013) ("[A]*ny* official action that treats a person differently on account of his race or ethnic origin is inherently suspect." (quotation marks and citation omitted, and emphasis added)).  "In order to satisfy strict scrutiny, a classification must further a compelling state interest and be narrowly tailored to accomplish the purpose."  *Pyke II*, 567 F.3d at 77 (citing *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)).

[89]    *Brown*, 221 F.3d at 337 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)).

[90]    *Id.* (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977); *Johnson v. Wing*, 178 F.3d 611, 615 (2d Cir. 1999)).

[91]    *Pyke I*, 258 F.3d at 110.  An exception exists for plaintiffs alleging a selective prosecution in violation of the Equal Protection Clause.  In order to prevail on this claim, plaintiffs "must plead and establish the existence of similarly situated individuals who were not prosecuted; that is because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute."  *Pyke I*, 258 F.3d at 109 (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).

[92]    *Paterson*, 594 F.3d at 163 (quoting *Arlington Heights*, 429 U.S. at 265).

'primary' one."[93]  Rather, plaintiffs must prove that "a discriminatory purpose has been *a*

motivating factor" in the challenged action.[94]  That is, plaintiffs must show that those who

carried out the challenged action "selected or reaffirmed a particular course of action at least in

part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[95]  As

the Supreme Court and the Second Circuit have explained:

> Because discriminatory intent is rarely susceptible to direct proof, litigants
> may make "a sensitive inquiry into such circumstantial and direct evidence
> of intent as may be available.  The impact of the official action — whether
> it bears more heavily on one race than another — may provide an important
> starting point."[96]

The consequences of government action are sometimes evidence of the government's intent:

"proof of discriminatory intent must necessarily usually rely on objective factors . . . . The

inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the

results its actions achieve, or the results they avoid."[97]  "'Once it is shown that a decision was

motivated at least in part by a racially discriminatory purpose, the burden shifts to the defendant

to show that the same result would have been reached even without consideration of race.'"[98]

---

[93]     *Arlington Heights*, 429 U.S. at 265.

[94]     *Id.* at 265–66 (emphasis added).  *Accord Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 277 (1979) ("Discriminatory intent is simply not amenable to calibration.  It either is a factor that has influenced the [governmental action] or it is not.").

[95]     *Paterson*, 594 F.3d at 163 (quoting *Feeney*, 442 U.S. at 279 (citation and footnote omitted)) (some quotation marks omitted).

[96]     *Id.* (quoting *Arlington Heights*, 429 U.S. at 266).

[97]     *Feeney*, 442 U.S. at 279 n.24.  "An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another."  *Washington*, 426 U.S. at 242.

[98]     *United States v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996) (quoting *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2d Cir. 1987)).

29

"'If the defendant comes forward with no such proof or if the trier of fact is unpersuaded that race did not contribute to the outcome of the decision, the equal protection claim is established.'"[99]

## IV.    FINDINGS OF FACT

A non-jury trial on liability and remedies was held between March 18 and May 20, 2013.[100]  Based on the preponderance of the credible evidence,[101] as well as the parties' post-trial submissions, the following are my findings of fact pursuant to Federal Rule of Civil Procedure 52(a).[102]

### A.    Overview of Uncontested Statistics

Officers are required to complete a UF-250 form, also known as a "Stop,

---

[99]    *Id.* (quoting *Yonkers*, 837 F.2d at 1217).

[100]    Plaintiffs filed the case on January 31, 2008.  On August 31, 2011, I granted in part and denied in part defendants' motion for partial summary judgment.  *See Floyd v. City of New York*, 813 F. Supp. 2d 417 (S.D.N.Y. 2011), *partial reconsideration granted*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011).  On April 14, 2012, I granted in part and denied in part defendants' motion to exclude the testimony of plaintiffs' liability expert.  *See Floyd v. City of New York*, 861 F. Supp. 2d 274 (S.D.N.Y. 2012).  On May 16, 2012, I granted plaintiffs' motion to be certified as a class.  *See Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012).  In an order entered March 8, 2013, I approved the parties' stipulation withdrawing plaintiffs' damages claims, dismissing plaintiffs' claims against individual officers, and altering the caption to reflect the remaining parties.  *See* Stipulation and Order of Withdrawal of Individual Damage Claims (3/8/13).  Plaintiffs have not pursued the state law claims in their Second Amended Complaint. *See* Second Amended Complaint (10/20/08); Pl. Mem. at i–ii; Def. Mem. at 2 n.2.  Plaintiffs' only claims are section 1983 claims against the City for Fourth and Fourteenth Amendment violations.

[101]    "To establish by a preponderance of the evidence means very simply to prove that something is more likely than not so."  *Duke Labs., Inc. v. United States*, 222 F. Supp. 400, 406 (D. Conn. 1963), *aff'd*, 337 F.2d 280 (2d Cir. 1964).

[102]    "In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).

Question and Frisk Report Worksheet," after each *Terry* stop.  Each side of the form contains

checkboxes and fields in which officers are required to indicate the nature of the stop and the

circumstances that led to and justified the stop (the "stop factors").  A copy of a blank UF-250

appears as Appendix A to this Opinion.[103]

        Plaintiffs' liability expert, Dr. Jeffrey Fagan, conducted various statistical

analyses of UF-250s based on an electronic database containing the information on the forms.[104]

The more complicated and contested statistical analyses will be discussed below.[105]  In this

section, I summarize the most relevant uncontested statistics culled from the UF-250 database:[106]

•       Between January 2004 and June 2012,[107] the NYPD conducted over 4.4 million *Terry*

---

[103]     *See infra* App. A ("Blank UF-250").

[104]     *See* Report of Jeffrey Fagan, Ph.D. (Oct. 15, 2010), PX 411 ("Fagan Rpt.");
Supplemental Report of Jeffrey Fagan, Ph.D. (Dec. 3, 2010), PX 412 ("Fagan Supp. Rpt.");
Second Supplemental Report of Jeffrey Fagan, Ph.D. (Nov. 29, 2012), PX 417 ("Fagan 2d Supp.
Rpt.").

[105]     *See infra* Part IV.B.  The City's liability experts concede that Dr. Fagan's
"descriptive statistics are not a source of contention."  Report of Dennis C. Smith, Ph.D. and
Robert M. Purtell, Ph.D. in Response to the Second Supplemental Report of Jeffrey Fagan, Ph.D.
(Feb. 1, 2013), Defendant's Trial Exhibit ("DX") H13, at 7 ("Smith Rpt.").  I rely on the Smith
Report for most of my citations to Dr. Smith's and Dr. Purtell's written opinions, although they
had prepared prior written opinions.  *See, e.g.*, Report of Dennis C. Smith, Ph.D. (Nov. 15,
2010), DX T8; Declaration of Dennis C. Smith (Dec. 19, 2011), DX O8.

[106]     Of course, if an officer decides that he has not made a *Terry* stop, or simply fails
to complete a UF-250 after a stop, then the encounter will not be reflected in the UF-250
database.  *See infra* Part IV.C.4–5 (evidence of inadequate training regarding what constitutes a
*Terry* stop, and of failures to fill out UF-250s).

[107]     These dates are the class period in this case.  Dr. Fagan's October 2010 and
December 2010 reports analyzed data from January 1, 2004 through December 31, 2009, while
his November 2012 report analyzed data from January 1, 2010 through June 30, 2012.  *See*
Fagan 2d Supp. Rpt. at 1.

stops.[108]

- The number of stops per year rose sharply from 314,000 in 2004 to a high of 686,000 in 2011.[109]

- 52% of all stops were followed by a protective frisk for weapons. A weapon was found after 1.5% of these frisks. In other words, in 98.5% of the 2.3 million frisks, no weapon was found.[110]

- 8% of all stops led to a search into the stopped person's clothing, ostensibly based on the officer feeling an object during the frisk that he suspected to be a weapon, or immediately perceived to be contraband other than a weapon. In 9% of these searches, the felt object was in fact a weapon. 91% of the time, it was not. In 14% of these searches, the felt object was in fact contraband. 86% of the time it was not.[111]

- 6% of all stops resulted in an arrest, and 6% resulted in a summons. The remaining 88% of the 4.4 million stops resulted in no further law enforcement action.[112]

---

[108] The City counts a total of 4,431,414 UF-250s, while plaintiffs count a total of 4,430,140. *See* DX V14-A; PX 417D; Fagan 2d Supp. Rpt. at 10 tbl. 1. While I use the 4.4 million figure throughout this Opinion, the actual number of stops during the class period is likely higher, because officers do not always prepare a UF-250 after a stop. *See, e.g., infra* Part IV.D.1.a (no UF-250 for Leroy Downs stop); *infra* Part IV.D.1.h (no UF-250 for Clive Lino stop); *Ligon*, 2013 WL 628534, at *11 (noting that the officer who stopped named plaintiff Charles Bradley failed to fill out a UF-250); *id.* at *20 & n.241 (noting that the CCRB has reported on a systematic problem with officers failing to complete UF-250s after stops). It is impossible to determine how often officers fail to fill out UF-250s for *Terry* stops, because the NYPD has no reliable mechanism for monitoring this failure. *See infra* Part IV.C.4.

[109] *See* DX V14-A.

[110] *See id.* (2,284,246 total frisks); DX V14-C (33,882 weapons found). This assumes that weapons were only found in stops that involved frisks. If weapons were found in stops that did not involve frisks, the percentage of frisks leading to the discovery of weapons would be even lower.

[111] *See* DX V14-B; DX V14-C; DX V14-D; Fagan Rpt. at 63 (defining contraband).

[112] These statistics are sometimes referred to as "hit rates." *See* Fagan Rpt. at 64 tbls. 14 & 15 (5.37% of stops resulted in arrest and 6.26% of stops resulted in a summons between 2004 and 2009); Fagan 2d Supp. Rpt. at 34 tbl. 14 (6.26% of stops resulted in arrest and 6.25% of stops resulted in a summons between 2010 and June 2012).

- In 52% of the 4.4 million stops, the person stopped was black.[113]

- In 31% of the stops, the person stopped was Hispanic.[114]

- In 10% of the stops, the person stopped was white.[115]

- In 2010, New York City's resident population was roughly 23% black, 29% Hispanic, and 33% white.[116]

- In 23% of the stops of blacks, and 24% of the stops of Hispanics, the officer recorded using force. The number for whites was 17%.[117]

- Weapons were seized in 1.0% of the stops of blacks, 1.1% of the stops of Hispanics, and 1.4% of the stops of whites.[118]

---

[113]    *See* Fagan Rpt. at 22 tbl. 3 (1,445,472 stops of blacks between 2004 and 2009); Fagan 2d Supp. Rpt. at 11 tbl. 3 (843,684 stops of blacks between January 2010 and June 2012). In Dr. Fagan's studies, the category "black" encompasses two checkboxes in the "Race" section on the UF-250, "Black" and "Black Hispanic." *See* Fagan Rpt. at 20; Blank UF-250. The term black is used throughout this opinion rather than African-American as that term is used on the UF-250 form.

[114]    *See* Fagan Rpt. at 22 tbl. 3 (841,755 stops of Hispanics between 2004 and 2009); Fagan 2d Supp. Rpt. at 11 tbl. 3 (520,171 stops of Hispanics between January 2010 and June 2012). As in Dr. Fagan's studies, when the term "Hispanic" appears in this Opinion, it refers only to the "White Hispanic" checkbox on the UF-250. *See* Fagan Rpt. at 20; Blank UF-250. "Hispanic" is an imperfect and contested term, like most racial and ethnic classifications. The term "Hispanic" is used rather than "Latino" because "Hispanic" appears on the UF-250. *See* Blank UF-250. It is unfortunately necessary to reduce New York's rich demographic diversity to a few simple racial categories for the purposes of this case.

[115]    *See* Fagan Rpt. at 22 tbl. 3 (286,753 stops of whites between 2004 and 2009); Fagan 2d Supp. Rpt. at 11 tbl. 3 (148,283 stops of whites between January 2010 and June 2012). 90% of all stops were of men, and 69% were of people between the ages of 16 and 34. *See* Fagan Rpt. at 22 tbl. 3; Fagan 2d Supp. Rpt. at 11 tbl. 3.

[116]    *See* Raymond W. Kelly, Police Commissioner, NYPD, Crime and Enforcement Activity in New York City (Jan[.] 1–Dec[.] 31, 2012) app. B (citing 2010 census).

[117]    *See* Fagan Rpt. at 64 tbl. 14; Fagan 2d Supp. Rpt. at 34 tbl. 14.

[118]    *See* Fagan Rpt. at 64 tbl. 15; Fagan 2d Supp. Rpt. at 35 tbl. 15. Because guns were seized in only 0.1% of stops, it is difficult to draw meaningful inferences from the statistics regarding gun seizures. *See* Fagan Rpt. at 63–64 & tbls. 14–15; Fagan 2d Supp. Rpt. at 35 & tbl.

- Contraband other than weapons was seized in 1.8% of the stops of blacks, 1.7% of the stops of Hispanics, and 2.3% of the stops of whites.[119]

- For the years 2004 to 2009,[120] the two most commonly checked boxes indicating the reasons for a stop were "Furtive Movements" and "Area Has Incidence Of Reported Offense Of Type Under Investigation" ("High Crime Area"). Setting aside stops based on radio runs, officers marked "Furtive Movements" as a basis for the stop on 42% of the forms, and "High Crime Area" on 55% of the forms. In 2009, officers indicated "Furtive Movements" as a basis for the stop nearly 60% of the time.[121]

- Both "Furtive Movements" and "High Crime Area" are weak indicators of criminal activity. For the years 2004 to 2009, stops were 22% more likely to result in arrest if "High Crime Area" was *not* checked, and 18% more likely to result in arrest if "Furtive Movements" was not checked.[122]

- Between 2004 and 2009, as the number of stops per year soared from 314,000 to 576,000, the percentage of UF-250s on which the officer failed to state a specific suspected crime rose from 1% to 36%.[123]

---

15.

[119]     *See* Fagan Rpt. at 64 tbl. 15; Fagan 2d Supp. Rpt. at 35 tbl. 15.

[120]     Dr. Fagan did not update the following statistics for the years 2010 through 2012.

[121]     *See* Fagan Rpt. at 51–52 & tbl. 11; Fagan Supp. Rpt. at 41. In a stop based on a radio run, as opposed to a self-initiated stop, the suspicion leading to the stop involves information received by the officer over the radio. *See* Fagan Rpt. at 50. 78% of stops during the class period were self-initiated. *See* PX 417D.
        I also note that the number of stop factors indicated on UF-250s increased from 2004 to 2009. In 2004, the average was 1.01 factors on the front of the form ("What Were Circumstances Which Led To Stop?") and 1.53 factors on the back ("Additional Circumstances/Factors"). By 2009, the average was 1.47 factors on the front of the form and 1.93 factors on the back. "Furtive Movements" appears on the front, and "High Crime Area" on the back. *See* Fagan Supp. Rpt. at 40 tbl. S6; Blank UF-250.

[122]     *See* Fagan Rpt. at 52.

[123]     *See* Fagan Supp. Rpt. at 39; DX V14-A. On the forms without a specific suspected crime, the "Specify Which Felony/P.L. Misdemeanor Suspected" field was either left empty, contained a text string that does not describe a penal law category or a violation, or contained the following generic text strings: "FEL," "FELONY," "MISD," or "MISDEMEANOR." *See* Fagan Supp. Rpt. at 39 n.89.

34

Finally, I note that the City's attempt to account for the low rate of arrests and summonses following stops was not persuasive. The City states that "[v]arious witnesses testified, including former Chief of Department Joseph Esposito, that many stops interrupt a crime from occurring, for example an individual casing a location or stalking an individual late at night."[124] No evidence was offered at trial, however, of a single stop that was: (1) based on reasonable suspicion, and (2) prevented the commission of a crime, but (3) did not result in probable cause for an arrest. While I have no doubt that such a stop has taken place at some time, it is highly implausible that successful "preventive" stops take place frequently enough to affect the conclusion that in at least 88% of the NYPD's 4.4 million stops between January 2004 and June 2012, the suspicion giving rise to the stop turned out to be misplaced.

Indeed, for several reasons, the 12% "hit rate" likely overstates the percentage of stops in which an officer's suspicions turn out to be well-founded. *First*, officers are trained to prepare UF-250s only for stops based on suspicion of a misdemeanor or felony. The UF-250 itself states: "Specify Which Felony/P.L. Misdemeanor Suspected."[125] By contrast, a summons may be issued for offenses less serious than a misdemeanor, such as violations.[126] Although the parties did not offer evidence on the types of summonses recorded in the UF-250 database, it is

---

[124]    6/12/13 Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. Findings") ¶ 88.

[125]    Blank UF-250. *See also* Patrol Guide 212-11: Stop and Frisk (7/18/13) ("Patrol Guide: Stop and Frisk"), PX 98, at 1.

[126]    In fact, by far the most commonly charged summons offenses in the City are public consumption of alcohol, a violation under New York City Administrative Code § 10-125(b), and disorderly conduct, a violation under N.Y. Penal Law ("PL") § 240.20. *See, e.g.*, Hon. Fern A. Fisher, Deputy Chief Administrative Judge, Criminal Court of the City of New York: Annual Report 2010, at 35 (recording 140,425 summonses for public consumption and 81,036 summonses for disorderly conduct in 2010).

35

likely that many of these summonses were for violations rather than misdemeanors or felonies.[127]

In these cases, the issuance of the summons provides no evidence that the suspicion giving rise

to the stop was well-founded, because if the officer was following NYPD procedures, the stop

cannot have been initiated based on suspicion of the summonsed offense.  Similarly, when a

stopped person provides identification and is then arrested for an unrelated open warrant, the

arrest does not prove that the suspicion leading to the stop was well-founded.[128]

     *Second*, the fact that many post-stop summonses are dismissed further

undermines the reliability of the 6% post-stop summons rate as a true "hit rate," that is, a

measure of validated suspicions.[129]  The same argument applies to post-stop arrests that were not

charged.[130]

     *Third*, both summonses and arrests may be unrelated to the suspected crime for

which a person was stopped.  For example, it has been reported that the most common arrest

after a stop is for marijuana possession.[131]  The NYPD has recognized concerns that some

---

[127]    *See, e.g.*, *infra* Part IV.D.1.g (David Ourlicht's post-stop summons for disorderly conduct based on conduct beginning after the stop).

[128]    *See, e.g.*, *infra* Part IV.D.2.e (stop in which officers approached Deon Dennis for drinking in public, then arrested him based on an active warrant).

[129]    *See, e.g.*, *infra* Part IV.D.1.g (Ourlicht's post-stop summons was dismissed); FISHER, CRIMINAL COURT OF THE CITY OF NEW YORK: ANNUAL REPORT 2010, at 16 (stating that 42% of all summonses in 2010 resulted in either dismissal or adjournment in contemplation of dismissal).

[130]    *See, e.g.*, *Ligon*, 2013 WL 628534, at *6–8 (discussing the Bronx ADA's decision to decline prosecution of some trespass arrests based on stops outside Clean Halls buildings).

[131]    *See* NEW YORK CIVIL LIBERTIES UNION, NYPD STOP-AND-FRISK ACTIVITY IN 2012, at 17 (2013) (noting that 16% of total arrests following stops are for marijuana possession, making marijuana the most common arrest offense arising out of stops).  However, marijuana possession can only lead to arrest when the marijuana is "in a public place . . . burning or open to

36

marijuana arrests are based, improperly, on "occasions when the officers recover marihuana pursuant to a search of the subject's person or upon direction of the subject to surrender the contents of his/her pockets."[132]  If it is true that officers sometimes carry out arrests for marijuana possession following stops that were based on suspicion of another crime, then these arrests do not provide evidence that the officers' initial suspicions were well-founded.[133]

## B.    Expert Testimony

Both parties offered expert testimony about whether the NYPD's stop and frisk practices violate the Constitution.  After describing the qualifications of the competing experts and discussing their differing views on the central issues in dispute here, I first determine which expert I find more reliable and the basis for that decision.  I then make certain findings based on the credible expert testimony with respect to both the Fourth and Fourteenth Amendment claims.

### 1.    The Liability Experts

Dr. Fagan is a Professor of Law at Columbia Law School and Professor of Epidemiology at the Mailman School of Public Health at Columbia University.  He has been studying the policies at issue in this case for over a decade.[134]  Dr. Fagan's honors, academic and professional appointments, and publications, make him an expert in criminology, with special

---

public view."  PL § 221.10(1).

[132]    NYPD, Operations Order 49 (9/19/11), ¶ 2.

[133]    The NYPD's marijuana possession arrest practices recently became the subject of a separate lawsuit filed by the Bronx Defenders.  *See Felix v. City of New York*, No. 13 Civ. 2941 (JMF).

[134]    *See Floyd v. City of New York*, 861 F. Supp. 2d 274, 279 (S.D.N.Y. 2012) (summarizing Dr. Fagan's qualifications, including his role in the production of the 1999 report from the New York State Office of the Attorney General on the NYPD's stop and frisk practices).

expertise in the statistical study of racial disparities in police enforcement activities.[135]

The City's liability experts are Dr. Dennis Smith, an Associate Professor of Public Administration at the Robert F. Wagner Graduate School of Public Service at New York University; and Dr. Robert Purtell, an Assistant Professor of Finance at the University of Albany's Nelson A. Rockefeller College of Public Affairs and Policy.[136] Dr. Smith has a Ph.D. in political science and is an expert at evaluating the effectiveness of police organizations. However, Dr. Smith is not a statistician. For this reason, Dr. Smith collaborated with Dr. Purtell, a statistical expert.[137] Dr. Purtell has a BS in Mathematics, an MBA with an emphasis on finance and economics, and a Ph.D. in Public Administration; began his career as a research mathematician writing code used to run regression analyses; spent over thirty years working in finance and management; and now teaches finance.[138] Dr. Purtell is not an expert in the study of policing, criminology, or racial discrimination.[139]

I find Dr. Fagan a more reliable expert than Drs. Smith and Purtell. While Dr. Smith's research makes him specially qualified to opine on the *effectiveness* of the NYPD's practices in controlling crime, the effectiveness of stop and frisk is not at issue in this case, as I have repeatedly explained. Unlike Dr. Fagan, Dr. Smith had never worked on a statistical study

---

[135] *See* Curriculum Vitae of Jeffrey Fagan (Oct. 2012), PX 417A.

[136] *See* Smith Rpt. at 3, 5.

[137] *See Floyd v. City of New York*, No. 08 Civ. 1034, 2012 WL 3561594, at *1 (S.D.N.Y. Aug. 17, 2012) (summarizing Dr. Smith's and Dr. Purtell's qualifications).

[138] *See* Smith Rpt. at 5–6; 5/2 Tr. at 5724, 5728–5729, 5839.

[139] Indeed, Dr. Purtell testified that he had never read a study of racial disparities in police stops other than Dr. Fagan's study in this case. *See* 5/2 Tr. at 5861.

38

of racial disparities in any context until he became the City's expert.

In addition, while both parties' experts made errors in the course of their analyses that were later corrected,[140] one error by Dr. Purtell called into question the general reliability of his interpretations of Dr. Fagan's statistical analyses. Dr. Purtell conflated Tables 5 and 7 in Fagan's Reports, which are at the center of Dr. Fagan's conclusions regarding racial disparities in the NYPD's stop practices. Table 5 deals with the effect of the racial composition of a geographic area on the number of stops that take place there — without reference to the race of the individuals being stopped. Table 7 deals with the races of individuals who are stopped.[141] Yet, in his testimony, Dr. Purtell described how the numbers in Dr. Fagan's Table 5 "are comparing the probability of a black person being stopped to the chances of a white person being stopped,"[142] and persisted in defending that analysis even after plaintiffs' counsel explicitly pointed out the error.[143]

---

[140]     To take two examples: *First*, in his October 2010 report, Dr. Fagan made a coding error, later corrected, that resulted in the mis-classification of a large number of "apparently unjustified" stops as "indeterminate." *See* 4/4 Tr. at 2295–2296; 4/5 Tr. at 2445–2448. *Second*, table 10 in the Smith Report contains a partly mislabeled column of data that was later corrected. *See* 5/13 Tr. at 6839; Smith Rpt. at 70 tbl. 10; PX 574 (corrected and expanded table 10).

[141]     *See* Fagan Rpt. at 33 tbl. 5, 42 tbl. 7; Fagan 2d Supp. Rpt. at 18 tbl. 5, 20 tbl. 7.

[142]     5/2 Tr. at 5764. Based on this assumption, Dr. Purtell claimed that Dr. Fagan's Table 5 showed that "the chance of a black person over a white person being stopped is . . . [0.22%] above random chance." *Id.*

[143]     In response to Dr. Purtell's testimony, plaintiffs' counsel objected that "nowhere in table 5 is there anything about the likelihood of a black or a white person being stopped." *Id.* at 5765. Dr. Purtell defended his analysis of the numbers in Table 5, stating: "This is a standard interpretation of these numbers." *Id.* at 5767. The following day, the City and Dr. Purtell conceded plaintiffs' objection. Dr. Purtell stated that his exhibit had been mistitled, and explained that he "wrote that the night before," while he had another of Dr. Fagan's tables on his mind. 5/3 Tr. at 5903.

Finally, while the "battle of the experts" between Dr. Purtell and Dr. Fagan showed that Dr. Purtell has a sophisticated understanding of the purely mathematical aspects of statistics, Dr. Fagan has a deeper understanding of the practical, real-world meaning and implications of the statistical analyses in this case. Given a choice between relying on highly sophisticated mathematical analysis but limited practical understanding, or deep practical understanding informed by established statistical expertise, I favor the latter.

### 2. The Fourth Amendment Claim

### a. Overview of Key Issues

Dr. Fagan performed an analysis of the NYPD's UF-250 database in order to evaluate how often the NYPD's stops lack reasonable suspicion. Before delving into Dr. Fagan's Fourth Amendment analysis and my findings, I highlight several general points.

*First*, it is *impossible* to assess individually whether each of the 4.4 million stops at issue in this case was based on an officer's reasonable articulable suspicion that criminal activity was afoot. It took weeks of testimony to try nineteen stops. It would take multiple lifetimes of many judges to try each of the 4.4 million stops.[144] The best available information for assessing those stops comes from the UF-250s prepared by officers shortly after the stops.

*Second*, while the UF-250 database is the best available source of information, it is highly flawed for the following reasons: (1) Officers do not always prepare a UF-250, either because the officer does not believe she made a *Terry* stop or because the officer failed to prepare the form. (2) A UF-250 is one-sided, in that the UF-250 only records the officer's version of the story. (3) Even NYPD commanders and supervisors have acknowledged that UF-

---

[144] Even if there were no time constraints, after-the-fact testimony from interested parties is an imperfect source of information, as the individual stop testimony in this case shows.

250s do not provide enough information to determine whether reasonable suspicion existed for a stop.[145]  (4) Many of the checkboxes on the UF-250 that officers use to indicate the basis for a stop are problematic.  "Furtive Movements" is vague and subjective.  In fact, an officer's impression of whether a movement was "furtive" may be affected by unconscious racial biases.  "Fits Description" is a troubling basis for a stop if the description is so general that it fits a large portion of the population in the area, such as black males between the ages of 18 and 24.  "High Crime Area" is also of questionable value when it encompasses a large area or an entire borough, such as Queens or Staten Island.

>        *Third*, Dr. Fagan was extremely conservative in characterizing stops as lacking reasonable suspicion.  He categorized each stop as "apparently justified," "apparently unjustified," or "ungeneralizable."  The City argued that because Dr. Fagan characterized only 6% of the stops as "apparently unjustified," that is, lacking reasonable suspicion, the plaintiffs have failed to demonstrate that the City has a policy or custom of carrying out stops without reasonable suspicion.  However, in light of Dr. Fagan's very generous assumptions in categorizing the stops, his analysis can best be understood as providing a very rough *minimum* number of unjustified stops.  The actual number of unjustified stops was likely far higher.  Moreover, even if I were to accept that Dr. Fagan's 6% figure accurately reflects the number of stops lacking reasonable suspicion — which I do not for the reasons stated here and below — that relatively small *percentage* still represents 200,000 individuals who were stopped without reasonable suspicion.  Even this number of wrongful stops produces a significant human toll.

>        **b.        Dr. Fagan's Method of Classifying Stops**

---

[145]        *See, e.g.*, 4/10 Tr. at 3207 (McHugh); Pl. Findings ¶ 118.  *Accord* Def. Mem. at 7.

Dr. Fagan estimated the number of stops apparently lacking reasonable suspicion by analyzing the UF-250 database. He began with the assumption that all the forms had been filled out accurately and completely, then distinguished the stop factors on Side 1 of the UF-250 from the stop factors on Side 2.[146] Dr. Fagan identified the following Side 1 boxes as providing a sufficient basis for a *Terry* stop, standing alone: (1) "Actions Indicative Of 'Casing' Victims Or Location" ("Casing"), (2) "Actions Indicative Of Engaging In Drug Transaction" ("Drug Transaction"), and (3) "Actions Indicative Of Engaging In Violent Crimes" ("Violent Crime"). Dr. Fagan defined the remaining Side 1 stop factors — except the "Other" box — as "conditionally justified," that is, contributing to reasonable suspicion, but not generally providing an independently sufficient basis for a *Terry* stop: (4) "Carrying Objects In Plain View Used In Commission Of Crime e.g., Slim Jim/Pry Bar, etc.," (5) "Suspicious Bulge/Object (Describe)," (6) "Actions Indicative Of Acting As A Lookout," (7) "Fits Description," (8) "Furtive Movements," and (9) "Wearing Clothes/Disguises Commonly Used In Commission Of Crime."[147]

Based on these classifications, Dr. Fagan categorized the stops recorded in the UF-250 database as (a) "apparently justified," that is, based on reasonable suspicion; (b) "apparently unjustified," that is, lacking reasonable suspicion; or (c) "ungeneralizable," meaning that the UF-250 contains insufficient information to make a determination without further

---

[146] *See* Fagan Rpt. at 48–50; 2/2/12 Declaration of Jeffrey Fagan, PX 415, ¶¶ 14–18; *Floyd*, 861 F. Supp. 2d at 283–84; Blank UF-250.

[147] *See* Fagan Rpt. at 48–50; Blank UF-250.

analysis.[148]  All stops in which officers checked the "Other" box are categorized as either

ungeneralizable or apparently justified.[149] A stop is "apparently unjustified" in Dr. Fagan's

analysis if: (a) no Side 1 stop circumstances are indicated, and only one Side 2 additional

circumstance is indicated — unless the Side 2 additional circumstance is "Other (Describe)," in

which case the stop is ungeneralizable; or (b) only one Side 1 stop circumstance is indicated, that

stop circumstance is only "conditionally justified," and no Side 2 additional circumstances are

indicated — unless the Side 1 stop circumstance is the "Other" box, in which case the stop is

ungeneralizable.[150]

### c.    Unreliable Stop Factors

Dr. Fagan thoroughly undermined the assumption that the two most frequently

checked stop factors provide a reliable basis for suspecting criminality:  Furtive Movements on

Side 1, and High Crime Area on Side 2.[151]  Part of Dr. Fagan's argument against the reliability of

these factors rested on the uncontested statistics cited above,[152] including that stops were more

likely to result in arrest when Furtive Movements and High Crime Area were *not* checked than

---

[148]    *See* Fagan 2d Supp. Rpt. at 24–25.  The revised version of the October 2010 report uses different language to describe these three categories, *see* Fagan Rpt. at 50, but I use the updated language in the Fagan 2d Supp. Rpt. for the sake of simplicity.

[149]    *See* Fagan Rpt. at 50; Fagan 2d Supp. Rpt. at 25.

[150]    *See id.* at 50–52, 56 tbl. 12.

[151]    The parties have generally referred to the latter factor as "High Crime Area" and I do the same, although everyone agrees that the abbreviation is not a perfect reflection of the full label, "Area Has High Incidence of Reported Offense Of Type Under Investigation."  The same applies to the shorthand for other stop factors, including "Time of Day" for "Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity," on Side 2 of the UF-250. *See* Blank UF-250.

[152]    *See supra* Part IV.A.

43

when they were.  Courts have also recognized that furtive movements, standing alone, are a vague and unreliable indicator of criminality.[153]  As Judge Richard Posner has stated in a related context:  "Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you.  Such subjective, promiscuous appeals to an ineffable intuition should not be credited."[154]  Recent psychological research has also provided evidence that officers may be more likely to perceive a movement as indicative of criminality if the officer has been primed to look for signs that "crime is afoot."[155]  As I stated in *Ligon*, "[g]iven the nature of their work on patrol, officers may have a systematic tendency to see and report furtive movements where none *objectively* exist."[156]

　　　　　Other recent psychological research has shown that unconscious racial bias continues to play an objectively measurable role in many people's decision processes.[157]  It

---

[153]　　The Supreme Court has "recognized that nervous, evasive behavior is a *pertinent* factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124 (emphasis added) (citing numerous cases).  But "furtive behavior absent additional indicia of suspicion generally does not suffice to establish reasonable suspicion." *United States v. Bellamy*, 592 F. Supp. 2d 308, 318–19 (E.D.N.Y. 2009) (collecting cases).  *Accord Ligon*, 2013 WL 628534, at *33.

[154]　　*United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005).

[155]　　*See Ligon*, 2013 WL 628534, at *33.

[156]　　*Id.* (footnote omitted).

[157]　　*See, e.g.*, Jerry Kang & Mahzarin R. Banaji, *Fair Measures: A Behavioral Realist Revision of "Affirmative Action"*, 94 CAL. L. REV. 1063 (2006) (illustrating relevance of implicit social cognition studies to issues of discrimination).  Kang and Banaji quote the following apt observation from a dissent by Justice Ruth Bader Ginsburg:  "Bias both conscious and unconscious, reflecting traditional and unexamined habits of thought, keeps up barriers that must come down if equal opportunity and nondiscrimination are ever genuinely to become the country's law and practice." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 274 (1995) (Ginsburg, J., dissenting).

would not be surprising if many police officers share the latent biases that pervade our society.[158]
If so, such biases could provide a further source of unreliability in officers' rapid, intuitive
impressions of whether an individual's movements are furtive and indicate criminality.
Unconscious bias could help explain the otherwise puzzling fact that NYPD officers check
"Furtive Movements" in 48% of the stops of blacks and 45% of the stops of Hispanics, but only
40% of the stops of whites.[159]  There is no evidence that black people's movements are
objectively more furtive than the movements of white people.

        The High Crime Area stop factor is likewise problematic.  Presence in an area
with high rates of crime is not a sufficient basis for a stop, although it may contribute to
reasonable suspicion.[160]  Plaintiffs offered evidence that the High Crime Area checkbox has been
interpreted so broadly by at least some officers that it would contribute very little to the
justification for a stop.[161]  In addition, Dr. Fagan has shown that the rate at which officers check

---

[158]    As I noted in a related context in *Ligon*, "this is an area in which further training
may be highly beneficial."  *Ligon*, 2013 WL 628534, at *33 n.374.  A study of police officers in
Savannah, Georgia found evidence that minority suspects were more likely than white suspects
to be viewed suspiciously by the officers for *nonbehavioral* reasons — even when the officers
knew they were being closely observed by social scientists while on patrol.  *See* Geoffrey P.
Alpert et al., *Police Suspicion and Discretionary Decision Making During Citizen Stops*, 43
CRIMINOLOGY 407, 417–19 (2005).

[159]    *See* Fagan 2d Supp. Rpt. at 23 app. tbl. D1.  These are the numbers for 2010
through June 2012.  In 2004 through 2009, the numbers were 46% for stops of black people,
42% for stops of Hispanics, and 37% for stops of white people.  *See* Fagan Rpt. app. D tbl. D1.

[160]    *See, e.g.*, *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47, 99
(1979); *Adams*, 407 U.S. at 144, 147–48).

[161]    *See, e.g.*, 4/1 Tr. at 1687 (Officer Fernando Guimaraes testifying that when he
worked in the 43rd Precinct, the entire precinct was a "high crime area"); 4/17 Tr. at 3717–3721
(Officer Edward French testifying that "two robberies with similar circumstances in Queens
could constitute a robbery pattern," and that this pattern could "encompass all of Queens," and
that when he was in the anticrime unit, there was a crime pattern that encompassed all of

High Crime Area in a precinct or census tract is roughly 55%, regardless of the amount of crime in the precinct or census tract as measured by crime complaints.[162]

Dr. Fagan also showed that over time, officers increasingly developed "scripts" for checking off stop factors.[163] Not only did the average number of stop factors checked on UF-250s increase, but this increase reflected a growing use of several of the more subjective stop factors, such as Furtive Movements, Evasive Response, High Crime Area, and "Actions Indicative Of Engaging In Violent Crimes."[164] There was also credible evidence of scripting in the UF-250s of officers who testified at trial. During a sample quarter in 2009, Officer Edgar

---

Queens).

[162] *See* Fagan Rpt. at 53–54 & fig. 13 (summarizing data for 2004 through 2009); Fagan 2d Supp. Rpt. at 32–34 & fig. 13 (summarizing data for 2010 through June 2012). The former analysis was based on precincts, and the latter on census tracts. The fact that the results of the analysis were unchanged despite a change in specifications and time period indicates the robustness of the results.

In otherwise low-crime areas, there may be small areas of concentrated criminality where the NYPD often deploys officers. The City appropriately notes that a particular building where a stop takes place might have a high incidence of the suspected crime for which the stop is made. *See* 4/5 Tr. at 2359–2361. But, as Dr. Fagan noted at trial, *see id.* at 2360–2361, it is simply not plausible that 55% of all stops take place in an "area" whose particular crime characteristics objectively justified checking the High Crime Area box, *regardless* of the crime rate of the census tract or the precinct where the stop takes place. The unvarying rate of checking High Crime Area across locations and times is more likely a product of reflexive box-checking that is unrelated to any defined crime condition.

[163] This reveals the fallacy of the critique by Drs. Smith and Purtell that Fagan's analysis failed to address the "steady improvement in NYPD use of '*Terry* stops.'" Smith Rpt. at 49. It may well be that officers simply learned how to fill out the UF-250s to better indicate reasonable suspicion — even when it did not exist.

[164] *See* Fagan Supp. Rpt. at 39–47. "Evasive, False Or Inconsistent Response To Officer's Questions" ("Evasive Response") is a Side 2 additional circumstance. *See* Blank UF-250. In theory, High Crime Area could be checked based on an analysis of crime data. In practice, however, it is often checked based on inconsistent, subjective impressions or scripts, as discussed above.

46

Gonzalez — who carried out a notably high number of stops — checked the same four boxes on *99%* of his UF-250s: Fits Description, Casing, High Crime Area, and Time of Day.[165] Officer Kha Dang — another aberrantly high stopper — checked an average of 4.2 boxes on the UF-250s he prepared during a sample quarter, and checked both High Crime Area and Time of Day on 75% of the forms, despite the stops being widely geographically and temporally dispersed.[166]

### d. Quantifying the Magnitude of Apparently Unjustified Stops Based on UF-250 Stop Factors

Dr. Fagan's extremely conservative definition of "apparently unjustified" almost guarantees that the roughly 200,000 stops he placed in that category underestimate the true number of stops lacking legal justification.[167] For example, a UF-250 on which the officer checked only Furtive Movements on Side 1, and only High Crime Area on Side 2, is not classified as "apparently unjustified" according to Dr. Fagan's definition. Similarly, a UF-250 on which the officer checked only Furtive Movements and Suspicious Bulge on Side 1, and no boxes on Side 2, is not classified as "apparently unjustified." While some stops in which an officer checked only these factors might be based on reasonable suspicion, there is little doubt that many others would not be. In addition, any UF-250 on which an officer checked only the

---

[165] *See* PX 557, 557-D.

[166] *See* DX L12, L14; 6/12/13 Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pl. Findings") ¶ 8.

[167] Without analyzing the "Other" text strings, 198,000 or 5.7% of the non-radio-run stops between 2004 and June 2012 were "apparently unjustified" according to Dr. Fagan's definition. *See* PX 417B (updating Fagan Rpt. at 56 tbl. 12 to show 6.45% of 2,233,027 non-radio-run stops between 2004 and 2009 to be "apparently unjustified"); Fagan 2d Supp. Rpt. at 26 tbl. 12 (categorizing 4.43% of 1,215,846 non-radio-run stops between 2010 and June 2012 as "apparently unjustified"). The summary numbers in PX 417D appear to include the results of the "Other" text string analysis. PX 417D states that 219,814 or 6.4% of the 3,448,873 non-radio-run stops between 2004 and June 2012 were "apparently unjustified."

"Other" box on Side 1, or only the "other" additional circumstances box on Side 2, is not classified by Dr. Fagan as "apparently unjustified."

The finding that Dr. Fagan's stop factor analysis likely significantly undercounts the number of unjustified stops is corroborated by evidence in this case, as well as in *Ligon*, showing that officers sometimes fail to fill out UF-250s for stops that lack reasonable suspicion, or fail to fill out UF-250s because they misunderstand when an encounter evolves into a *Terry* stop, or fill out UF-250s inaccurately and in a way that increases the apparent justification for a stop.[168] In addition, several of the uncontested statistics suggest that far more than 6% of stops are "apparently unjustified," including: the number of UF-250s that do not identify a suspected crime (36% of all forms in 2009), the fact that the two most commonly checked stop factors (Furtive Movements and High Crime Area) are negatively correlated with a summons or arrest, and the fact that only 12% of *all* stops result in an arrest or summons.[169]

The problems with Dr. Fagan's Fourth Amendment analysis of the UF-250s result not from analytical failures but from the inadequacy of the NYPD's systems for identifying unjustified stops when they occur. As a result, the magnitude of Fourth Amendment violations that have taken place in this case — beyond the rough minimum indicated by Dr. Fagan's statistics — will almost certainly never be known.

### 3. The Fourteenth Amendment Claim

---

[168] *See, e.g.*, *infra* Part IV.D.1.a (Downs); *infra* Part IV.D.1.h (Lino); *Ligon*, 2013 WL 628534, at *11; *id.* at *20 & n.241. It remains likely that there are "'many unlawful searches . . . of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.'" *Washington v. Lambert*, 98 F.3d 1181, 1193 n.1 (9th Cir. 1996) (quoting *Brinegar v. United States*, 338 U.S. 160, 181 (1949) (Jackson, J., dissenting)).

[169] In fact, as discussed *supra* in Part IV.A, the true "hit rate" is likely below 12%.

48

### a. Overview of Key Issues

The crux of plaintiffs' Fourteenth Amendment claim is that blacks and Hispanics are stopped more frequently than they would be if police officers did not discriminate based on race when deciding whom to stop. Assessing this claim required comparing statistics about rates of stops of blacks and Hispanics to "[a] standard, or point of reference, against which [those statistics] can be compared, assessed, measured or judged" — what is known in statistics as a "benchmark."[170] In this case, the benchmark was meant to capture "what the racial distribution of the stopped pedestrians would have been if officers' stop decisions had been racially unbiased."[171]

Conclusions regarding racial bias drawn from statistics "may vary drastically based on which benchmark is used."[172] As such, a central dispute between the experts regarding the Fourteenth Amendment claim was the appropriate benchmark for measuring racial bias in stops.

### b. Competing Benchmarks

Each expert submitted voluminous reports and testified at trial in support of his choice of benchmark. Of necessity, I must simplify their very detailed and complex submissions

---

[170] Organization for Economic Cooperation and Development Statistical Glossary, available at http://stats.oecd.org/glossary/detail.asp?ID=7228. *Accord* BLACK'S LAW DICTIONARY (defining benchmark as "a standard unit used as a basis for comparison").

[171] GREG RIDGEWAY, RAND, ANALYSIS OF RACIAL DISPARITIES IN THE NEW YORK POLICE DEPARTMENT'S STOP, QUESTION, AND FRISK PRACTICES xi (2007) ("RAND REPORT"), DX K6. *See also* Smith Rpt. at 11 ("Benchmarks help social scientists demonstrate statistically if there is an unjustifiable cause-and-effect relationship between membership in a group . . . and a particular practice . . . .").

[172] RAND REPORT at 19.

49

and testimony to focus on the question at the heart of the parties' dispute: is there statistical

evidence of racial discrimination in the NYPD's stop practices?  With that caveat, I endeavor to

summarize their differing benchmarks.

> Dr. Fagan explained his choice of benchmark as follows:
>
> [A] valid benchmark requires estimates of the supply of individuals of each
> racial or ethnic group who are engaged in the targeted behaviors and who are
> available to the police as potential targets for the exercise of their stop
> authority.  Since police often target resources to the places where crime rates
> and risks are highest, and where populations are highest, some measure of
> population that is conditioned on crime rates is an optimal candidate for
> inclusion as a benchmark.[173]

Accordingly, Dr. Fagan's "analyses use both population and reported crime as benchmarks for

understanding the racial distribution of police-citizen contacts."[174]  While there is scholarly

disagreement regarding the best benchmark to use in such measurements, none of the sources

Drs. Smith and Purtell cited criticized the benchmark used by Dr. Fagan.  In addition, at least

one other study of a police department's stop patterns — a study of stop patterns in Los Angeles

by Dr. Ian Ayres, the William K. Townsend Professor of Law at Yale Law School — used an

"[a]lmost identical" benchmark to Dr. Fagan's.[175]

---

[173]     Fagan Rpt. at 16–17.

[174]     *Id.* at 17.  *See also* Fagan Rpt. at 33 tbl. 5; Pl. Mem. ¶ 22.  To be clear: Dr. Fagan
includes local crime rate data because the police are more likely to be deployed to places with
higher crime rates, and stops are more likely to take place in areas where the police are more
heavily deployed.

[175]     *See* 5/6 Tr. at 6121, 6135–6139 (Smith).  Dr. Ayres' report on the LAPD is
discussed in 3/4/13 Amicus Curiae Brief of Communities United for Police Reform at 6.  Drs.
Smith and Purtell cited Dr. Fagan's and Dr. Ayres' scholarship in a short list of "[n]otable
articles" in the literature on benchmarking in disparate treatment claims.  *See* Smith Rpt. at 11
n.5.  The City concedes that "[t]here is no prevailing benchmark for racial disparity regression
analysis."  Def. Findings ¶ 69.

The City's experts, by contrast, used a benchmark consisting of the rates at which various races appear in suspect descriptions from crime victims — in other words, "suspect race description data."[176] The City's experts assumed that if officers' stop decisions were racially unbiased, then the racial distribution of stopped pedestrians would be the same as the racial distribution of the criminal suspects in the area.[177]

I conclude that Dr. Fagan's benchmark is the better choice. The reason is simple and reveals a serious flaw in the logic applied by the City's experts: there is no basis for assuming that the racial distribution of stopped pedestrians will resemble the racial distribution of the local criminal population *if the people stopped are not criminals*. The City defends the fact that blacks and Hispanics represent 87% of the persons stopped in 2011 and 2012 by noting that "approximately 83% of all known crime suspects and approximately 90% of all violent crime suspects were Black and Hispanic."[178] This might be a valid comparison if the people stopped were criminals, or if they were stopped based on fitting a specific suspect description. But there was insufficient evidence to support either conclusion. To the contrary, nearly 90% of the people stopped are released without the officer finding any basis for a summons or arrest,[179]

---

[176]    Smith Rpt. at 19 (quotation marks omitted).

[177]    Because crime victims are often unable to provide race information — especially for non-violent crimes — the City's experts eventually attempted to supplement their crime suspect race data with data showing the races of arrestees. Dr. Fagan offered persuasive criticisms of the resulting "Merge File" — such as its reliance on arrestee data that may obscure rather than reveal racial bias — as well as of the City's experts' earlier reliance on extrapolations from incomplete crime suspect data. *See* Pl. Findings ¶ 20 (collecting sources).

[178]    Def. Findings ¶ 70 (citations and emphasis omitted).

[179]    *See supra* Part IV.A.

51

and only 13% of stops are based on fitting a specific suspect description.[180]  There is no reason to

believe that the nearly 90% of people who are stopped and then subject to no further

enforcement action are criminals.  As a result, there is no reason to believe that their racial

distribution should resemble that of the local criminal population, as opposed to that of the local

population in general.  If the police are stopping people in a race-neutral way, then the racial

composition of innocent people stopped should more or less mirror the racial composition of the

areas where they are stopped, all other things being equal.  Dr. Fagan's benchmark captures what

the NYPD's stops would look like in the absence of racial discrimination:  his use of local

population data reflects who is available to be stopped in an area (assuming, as the evidence

shows, that the overwhelming majority of stops are not of criminals), and his use of local crime

rates reflects the fact that stops are more likely to take place in areas with higher crime rates.

By contrast, Dr. Smith rejected the assumption that 88% of those stopped were

innocent.  "[H]ow do we know . . . [i]f they were utterly innocent[?]" Dr. Smith asked at trial.

He then proposed a "hypothetical" in which "the stop prevents a crime."[181]  If one assumes that

those stopped with no further enforcement action are nevertheless criminals, then it is natural to

conclude, as Dr. Smith did, that a valid benchmark for measuring racial disparities in stops must

---

[180]     *See* Fagan 2d Supp. Rpt. at 23 app. tbl. D1; Fagan Rpt. app. D tbl. D1.  The City's
speculation that the low hit rate for stops overall could be explained by "multiple people [being]
stopped in connection with the description provided in a single radio run" neglects the fact that
only 13% of stops are based on matching a suspect description.  Def. Findings ¶ 90.  In addition,
the City's theory is weakened by its failure to collect evidence from the UF-250 database
concerning how often multiple stops are made in connection with a single event or a single
suspect description.  *See id.*

[181]     5/6 Tr. at 6155–6156.

"enable us to know who is committing the crime in [an] area."[182] Thus, he concludes that the best benchmark for the population of people who will be stopped in the absence of racial discrimination is the local criminal population. As Dr. Smith testified, "the best proxy for the share of the population by race engaged in the targeted behaviors that lead officers to make *Terry* stops" is the percentage of each racial category that appears in crime suspect data, or more precisely a combination of crime suspect data and arrestee data, because "[t]hat's what we know about who is committing crime."[183]

Based on this analysis, Dr. Smith concludes that the disproportionate stopping of black people can be explained by the disproportionately black composition of the pool of criminals.[184] But even if all stops by the NYPD were based on reasonable suspicion — which is highly unlikely for reasons already stated — the low hit rate would undermine the assumption

---

[182]     *Id.* at 6114.

[183]     *Id.* at 6151, 6154. *Accord* Def. Findings ¶ 70 ("Crime suspect description data estimates the available pool of *persons exhibiting suspicious behavior* that could be observed by the police — while population merely estimates the potential number of *persons* in a given area." (citations omitted)).

[184]     Drs. Smith and Purtell state:

> Obviously, if particular racial or ethnic groups in New York City participate in crime at a rate disproportionate to their share of the population, we would expect officers to conduct *Terry* stops for such groups at rates higher than each groups' respective share of the City's population. The benchmark of suspect race description allows us to measure if [the] NYPD's officers are stopping minorities at a rate *over and above* what could be explained by the racial composition of the criminally active population in New York.

Smith Rpt. at 20. *Accord id.* at 14–15 (suggesting that criminal participation of various races must be incorporated into benchmark, because certain races may commit crimes at a higher rate than others, "*and so* are more likely to be observed by police engaging in suspicious activity that would justify a *Terry* stop" (emphasis added)).

53

that the stopped people were *in fact* engaged in criminal activity, and thus members of the criminal population. The City failed to establish that a significant number of the approximately 3.9 million stops that resulted in no further enforcement action were stops of people who were about to commit, but were prevented from committing, a crime.[185] Dr. Smith's theory that a significant number of these stops resulted in the prevention of the suspected crime is pure speculation and not reliable.

Crime suspect data may serve as a reliable proxy for the pool of *criminals* exhibiting suspicious behavior. But there is no reason to believe that crime suspect data provides a reliable proxy for the pool of *non-criminals* exhibiting suspicious behavior. Because the overwhelming majority of people stopped fell into the latter category, there is no support for the City's position that crime suspect data provides a reliable proxy for the pool of people exhibiting suspicious behavior. Moreover, given my finding that a significant number of stops were *not* based on reasonable suspicion — and thus were stops drawn from the pool of *non-*criminals *not* exhibiting suspicious behavior — the use of crime suspect data as a benchmark for the pool of people that would have been stopped in the absence of racial bias is even less appropriate.[186]

---

[185] *See* 4/19 Tr. at 4310–4314 (Assistant Commissioner Philip McGuire stating that "nobody knows" what portion of people who are stopped but not arrested or summonsed "were probably about to or might have committed a crime," and that "the number could be zero to fifty percent," but that he does not know); 4/9 Tr. at 2915–2916, 2983–2984 (Chief Esposito stating "we're not really able to tell" how often a stop prevents a crime, then imagining what such a stop might look like). I also note that none of the testifying plaintiffs — even those whose stops were based on reasonable suspicion — were engaged in criminal activity.

[186] Of course, if the real purpose of the stops is not to investigate suspected criminal activity based on individualized suspicion, but instead to deter criminals from carrying weapons or contraband by stopping people who fit a general profile of criminal suspects in an area, then criminal suspect data would *in a sense* be the appropriate benchmark for measuring racial

When confronted by plaintiffs' counsel with similar reasoning, Dr. Smith ultimately appeared willing to entertain the possibility that black people, even when they are law-abiding, might simply be more likely to engage in suspicious behavior than white people:

> Q.  So is it your testimony that law-abiding black people in New York City are more likely to engage in suspicious behavior than law-abiding white people?
>
> A.  I'm only saying that that's the evidence from the stop patterns, which we have said, according to Professor Fagan, are ninety percent apparently justified.[187]

Dr. Smith's position, while surprising, is not illogical once his premises are accepted.  Dr. Smith apparently does not find it plausible that officers' decisions regarding whether to stop a person may be swayed by conscious or unconscious racial bias.[188]  If a researcher begins with this premise, he will attempt to find a credible, race-neutral explanation for the NYPD's stopping of blacks and Hispanics out of proportion to their share of the population.  For example, the researcher may seek to explain the disproportionate stopping of

---

disparities in stops.  But the City does not make this argument, and if it did, the argument would fail for reasons related to plaintiffs' Fourth and Fourteenth Amendment claims.  *First*, to the extent that such "deterrence" stops were based solely on a person's resemblance to a general profile of the criminals in an area, the stop would not be based on *individualized* reasonable suspicion of criminal activity.  *Second*, to the extent that "the general profile of criminal suspects in an area" contains a racial description, the use of that description as a basis for stops would constitute racial profiling.  On the issue of racial profiling, see *infra* Part V.B.1.

[187]     5/6 Tr. at 6158.

[188]     *See* Smith Rpt. at 9 (asking rhetorically: "In view of the tens or even hundreds of thousand[s] of persons an officer observes in the course of each month on duty, when the overwhelming majority are Blacks and Hispanics, is it plausible to believe that the several persons actually stopped were selected based on their race?").  Plaintiffs and the City dispute the average number of stops per officer per month, with the City claiming it is "only" two to three, and the plaintiffs claiming it is far higher.  A review of the numerous monthly activity reports in the record suggests that most officers who are actively making stops conduct between 10 and 20 per month.  *See, e.g.*, PX 15, 178, 219, 229, 236, 309, 310.  But the *number* of stops is not particularly relevant.  It is the *quality* of the stops that is at issue here — that is, whether the stops were based on reasonable suspicion and free of racial discrimination.

minorities as the result of the characteristics of the criminal population.  However, as already explained, there is no evidence that 88% of the people stopped are, in fact, members of the criminal population.  Next, the researcher may analyze the deployment of police to high crime areas or "hot spots."  If these areas happen to be disproportionately minority, then heavy deployment to these areas will provide a race-neutral basis for the disproportionate stopping of minorities.  But Dr. Fagan's "Table 5" analysis showed that blacks and Hispanics are overstopped even after controlling for police deployment to high crime areas.[189]  In the end, if the researcher cannot think of any relevant race-neutral factors for which Dr. Fagan did not control, the only remaining race-neutral explanation for the NYPD's stop patterns may be that members of the overstopped racial groups have a greater tendency to appear suspicious than members of other racial groups, even when they are not breaking the law.

Rather than being a defense *against* the charge of racial profiling, however, this reasoning is a defense *of* racial profiling.  To say that black people in general are somehow more suspicious-looking, or criminal in appearance, than white people is not a race-neutral explanation for racial disparities in NYPD stops: it is itself a *racially biased explanation*.  This explanation is especially troubling because it echoes the stereotype that black men are more likely to engage in criminal conduct than others.[190]  In a recent speech responding to the public controversy surrounding the shooting of a black teenager,  President Obama noted his personal experience with this stereotype:

There are very few African-American men in this country who haven't had

---

[189]    Similarly, by controlling for various other factors, such as patrol strength, socioeconomic factors, and other local characteristics, Dr. Fagan persuasively undermined a number of other potential race-neutral explanations for the racial disparities in stops.

[190]    For an analysis touching on the prevalence of this stereotype, and the consequences related to it, see generally MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS (2010).

> the experience of being followed when they were shopping in a department store. That includes me. There are very few African-American men who haven't had the experience of walking across the street and hearing the locks click on the doors of cars. That happens to me, at least before I was a senator. There are very few African-Americans who haven't had the experience of getting on an elevator and a woman clutching her purse nervously and holding her breath until she had a chance to get off. That happens often.[191]

Another commentator observed in even starker terms:

> What is reasonable to do, especially in the dark of night, is defined by preconceived social roles that paint young black men as potential criminals and predators. Black men, the narrative dictates, are dangerous, to be watched and put down at the first false move. This pain is one all black men know; putting away the tie you wear to the office means peeling off the assumption that you are owed equal respect. Mr. Martin's hoodie struck the deepest chord because we know that daring to wear jeans and a hooded sweatshirt too often means that the police or other citizens are judged to be reasonable in fearing you.[192]

No doubt many people have heard similar fears and stereotypes expressed, whether intentionally or unintentionally. But race alone is not an objective basis for suspicion by the police. Because there is no evidence that law-abiding blacks or Hispanics are more likely to behave *objectively* more suspiciously than law-abiding whites, Dr. Smith's — and the City's — refuge in this unsupported notion is no refuge at all. It is effectively an admission that there is no explanation for the NYPD's disproportionate stopping of blacks and Hispanics other than the NYPD's stop practices having become infected, somewhere along the chain of command, by racial bias.

Why would the people stopped by the NYPD, both criminal and law-abiding, so closely resemble the criminal population — or, more precisely, the NYPD's understanding of the

---

[191] 7/19/13 Remarks by President Barack Obama on Trayvon Martin, White House Press Briefing Room.

[192] Ekow N. Yankah, Op-Ed., *The Truth About Trayvon*, N.Y. TIMES, July 16, 2013, at A23.

criminal population, based on its limited suspect data?[193]  A simple explanation exists:  the racial composition of the people stopped by the NYPD resembles what the NYPD perceives to be the racial composition of the criminal population *because that is why they were stopped*.  Evidence discussed later in this Opinion shows that the NYPD has an unwritten policy of targeting racially defined groups for stops, based on the appearance of members of those groups in crime suspect data.[194]  A strong correlation between the races of people stopped and the known races of criminal suspects is the natural result.

In short, the correlation highlighted by the City and its experts in their attempt to refute the allegation of racial profiling in fact provides evidence of racial profiling.  Rather than revealing a valid race-neutral variable that explains the NYPD's disproportionate stopping of blacks and Hispanics, the correlation highlighted by the City's experts suggests how the racial disparities identified by Dr. Fagan might have come about — namely, through a widespread practice of racial profiling based on local criminal suspect data.

### c.   Findings Based on Dr. Fagan's Analyses

Because I accept Dr. Fagan's benchmark for measuring racial disparity and find his statistical analyses generally reliable, I make the following findings.

---

[193]    The suspect's race was unknown in 70% of crime complaints in 2005 and 2006.  *See* Fagan Rpt. at 76 tbl. 18.  Even after merging crime suspect data and arrestee data, the race of the perpetrator is only known for roughly 63% of crimes.  *See* Fagan 2d Supp. Rpt. app. B tbl. 1–2 (using data from 2010 to 2011); Smith Rpt. at 34.  In addition, based on this "merged" data, while the suspect's race is known for a high percentage of certain types of crime — such as felony violent crimes (86%), weapons crimes (98%), and drug offenses (99%) — race is known in only 22% of felony property crimes, which are the basis for 25% of all stops.  *See id.* app. B tbl. 2.  Dr. Fagan persuasively showed that using data where almost 40% of the information is missing would introduce sample selection bias, and is not a reliable approach to drawing conclusions about the criminal suspect population.  *See id.*; 4/3 Tr. at 2148–2150 (Fagan); 5/6 Tr. at 6160–6161 (Dr. Smith acknowledging that he had not found any scholarly support for estimating the demographics of crime suspects based on data that is nearly 40% incomplete).

[194]    *See infra* Part IV.C.3.

First, as reflected in Dr. Fagan's Table 5, the NYPD carries out more stops in areas with more black and Hispanic residents, even when other relevant variables are held constant.  The best predictor for the rate of stops in a geographic unit — be it precinct or census tract — is the racial composition of that unit rather than the known crime rate.[195]  These findings are "robust," in the sense that the results persist even when the units of analysis are changed from precincts to census tracts, or from calendar quarters to months.

Second, as reflected in Dr. Fagan's Table 7, within any area, regardless of its racial composition, blacks and Hispanics are more likely to be stopped than whites.  This is different from the first finding — that the best predictor for the stop rate in a geographic area is the racial composition of that area.  Table 7, by contrast, shows that blacks and Hispanics are more likely to be stopped than whites within precincts and census tracts, even after controlling for the racial composition, crime rate, patrol strength, and various socioeconomic characteristics of the precincts or census tracts where the stops take place.  These findings are also robust.  They apply not only when the spatial and temporal units of the analysis are changed, but also when the analysis is limited to areas with low crime rates, racially heterogenous populations, or predominately white populations.[196]

Third, for the period 2004 through 2009, blacks who were subject to law enforcement action following their stop were about 30% more likely than whites to be arrested (as opposed to receiving a summons) after a stop for the same suspected crime, even after controlling for other relevant variables.[197]

---

[195]     See 4/3 Tr. at 2029.

[196]     See Pl. Findings ¶ 15 (citing, among other sources, Dr. Fagan's testimony; Fagan Rpt. at 4, 40–45 & tbls. 7–10; Fagan 2d Supp. Rpt. at 19–21 & tbl. 7).  See also 4/3 Tr. at 2030.

[197]     See 4/3 Tr. at 2031–2032.  See also Fagan Rpt. at 66.

*Fourth*, for the period 2004 through 2009, after controlling for suspected crime and precinct characteristics, blacks who were stopped were about 14% more likely — and Hispanics 9% more likely — than whites to be subjected to the use of force.[198]

*Fifth*, for the period 2004 through 2009, all else being equal, the odds of a stop resulting in any further enforcement action were 8% *lower* if the person stopped was black than if the person stopped was white. In addition, the greater the black population in a precinct, the less likely that a stop would result in a sanction. These results show that blacks are likely targeted for stops based on a lesser degree of objectively founded suspicion than whites.[199]

### C.    Institutional Evidence of Deliberate Indifference

The previous two sections addressed the statistical evidence of unconstitutional stops. This section addresses the evidence regarding the NYPD's awareness of and response to those unconstitutional stops. In short, I find that the "institutional evidence" — evidence regarding the actions or inactions of the NYPD — shows that the City has been deliberately indifferent to violations of the plaintiff class's Fourth and Fourteenth Amendment rights.

The NYPD has known for more than a decade that its officers were conducting unjustified stops and frisks and were disproportionately stopping blacks and Hispanics. Despite this notice, the NYPD expanded its use of stop and frisk by seven-fold between 2002 and 2011. This increase was achieved by pressuring commanders at Compstat meetings to increase the numbers of stops. The commanders, in turn, pressured mid-level managers and line officers to

---

[198]    *See* Pl. Findings ¶ 17; Fagan Rpt. at 66, 68 fig. 14. I note two reservations about this data: *First*, it is difficult to control reliably for the suspected crime when by 2009, 36% of UF-250s stated no suspected crime. *See* Fagan Supp. Rpt. at 39. *Second*, these "use of force" figures refer to stops in which *any* use of force was indicated, including "Hands On Suspect." *See* Fagan Rpt. at 63–69; Blank UF-250.

[199]    *See* Pl. Findings ¶ 16 (citing, among other sources, Fagan Rpt. at 66–67 & tbl. 16); 4/3 Tr. at 2123.

increase stop activity by rewarding high stoppers and denigrating or punishing those with lower numbers of stops.

This pressure to increase the quantity of stops was not accompanied by attention to the constitutionality of the stops. No policies were implemented to ensure that officers were recording each stop with sufficient detail to permit an assessment of the constitutionality of the stops. Similarly, no study was done to ensure that officers were not reflexively creating a "script" of checkmarks — especially Furtive Movements and High Crime Area — by searching the UF-250 database to identify such patterns. No effort was made to identify outliers — meaning those officers with the highest stop numbers, officers who stopped only or almost only blacks or Hispanics, or officers who routinely checked the same boxes on the UF-250. No rewards or punishments turned on the quality of stops conducted. Indeed, when officers were found to have made "bad" stops, little or no discipline was imposed. The evidence showed that the NYPD turned a blind eye to its duty to monitor and supervise the constitutionality of the stops and frisks conducted by its officers.

In addition, I find that the NYPD instituted a policy of indirect racial profiling by directing its commanders and officers to focus their stop activity on "the right people" — the demographic groups that appear most often in a precinct's crime complaints. This policy led inevitably to impermissibly targeting blacks and Hispanics for stops and frisks at a higher rate than similarly situated whites.

### 1. Early Notice: the 1999 AG Report

In 1999, New York's Attorney General investigated the constitutionality of the NYPD's stop and frisk practices under the Fourth and Fourteenth Amendments. The investigation was prompted in part by the Attorney General's finding that despite a decade of falling crime rates, "the climate in many of New York's minority neighborhoods . . . was one of

resentment and distrust of the NYPD." Many of the complaints involved "lower-level police involvement in the everyday lives of minority residents," such as stop and frisk encounters.[200]

The Attorney General sought the assistance of a team of researchers from Columbia University's Center for Violence Research and Prevention, led by Dr. Fagan. The researchers performed statistical analyses of 175,000 UF-250s from January 1, 1998 through March 31, 1999. The resulting Report was apparently the first-ever quantitative analysis of pedestrian stop and frisk practices in the United States.[201]

For their Fourth Amendment investigation, the researchers analyzed and grouped 15,000 UF-250s using a methodology that resolved "every ambiguity of factual or legal interpretation . . . in favor of a determination that 'reasonable suspicion' existed." Nevertheless, the researchers found that 15% of the UF-250s contained facts that did not meet the legal test for reasonable suspicion.[202]

For their Fourteenth Amendment investigation, the researchers tested then-NYPD Commissioner Howard Safir's theory — which largely remains the City's theory in this case — that the apparently disproportionate stopping of blacks and Hispanics can be explained on race-neutral grounds by police deployment to high crime areas, and by racial differences in crime

---

[200]    The investigation was also prompted by the shooting and killing of Amadou Diallo, an unarmed twenty-two-year-old West African immigrant, by members of the NYPD's now-disbanded Street Crimes Unit. Diallo was shot during an incident that apparently began as a stop. *See* THE NEW YORK CITY POLICE DEPARTMENT'S STOP AND FRISK PRACTICES: A REPORT TO THE PEOPLE OF THE STATE OF NEW YORK FROM THE OFFICE OF THE ATTORNEY GENERAL (1999) ("1999 AG Report"), PX 333, at 4–5. The 1999 AG Report was admitted only for the purpose of showing that the NYPD had notice of various issues raised in this case, not for the truth of its contents. *See* 4/19 Tr. at 4283–4284.

[201]    *See* 1999 AG Report at v–xv, 1, 12. The UF-250s analyzed in the report were the old version of the form. *See id.* at 89; PX 449 (old UF-250).

[202]    *See* 1999 AG Report at vii–xv.

rates.[203]  The researchers found, however, that "blacks and Hispanics were significantly more likely than whites to be 'stopped' [even] after controlling for race-specific precinct crime rates and precinct population composition by race."[204]  In addition, the Report found that different crime rates among precincts did not explain the higher overall stop rate in majority-minority precincts as opposed to majority-white precincts.[205]

The Report called for a broad, public dialogue among the Office of the Attorney General, the NYPD, and members of the community.[206]  This dialogue never occurred.  Instead, senior officials at the NYPD either found pretexts for rejecting the Report's findings,[207] or ignored the Report entirely — like Chief Esposito, who testified that he had never read it.[208]

---

[203]    The Report quotes Safir as stating:  "'The racial/ethnic distribution of the subjects of 'stop' and frisk reports reflects the demographics of known violent crime suspects as reported by crime victims.  Similarly, the demographics of arrestees in violent crimes also correspond with the demographics of known violent crime suspects.'"  *Id.* at 120 n.26.  The Report also highlights an issue discussed later in this Opinion:  because only 13% of stops resulted from the stopped person fitting the description of a known criminal suspect, suspect descriptions for violent criminals cannot be the primary driver for NYPD stop activity, which suggests that such descriptions cannot provide a race-neutral explanation for racial disparities in stops overall.  *See id.* at 122 n.30.

[204]    *Id.* at 121.

[205]    *See id.* at 130–131.

[206]    "It is now for the [NYPD] and others interested in a constructive dialogue to review the data and offer their perspectives." *Id.* at 175.

[207]    Assistant Commissioner Philip McGuire, who has been in charge of Crime Analysis and Program Planning (CAPPS) in the Office of Management, Analysis and Planning (OMAP) since 1994, disagreed with the Report's findings because the benchmark it used was the arrest data from 1997, instead of data from 1998 and 1999, the years in which the UF-250s were prepared.  Deputy Commissioner Michael Farrell has overseen OMAP and the Quality Assurance Division (QAD) since 2002.  He disagreed with the findings in the Report because Dr. Fagan used arrest data instead of suspect description data as his benchmark. *See* 5/14 Tr. at 7081–7082, 7090–7091.  The use of arrest data rather than suspect data would likely hide rather than exaggerate the overstopping of minorities.

[208]    *See* 4/9 Tr. at 2804.

## 2. Pressure to Increase Stops

Between 2002 and 2011, the number of stops increased from roughly 97,000 to roughly 686,000 per year.[209] How did the NYPD increase its stop activity by roughly 700%, despite the fact that crime continued to fall during this period?[210]

Based on numerous, mutually reinforcing sources of evidence at trial including live testimony, depositions, roll call recordings, internal NYPD documents, and survey results, the most plausible explanation is that NYPD officers prior to and during the class period experienced significant pressure to increase their stop activity.[211]

### a. Compstat: Pressure on Commanders

Introduced in 1994, Compstat is the NYPD's statistics-based performance management system.[212] The system collects and analyzes statistical and other data about local crime and enforcement activities, conducts weekly meetings during which senior officials question local commanders about the data, and holds commanders accountable for addressing

---

[209] *See id.* at 2807; DX V14-A. The City speculates that this increase may only reflect increased documentation of stops, but offers no evidence for its speculations. *See* 4/11/13 Defendant['s] Memorandum of Law in Opposition to Plaintiffs' Requested Injunctive Relief ("Def. Inj. Mem.") at 1.

[210] *See, e.g.*, NEW YORK STATE DIVISION OF CRIMINAL JUSTICE SERVICES, INDEX CRIMES REPORTED TO POLICE BY REGION: 2003–2012 (2013) (showing 17% drop in index crime reports between 2003 and 2012, and 30% drop in reported murders). I emphasize again that this Opinion takes no position on whether stop and frisk contributed to the decline in crime. The point here is that the dramatic increase in the number of stops cannot be explained by an increase in the number of people displaying suspicious behavior on the streets. To the contrary, the fall in crime reports suggests that stops based on suspicious behavior rose even as the amount of suspicious behavior declined.

[211] *See generally* Pl. Findings ¶¶ 56–85 (collecting many of the sources discussed below).

[212] *See* John A. Eterno & Eli B. Silverman, *The NYPD's Compstat: Compare Statistics or Compose Statistics?*, 12 INT'L J. POLICE SCI. & MGMT. 426–29 (2010). Redacted versions of two tables from the Eterno and Silverman article were admitted into the record as PX 291 and 292. *See* 5/31/13 Endorsed Letter [Dkt. No. 306].

crime conditions and improving the quantitative measures of their performance.

Chief Esposito, who chaired Compstat's meetings until his retirement earlier this year, and Assistant Chief Raymond Diaz testified that the amount of UF-250s that a unit has completed is a factor in evaluating the unit's performance.[213]  Excerpts from heavily redacted minutes of Compstat meetings show Chief Esposito questioning commanders about their low stop numbers.[214] Assistant Chief Diaz also stated that one way of measuring the effectiveness of impact response teams is to look at the number of UF-250s they generate[215] and that "an increase in the 250s is usually a good sign . . . that the unit that is being reviewed is engaging in more activity as opposed to less."[216]

Chief Esposito and other NYPD officials testified that the *quality* of UF-250s is also reviewed at Compstat meetings.  Indeed, there was evidence that attention is paid at

---

[213]    *See* 4/9 Tr. at 2868–2869 (Esposito); 3/29 Tr. at 1511 (testimony that Chief Esposito chaired weekly Compstat meetings).  *See also* 3/22 Tr. at 1030–1031 (Diaz).

[214]    *See, e.g.*, 2008 Compstat Meeting Notes Part A, PX 281, at *7017 (Chief Esposito: "Your [enforcement] numbers are way down. . . . If you look at [the] raw [number] of 250s[,] you are down 50%."  An executive officer responds that he "[w]ill look at it."); *id.* at *7026 (Chief Esposito: "How many C summonses are given out per officer on straight time? What should [the] average be?"  A commanding officer responds:  "2.3 sir and 2.3 for 250s as well."); *id.* at *7080 (Chief Esposito: "I have to go but 9 robberies compared to none[,] I don't think we are doing enough[] in that zone. You have 4 C[']s and 5 250s in [a] 28 day period."); 2008 Compstat Meeting Notes Part B, PX 283, at *7959 (Chief Esposito noting that there were only "1 250 and 4 C [summonses] for [a] whole daytour."  A commanding officer responds: "I[']m on top of it[,] I saw it."); *id.* at *8045 (Chief Esposito:  "Everyone is working hard, just trouble with the violence, 250s[] down, C[s] down, arrests down.  OCCB collars up 16%[,] doing [a] great job."); *id.* at *8144 (Chief Esposito: "In and around housing you are down in C's, 250s."  A commanding officer responds: "We have called on the [borough] for resources . . . .").  The quotations come from Compstat meeting notes.

[215]    *See* 3/29 Tr. at 1556.  *Accord* Deposition of Chief of Patrol Robert Giannelli ("Giannelli Dep."), PX 157, at 268–269 (testifying that at Compstat meetings, Chief Esposito might criticize an inordinately low number of stops in relation to a crime pattern).

[216]    3/29 Tr. at 1555.

65

Compstat meetings to the quality of enforcement activity in the sense of its *effectiveness*.[217] For example, Chief Esposito often questions commanders at Compstat about whether enforcement activity was responding to crime conditions in specific places and times.[218] There was no evidence, however, that the quality of stops in the sense of their *constitutionality* receives meaningful review or plays a role in the evaluation of commanders' performance during Compstat meetings.

Several NYPD officials conceded in testimony that Compstat focuses on effectiveness, not constitutionality. For example, Chief Esposito was asked to explain an excerpt from the Compstat meeting notes in which he is recorded as stating:

> Quality on 250s[,] forget the number. 5% enforcement rate off 250s, 102 [Precinct] is the worst with enf[orcement] off 250s. A lot of it is probably training. But quality of 250 in [Queens] South has a lot to be desired.[219]

When asked by plaintiffs' lawyers whether "quality" in this passage could refer to whether stops were based on reasonable suspicion, Chief Esposito stated: "No. I think we talk more about where and when. Does it match up with the crime picture? That's what is paramount."[220] None

---

[217] *See, e.g.*, 4/9 Tr. at 2881 (Chief Esposito testifying that "[i]n the context of CompStat, we always stress quality"); 3/22 Tr. at 925 (Deputy Chief Michael Marino testifying that "[t]he main thing that you hear a lot at CompStat is they talk about quality over quantity. Nobody from the top on down has ever said they want more numbers for numbers' sake."); 3/22 Tr. at 1030 (similar testimony from Assistant Chief Diaz).

[218] *See, e.g.*, Giannelli Dep. at 268–269; 2008 Compstat Meeting Notes Part B at *7958 (Chief Esposito considering redistribution of resources, in part based on low number of UF-250s in area with spike in robberies). *Accord* 3/22 Tr. at 925 (Deputy Chief Marino illustrating the emphasis on quality at Compstat meetings by stating: "They can do things like they can put up the computer maps and show robberies up in this area. And then they will show a lot of activity in this area. No, it should be here. You're not taking proper steps to stop the conditions.").

[219] 2008 Compstat Meeting Notes Part B at *8025.

[220] 4/9 Tr. at 2893–2894. *See also* 4/9 Tr. at 2879–2881, 2893–2894 (Chief Esposito credibly clarifying that 2008 Compstat Meeting Notes Part B at *8051–8052 does not question the constitutionality of stops generating a low hit rate).

of the excerpts from the Compstat meeting notes regarding UF-250s include a discussion of racial profiling or use the term reasonable suspicion.[221]

Similarly, to the extent that Chief of Patrol James Hall and his staff "raise issues or concerns about the UF-250s with COs at the meetings,"[222] these relate to the effectiveness of stops and officers' basic compliance with paperwork requirements.[223] There was no credible evidence that Chief Hall or his staff perform regular or meaningful reviews of the *constitutionality* of stops before Compstat meetings.[224]

In sum, Compstat exists to measure the effectiveness of police enforcement activities, not their constitutionality.

### b. Evidence of Pressure in Survey Data

The evidence discussed in the previous section shows that senior NYPD officials at Compstat meetings routinely place pressure on commanders to increase their enforcement activity, including their stop numbers. The survey evidence in this section shows that subordinate managers in the NYPD have communicated this pressure to the rank and file.

---

[221] *See id.* at 2895. *See also* 4/2 Tr. at 1838 (Deputy Inspector Steven Mauriello stating that he did not recall any discussion at a Compstat meeting of "whether the stops and frisks that would be recorded in [a commander's] 250s are . . . legal or constitutional"); 4/16 Tr. at 3544 (Deputy Inspector Charles Ortiz stating that the review of UF-250s at Compstat meetings consisted only of aggregate statistics, not the review of individual forms). For further evidence of NYPD officials' and managers' failure to discuss racial profiling at Compstat meetings, or among themselves, see Pl. Findings ¶¶ 186–190 (collecting sources).

[222] Def. Findings ¶ 47 (citing 5/15 Tr. at 7348–7352).

[223] *See* 5/15 Tr. at 7349. *See also id.* at 7348–7350; 5/16 Tr. at 7623.

[224] Chief Hall ultimately conceded that "[p]rimarily," the purpose of his and his staff's reviews of UF-250s "would probably be more related to the crime condition than the actual stop." 5/16 Tr. at 7626; *id.* at 7621–7626. When asked whether there is "ever an analysis of the circumstances which led to [a] stop" at a Compstat meeting, Assistant Chief Diaz replied "No": "The CompStat process is basically to look at criminal activity and to see what strategies are in place to address that criminal activity, not so much to look at the quality . . . of the stop." 3/29 Tr. at 1518.

Dr. Eli Silverman and Dr. John Eterno, a retired NYPD captain, conducted two surveys of retired members of the NYPD, one in 2008 and the other in 2012.[225] The 2008 survey was sent to 1,197 retired NYPD personnel with the rank of captain or above. 41% responded. The 2012 survey was sent to 4,069 retired NYPD personnel of all ranks who had listed themselves as "active retirees," that is, available if needed to serve in an emergency. 48% responded.[226]

The 2008 survey asked: "With respect to the following criteria and based on your personal experience, on a scale of 1 to 10 (with 1 being the least and 10 the most), how much pressure was there from management/supervisors to . . ." — followed by a list including, among other items, "Increase summonses," "Increase arrests," and "Increase Stop and Frisk Reports." The final page of the survey asked: "Did you serve on [the] NYPD after 1994?"[227] As noted above, 1994 was the year in which Compstat was introduced.

The responses to the 2008 survey show that mid-level managers in the NYPD who served during the Compstat era perceived significantly greater pressure to increase stops,

---

[225]    These surveys were pre-tested and approved by the Institutional Review Board of Molloy College, where Dr. Eterno is an associate dean and professor of criminal justice.

[226]    *See* 4/5 Tr. 2470–2481 (Silverman testimony regarding 2008 survey); *id.* at 2503–2509 (same regarding 2012 survey); PX 300 (blank copy of questionnaire used in 2008 survey). Dr. Silverman testified that the original purpose of the 2008 survey was to determine whether NYPD personnel were experiencing pressure to misrepresent crime numbers in order to improve their performance measurements at Compstat meetings. *See* 4/5 Tr. at 2470. After the publication of the survey results, Commissioner Kelly appointed a three-person committee, including two former federal prosecutors, to prepare a report on "whether the NYPD's internal-auditing and quality-control processes are sufficient to ensure the accuracy" of Compstat. DAVID N. KELLEY & SHARON L. MCCARTHY, THE REPORT OF THE CRIME REPORTING REVIEW COMMITTEE TO COMMISSIONER RAYMOND W. KELLY CONCERNING COMPSTAT AUDITING i (Apr. 8, 2013). The report finds support for Dr. Silverman's concerns, *see id.* at 49–50, and recommends a number of reforms, including officer interviews to complement QAD's document-focused audits, more accountability for egregious misclassifications of crimes, and formalized periodic external assessments of the Compstat audit process. *See id.* at 55–58.

[227]    PX 300.

68

arrests, and summons than those who retired prior to 1994. Specifically, when asked to rate the amount of pressure they perceived to increase stops, the mean response of Compstat era personnel was a statistically significant 2.2 points higher on the scale from 1 to 10 than pre-Compstat era personnel.[228] In addition, between the pre-Compstat and Compstat eras, the percentage of NYPD personnel who reported low pressure (1 to 3 on the scale) fell from 55% to 23%, while the percentage who reported high pressure (8 to 10 on the scale) rose from 5% to 28%.[229]

      The 2012 survey began by stating: "For all questions, if you retired before 1994, base your answers on your overall impressions over your entire career; if you retired in 1994 or after, base your answers on experiences that occurred only in 1994 and after." The second set of questions presented a refinement of the question on the first page of the 2008 survey: "With respect to the following criteria and based on your personal experience/knowledge, on a scale of 1 to 10 (with 1 being the least and 10 the most), how much pressure did precinct (patrol) personnel receive from management/supervisors to . . ." — followed by a list including "Increase summonses," "Increase stop and frisk," and "Increase arrests," as well as a new item: "Obey Legal/Constitutional Rules." The survey later asked respondents to state the year in which they retired.[230]

      Dr. Silverman divided the respondents to the 2012 survey into three categories:

---

[228]    *See* PX 291. The mean responses with regard to pressure to increase summonses and arrests were 1.5 points and 1.8 points higher for Compstat-era personnel, and both of these results were also statistically significant. *See id.*

[229]    The increases in the degrees of reported pressure to increase summonses and arrests were similarly stark. *See* PX 443; PX 441 (with regard to summonses, reports of low pressure fell from 28% to 9%, while reports of high pressure rose from 26% to 45%); PX 442 (with regard to arrests, reports of low pressure fell from 31% to 8%, while reports of high pressure rose from 17% to 42%); 4/5 Tr. at 2496–2500.

[230]    *See* PX 293.

those who retired in 1994 or earlier (pre-Compstat), those who retired between 1995 and 2001, and those who retired after 2002 (the year of Mayor Bloomberg's arrival and his appointment of Commissioner Kelly). The responses showed that the percentage of NYPD personnel reporting high pressure to increase stops increased from 9% in the pre-Compstat era, to 19% in the Compstat era before Mayor Bloomberg, to 35% of all respondents who retired after 2002. The percentage of personnel reporting low pressure fell from 58% for pre-Compstat retirees to 37% for pre-Bloomberg retirees to 24% for post-Bloomberg retirees. The increases in reported pressure to raise summons and arrest numbers was similarly stark.[231]

   Finally, while the 2012 survey showed an increase from 35% to 42% in those reporting medium pressure to obey legal and constitutional rules, it also showed a significant post-2002 decrease in those reporting high pressure to do so. 45% of pre-Compstat retirees and 47% of early Compstat era retirees reported high pressure to obey legal and constitutional rules, while only 36% of post-Bloomberg retirees reported high pressure. Dr. Silverman testified that this represented a modest but statistically significant decline.[232]

   Although the City attempted to undercut the reliability of the 2008 and 2012 findings,[233] I find that the City's criticisms do not undermine the surveys' central finding for the purposes of this case: NYPD personnel experienced or were aware of pressure to increase the number of stops after the introduction of Compstat, and especially after the arrival of Mayor Bloomberg and Commissioner Kelly. In addition, this rising pressure for stop numbers was not

---

[231]  *See* PX 446 (stops); PX 444 (summonses); PX 445 (arrests).

[232]  *See* PX 292, 447; 4/5 Tr. at 2518–2519.

[233]  *See* Def. Findings ¶ 68 (arguing, for example, that the 2008 survey is not "representative" because it "included only retirees who opted to join [a] union mailing list," without offering any grounds for believing that retirees who joined this mailing list are more or less likely than other retirees to perceive pressure to increase stops).

accompanied by equivalent pressure to obey constitutional restrictions.

### c.    Further Evidence of Pressure on Officers

Additional anecdotal evidence supports plaintiffs' argument that the NYPD pressured officers to increase stops without due regard to the constitutionality of those stops. For convenience, I divide the evidence into two periods:  before the enactment of New York's Quota Law in 2010, and after.

### i.    Pressure Before the 2010 Quota Law

Before 2010, the NYPD had no written policy prohibiting quotas for stops, arrests, or other enforcement activities.[234]  There is abundant evidence during this period of supervisors directing officers to meet numerical enforcement goals, as well as threatening the officers with negative consequences if they did not achieve those goals.  In particular, three NYPD officers from three precincts made secret recordings revealing institutional pressure to increase enforcement numbers:  Officers Adrian Schoolcraft, Adhyl Polanco, and Pedro Serrano.[235]  The three officers' recordings provide a rare window into how the NYPD's policies are actually carried out.  I give great weight to the contents of these recordings.

Officer Schoolcraft's recordings take place at the 81st Precinct in the Bedford Stuyvesant area of Brooklyn.  Many of the recordings are of roll calls, the period before a tour when officers assemble to receive assignments and training.[236]  Requests or commands to issue

---

[234]    *See* Chief of Patrol, Memorandum Regarding Quota Bill (Oct. 22, 2010), PX 290, at *0096 ("Quotas are not addressed as part of any managerial training . . . .").  The lack of citation to any prior written policy prohibiting quotas strongly suggests that no such policy existed.

[235]    To the extent that the officers chose what to record, the recordings may present an incomplete picture.  But for the most part, the context of the recordings and the meaning of the supervisors' words were plain.

[236]    *See* 3/19 Tr. at 425 (Polanco).

UF-250s are common on the recordings, though sometimes innocuous.[237]  The recordings also show repeated calls for increased "activity," including summonses, stops, and arrests. Sometimes supervisors use numerical goals backed by the threat of negative consequences if the goals are not met.  For example, at a June 12, 2008 roll call, Lieutenant Jean Delafuente stated:

> [W]e had the CO's meeting today. . . .  First and foremost, we need more activities, all right?  The CO wants more activity.  The XO wants more activity.  The borough is monitoring the activity sheets.  So, if your activity falls below par, they're going to have either you or I or the Sergeant or the CO have to explain what's going on, all right?  So, let's not let it get that far, all right?[238]

Later, Lieutenant Delafuente states:  "The XO was in the other day. . . .  He actually laid down a number, all right?"  Lieutenant Delafuente says, perhaps jokingly, that he is not going to quote the number, then proceeds to say that the Executive Officer "wants at least three seatbelts, one cellphone, and 11 others."  He also suggests that he has criticized officers whose numbers were not high enough:  "The CO gave me some names.  I spoke to you.  I'm not going to embarrass you in front of everyone."[239]

The most striking aspect of the Schoolcraft recordings is the contempt and hostility of supervisors toward the local population.  For example, at a roll call on November 8, 2008, Lieutenant Delafuente states:

> All right, I went out there [to Howard and Chauncey] yesterday and . . . we've got the old man out there with the grey hairs.  A loud mouth.  He thinks since he's 55 years old he's not going to get locked up.  Well, guess what?  I don't tolerate shit out there.  He went in and two of his pals went in. All right?  So we've got to keep the corner clear. . . .  Because if you get too big of a crowd there, you know, . . . they're going to think that they own the block.  We own the block.  They don't own the block, all right?  They might

---

[237]    *See, e.g.*, PX 289T (10/30/08 at 4.20–6.30) ("If you see something just do some, uh, 250's, get all the fucking riff-raff off the corners.").

[238]    *Id.* (6/12/08 at 7.13–8.10).

[239]    *Id.* (6/12/08 at 12.10–13.28).

live there but we own the block.  All right?  We own the streets here.  You
tell them what to do.[240]

Similarly, Lieutenant Delafuente reminds the officers at a roll call on November 1, 2008 that

they are "not working in Midtown Manhattan where people are walking around smiling and

happy.  You're working in Bed-Stuy where everyone's probably got a warrant."[241]  Because

Bedford Stuyvesant is a historically black neighborhood and continues to have a majority black

population,[242] Lieutenant Delafuente's comment carries troubling racial overtones.

As further evidence of a culture of hostility in the 81st Precinct, Sergeant

Raymond Stukes said the following at a roll call on March 13, 2009:

> If you see guys walking down the street, move 'em along.  Two or three guys
> you can move, you can't move 15, all right?  If you want to be a[n] asshole
> or whatever you want to call it, make a move.  If they won't move, call me
> over and lock them up [for disorderly conduct].  No big deal.  We could
> leave them there all night.  . . .  The less people on the street, the easier our
> job will be . . . . *If you stop them[,] 250, how hard is a 250.  I'm not saying
> make it up but you can always articulate robbery, burglary, whatever the
> case may be.  That's paperwork . . .  It's still a number.  It keeps the hounds
> off, I've been saying that for months.*[243]

---

[240]    *Id.* (11/8/08 at 13.09–14.36).

[241]    *Id.* (11/1/08 at 2.12–3.50).

[242]    *See* 5/9 Tr. at 6458–6459 (Inspector Juanita Holmes, who became the
Commanding Officer of the 81st Precinct after the release of Officer Schoolcraft's tapes in 2010,
testifying that the 81st Precinct is "77 percent African-American"); NYC.gov, Community
Snapshot 2011, CD3: Bedford Stuyvesant (2012) (stating that Bedford Stuyvesant as a whole is
59% black).

[243]    PX 289T (3/13/09 at 4.32–5.20) (emphasis added).  "The hounds" apparently is a
reference to superiors, such as commanders, who are monitoring enforcement activity, pushing
for higher activity, and have the power to transfer an officer as punishment for low enforcement
activity.  *See, e.g.*, *id.* (6/12/08 at 14.58–16.40); *id.* (12/8/08 at 12.20–15.00); 4/2 Tr. at
1897–1898.
        For another example of Sergeant Stukes' directives at roll call, see PX 289T
(1/7/08 at 6.58–8.00) ("Be an asshole.  They going to do something, shine a light in their face
whatever the occasion, inconvenience them.").  When asked to explain Sergeant Stukes'
statement "[b]e an asshole," Deputy Inspector Steven Mauriello offered the following
interpretation:  "It means be a police officer.  You have a footpost.  You walk your footpost.

Similarly, Sergeant Stukes states at a roll call on November 23, 2008: "If they're on a corner, make them move. They don't want to move, you lock them up. Done deal. *You can always articulate later*."[244]

> In a speech at roll call on Halloween in 2008, Deputy Inspector Mauriello states:
>
> Tonight is zero tolerance. It's New Years Eve all over again. Everybody goes. I don't care. . . . They're throwing dice? They all go, promote gambling. I don't care. Let the DA discuss what they're going to do tomorrow. . . . They got [bandanas] on and they're running like nuts down the block, chasing people? Grab them. Fuck it. You're preventing a robbery . . . . You know that and I know that.[245]

When asked to explain what he meant in these remarks, Deputy Inspector Mauriello testified that throwing dice is a quality of life infraction.[246]

> In addition to revealing a virulent precinct culture that the NYPD failed to address until forced to do so by the publication of the recordings, some of the recorded statements are directly relevant to plaintiffs' claims. Sergeant Stukes' statements on more than one occasion that "you can always articulate" some basis for a stop after the fact encourages officers to stop first and develop a justification later.[247] The same Sergeant Stukes later directs his officers to "[s]hake everybody up. Anybody moving, anybody coming out that building, 250, verticals, and

---

And be omnipresent." 4/2 Tr. at 1900.

[244]     PX 289T (11/23/08 at 5.46–6.28) (emphasis added); 4/2 Tr. at 1825. When asked to interpret the phrase "[y]ou can always articulate later," Deputy Inspector Mauriello at first evaded the question by discussing the NYPD's commitment to "CPR" (Courtesy, Professionalism, and Respect). *Id.* at 1903–1904. He eventually responded: "I guess he means do your paperwork later. Articulate. Online booking sheet." *Id.* at 1903.

[245]     PX 289T (10/31/08 at 9.05–9.50).

[246]     *See* 4/2 Tr. at 1912–1913.

[247]     This tactic, of course, contravenes the requirement that an officer must have individualized and articulable reasonable suspicion *before* making a stop.

give me a couple of community visits.  C-summons as well."[248]  Because exiting a building —

even in a high crime area — is not a sufficient basis for reasonable suspicion, these words are an

instruction to carry out stops and other enforcement activity without legal justification.

Likewise, the following words by Deputy Inspector Mauriello at a roll call on

November 8, 2008 provide evidence that the rapid escalation in stops between 2002 and 2011

may have been accomplished in part by encouraging stops without reasonable suspicion of any

crime:

> I'm tired of bandanas on their waist and I'm tired of these beads.  Red and
> black beads mean Bloods.  Their bandanas — if they're walking down the
> street and they've got a bandana sticking out their ass, coming out there —
> they've got to be stopped.  A 250 at least.  At least.[249]

Most significantly, Sergeant Stukes repeatedly instructs the officers that their

careers depend on carrying out high levels of activity, and shows utter disregard for the

requirement that a stop only be made based on a reasonable suspicion that crime is afoot.  At a

December 8, 2008 roll call, Sergeant Stukes explained:

> This job is so easy.  Just keep the hounds off.  A parker, a 250, you could
> book somebody walking down the street.  You know what?  I stopped and
> asked — so what?  I did a 250.  What's the big deal?  Let him go.  He
> doesn't want to give you no information, who cares?  It's still a 250.[250]

---

[248]     PX 289T (12/8/08 at 1.20–1.38).  According to one officer's testimony, there are
three types of summonses:  A summonses for parking violations ("parkers"), B summonses for
moving violations, and C summonses for quality of life offenses (also known as "criminal court
summonses").  *See* 5/10 Tr. at 6765 (Herran).

[249]     PX 289T (11/8/08 at 15.34–15.45).  Even if it were an *effective* gang-suppression
strategy to stop every person wearing known gang paraphernalia, it would not be a *constitutional*
strategy, because neither carrying beads nor flaunting a bandana is a crime.

[250]     *Id.* (12/8/08 at 12.20–15.00).  *Accord id.* (12/8/08 at 7.07–7.42) (suggesting that
officers with low activity will be transferred); *id.* (12/12/18 at 2.20–4.30) (encouraging
more UF-250s and C summonses, and stating "your evaluations are based on your activity"); *id.*
(1/28/09 at 23.24–24.10) ("[T]hey're looking at those numbers and people are gonna be
moved."); *id.* (1/29/09 at 6.56–9.03) ("You get . . . your numbers, and everybody leaves you
alone.").

Officer Polanco's recordings take place in 2009 at the 41st Precinct in the Bronx, and reveal similar pressure on officers to achieve enforcement activity numbers regardless of whether there is a reasonable suspicion of criminal activity. In one recording, Officer Polanco's union delegate, Officer Angel Herran, refers repeatedly to a requirement that officers complete "20 and 1," which Officer Polanco testified meant twenty summonses and one arrest per month.[251] Officer Herran encourages the other officers to "[c]rush the fucking city" and make the required numbers, because someone who does not is a "zero," and he will not fight for a zero.[252] Officer Herran confirmed in his testimony that "20 and 1" referred to the goal of 20 summonses and 1 arrest, which patrol officers in the 41st Precinct were expected to achieve (at least prior to the Quota Law) in approximately 20 to 22 days on patrol.[253] Officer Polanco's recordings also appear to show Lieutenant Andrew Valenzano instructing officers to stop anyone on a bike who is carrying a bag near an area where there have been car break-ins.[254] "[T]hose are good stops," Lieutenant Valenzano states.[255]

Officer Serrano's recordings take place at the 40th Precinct in the Bronx, and also show the pressure for enforcement activity. During a roll call on June 30, 2010, Lieutenant

---

[251]   PX 284T track 1; 3/19 Tr. at 423–425.

[252]   PX 284T track 1–2. *See also* 3/20 Tr. at 469–470 (Officer Polanco interpreting Officer Herran as encouraging officers to carry out an arrest on Friday night so that the City will have to pay overtime the following day); 3/21 Tr. at 734–735 (Officer Serrano describing distinction between a "zero" with low activity and a "hero" with high activity).

[253]   *See* 5/10 Tr. at 6765–6766, 6768.

[254]   *See* PX 284T track 5; 3/19 Tr. at 417.

[255]   PX 284T track 5. Officer Polanco credibly interpreted this as an instruction to "[s]top and frisk anybody who is on a bike carrying a bag" in the area of the crime pattern. 3/20 Tr. at 487–488.

Stacy Barrett directs each officer to get five summonses or UF-250s,[256] and says it should not be difficult. She tells the officers to "go crazy" in St. Mary's Park: "If we get every single summons in St. Mary's, I don't care." Her primary concern is to "get those numbers."[257]

Beyond the recordings, many other officers offered credible, consistent testimony regarding the pressure to increase enforcement activity and the threat of adverse consequences for failing to achieve high enough numbers.[258]

### ii. Pressure After 2010 Quota Law

In 2010, after the *Village Voice* publicized Officer Schoolcraft's recordings,[259] the State of New York enacted the Quota Law, which prohibits retaliation against officers for failing to meet quotas for tickets, stops, summonses, and arrests.[260]

Subsequently, Chief Hall sent a memo to the commanders of every patrol borough purporting to clarify the NYPD's position on performance quotas. The memo first clarifies that "a requirement that a specific number of summonses be issued or arrests be made over a specific period of time has always been prohibited." The memo then states that "[o]fficers who avoid engaging in enforcement activities . . . can be subjected to adverse consequences."[261] Furthermore, "[a]n obvious way of gauging an officer's activity level is to count the number of enforcement encounters that an officer has over time," and to compare an

---

[256] Lieutenant Barrett credibly testified that "we were looking for fives, that was any combination of summonses or UF-250s." 5/7 Tr. at 6272.

[257] PX 297.

[258] *See* Pl. Findings ¶¶ 61–62 (collecting sources).

[259] *See* 4/2 Tr. at 1842.

[260] Previously, section 215 only addressed quotas for traffic violations. *See* PX 290 at *0096.

[261] *Id.* at *0097.

officer's activity level to that of similarly situated officers. The memo only explicitly prohibits "discussing *specific numerical objectives*" or linking "the failure to reach a *specific numerical goal* with an adverse employment consequence."[262]

In 2011, the NYPD introduced the "Quest for Excellence" program, a set of new policies for evaluating the performance of officers and encouraging the use of performance goals.[263] One of the central documents in the Quest program is Operations Order 52 ("OO 52"), which was issued October 17, 2011 and describes officers' performance objectives. OO 52 made clear that supervisors must evaluate officers based on their activity numbers, with particular emphasis on summonses, stops, and arrests, and that officers whose numbers are too low should be subjected to increasingly serious discipline if their low numbers persist. Specifically, NYPD managers "*can* and *must*" set "performance goals" for "proactive enforcement activities," with "particular attention" to "self-initiated arrests, issuing summonses, [and] conducting stops."[264] Deputy Commissioner Beirne testified that "performance goals" could include "setting a goal of a certain number of stops."[265] Officers who "fail to engage in proactive activities," and thus continue to fail in "addressing sector/post conditions," will ultimately be referred to the "Performance Monitoring Unit" for potential "transfer,

---

[262]     *Id.* (emphasis added).

[263]     *See* 4/15 Tr. at 3364 (Deputy Commissioner of Labor Relations John Beirne, one of the designers of Quest).

[264]     OO 52, PX 285 ¶¶ 1, 3.  For the many ways of referring to low activity numbers, see 3/22 Tr. at 966 (Lieutenant Rafael Mascol testifying that he would tell an underperforming officer: "Listen, you need to be a little more *proactive* out there, be a little bit busier about *doing your assignments* out there, *handling the conditions* that you have out there, you know, *you seem to have fallen off for a few months there*, is there something going on?" (emphases added)).

[265]     4/15 Tr. at 3368–3369.

reassignment or other appropriate disciplinary action."[266]

In addition, the form used to track officer performance reflects the NYPD's emphasis on enforcement activity numbers and effectiveness without attention to the constitutional justifications for enforcement. An officer is required to tally her activities each day on the Police Officer's Monthly Conditions Impact Measurement Report.[267] The form contains columns for a number of activities, including vertical patrols, radio runs, arrests and summonses, and the preparation of various reports, including UF-250s.[268] At the end of the month, the officer tallies her total activities, and the supervisor provides a brief written evaluation of whether the officer's "impact on declared conditions" was "effective." Each quarter, the supervisor reviews the officer's activity over the prior three months and evaluates the officer's effectiveness.[269]

In contrast to this detailed review system for effectiveness, there is no process for evaluating whether enforcement activities are legally justified.[270] For the purposes of

---

[266]    OO 52 ¶ 15.

[267]    *See* Interim Order 49 (Oct. 24, 2011) ("IO 49"), PX 315 (suspending Patrol Guide 205-57), at 2; Police Officer's Monthly Conditions Impact Measurement Report, PX 205 (blank form).

[268]    *See* PX 205.   The form provides another example of the NYPD systematically collecting information relevant to evaluating the "quality" of stops in the sense of their *effectiveness*, but not in the sense of their *constitutionality*.

[269]    *See* IO 49 at 2–5; PX 205; 3/22 Tr. at 892–893 (Deputy Chief Marino confirming that officers' success or failure in meeting performance goals is monitored exclusively through the monthly, quarterly, and annual reports).  The monthly and quarterly evaluations also play a significant part in an officer's annual performance evaluation.  *See, e.g.*, 4/15 Tr. at 3410 (Beirne).

[270]    This fact is evident from the form itself, *see* PX 205, but was also corroborated by testimony.  *See, e.g.*, 3/27 Tr. at 1178 (Lieutenant Jonathan Korabel acknowledging "there's no substantive information [on a monthly activity report] about [the] stops and frisks, arrests, or summonses" tallied on the report).

79

performance review, an unconstitutional stop is no less valuable to an officer's career than a constitutional one — because the two are indistinguishable. In fact, a review of several monthly activity reports suggests that in practice, many officers are evaluated almost exclusively based on the number of stops, arrests, and summonses that they carry out. Based on these reports, as well as corroborating testimony, an "effective" "impact on declared conditions," in the context of performance reviews, is sometimes nothing more than a euphemism for an acceptable number of stops, arrests, and summonses in targeted locations.[271]

   Officers may be subject to warnings and more severe adverse consequences if they fail to achieve what their superiors perceive as appropriate enforcement activity numbers. Deputy Commissioner Beirne acknowledged that an officer's failure to engage in enough proactive enforcement activities could result in a negative performance evaluation and reassignment to a different command, and that both of these steps represent "an adverse employment action."[272] As noted earlier, the only proactive enforcement activities mentioned in

---

[271] For example, the following are notes from supervisors on the back of officers' monthly report forms in the field labeled "Officer's Impact on Declared Conditions," which invites supervisors to "[d]*escribe in detail why* [the officer] *was effective/ineffective.*" All of the evaluations are from 2012: "Officer showed improvement from last month and was proactive in combating conditions which resulted in 24 summonses to address conditions." PX 234 (marked "Effective"). "PO . . . was effective for the month with 1 grand larceny . . . arrest and 20 UF-250s." *Id.* at *1255 (marked "Effective"). "PO . . . was effective for the month [with] 1 arrest and 20 UF-250s in target areas." *Id.* at *1257 (marked "Effective").

[272] 4/15 Tr. at 3370–3372. In contrast to Deputy Commissioner Beirne, Chief Esposito and Deputy Chief Marino evaded plaintiffs' questions about numerical enforcement activity goals, and insisted that officers are evaluated on "tak[ing] care of the condition," 4/9 Tr. at 2957 (Esposito). *Accord* 3/22 Tr. at 881 (Marino). Chief Esposito and Deputy Chief Marino offered this testimony even though the Quest program contains no metrics for measuring "addressing conditions" other than the tallies of an officer's activities. I also note that an arbitration proceeding found that Deputy Chief Marino himself imposed quotas on officers when he was the Commanding Officer of the 75th Precinct. *See* 4/9 Tr. at 2954–2955 (Chief Esposito acknowledging Marino arbitration findings).

OO 52 are stops, summonses, and arrests.[273]

It is difficult to see any difference between a performance goal and a quota if "performance goals" operate as Deputy Commissioner Beirne testified.[274]  It is not surprising, then, that since 2010, there have been at least nine grievances filed by police officers against the NYPD alleging adverse employment action as a result of quotas.[275]

### d.    Conclusion

The foregoing evidence shows that officers are routinely subjected to significant pressure to increase their stop numbers, without corresponding pressure to ensure that stops are constitutionally justified.  Together with evidence described in the next section, this is a predictable formula for producing unjustified stops.  To paraphrase a statement by Chief Hall from his 2010 memo, imposing numerical performance goals for enforcement activities, without providing effective safeguards to ensure the activities are legally justified, "could result in an officer taking enforcement action for the purpose of meeting a [performance goal] rather than because a violation of the law has occurred."[276]

### 3.    Targeting "the Right People"

The role of race in stop and frisk has been a source of contention since the Supreme Court first sanctioned the practice in 1968.  In *Terry*, the Supreme Court recognized that "'[i]n many communities, field interrogations are a major source of friction between the police and minority groups,'" and that friction "'increases as more police departments

---

[273]    *See* OO 52 ¶¶ 1, 3.

[274]    4/15 Tr. at 3369 (distinguishing quota and performance goal).

[275]    *See id.* at 3399–3400 (Beirne); 5/10 Tr. at 6790–6791 (Herran).

[276]    PX 290 at *0096.  The original includes "quota" rather than "performance goal," but the meaning is the same.

[encourage] officers . . . routinely to stop and question persons on the street.'"[277]   In 1996, the

Ninth Circuit noted that these stops "are humiliating, damaging to the detainees' self-esteem, and

reinforce the reality that racism and intolerance are for many African-Americans a regular part

of their daily lives."[278]

The NYPD maintains two different policies related to racial profiling in the

practice of stop and frisk:  a written policy that prohibits racial profiling and requires reasonable

suspicion for a stop[279] — and another, unwritten policy that encourages officers to focus their

reasonable-suspicion-based stops on "the right people, the right time, the right location."[280]

Based on the evidence summarized below, I find that the NYPD's policy of

targeting "the right people" encourages the disproportionate stopping of the members of any

racial group that is heavily represented in the NYPD's crime suspect data.  This is an indirect

form of racial profiling.  In practice, it leads NYPD officers to stop blacks and Hispanics who

would not have been stopped if they were white.  There is no question that a person's race, like a

person's height or weight, is a permissible consideration where a stop is based on a specific

description of a suspect.[281]  But it is equally clear that it is impermissible to subject all members

---

[277]     *Terry*, 392 U.S. at 14 n.11 (quoting PRESIDENT'S COMMISSION ON LAW
ENFORCEMENT AND ADMINISTRATION OF JUSTICE, TASK FORCE REPORT: THE POLICE (1967)).
*See also id.* at 14–15 (noting the problem of "[t]he wholesale harassment by certain elements of
the police community, of which minority groups, particularly Negroes, frequently complain").

[278]     *Lambert*, 98 F.3d at 1188 (collecting scholarly sources).

[279]     *See, e.g.*, Interim Order 20 (5/16/12), PX 183 ¶¶ 2–4 (current racial profiling
policy, emphasizing that stops must be based on reasonable suspicion); Operations Order 11
(3/13/02), PX 184 ¶¶ 1–2 (previous racial profiling policy, emphasizing same).

[280]     PX 332T at 20.  NYPD personnel of diverse ranks repeated variations on this
phrase throughout the trial.  *See* Pl. Findings ¶¶ 49–55 (collecting sources); 4/10 Tr. at 3035
(Chief Esposito agreeing that the NYPD looks for "the right people, at the right place, at the
right time").

[281]     *See infra* Part V.B.1 (conclusions of law regarding racial profiling).

of a racially defined group to heightened police enforcement because some members of that

group appear more frequently in criminal complaints.  The Equal Protection Clause does not

permit race-based suspicion.

Chief Esposito, the highest ranking uniformed member of the NYPD throughout

the class period and the chair at Compstat meetings, was especially frank about the NYPD's

policy of targeting racially defined groups for stops, provided that reasonable suspicion is also

present:

> Q. Quality stops are stops that are in the right place at the right time, correct?
> A. Yes.
> Q. And targeting . . . the right people, correct?
> A. Among other things.
> Q. And the right people would be young black and Hispanic youths 14 to 20, correct?
> A. At times. [pause] You failed to mention reasonable suspicion.[282]

Chief Esposito conceded that not all stops are based on a specific suspect description from a

crime complaint.  In fact, officers check "Fits Description" on only 13% of UF-250s.

Nevertheless, Esposito testified, the NYPD uses criminal suspect data to target certain

individuals for stops even when there is no suspect description:

> Q: Do you believe the disparity in stop, question and frisk among black and Latino men is evidence of racial profiling?
> A: No.  I don't believe that. . . .  Because the stops are based on complaints that we get from the public.
> . . .
> THE COURT: But there are many street stops that have nothing to do with complaints, right?
> THE WITNESS: Correct.
> THE COURT: It's observed conduct. . . . It's not based on a complaint of a victim.
> THE WITNESS: It's based on the totality of, okay, who is committing the

---

[282]     4/10 Tr. at 3034.  To be clear, there is nothing constitutionally problematic about targeting "the right place at the right time," where this means that deployment should "mirror the time of the crime and the place of the crimes that are being committed."  PX 157 at 268–269 (Giannelli).

— who is getting shot in a certain area? . . . *Well who is doing those shootings? Well, it's young men of color in their late teens, early 20s.*[283]

Thus, within the pool of people that an officer could reasonably suspect of criminal activity, the people who match the general demographics of the local criminal suspect data are "the right people" to be stopped.[284]

Other evidence corroborates this interpretation of Chief Esposito's testimony. On one of the Serrano recordings, Deputy Inspector Christopher McCormack explained to Officer Serrano that stopping "the right people, [at] the right time, [in] the right location" meant not stopping "a 48-year-old lady [who] was walking through St. Mary's Park when it was closed."[285] He continued as follows:

> INSPECTOR: This is about stopping the right people, the right place, the right location.
> SERRANO: Okay.
> INSPECTOR: Again, take Mott Haven where we had the most problems. And the most problems we had, they was robberies and grand larcenies.
> SERRANO: And who are those people robbing?

---

[283]    4/10 Tr. at 3027–3029 (emphasis added). Chief Esposito later testified that stop activity targets "the people that are committing the crimes." *Id.* at 3029. While I find that the NYPD has defined "the right people" to be stopped in terms of race, gender, and age, I note that it would be equally problematic if the NYPD instructed officers to target "the right people" or "the people that are committing the crimes" *without* defining these categories. This would invite officers to fill in the undefined terms with their own stereotypes and biases regarding what a criminal looks like.

[284]    Chief Esposito does not view targeting "the right people" as a form of racial profiling, because in his view, racial profiling cannot exist provided that stops are based on reasonable suspicion:

> As I think about, since this has been going on since '08, yeah, I think if you look at that form, if it's filled out properly, it gives you reasonable suspicion, and if you have reasonable suspicion established, then you do not have racial profiling. It's as simple as that.

4/9 Tr. at 2824. Of course, it is also erroneous to suggest that properly filling out a UF-250 necessarily establishes reasonable suspicion.

[285]    PX 332T at 21.

INSPECTOR: The problem was, what, male blacks. And I told you at roll call, and I have no problem telling you this, male blacks 14 to 20, 21. I said this at roll call.[286]

Deputy Inspector McCormack testified that his statements in the recording were based on suspect descriptions from victims. But he also acknowledged that the descriptions of the suspects consisted only of the information stated here: males, black, between 14 and 21.[287]

Earlier in the recording, when challenged by Officer Serrano, Deputy Inspector McCormack clarified that he does not believe "every black and Hispanic" is subject to being stopped based on the crime suspect data.[288] Deputy Inspector McCormack, like Chief Esposito, recognized that reasonable suspicion is required for every stop. But both believe that, within the pool of people displaying reasonably suspicious behavior, those who fit the general race, gender, and age profile of the criminal suspects in the area should be particularly targeted for stops.[289]

The stop of Cornelio McDonald illustrates the NYPD's policy of indirect racial profiling based on crime suspect data. Officer Edward French (now a detective) was aware of crime reports that a black male had been burglarizing residences in Queens, as well as reports of a black male committing armed robberies of commercial establishments in the borough. The only information known about the suspects in these robbery patterns was that they were male

---

[286] *Id.* at 23–24. Mott Haven is a mostly black and Hispanic housing development in the Mott Haven neighborhood in the Bronx. *See id.* at 22–23; 5/13 Tr. at 7014 (McCormack).

[287] *See* 5/13 Tr. at 7016–7017.

[288] *See* PX 332T at 23. I also note that Deputy Inspector McCormack does not display the contempt or hostility toward the local population that appears in many of the Schoolcraft recordings. To the contrary, Deputy Inspector McCormack emphasizes his belief "that 99 percent of these people in this community are great, hardworking people," and makes clear that he has no interest in targeting blacks or Hispanics as such: his goal is to focus stop activity on "whatever group" is committing targeted crimes. *Id.* at 8, 11.

[289] Similarly, Deputy Inspector Stephen Cirabisi testified that at Compstat meetings, attention is paid to whether the people being stopped are the same as "the people that are suspected of committing the crimes." 5/2 Tr. at 5696–5697.

and black — a very general description that would not justify a stop based on "fits

description."[290]  Nevertheless, Officer French stopped McDonald in part because he fit the

suspect description.  McDonald was a black man crossing the street late on a winter night with

his hands in his pockets, and as a *black* man he was treated as more suspicious than an

identically situated white man would have been.[291]  In other words, because two black males

committed crimes in Queens, all black males in that borough were subjected to heightened police

attention.

      The UF-250s prepared by Officer Gonzalez, one of the most aggressive stoppers

in 2009, provide a different illustration of an officer responding to the NYPD's policy of indirect

racial profiling based on crime suspect data.  Officer Gonzalez checked "Fits Description" on

132 of his 134 UF-250s, although he also indicated that not a single one of those stops was based

on an ongoing investigation, a report from a victim, or a radio run.[292]  Nonetheless, Gonzalez's

supervisor, then-Sergeant Charlton Telford, testified that he was not concerned by this

discrepancy.  Telford insisted that Officer Gonzalez's stops were based on "the race, the height,

[and] the age" of criminal suspects.[293]  The following were the suspect descriptions that formed

the basis for Officer Gonzalez's 134 stops:

> The burglaries, the description we had was a male Hispanic, between 5'8",
> 5'9", in his 30s.  The robberies were male blacks, anywhere from four to five
> [in number], between the ages of 14 to 19.  And the shooting was a male

---

[290]    *See* 4/17 Tr. at 3743; Def. Findings ¶ 13.

[291]    *See infra* Part IV.D.1.c.

[292]    *See* PX 557; PX 557-D; 5/7 Tr. at 6327–6328 (Lieutenant Charlton Telford).
"Radio Run/Sprint #" is a field on the front of the UF-250, while "Report From Victim/Witness"
and "Ongoing Investigations, e.g., Robbery Pattern" are boxes in the Additional Circumstances
section on the back of the form.  *See* Blank UF-250.

[293]    5/7 Tr. at 6327–6328.

black in his 20s.[294]

Perhaps as a result of Officer Gonzalez's reliance on this general suspect data, 128 of the 134

people he stopped were black or Hispanic.[295]  This is roughly in line with the percentage of

criminal suspects in his precinct who are either black or Hispanic (93%), but far exceeds the

percentage of blacks and Hispanics in the local population (60%).[296]  Thus, Officer Gonzalez's

UF-250s provide a perfect example of how racial profiling leads to a correlation between the

racial composition of crime suspects and the racial composition of those who are stopped by the

police.  By checking "Fits Description" as a basis for nearly every stop, Officer Gonzalez

documented what appears to be a common practice among NYPD officers — treating generic

crime complaint data specifying little more than race and gender as a basis for heightened

suspicion.

New York State Senator Eric Adams' testimony provided further evidence of

official acquiescence in racial profiling by NYPD leadership.  Senator Adams, a former NYPD

captain, testified about a small meeting he attended at the Governor's office in Manhattan in July

2010.  Former New York Governor David Paterson, Senator Adams, another state senator, a

state assemblyman, and Commissioner Kelly were all present to discuss a bill related to stop and

frisk.  Senator Adams raised his concern that a disproportionate number of blacks and Hispanics

were being targeted for stops.  Commissioner Kelly responded that he focused on young blacks

and Hispanics "because he wanted to instill fear in them, every time they leave their home, they

---

[294]    *Id.* at 6341.

[295]    PX 557-D.  Similarly, Officer Dang stopped 120 blacks and 0 whites during a
sample quarter in 2009, despite the fact that he was patrolling a 43% black precinct.  *See* DX
L14; RAYMOND W. KELLY, POLICE COMMISSIONER, REASONABLE SUSPICION STOPS: PRECINCT
BASED COMPARISON BY STOP AND SUSPECT DESCRIPTION, DX Y8, at *4974.

[296]    DX Y8 at *4974.

could be stopped by the police."[297]  Senator Adams testified that he was "amazed" that Commissioner Kelly was "comfortable enough to say that in the setting."[298]

I find Senator Adams' testimony credible, especially in light of the Senator's former affiliation with the NYPD, Commissioner Kelly's decision not to appear at trial to rebut the testimony, the City's failure to offer *any* rebuttal evidence regarding Commissioner Kelly's statement at this meeting, and the other evidence of tolerance toward racial profiling at the NYPD.  In fact, the substance of Commissioner Kelly's statement is not so distant from the City's publicly announced positions.  Mayor Bloomberg stated in April that the NYPD's use of stop and frisk is necessary "to *deter* people from carrying guns. . . . [I]f you end stops looking for guns, . . . there will be more guns in the hands of young people and more people will be getting killed."[299]  At the same time, the City emphasized in its opening arguments that "blacks and Hispanics account for a disproportionate share of . . . crime perpetrators,"[300] and that "90 percent of all violent crime suspects are black and Hispanic."[301]  When these premises are combined — that the purpose of stop and frisk is to deter people from carrying guns and that blacks and Hispanics are a disproportionate source of violent crime — it is only a short leap to the conclusion that blacks and Hispanics should be targeted for stops in order to deter gun violence, regardless of whether they appear objectively suspicious.  Commissioner Kelly simply made explicit what is readily inferrable from the City's public positions.

---

[297]    4/1 Tr. at 1589.  Defendants did not object to this out of court statement.

[298]    *Id.* at 1585–1589.

[299]    Mayor Bloomberg Delivers Address on Public Safety to NYPD Leadership (4/30/13) ("April 30, 2013 Bloomberg Address"), PX 583 (emphasis added).

[300]    3/18 Tr. at 44 (Heidi Grossman).

[301]    *Id.* at 45.

### 4.    Inadequate Monitoring and Supervision

Previous sections have described the institutional pressure on NYPD officers to make more stops and the reward for high stop activity. The City argues that the NYPD has taken effective measures to counter the risk that this pressure will lead to legally unjustified stops. However, after nine weeks of trial, the City failed to establish that the NYPD has any effective mechanism for identifying or tracking unconstitutional stops.

### a.    Inadequate Documentation and Document Review

The City concedes that a UF-250, standing alone, often provides inadequate information to indicate whether a stop was based on reasonable suspicion.[302] An earlier version of the UF-250 included a large blank space in which officers were required to state the "factors which caused [the] officer to reasonably suspect [the] person stopped."[303] The current UF-250, which has been in use since November 2002, does not require the officer to articulate in writing the facts justifying the stop.[304] Instead, officers are directed to record the details of each stop in their memo books, also known as "activity logs."[305]

In practice, however, officers do not in fact record the factors justifying a stop in

---

[302]    *See* Def. Mem. at 7; *supra* Part IV.B.2 (discussing weaknesses of UF-250s for verifying constitutionality of stops); Fagan Rpt. at 53–55.

[303]    Stop and Frisk Report, PX 449. As one supervisor stated on a recording: "We used to have to write a two-page story on the damn thing. . . . You had to write the whole story. . . . Now it's easy. You just check a couple boxes off." PX 289T (1/29/09 at 6.56–9.03).

[304]    *See* Blank UF-250.

[305]    *See* Operations Order 44 (9/11/08), PX 96, at 1 (emphasizing the importance of activity logs, stating that supervisors must inspect subordinates' activity logs for "accuracy and completeness at regular and unspecified intervals," and noting that failure to make required entries may result in discipline); *id.* at 2 (stating that "IT IS IMPERATIVE THAT A DETAILED ENTRY BE MADE AS INDICATED" for each stop, such as: "susp. male randomly looking in apt. windows"); Patrol Guide: Stop and Frisk at 1 (noting that officer is required to enter details of stop in activity log); 3/27 Tr. at 1099 (B. Dennis) (stating that all officers are required to carry a memo book, which is also called an activity log).

their memo books, and supervisors do not address this deficiency. Officer Dennis testified that "while it was suggested" that officers record the "time, date, location of the stop, name of the person stopped, crime suspected, and that a 250 was prepared," it was not "always" necessary and he did not always do so.[306]  Officer Dennis's memo book entry regarding his stop of Devin Almonor included only the time of the stop and the following two statements: "2 males stopped," "one male refused [illegible mark], UF-250."  With regard to Almonor's arrest and transfer to the 30th Precinct, Dennis wrote only "one under to 30."[307]  No one ever discussed these memo book entries with him.[308]  In fact, throughout his many years as a police officer, no superior ever told him that his activity log entries concerning stops were insufficient.[309]

Some supervisors are not even aware that officers are required to record the factors justifying a stop in their memo books.  Sergeant Michael Loria could not remember ever being told in training that officers should record more information in their memo books than appears on the UF-250.[310]  In addition, Chief Esposito openly expressed resistance to the policy of requiring officers to state the justifications for a stop in their memo books, suggesting that the practice was "redundant many times" and interfered with an officer's "ability to do police

---

[306]    3/27 Tr. at 1099–1100.  *Accord id.* at 1141–1142 (B. Dennis).

[307]    *Id.* at 1101–1102; PX 19 (memo book).

[308]    *See* 3/27 Tr. at 1103.

[309]    *See id.* at 1100–1101.  Similarly, Officer French did not believe he needed to state the reasons for a stop in his memo book, as long as he noted the suspected crime.  *See* 4/17 Tr. at 3737.  For numerous other examples of credible testimony concerning inadequate memo book entries, supervisors' failures to discuss these deficiencies, and superiors' failures to address the problem, see Pl. Findings ¶¶ 97, 99 (collecting sources).

[310]    *See* 4/17 Tr. at 3796–3797.

work."[311]

   In fact, the NYPD has been aware for the last *decade* of a systematic failure by officers to record the justifications for stops in their memo books. Each month, every enforcement command is required to perform a self-inspection of a sample of twenty-five of its UF-250s and corresponding activity log entries. As part of the self-inspection, the reviewer is required to indicate whether, for each stop, the officer made an activity log entry detailing the circumstances of the stop.[312]

   According to QAD, which is responsible for ensuring that the NYPD as an organization complies with its written policies and procedures,[313] *every* patrol borough has failed *every* annual audit of activity log entries corresponding to stops for the last decade.[314] Numerous commanders acknowledged that they received QAD audits showing their officers' failure to prepare activity log entries for stops, but did not correct the failure.[315] Assistant Chief Thomas Dale, the Commanding Officer of Patrol Borough Queens South, acknowledged that failure to complete activity log entries for stops is "a serious problem," but testified that he took no

---

[311] 4/9 Tr. at 2912. *Accord id.* (Chief Esposito testifying that "[i]n a perfect world, I think this is a hundred percent acceptable. But we're not in a perfect world out there."); *id.* at 2929 (Chief Esposito testifying that memo book entries providing more detail than a UF-250 would be "[f]or the most part" redundant, and that "if an officer checked off furtive movement," that would be "enough" for him).

[312] *See* PX 58, 71, 89 (Worksheets 802 and 802-A, and instructions for completing them). Reviewers are instructed that an activity log entry does not need to include any information about the reasons for a stop beyond what already appears on the UF-250. *See* 4/23 Tr. at 4645 (Cronin).

[313] *See* 4/23 Tr. at 4624.

[314] *See* Pl. Findings ¶ 197 (citing PX 450; DX G6); 4/23 Tr. at 4651 (testimony that any score below a three is considered failing).

[315] *See, e.g.,* 4/10 Tr. at 3213–3219 (Inspector Donald McHugh, Commanding Officer of 41st Precinct); 4/16 Tr. at 3527–3531 (Deputy Inspector Charles Ortiz, Commanding Officer of 43rd Precinct); Pl. Findings ¶ 198 (collecting sources).

corrective actions even after every precinct in Queens South failed the QAD audit of activity log entries for three consecutive years.[316]  Failure on this scale indicates, in the words of plaintiffs' police practices expert Lou Reiter, that "the operational way memo books are used in the field is contrary to . . . all of the written training and all of the policy," and the supervisors "are not holding their officers accountable for it."[317]

On March 5, 2013, five years after the commencement of this litigation and two weeks before the beginning of trial, Chief Hall circulated a memo requiring all patrol borough officers to include nine categories of information in every activity log entry for a stop; to elaborate the basis for a stop in the "Additional Circumstances/Factors" section of the UF-250; and to photocopy every activity log entry for a stop and attach the photocopy to the UF-250 before submitting it to a supervisor.[318]  Just as I gave little weight to the equally ambitious memo that Chief Hall circulated shortly before the beginning of the *Ligon* preliminary injunction hearing,[319] I give little weight to the March 5 memo or to the City's uncorroborated anecdotal evidence of compliance with it.[320]

---

[316]     PX 155 at 93–94, 118–120 (Dale deposition).

[317]     4/24 Tr. at 4845.  *Accord id.* (Reiter testifying that "[i]t's like everybody sticks their head in the sand and hopes that passing [a] memo up through the chain of command and back down will somehow change it.").

[318]     *See* 2013 Memorandum of Chief of Patrol James Hall, DX J13.  The nine categories of information are: "Date/time of stop; Location of stop; Suspect's Last name, First name; Suspect's pedigree; Suspected crime or offense (*felony or penal law misdemeanor*); Explanation of suspicion (*looking into windows*, *pulling on doorknobs*, *etc*[.]); Whether or not the suspect was frisked; Sprint/Job number; Disposition of stop (*96*, *92C*, *93Q*, *etc.*)."  *Id.*

[319]     *See Ligon*, 2013 WL 628534, at *25 n.291.

[320]     *See* Def. Findings ¶ 54 (citing testimony of Chief Hall and Chief William Morris).  This evidence included the review by NYPD personnel of a sample of forty UF-250s.  According to the City's witness, all forty were accompanied by memo book entries, but sixteen contained "either no entry or an inadequate entry regarding the reason for the stop" — the essential element in determining whether a stop was legally justified.  5/9 Tr. at 6578–6580.  In addition,

An untested, last-minute adjustment — even if undertaken in good faith — cannot undo ten uninterrupted years of willful disregard.  I take the March 5 memo neither as evidence that the NYPD has solved the problem of documenting stops, nor as evidence of the NYPD's commitment to finding a solution, but rather as a belated recognition of the obvious inadequacies of the existing system of documentation.[321]

Finally, I note that the NYPD has no meaningful procedures for auditing stop paperwork to monitor the constitutionality of stops.  The City agreed to conduct regular audits of whether stops recorded on UF-250s were based on reasonable suspicion when it executed the Stipulation of Settlement in *Daniels v. City of New York* on September 24, 2003.[322]  After signing the settlement, however, QAD simply continued to use audit protocols that it had introduced in 2002.  These protocols, which remain in effect today, require every command to conduct the monthly "self-inspection" described above, using two forms, Worksheets 802 and 802-A, which are then reviewed by QAD.[323]  The only arguably substantive element of these forms is a column on Worksheet 802 in which the reviewer is asked to note whether at least one

---

because plaintiffs were not given an opportunity to review the forty UF-250s and accompanying memo book entries, *see id.*, it is possible that more than sixteen lacked adequate entries regarding the reason for the stop.

[321]    *Cf. United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.").

[322]    *See* 9/24/03 Stipulation of Settlement, *Daniels v. City of New York*, No. 99 Civ. 1695, PX 114, at 6.

[323]    *See* PX 58, 71, 89 (Worksheets 802 and 802-A, and instructions); Finest Message Regarding Compliance with Operations Order 11 § 2 (12/26/02), PX 350 (ordering self-inspection based on Worksheets 802 and 802-A); 4/23 Tr. at 4630; Pl. Findings ¶¶ 108–121; Def. Findings ¶ 24.

93

box on the UF-250 was checked under "What Were Circumstances Which Led To Stop?"[324] In other words, the Worksheets lead to a superficial review of whether paperwork was completed, not a substantive review of whether a stop was constitutional. QAD's annual audit of the self-inspections is similarly ineffective.[325]

Despite the obvious inadequacy of the QAD audits as a means to identify either unjustified stops or racial profiling,[326] officials in the NYPD continue to defend the QAD audit process.[327] Inspector Mary Cronin, the former Executive Officer and current Commanding Officer of QAD, testified that the QAD audit worksheets allow reviewers to evaluate whether a stop was based on reasonable suspicion, because any form on which at least one stop circumstance has been checked — for example "furtive movements" as the sole basis for a criminal trespass stop — is sufficient "for purposes of [QAD's] review."[328] This testimony demonstrates the patent inadequacy of QAD audits. A review of whether a single stop factor has

---

[324]    *See* PX 89 at 2, 4.

[325]    *See* 4/23 Tr. at 4650 (Cronin).

[326]    *See, e.g.*, 3/22 Tr. at 1053–1055 (Assistant Chief Diaz conceding that officers engaged in racial profiling are unlikely to write on a UF-250 "'I stopped this person because they're black'"). As early as 1999, Commissioner Safir recognized the inadequacy of relying solely on paperwork prepared by an officer to monitor the constitutional adequacy of the officer's stops. *See* PX 46 at 48. In addition, NYPD commanders and supervisors testified at trial that UF-250s do not provide enough information to determine whether reasonable suspicion existed for a stop. *See, e.g.*, 4/10 Tr. at 3207 (McHugh); Pl. Findings ¶ 118. *Accord* Def. Mem. at 7.

[327]    Defending the current paperwork-only audit process, Deputy Commissioner Farrell rejected a proposal to include field observations of stops in the audit. *See* 5/15 Tr. at 7297–7299. QAD is aware of practical methods for evaluating police conduct without relying purely on paperwork, such as the methods it uses to audit the treatment of crime complaints, and complaints about courtesy, professionalism, and respect. In both cases, QAD makes phone calls to a sample of civilians to evaluate their encounters with the police. *See* 4/24 Tr. at 4792 (Cronin); 5/15 Tr. at 7291–7293 (Farrell).

[328]    4/23 Tr. at 4640–4641, 4720–4721.

been checked on a UF-250 is not an effective review of the constitutionality of a stop.

### b. Inadequate Supervision

As summarized above, the NYPD's documentation provides an inadequate basis for monitoring whether officers are conducting unconstitutional stops. Nevertheless, the City argues that in practice, the NYPD identifies unconstitutional stops through "a chain of command of supervisors, namely, sergeants, lieutenants, and precinct commanders."[329] At trial, the City introduced a large volume of testimony and other evidence concerning the details of this chain of command, and the responsibilities of NYPD personnel at various ranks.[330] Very little of this evidence was relevant, however, because very little of it concerned the supervision of *the constitutionality of stops*. In fact, the City notes only two concrete mechanisms for identifying unconstitutional stops: *first*, sergeants "routinely witness stops made by officers"; and *second*, sergeants "review their officers' UF-250s and frequently discuss the underlying facts of stops with officers to determine whether an officer is able to articulate a proper basis for the stop."[331]

The evidence showed that neither mechanism provides an effective means for monitoring the constitutionality of stops. With regard to sergeants witnessing stops, there was no *quantitative* evidence concerning how many of the 4.4 million stops during the class period were witnessed by sergeants or how many of the observed stops were self-initiated versus based

---

[329] Def. Findings ¶ 47. *Accord* Pl. Findings ¶ 86; 4/9 Tr. at 2841–2842, 2919 (Chief Esposito testifying that supervisory review mitigates the risk posed by incomplete or inaccurate documentation of stops); *id.* at 2929–2930 (Chief Esposito testifying that he relies on supervisors as his "main . . . way of determining" whether the NYPD's officers are acting in accordance with the policy against racial profiling and the policy of only making stops based on reasonable suspicion).

[330] *See, e.g.*, Def. Findings ¶ 47 (collecting some sources).

[331] *Id.*

on radio runs.[332]  More importantly, the evidence showed that sergeants do not effectively

monitor the constitutionality of stops even when they are present.[333]

        With regard to supervisors' review of stops after the fact, there are no written

policies requiring supervisors to evaluate the constitutionality of stops.  The section of the Patrol

Guide containing the procedures for stops and frisks directs uniformed members of the service to

"[i]nform [the] desk officer, [in the] precinct of occurrence, of [the] facts [of the stop]."[334]  Chief

Giannelli explained that this requirement is satisfied when the officer submits a UF-250 to her

supervisor.[335]  Despite the fact that NYPD officials like Chief Esposito present supervisory

review as the central mechanism for monitoring the constitutionality of stops, the section of the

Patrol Guide describing the desk officer's duty to review UF-250s contains *no mention* of a

---

[332]    As noted above, 78% of the stops during the class period were self-initiated rather than based on a radio run.  *See* PX 417D.

[333]    Sergeant Stephen Monroe, when asked directly how he ensures "that officers under [his] supervision are conducting lawful stops based on reasonable suspicion," responded : "I usually . . . observe the stops *looking for safety and their approach of the suspect*."  4/29 Tr. at 5266–5267 (emphasis added).  When asked what he discusses with officers regarding their stops, Sergeant Monroe again emphasized officer safety and effectiveness, making no mention of constitutionality.  *See id.* at 5267; 4/17 Tr. at 3778.  In addition, the supervisors who witnessed the unconstitutional stops in this case failed to recognize or respond to their unconstitutionality.  *See, e.g.*, 3/27 Tr. at 1145–1147, 1176–1179 (Sergeant Korabel testifying that he was supervising Officer Dennis in the anticrime unit during the stop of Devin Almonor); *infra* Part IV.D.1.b (concluding that Almonor's stop and frisk was unconstitutional).
        Sergeant Loria testified that during his twelve years as an anticrime sergeant, he was present "[v]ery frequently" for stops by his officers.  4/17 Tr. at 3755–3756, 3789–3792.  Nevertheless, he testified that he had never told a single officer that a stop or frisk was improper.  *See id.* at 3778.  Sergeant Loria also testified at his deposition that as a sergeant, he did not review his officers' UF-250s for reasonable suspicion, and that he could not recall anyone in the NYPD ever telling him to do so.  *See id.* at 3770; 4/8 Tr. at 2706 (Officer Leek testifying that his supervising Sergeant never exited the police van during the February 24, 2011 stop of Clive Lino).  *See infra* Part IV.D.2.d.

[334]    Patrol Guide 212-11, Stop and Frisk (7/18/03) ("P.G. 212-11"),  PX 98 at 1; Patrol Guide 212-11, Stop and Frisk (5/24/02), Ex. 4 to Giannelli Dep.

[335]    *See* Giannelli Dep. at 166–167.  Chief Giannelli also testified that he did not require desk officers to ask police officers about the facts of a stop.  *See id.* at 168.

review for constitutionality, or of any substantive review for that matter.[336]  In addition, while the lesson plan for training newly promoted sergeants on stop and frisk mentions the need for reasonable suspicion and the prohibition on racial profiling, the plan does not instruct sergeants to perform any review of stops for constitutionality.[337]

The evidence also shows that in practice, supervisors do not review the constitutionality of stops after the fact.  Rather, supervisors review whether a UF-250 was fully completed.[338]  Supervisors are not required to review activity logs alongside UF-250s,[339] nor do they routinely discuss the circumstances of a stop with the stopping officer in order to determine whether the stop was justified.[340]

---

[336]     *See* P.G. 212-11 ¶ 10.

[337]     *See* Lesson Plan, Sergeants Leadership Course (4/30/09), DX R3; 4/29 Tr. at 5168–5170 (Chief James Shea unable to explain why, contrary to his testimony that sergeants are trained to review every street stop for reasonable suspicion, lesson plan does not instruct newly promoted sergeants to do this); 4/2 Tr. at 1937, 1939, 1951–1953 (Sergeant Richard Hegney testifying that he does not recall receiving any training regarding stop and frisk after he was promoted to sergeant in 2000).  I also note that the Quest for Excellence program, as discussed above, does not require supervisors to review the constitutionality of officers' stops. *See supra* Part IV.C.4.a; 4/15 Tr. at 3385–3390 (Deputy Commissioner Beirne conceding that nothing in Orders 49, 50, or 52 directs a supervisor to review stops for constitutionality).

[338]     *See, e.g.*, Pl. Findings ¶ 94 (collecting sources); 4/17 Tr. at 3763 (Sergeant Loria's deposition testimony that when he reviews UF-250s, he "make[s] sure that it's signed and all the boxes are filled in," but does not review it for anything else); 3/20 Tr. at 634 (Officer Edward Velazquez testifying that supervisors had only returned UF-250s to him based on incompleteness, such as failing to record the date); 3/22 Tr. at 986–990 (Sergeant Julio Agron ultimately conceding that he does not believe an Operation Impact sergeant is required to review his officers' UF-250s at the end of a tour).

[339]     *See, e.g.*, Pl. Findings ¶ 100 (collecting sources); 4/16 Tr. at 3522 (Deputy Inspector Ortiz testifying that he did not require supervisors to review activity logs alongside UF-250s).

[340]     *See, e.g.*, Pl. Findings ¶¶ 95–96 (collecting sources); 3/20 Tr. at 606–607 (Officer Victor Marrero testifying that when a sergeant reviews a UF-250, the officer is usually present, but that the only question the sergeant asks is the time of the occurrence); 3/20 Tr. at 634 (Officer Velazquez testifying that no supervisor had ever questioned him about the circumstances of a stop based on a UF-250).  In addition, supervisors do not notice stop patterns

Alternately, the City suggests that Integrity Control Officers ("ICOs") are available to monitor the constitutionality of stops.[341] ICOs are "the eyes and ears of the Precinct Commander," and they are tasked with performing various inspections and reviews to identify misconduct by officers.[342] While ICOs might in theory be well-positioned to review the constitutionality of officers' stops,[343] there is no evidence that ICOs do so in practice, or are instructed to do so through training or written policies.[344] The detailed thirty-one-point list of an ICO's duties and responsibilities contains no mention of monitoring the constitutionality of officer behavior in general or of stops specifically, nor does it require ICOs to review officers' UF-250s or activity log entries for stops.[345] Former Chief Giannelli testified that he expects

---

that suggest unconstitutionality. *See* Pl. Findings ¶ 87. For example, Lieutenant Telford testified that as an anticrime sergeant, he reviewed his officers' UF-250s. However, he was unaware that two of his officers were among the four top issuers of UF-250s in the NYPD in the third quarter of 2009 — including Officer Gonzalez, who checked the same four boxes on 99% of his UF-250s. *See* 5/7 Tr. at 6314–6315. Sergeant Joseph Marino was unaware that Officer Dang, one of the anticrime officers under his supervision, was another of the officers who conducted the most stops in the third quarter of 2009. *See* 4/30 Tr. at 5555–5556.

[341] *See* Def. Findings ¶ 48.

[342] Giannelli Dep. at 47. *See generally* 4/16 Tr. at 3581–3582 (Lieutenant Enno Peters, ICO of the 28th Precinct, stating that ICOs are usually lieutenants, and assistant ICOs are usually sergeants).

[343] For example, ICOs observe officers in the field responding to radio runs, and at least some ICOs review officers' memo books.

[344] For example, Lieutenant Cosmo Palmieri, ICO of the 43rd Precinct, testified that despite his regular field observations of officers, during his five years as an ICO he has never observed an officer perform a stop. *See* 4/17 Tr. at 3673. Lieutenant Peters testified at a deposition that as ICO of the 28th Precinct, he could not remember having ever discussed reasonable suspicion with members of the precinct. *See* 4/16 Tr. at 3583–3584.

[345] *See* Patrol Guide 202-15, Command Integrity Control Officer ("P.G. 202-15"), DX F5. Paragraph 16 of P.G. 202-15 requires ICOs to inspect and sign the activity logs of *sergeants*, but not of officers, and not specifically in relation to stops. I note that the burden of carrying out the thirty-one duties listed on P.G. 202-15 make it highly unlikely that ICOs would have the time or resources to review the constitutionality of stops unless specifically trained and directed to do so.

ICOs to review UF-250s to determine whether officers' stops are based on reasonable suspicion.[346]  In practice, however, ICOs review UF-250s and officers' activity logs solely for completeness, if at all,[347] rather than for the constitutionality of the underlying stop.[348]

In sum, neither the NYPD's review of stop documentation nor its supervision of officers provides an adequate mechanism for identifying unconstitutional stops.  Consequently, the NYPD is unable to hold officers accountable for those stops or prevent them from happening in the future.  I also note that the failure of supervisors and ICOs to effectively supervise the constitutionality of stops is not the result of oversight by subordinates, but rather stems from the failure of senior NYPD managers and officials to direct supervisors and ICOs to perform this task.[349]

### 5.　　Partially Inadequate Training

The core constitutional standards governing stop and frisk are well established.[350]  Training officers to comply with these standards, however, is no simple task, because there are no mechanical rules for their application to the varied circumstances of an officer's work.  Viewed in light of this difficulty, the NYPD's efforts to train its recruits have been largely

---

[346]　　*See* Giannelli Dep. at 48–50, 106.

[347]　　*See* 4/17 Tr. at 3675 (Lieutenant Palmieri testifying that as an ICO, he has not reviewed UF-250s).

[348]　　*See, e.g.*, 5/2 Tr. at 5692–5693 (Cirabisi); Pl. Findings ¶¶ 102–107.  The City solicited lengthy testimony concerning the duties and activities of ICOs.  *See, e.g.*, Def. Findings ¶ 48 (collecting sources).  As with so much of the City's evidence concerning institutions at the NYPD, however, this testimony was largely irrelevant because it did not relate to the constitutionality of stops.

[349]　　*See, e.g.*, Pl. Findings ¶¶ 89, 91 (collecting some sources showing that high-level managers, such as precinct commanders, did not direct supervisors and ICOs to monitor the constitutionality of stops).

[350]　　*See supra* Part III.

adequate.[351]  The gravest problems in the NYPD's stop and frisk practices stem not from inadequate training but from a divergence between the NYPD's written training materials and the "operational policy" carried out in the streets.[352]

Nevertheless, plaintiffs accurately note several problematic and obvious omissions or errors in the NYPD's training programs.[353]  Some of these flaws effectively encourage officers to commit constitutional violations, and the evidence in this case shows that predictably, such violation have in fact occurred on a widespread basis.  The following are some of the problems I find in the written training materials.

*First*, the Police Student's Guide's training on reasonable suspicion explains "Furtive Behavior" as follows: "If an officer observes strange, suspicious, or evasive behavior, he or she may have reasonable suspicion.  The officer's experience and/or expertise are often taken into account in these situations."[354]  The vagueness and overbreadth of this description invites officers to make stops based on "hunches," in violation of *Terry*.  Given the frequency with which Furtive Movements is checked (roughly 42% of forms), and the obvious risk that stops based merely on "strange, suspicious, or evasive behavior" may lack reasonable suspicion, the Guide's description of furtive movements is inadequate.

The danger of this inadequate training is illustrated by the testimony of Officer Christopher Moran, who stopped David Ourlicht for walking in a suspicious way with an

---

[351]    *See* Def. Findings ¶¶ 43, 45 & nn.46, 48 (collecting sources).

[352]    The distinction between official policy and operational policy is common in the study of law enforcement.  *See* 4/24 Tr. at 4834–4835 (Reiter).

[353]    *See generally* Pl. Findings ¶¶ 122–134.

[354]    Police Student's Guide, Policing Legally: Street Encounters (July 2012) ("Student's Guide: Street Encounters"), DX Q11, at 17.

100

ostensible bulge under his winter clothing.[355]  Officer Moran testified that "people acting

nervous" could "[o]f course" provide reasonable suspicion for a stop.[356]  Officer Moran also

explained that "furtive movement is a very broad concept," and could include "changing

direction," "walking a certain way," "acting a little suspicious," "making a movement that is not

regular," being "very fidgety," "going in and out of his pocket," "going in and out of a location,"

"looking back and forth constantly," "looking over their shoulder," "adjusting their hip or their

belt," "moving in and out of a car too quickly," "[t]urning a part of their body away from you,"

"[g]rabbing at a certain pocket or something at their waist," "[g]etting a little nervous, maybe

shaking," and "stutter[ing]."[357]  To the extent that Officer Moran views nervousness or fidgeting,

standing alone, as an adequate basis for seizing, questioning, and potentially frisking a person

under the Fourth Amendment, he is incorrect.  But his view is also a natural response to the

vague and overly broad description of furtive movement in the Police Student's Guide.

Misconceptions like Officer Moran's are a predictable consequence of the training reflected in

the Guide, and likely lead to unconstitutional stops.[358]

    *Second*, the NYPD's training on the identification of weapons invites unjustified

stops based on "suspicious bulges" that are not in fact suspicious, and constitutionally unjustified

frisks and searches based on objects that officers cannot reasonably suspect to be weapons.  In

---

[355] *See infra* Part IV.D.1.g.

[356] 4/18 Tr. at 4042 (Moran).

[357] *Id.* at 4046–4049.

[358] *See infra* Part IV.D.1.g.  *See also infra* Part IV.D.1.b (unconstitutional Almonor stop based in part on "furtive movements"); 5/9 Tr. at 6431–6433 (Officer Dang explaining that "usually" a furtive movement is someone "hanging out in front of [a] building, sitting on the benches or something like that" and then making a "quick movement," such as "bending down and quickly standing back up," "going inside the lobby . . . and then quickly coming back out," or "all of a sudden becom[ing] very nervous, very aware").

particular, the training draws attention to several "unusual firearms," such as a gun shaped like a pen, a gun shaped like an old-model cell phone, and a folding gun that fits into a wallet.[359] It is no doubt valuable for officers' safety to know that such weapons exist.[360] However, the outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk, nor does feeling such an object during a frisk justify a search. The training materials are misleading and unclear on this point.[361] The materials encourage officers to perform stops and frisks without reasonable suspicion based on the now-ubiquitous bulge created by a cell phone or other common objects — as was the case in the stops of Leroy Downs, Devin Almonor, Cornelio McDonald and Nicholas Peart,[362] and was likely the case in the vast majority of stops involving suspicion that the suspect was carrying a weapon, based on the extremely low seizure rate.[363]

       *Third*, more generally, the NYPD's training materials fail to make clear the legal standard for when a frisk may be undertaken. Rather than simply stating that a frisk must be based on reasonable suspicion that a person is armed and dangerous,[364] the training materials present a four-part rule that includes an invitation for officers to conduct frisks whenever "they

---

    [359]    *See* Detective Benito Gonzalez, Characteristics of Armed Subjects ("Armed Subjects Powerpoint"), DX C8, at 44–57.

    [360]    *See* 4/25 Tr. at 5040–5043 (Shea).

    [361]    *See* Armed Subjects Powerpoint at 4; Lesson Plan, Firearms and Tactics Section (3/12) ("Firearms Lesson Plan"), DX W3, at 1, 20; 4/29 Tr. at 5176–5177 (Shea).

    [362]    *See infra* Part IV.D.1.a–d (Leroy Downs frisked based on presence of keys, wallet and bag of cookies in his pocket; Officer Brian Dennis checked "suspicious bulge" on the UF-250 after the fact, when Devin Almonor had only his cell phone in his pocket; Cornelio McDonald stopped based on "suspicious bulge" that turned out to be cell phone; Nicholas Peart stopped in August 2006 based on anonymous suspect description corroborated only by "suspicious bulge" that turned out to be cell phone).

    [363]    *See* Fagan Rpt. 57, 64 tbl. 15.

    [364]    *See Johnson*, 555 U.S. at 326–27.

are in fear of their safety," without clarifying that the fear must be both reasonable or related to a weapon.[365] Based on this four-part rule, which officers have apparently internalized,[366] it is not surprising that several of the individual stops in this case involved unconstitutional frisks,[367] or that the 2.3 million frisks during the class period resulted in the recovery of weapons only 1.5% of the time.[368]

        *Fourth*, while the NYPD deserves praise for its use of scenarios and role playing in training on the legal justification for stops, plaintiffs correctly observe that these exercises are exclusively based on radio runs rather than self-initiated stops.[369] As noted above, 78% of stops during the class period were self-initiated,[370] and self-initiated stops create a different set of constitutional risks than stops based on suspect descriptions from a radio run. Just as ICOs observing stops based on radio runs cannot provide adequate monitoring of self-initiated stops,

---

[365]    Firearms Lesson Plan at 2. If an officer's fear for her safety is unrelated to any suspicion that the stopped person may be armed, there is no reason to conduct a protective frisk for weapons, and such a frisk would be unjustified. For example, an officer may not frisk a stopped person simply because the stopped person is physically imposing, or because the stop took place in a dangerous neighborhood. The only justification for a protective frisk is to discover weapons. *See generally supra* Part III.B.3 (noting that the frisk standard in CPL § 140.50 does not reflect the constitutional standard for a frisk).

[366]    *See, e.g.*, 4/17 Tr. at 3867 (Officer Mahoney, who frisked Downs, testifying that the standard for whether a stopped person may be frisked is "[w]hether it was a violent crime or you have reasonable . . . fear for your safety or the safety of . . . [a] civilian"); 4/10 Tr. at 3117–3120 (Officer Luke White testifying, although somewhat unclearly, that his frisk of Dominique Sindayiganza was justified based on reasonable suspicion that Sindayiganza had committed aggravated harassment, even though this is not a violent crime and Officer White did not suspect that Sindayiganza had a weapon). *See also infra* Parts IV.D.1.a, IV.D.2.a (detailing Downs's and Sindayiganza's stops and frisks).

[367]    *See infra* Parts IV.D.1–2.

[368]    *See* DX V14-A; DX V14-C.

[369]    *See* Pl. Findings ¶ 126; 4/25 Tr. at 5161–5162 (Shea).

[370]    *See* PX 417D.

role playing that focuses exclusively on radio runs is inadequate to train officers about the application of constitutional standards to self-initiated stops.

*Fifth*, the NYPD's training regarding racial profiling does not clearly define the difference between the constitutionally permissible use of race in a stop based on a specific, reliable suspect description, and the constitutionally impermissible targeting of racially defined groups for stops in general.[371] Because the NYPD has an unwritten policy of conducting the latter type of stops, as described above, this omission is not surprising.

*Sixth*, I have already noted in another opinion the constitutional infirmities in the NYPD's stop and frisk refresher course at the Rodman's Neck training center in the Bronx, as well as other recently introduced materials.[372] In that opinion, I expressed concern that the recent training materials misstate what constitutes a stop, which likely leads some officers not to prepare UF-250s in cases when they wrongly conclude that the encounter did not rise to the level of a stop.[373] Although Chief Shea testified that the Rodman's Neck training was developed in part because the NYPD wants officers to fill out UF-250s more selectively, a more significant concern is the failure of officers to fill out UF-250s after encounters that clearly *were* stops.[374] In

---

[371]    *See generally infra* Part V.B.1 (conclusions of law regarding racial profiling). For the NYPD's racial profiling training, see, for example, Police Student's Guide, Policing Impartially, DX V11, at 3–7, 12–14 (appropriately drawing attention to latent bias even among well-intentioned officers, but offering an inadequately narrow definition of racial profiling: "when a police officer decides to stop and question a person when the *sole* rationale for the contact is the race, ethnicity, or national origin of the person being stopped" (emphasis added)).

[372]    *See Ligon*, 2013 WL 628534, at *25, *35–39; Pl. Findings ¶¶ 130–131. I stated in that opinion that more than three thousand officers had attended the training since its development in 2012. *See Ligon*, 2013 WL 628534, at *25. More than six thousand officers have now attended. *See* 4/25 Tr. at 5121 (Shea).

[373]    *See Ligon*, 2013 WL 628534, at *38.

[374]    *See* 4/25 Tr. at 5126, 5151–5154 (Shea). The individual stops in this case show that officers frequently fail to fill out UF-250s after encounters that were clearly stops. *See, e.g., infra* Part IV.D.1.a (no UF-250 for Downs stop); *infra* Part IV.D.1.h (no UF-250 for February 5

addition, testimony in the present case confirmed that officers misunderstand what constitutes a stop based on training materials used at Rodman's Neck.[375]

### 6. Inadequate Discipline

As described in earlier sections, the NYPD has chosen to document, review, and supervise its officers' stops in such a way that unconstitutional stops are unlikely to be identified, and as a result the responsible officer cannot be held accountable. Moreover, when confronted with evidence of unconstitutional stops, the NYPD routinely denies the accuracy of the evidence, refuses to impose meaningful discipline, and fails to effectively monitor the responsible officers for future misconduct.

Civilian complaints are one source of notice to the NYPD that an unconstitutional stop may have taken place. Anyone can make a complaint against an NYPD officer for misconduct through a variety of channels, including the CCRB, an all-civilian municipal agency tasked with investigating allegations against the NYPD of excessive force, abuse of authority,

---

Lino stop). *See also Ligon*, 2013 WL 628534, at *11, *20 & n.241.

[375] *See* 4/29 Tr. at 5212 (Detective Damian Vizcarrondo testifying that an encounter rises to the level of a stop not based on whether the stopped person is free to leave, but based on whether the officer has reasonable suspicion); 4/25 Tr. at 4971 (Lieutenant James McCarthy testifying to the same). The Rodman's Neck training materials, which are reflected in Detective Vizcarrondo's and Lieutenant McCarthy's testimony, teach the following lesson: if an officer has an encounter with a civilian and is wondering whether to fill out a UF-250, the officer should ask himself whether the encounter was based on reasonable suspicion — *not* whether a reasonable person would have felt free to leave. This approach is legally incorrect and will predictably lead to officers not filling out UF-250s after encounters that began based on something less than reasonable suspicion, but that in retrospect involved a level of coercion amounting to a stop. Chief Shea argued that it makes more sense to train officers never to conduct stops without reasonable suspicion than it does to train officers to prepare a UF-250 even when a stop was not based on reasonable suspicion. *See* 4/25 Tr. at 5119–5124 (Shea). But officers can and should be trained to do both. That is, they should be trained never to conduct stops without reasonable suspicion *and* trained to recognize when an encounter that was intended to be a "Level 1" request for information or "Level 2" inquiry under *De Bour* in fact resulted in a *Terry* stop. Whenever this occurs, whether intentionally or unintentionally, the encounter must be recorded as a stop.

discourtesy, or offensive language (collectively referred to as "FADO");[376] the Bloomberg

administration's "311" information and government services hotline; or by contacting the NYPD

directly.[377] Of course, a complaint made to the NYPD may not even be recorded if the officer

receiving that complaint decides to ignore it — as Officer Anthony Moon did in response to

Downs's complaint.[378] It is impossible to know how often the NYPD simply disregards

complaints.

       The correct practice when the NYPD receives a complaint regarding a stop is to

either forward the complaint to the CCRB, or, if the complaint falls outside of the FADO

categories, to the Investigative Review Section of the Office of the Chief of Department

("OCD").[379] The NYPD's Internal Affairs Bureau ("IAB") can, in theory, initiate its own

investigations into alleged misconduct based on media reports,[380] although no evidence was

offered that IAB has in fact done this in response to the media reports over the last decade

concerning racially biased and/or constitutionally unjustified stops and frisks.

       Once the CCRB receives a complaint of an unconstitutional stop, CCRB

investigators will generally "interview complainants, witnesses, and officers and determine

---

[376]    Allegations of improper stops or frisks fall within the category of "abuse of authority" complaints. *See* 4/15 Tr. at 3284 (Joan Thompson, Executive Director of CCRB); CCRB, January–June 2012 Report ("CCRB June 2012 Report"), DX V13, at 4 (defining "Abuse of Authority").

[377]    *See* Def. Findings ¶ 25.

[378]    *See infra* Part IV.D.1.a. Downs took extraordinary measures to identify the police officers despite the lack of any official record of the stop.

[379]    *See* Def. Findings ¶ 25 & n.34 (noting that the NYPD refers all FADO complaints to the CCRB, including "[s]earch and seizure allegations relating to stop, question, and frisk," and refers "the remainder of the complaints" to the OCD); *id.* ¶ 32 (noting that the OCD processes a small number of "complaints featur[ing] allegations related to" stop and frisk).

[380]    *See id.* ¶ 25.

whether allegations are substantiated, unsubstantiated, exonerated, or unfounded."[381]  A complaint is "substantiated" if, based on the preponderance of the evidence, "[t]here is sufficient credible evidence to believe that the subject officer committed the act charged in the allegation and thereby engaged in misconduct."[382]  A complaint is "unsubstantiated" if there is insufficient evidence to determine whether the officer committed misconduct.[383]  The investigator's decision will be reviewed by a supervisor and then passed along to a three-member panel, which makes the final decision after reviewing the evidence.  If the panel finds a complaint substantiated, the case is forwarded to the NYPD's Department Advocate's Office ("DAO"), which serves as an internal prosecutor for officer misconduct at the NYPD.[384]

It is at this stage that the CCRB complaint process founders.  Rather than accepting the CCRB's findings, the DAO conducts its own review of the materials that the CCRB's three-member panel has just reviewed.  Instead of applying the well-established "preponderance of the evidence" standard like the CCRB, the DAO applies its own evidentiary standards.  Deputy Commissioner Julie Schwartz, an attorney who has lead the DAO since 2005, testified that if the CCRB bases its findings on a credibility determination in favor of a witness and against a police officer, the DAO will *as a rule* reject the CCRB's findings.  In Deputy Commissioner Schwartz's words, it "doesn't matter" that the CCRB has seen and heard the

---

[381]  Def. Findings ¶ 26.

[382]  CCRB June 2012 Report at 4.

[383]  *See id.*  An officer is "exonerated" if she committed the alleged acts, but the acts "were determined to be lawful and proper," and an allegation is "unfounded" if there is sufficient evidence that the officer did not commit the alleged act.  *Id.  Accord* 4/15 Tr. at 3272 (Thompson).

[384]  *See* Def. Findings ¶ 26; CCRB, 2011 Annual Report ("CCRB 2011 Annual Report"), DX P12, at 17–18 (describing prosecutorial function of the DAO).  In the first half of 2012, the CCRB closed 2,518 cases.  Of the 27% of cases closed after full investigations, 11% resulted in a finding of substantiated misconduct.  *See* CCRB June 2012 Report at 10.

witnesses, while the DAO has not, "[b]ecause if one witness says A happened and the other witness says B happened," the complaining witness cannot satisfy the preponderance of the evidence standard: "there is nothing that brings [the allegation] to 51 percent."[385] In this "he said . . . she said" situation, the DAO will only accept the CCRB's findings if there is "a little corroboration," like visible marks on a complainant alleging overly tight handcuffs.[386]

Deputy Commissioner Schwartz stated further that "in any stop-and-frisk case in which you only have the complainant's version and the officer's version, the department cannot pursue discipline."[387] It appears that in the eight years that she has led the DAO, Deputy Commissioner Schwartz has consistently applied the unique evidentiary standard that a complainant's testimony can never be sufficient standing alone.

Deputy Commissioner Schwartz also testified that the CCRB and the OCD apply the same evidentiary standard,[388] although she was unable to cite any source articulating that standard. When pressed, Deputy Commissioner Schwartz changed her testimony and stated that in some instances a complainant's word is enough to sustain a complaint.[389] I do not find this later testimony credible.[390] Instead, I find that the DAO follows a policy of rejecting CCRB determinations when they are based only on the uncorroborated testimony of a civilian witness. Deputy Commissioner Schwartz testified that she was not concerned about allegations that the

---

[385] 4/22 Tr. at 4485–4486.

[386] *Id.* at 4486–4487.

[387] *Id.* at 4508.

[388] *See id.* at 4484, 4486–4487, 4508.

[389] *See id.* at 4508–4511.

[390] Deputy Commissioner Schwartz's later testimony also conflicted with her deposition testimony in another case. *See id.* at 4511–4512.

DAO is biased in favor of police officers.[391]

Because many of the complaints related to stop and frisk involve precisely the scenario described by Deputy Commissioner Schwartz, the DAO's evidentiary theory seriously undermines the NYPD's ability to hold officers accountable for unconstitutional stops or frisks.[392] In light of this evidentiary standard, as well as other indications of the DAO's resistance to evidence of unconstitutional stops provided by the CCRB,[393] it is not surprising that the DAO frequently declines to pursue *any* discipline against officers who have been the subject of substantiated CCRB complaints. Between 2007 and 2011, the DAO declined to pursue discipline in between 16% and 36% of the substantiated complaints forwarded by the CCRB, and in 2012 the percentage of substantiated cases resulting in no discipline rose again.[394] In addition, the NYPD consistently downgrades the discipline recommended by the CCRB, imposing only instructions — the least serious form of discipline — in the majority of cases in most years.[395] The DAO's frequent rejection of the CCRB's disciplinary recommendations has

---

[391]   *See id.* at 4512–4513.

[392]   *See id.* at 4481–4482, 4485–4486, 4496; 4/15 Tr. at 3289, 3292 (Thompson).

[393]   Deputy Commissioner Schwartz also testified that the law governing search and seizure, and especially *De Bour*, is not "clearly established, well-articulated, and understandable," and when an officer violates an unclear law like *De Bour* unintentionally, the CCRB should consider the officer's "good faith" in its credibility determination. 4/22 Tr. at 4513–4521. In addition, she testified that when the CCRB has failed to identify an officer by name and has not conducted a show-up or a photo array, the DAO will dismiss the case rather than attempting to determine the identity of the officer based on specific identifying information in the CCRB's findings. *See id.* at 4484–4485.

[394]   *See* CCRB 2011 Annual Report at 17; CCRB, Police Department Discipline, DX U13. These figures exclude the small number of cases where the statute of limitations had expired or the officer resigned before the NYPD could take action. Several officers testified that they were never disciplined even after the CCRB substantiated complaints against them. *See* Pl. Findings ¶¶ 139–141 (collecting sources).

[395]   *See* 4/15 Tr. at 3294 (Thompson); CCRB 2011 Annual Report at 18, tbl. 30. Instructions as the most common form of discipline in every year. Chief Hall testified that an

likely undermined public confidence in the CCRB and discouraged the filing of complaints —

many of which may have been meritorious.[396]

The relatively few stop complaints that pass through the OCD are no more likely

to result in officer discipline than those processed by the CCRB and the DAO.[397]  Despite the

fact that the OCD is apparently the only entity responsible for addressing civilian complaints of

racial profiling, its system for categorizing and tracking complaints contains no tracking code for

either stop complaints or complaints of racial profiling.[398]  Not surprisingly, the evidence showed

that the OCD has been ineffective in monitoring and imposing discipline in response to

allegations of racial profiling.  For example, the OCD received an allegation that Officer

---

officer who engages in stops that are not based on reasonable suspicion could be subjected to "incredibly severe discipline," up to and including termination.  5/16 Tr. at 7628.  When asked on cross-examination whether he had personal knowledge of any officer being subjected to such discipline for a stop lacking reasonable suspicion, Chief Hall said that he did not.  *See id.* at 7629.

[396]     *See* 3/19 Tr. at 345 (Nicholas Peart testifying that after his first CCRB complaint was not substantiated, he did not file any CCRB complaints in response to later stops because he did not believe that the CCRB would do anything).  *See also* Pl. Findings ¶ 155 (collecting sources indicating the DAO's awareness of longstanding public concerns that the NYPD does not take the CCRB's recommendations seriously); *id.* ¶ 156 (noting that even after the NYPD agreed in 2012 to allow CCRB attorneys to prosecute a small category of serious police misconduct cases, they can only do so at the discretion of the Police Commissioner).  The City's proposed findings describe at great length the NYPD's performance monitoring system, which tracks officers who have received *multiple* substantiated CCRB complaints.  *See* Def. Findings ¶¶ 36–42; Pl. Findings ¶ 138.  However, this system is ineffective for monitoring unjustified stops because of the low likelihood that a wrongfully stopped person will have the knowledge and take the time to file a CCRB complaint.  The likelihood of multiple complaints against the same officer is even lower.

[397]     *See* Pl. Findings ¶¶ 142–147 (collecting sources).

[398]     *See* 4/18 Tr. at 3962–3968, 3981, 4013 (Inspector McAleer).  In addition, there was evidence that complaints of racial profiling made *during* stops are not conveyed to the OCD.  *See* Tr. 5/7 at 6307, 6332–6333 (Lieutenant Telford testifying that as an anticrime supervisor in 2009, he was not concerned after Officer Gonzalez submitted a UF-250 indicating that a black male he had stopped had asked:  "Why don't you stop other people?"); PX 557 at *15999–16000.

Jonathan Rothenberg stopped and arrested someone based on racial profiling a year before his stop of Ian Provost,[399] yet he was never questioned about the allegation,[400] and the NYPD is unable to determine whether an investigation ever occurred.[401] The OCD's inadequate response to civilian complaints of wrongful stops is all the more troubling because the OCD receives most of the racial profiling complaints that are addressed either to the CCRB or the NYPD.[402]

### 7.    Ongoing Notice of Constitutional Violations

The 1999 AG Report put the NYPD on notice that its stop and frisk practices were resulting in constitutional violations. Despite that notice, senior NYPD officials significantly increased the risk of constitutional violations by applying pressure throughout the chain of command to raise the number of stops without imposing a countervailing pressure to ensure their constitutionality, and without instituting adequate supervisory, monitoring, or disciplinary procedures. This section describes the various ways the NYPD has continued to receive notice since 1999 of widespread constitutional violations in its practice of stop and frisk.

The NYPD has received thorough and consistent notice of constitutional problems in its stop practices from multiple sources, including the media, community members, community and legal organizations, individual police officers, and the class members and attorneys in this case. As Reiter testified, the prominent media coverage of complaints about baseless and racially motivated stops would have given "any reasonable police department"

---

[399]    *See* 4/17 Tr. at 3822 (Rothenberg); *infra* Part IV.D.1.f (detailing Provost stop and frisk).

[400]    *See* 4/17 Tr. at 3820, 3825 (Rothenberg).

[401]    *See* 4/30 Tr. at 5385 (stipulation).

[402]    *See, e.g.*, 4/18 Tr. at 3962–3963 (Inspector Helen McAleer, OCD, testifying that CCRB forwards non-FADO complaints to OCD, including racial profiling complaints, of which there have been "[v]ery few"); 4/15 Tr. at 3271 (Thompson testifying that the CCRB sometimes forwards racial profiling complaints to the OCD).

notice of the need "to take a look at" these issues.[403]  In fact, Chief Esposito is aware of media reports that the NYPD racially profiles young black and Hispanic males in its stop activities, and has personally heard complaints from community organizations, civil liberties groups, and elected officials about racial profiling in stops.[404]  Deputy Chief Marino testified that the NYPD's stop and frisk practices are "always a concern and a complaint in any precinct I've worked in," and that community leaders and community members had complained to him about suspicionless stops and frisks.[405]  Similarly, Inspector Lehr has heard complaints from black residents about being stopped for no reason, and has witnessed demonstrations in overwhelmingly black precincts that raised concerns about stop and frisk and racial profiling.[406]  Chief Morris testified that he, too, had heard complaints from individuals who felt they were stopped for no reason.[407]  Chief Shea testified that when members of the community participate in the multicultural immersion course for newly graduated officers, community leaders have repeatedly shared complaints involving stops based on racial profiling.[408]  Similarly, Chief Shea testified that when he was a precinct commander, "there were occasions when community members might come to a community meeting and claim a family member or themselves was the subject of police action and they fear it was influenced by their race."[409]  Despite this

---

[403]  4/24 Tr. at 4878.

[404]  *See* 4/10 Tr. at 3023–3027.  Chief Esposito also testified that he has been aware of public controversies concerning street encounters between NYPD officers and blacks and Hispanics since at least 2000, when he became Chief of Department.  *See* 4/9 Tr. at 2794–2796.

[405]  3/22 Tr. at 931.

[406]  *See* 4/30 Tr. at 5410, 5429–5430, 5434–5435.

[407]  *See* 5/10 Tr. at 6633.

[408]  *See* 4/25 Tr. at 5081.

[409]  *Id.* at 5081–5082.

extensive evidence, Chief Esposito and other NYPD officials testified that they had never heard an individual complain about being stopped based on his race.[410]  I do not find this testimony credible given the other testimony in this case and the widespread public concern regarding racially biased policing by the NYPD.[411]  In any event, whether or not high officials heard individual complaints is immaterial, given the many other sources of notice discussed in this section.

In addition to receiving notice from the public and community organizations, the NYPD has been apprised of unconstitutional practices by some of its own officers.  In 2009, Officer Polanco delivered an anonymous letter[412] to his ICO, reporting that officers were engaging in racial profiling and other misconduct toward minority communities:

> [W]e were handcuffing kids for no reason.  They would just tell us handcuff them.  And boss, why are we handcuffing them?  Just handcuff them.  We'll make up the charge later.
> Some of those kids were not doing anything.  Some of those kids were just walking home. Some of those kids were just walking from school.[413]

In his letter, which he believed would be forwarded to IAB, Officer Polanco described the following incident, from 2009:

> I remember one incident where one kid — and I reported this — they stopped

---

[410]    *See, e.g.*, 3/22 Tr. at 1055–1056 (Diaz testifying that he is not sure); 4/10 Tr. at 3025–3026 (Esposito); 4/30 Tr. at 5434 (Lehr); 5/9 Tr. at 6511 (Holmes); 5/10 Tr. at 6633 (Morris); Def. Findings ¶ 23.

[411]    *See, e.g.*, 5/14 Tr. at 7174 (Deputy Commissioner Farrell testifying that he was aware in early 2007 of "concerns raised by [some] members of the public that the NYPD may be engaging in racially biased policing").

[412]    When asked why he submitted the letter anonymously, Officer Polanco explained that he was worried by the adverse consequences Officer Schoolcraft suffered after reporting the alleged manipulation of crime statistics.  *See* 3/20 Tr. at 453.

[413]    3/20 Tr. at 450, 453, 508–509.  The letter does not appear in the record.  *See id.* at 450, 661; 3/19 Tr. at 435–436.

113

> his brother. He was 13. And he was waiting for him from school at the
> corner to bring him home. When he came to us, the officer — Officer,
> what's wrong with my little brother? Was he acting out? He wind[s] up with
> handcuffs too. For simply asking what was going on with his brother.[414]

Officer Polanco also reported in the letter that on more than one occasion, he was required to

drive on patrol with supervisors who directed him to stop individuals without what he believed

to be reasonable suspicion. A supervisor would point to a "group of black kids or Hispanic kids

on the corner, in the park, or anywhere," and direct Officer Polanco to "just go grab, go 250

them, go summons them. Sometimes they will ask me to summons them. We will ask the

supervisor why. And they will say unlawful assembly or something like that . . . [b]ecause

there's more than three of them on the corner."[415]

After his initial letter in 2009, Officer Polanco anonymously called IAB to

express his concerns regarding the treatment of minority youths and the manipulation of crime

statistics.[416] Finally, Officer Polanco gave IAB the recordings played at trial, which corroborated

his testimony about institutional pressure to meet target numbers of enforcement activity by

making stops and arrests without an adequate legal basis.[417]

---

[414]  3/20 Tr. at 450-451, 509. *See also id.* at 460–461 (Officer Polanco testifying that his letter to IAB stated the address, date, and other information concerning the encounter with the thirteen-year-old).

[415]  *Id.* at 457–458. *See also id.* at 459–460 (Officer Polanco testifying that after an unjustified stop, supervisors instructed him about which boxes to check on the UF-250, including High Crime Area and Furtive Movements).

[416]  *See id.* at 455–456.

[417]  *See id.* at 462–464. For a summary of some of Officer Polanco's recordings, see *supra* Part IV.C.2. Eventually, Officer Polanco abandoned his anonymity and participated in a televised interview. *See* 3/20 Tr. at 515–516. After the interview aired in March 2010, IAB charged him with perjury. The charge was based on an incident described in Officer Polanco's complaint to IAB. Officer Polanco stated that he was once instructed to issue a summons to someone for walking a dog without a license, even though he had not seen a dog, and that he obeyed the instruction. *See id.* at 451–452, 540. While Officer Polanco was charged with perjury, the supervisor who issued the instruction was promoted. *See id.* at 540.

CCRB complaints regarding stop and frisk, discussed above, provided a further source of ongoing notice to the NYPD.[418]  In addition, the NYPD has received mounting evidence regarding unconstitutional stops through the proceedings in *Daniels v. City of New York*, filed in 1999;[419] this case, filed in 2008;[420] and the two related stop and frisk cases, *Davis v. City of New York* and *Ligon v. City of New York*, filed in 2010 and 2012, respectively.[421]

The City attempts to rebut evidence of notice by pointing to a 2007 report by the RAND Corporation that found little evidence of pervasive racial profiling in the NYPD's pedestrian stop and frisk activity.[422]  But the RAND study used violent crime suspect data as its benchmark, which is problematic for reasons discussed at length in the section on expert

---

I note that Officer Craig Matthews has alleged in another case that the NYPD retaliated against him for complaining to superiors about "'a system of quotas mandating numbers of arrests, summonses, and stop-and-frisks'" that was allegedly introduced in 2008. *See Matthews v. City of New York*, No. 12 Civ. 1354, 2013 WL 3879891, at *1 (S.D.N.Y. July 29, 2013) (quoting Complaint ¶ 2).  Officer Matthews' allegations of retaliation echo Officer Polanco's allegations.  *Compare* 3/20 Tr. at 575–576 (Officer Polanco testifying that footpost assignment was punitive for someone with his seniority), *and* 3/21 Tr. at 727, 789 (Officer Serrano testifying to same), *with* Complaint ¶ 21, *Matthews*, 2013 WL 3879891  (describing footpost assignment as punitive).  While recognizing that "as a matter of fact, Officer Matthews' speech had undeniable value to the public," the Court granted summary judgment to the City based on First Amendment grounds unrelated to the substance of Officer Matthews' allegations. *Matthews*, 2013 WL 3879891 at *19.

[418]    *See* 3/28 Tr. at 1424–1425 (Officer Hernandez testifying regarding CCRB complaints about his stop activity).

[419]    *See Daniels*, No. 99 Civ. 1695.  *See also* 4/9 Tr. at 2800–2801 (Chief Esposito testifying that, as of 1999, he was aware of the allegations in *Daniels* of racial profiling and stops and frisks that lacked reasonable suspicion).

[420]    I note that plaintiffs originally intended to pursue this case as a challenge to the NYPD's non-compliance with the *Daniels* settlement.

[421]    *See Davis*, No. 10 Civ. 0699; *Ligon*, No. 12 Civ. 2274.

[422]    Def. Findings ¶ 20.  *See* RAND REPORT.  I note that the City only relies on the RAND Report as proof that it lacked notice of racially motivated stops, but not that it lacked notice of stops made without reasonable suspicion.  *See* Def. Findings ¶ 20.  I also note that the RAND Report was admitted only for the purpose of notice, not for the truth of its conclusions.

testimony.[423]  As a result, the Report concluded that the NYPD's stop patterns are racially neutral

because the people stopped by the NYPD resemble the suspects in reported violent crimes —

even though less than a quarter of stops are based on suspicion of violent crimes,[424] and even

though blacks are more highly represented in the violent crime suspect data than in the suspect

data for other types of crime.[425]  Nonetheless, the Report cautioned that the use of benchmarks

"can either detect *or hide* racial bias due to unobserved or unmeasured factors that affect both

the racial distribution that the benchmark establishes and the racial distribution of the stops."[426]

      Moreover, even if the NYPD did not question the Report's choice of benchmark,

the Report concluded that "for some particular subsets of stops, there are racial disparities, and,

---

[423]     *See supra* Part IV.B.3.

[424]     *See* 4/19 Tr. at 4302 (Assistant Commissioner McGuire); Fagan Rpt. apps. C4–C6 (noting that 15% of stops from 2004 to 2009 were based on suspicion of violent crime); Fagan 2d Supp. Rpt. app. B tbl. 2 (noting that 23% of stops from 2010 to 2011 were based on suspicion of violent crime).  The earlier chart shows that 15% of *all* UF-250s from 2004 to 2009, including those that failed to state a specific suspected crime, were based on suspicion of a violent crime; by contrast, the later table appears to show that 23% of the UF-250s from 2010 to 2011 *containing a codable suspected crime* were based on suspicion of a violent crime.  *Compare* Fagan Rpt. app. C4–C5 noting that the suspected crime on 18% of UF-250s was uncodable or otherwise erroneous), *with* Fagan 2d Supp. Rpt. app. B tbl. 2 (not including UF-250s with erroneous crime codes in any category).  Thus, the 15% figure appears to be a more accurate indication of the percentage of stops that are based on suspicion of a violent crime.

[425]     *See* RAND REPORT at 19 (noting that "black suspects were described in 69 percent of all violent-crime suspect descriptions"); Fagan Rpt. at 76 tbl. 18 (revealing, apparently based on updated data, that the suspect's race was black in 73% of the *violent* crime reports in 2006 indicating a suspect's race, versus 54% for *non-violent* crimes).  The RAND Report's claim that black suspects were described in 69% of all violent-crime suspect descriptions in 2006 is not strictly accurate, because *no* race was indicated in 47% of those complaints.  *See* Fagan Rpt. at 76 tbl. 18, 77 (noting that contrary to the language in the RAND Report, black was in fact "identified as the suspect's race in only 38.50% of all violent crime complaints . . . in 2005," once the complaints lacking race data are included).  As Dr. Fagan testified, the lack of race information in 47% of the complaints further undermines the reliability of the 2006 violent crime suspect data as a benchmark.  *See* 4/4 Tr. at 2266–2268; Fagan Rpt. at 75–77.

[426]     RAND REPORT at 19 (emphasis added).

in some boroughs for some outcomes, the disparities are fairly large" — such as in Staten Island for frisks of blacks, and Brooklyn South for the use of force against blacks.[427]  The Report recommended a "closer review" of stop outcomes in these boroughs, which was never carried out.[428]  The NYPD also failed to effectively implement other recommendations in the Report.[429]  In light of these warnings and recommendations, the NYPD's reliance on the RAND Report as proof that its stops are racially neutral was and is unreasonable.  In sum, the numerous sources discussed above were more than adequate to put the NYPD on notice that its officers were engaging in racially motivated stops, and nothing in the RAND report justified ignoring those clear signs.

### D.     Individual Stops

Plaintiffs offered evidence from twelve individuals regarding nineteen stops.  In twelve of those stops the plaintiff testified as did some or all of the police officers involved in the stop.  Evaluating whether these stops — and often frisks — complied with the Fourth Amendment turned, in large part, on the credibility of the witnesses.  In some cases the

---

[427]     *Id.* at 44.

[428]     *See* 4/9 Tr. at 2830–2831 (Esposito); 5/14 Tr. at 7121 (Deputy Commissioner Farrell testifying that "it was our conclusion that the differences that did exist were quite small").  Throughout his testimony, Deputy Commissioner Farrell refused to acknowledge the validity of statistical evidence of racial disparities in stops and stop outcomes, no matter how large or persistent the disparities.  *See, e.g.*, 5/15 Tr. at 7248–7256.

[429]     *See* RAND REPORT at 44–46.  For example, the NYPD began a pilot project to distribute information cards to stopped pedestrians, as recommended by the RAND Report.  *See* 5/14 Tr. at 7106–7107; DX A8 (tear-off card used in pilot project).  Although Deputy Commissioner Farrell testified that the pilot project had been expanded citywide, none of the individuals stopped in this case testified to receiving a card, and the card itself does not provide a number for making complaints to the CCRB or the NYPD.  Instead, the card states:  "For more information . . . www.nyc.gov/nypd," and directs recipients of the card to call a toll-free number or 311 with tips about illegal handguns.  DX A8.  *See also* Pl. Findings ¶¶ 179–182 (collecting sources regarding the NYPD's failure to implement the RAND Report's recommended early warning system for officers who overstop minorities).

testimony of the plaintiff and the officers was irreconcilable, and I was required to accept one version and disregard the other.

In the remaining seven stops, no officer testified — either because the officers involved in the stop could not be identified or, in one case, because the officers identified dispute that the stop ever occurred. In the majority of these cases the plaintiff's testimony was either not sufficiently credible or lacked sufficient detail to establish that the stop was unconstitutional. In others, I found the plaintiff's testimony sufficiently credible *and* sufficiently detailed to make a determination about the constitutionality of the stop. I recognize the dilemma posed by making findings based on only one side of the story, particularly given the NYPD's apparent good faith efforts to locate the officers involved. However, finding a failure of proof in *all* stops where no officer was identified would create a perverse incentive for officers not to record stops where the basis for those stops or the police conduct during the stop was clearly problematic, which would immunize the most egregious stops from scrutiny. This appears to be what happened in the stop of Leroy Downs, discussed below, and it was only through his extraordinary persistence that the officers involved were identified.

Evaluating the police conduct in each of these stops is an imperfect science. There is no objective contemporaneous recording of the stop — either audio or visual. I am relegated to finding facts based on the often conflicting testimony of eyewitnesses. The task is particularly challenging where everyone who testified had an interest in the outcome, which may have, consciously or otherwise, affected the veracity of his or her testimony. I understand that a judge reviewing the facts in hindsight is in an entirely different position from officers on the beat making split-second decisions in situations which may pose a danger to themselves and others. With this in mind, I have endeavored to exercise my judgment faithfully and impartially in making, as I am required to do, the following findings of fact with respect to each of the nineteen

stops at issue.[430]  I have placed each stop in one of three categories: (1) unconstitutional stop and frisk (if frisk occurred); (2) unconstitutional frisk only; (3) insufficient evidence to find that the stop or frisk was unconstitutional.

### 1.    Unconstitutional Stop and Frisk

#### a.    Leroy Downs

##### i.    Findings of Fact

Leroy Downs is a black male resident of Staten Island in his mid-thirties.[431]  On the evening of August 20, 2008, Downs arrived home from work and, before entering his house, called a friend on his cell phone while standing in front of a chain link fence in front of his house.  Downs used an earpiece connected to the phone by a cord, and held the cell phone in one hand and the black mouthpiece on the cord in the other.[432]

Downs saw a black Crown Victoria drive past and recognized it as an unmarked police car.  The car stopped, reversed, and double-parked in front of Downs's house, at which point Downs told his friend he would call back.[433]  Two white plainclothes officers, later identified as Officers Scott Giacona and James Mahoney, left the car and approached Downs.[434]  One officer said in an aggressive tone that it looked like Downs was smoking weed.  They told

---

[430]    *See Terry*, 329 U.S. at 22 ("The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.").

[431]    *See* 4/19 Tr. at 4094–4095 (Downs).  The following account is largely taken from Downs's testimony, which I found credible despite minor inconsistencies.

[432]    *See id.* at 4095–4097.

[433]    *See id.* at 4097–4098.

[434]    Officer Giacona was wearing a black t-shirt and Officer Mahoney was wearing a New York Jets jersey that said "Favre" on the back.

him to "get the [fuck] against the fence," then pushed him backwards until his back was against the fence.  Downs did not feel free to leave.[435]

Downs explained that he was talking on his cell phone, not smoking marijuana, that he is a drug counselor, and that he knows the captain of the 120th Precinct.  Without asking permission, the officers patted down the outside of his clothing around his legs and torso, reached into his front and back pants pockets and removed their contents: a wallet, keys, and a bag of cookies from a vending machine.  The officers also searched his wallet.[436]

After the officers failed to find any contraband, they started walking back to the car.  Downs asked for their badge numbers.  The officers "laughed [him] off" and said he was lucky they did not lock him up.  Downs said he was going to file a complaint, and one of them responded by saying, "I'm just doing my [fucking] job."  Charles Joseph, a friend of Downs who lives on the same block, witnessed the end of the stop.  After the officers drove away, Downs walked to the 120th Precinct to file a complaint.[437]

Downs told Officer Anthony Moon at the front desk that he wanted to make a complaint and described what had happened.  Officer Moon said that he could not take the complaint because Downs did not have the officers' badge numbers, and that Downs should file a complaint with the CCRB.  As Downs left the station he saw the two officers who stopped him driving out of the precinct in their Crown Victoria, and he wrote down its license plate number on his hand.[438]

Downs then returned to the station.  He tried to give Officer Moon the license

---

[435]    *See id.* at 4098–4102.

[436]    *See id.* at 4101–4106.

[437]    *See id.* at 4106–4108.

[438]    *See id.* at 4108–4111.

plate information, but Officer Moon said that he should give the information to the CCRB instead. Downs waited at the station until he saw the two officers come through the back door with two young black male suspects.[439]

Downs pointed out the two officers to Officer Moon and asked him, "Can you get their badge numbers?" Officer Moon talked to the officers and then told Downs "maybe you can ask them." At that point, Downs went outside again and took a picture of the license plate on the Crown Victoria, which was the same number he had written on his hand.[440]

Eventually, Downs spoke with a supervisor, who said he would try to get the officers' badge numbers and then call Downs. The call never came. Having spent a few hours at the station, Downs went home.[441]

The next day, Downs submitted a complaint to the CCRB. Five months later, Officers Mahoney and Giacona both testified under oath to the CCRB that they had no memory of stopping and frisking Downs — an assertion that was "not entirely credited" by the CCRB, because it is "unlikely that PO Giacona and PO Mahoney would not recall their actions immediately prior to effecting two arrests." The CCRB substantiated Downs's complaint that Officers Mahoney and Giacona failed to provide their badge numbers. The CCRB found the complaints that the officers stopped Downs without reasonable suspicion, and used profanity unsubtantiated. The CCRB found Downs's allegation of a search into his pants pockets

---

[439]  *See id.* at 4110–4111, 4113; PX 166-D, 166-CL. Officer Mahoney was still wearing his Brett Favre jersey. Officer Giacona's records confirm that he arrested two young, black men that evening.

[440]  *See* 4/19 Tr. at 4111–4112; PX 166-C.

[441]  *See* 4/19 Tr. at 4114–4115. Downs later spoke with a Deputy Inspector at the 120th Precinct, who told him the stop "was probably an isolated incident," and invited Downs to attend the citizens' police academy, to better understand the NYPD's practices. Downs attended the academy for eleven months. At the end, he still believed the August 20 stop violated his rights. *See id.* at 4116–4119, 4124–4126.

"unfounded," based in part on Joseph's testimony that he did not witness a search.  The CCRB

substantiated the complaint against Officer Moon for failing to process Downs's complaint.[442]

        Neither Officer Mahoney nor Officer Giacona received any discipline as a result

of the CCRB's recommendations.  Instead, each lost five vacation days for failing to make a

memo book entry for the Downs stop.  They also failed to prepare a UF-250 for the stop, but

received no discipline for this.  Officer Mahoney has since been promoted to Sergeant.[443]

        Officers Mahoney and Giacona testified that they have no recollection of the

Downs stop.  Like the CCRB, I do not find their denials of recollection credible.[444]

        Downs testified that he has been stopped "[m]any times" other than the stop on

August 20, 2008.[445]

### ii.      Mixed Findings of Fact and Law

        Downs was stopped when the officers told him to "get the [fuck] against the

fence."  The officers lacked reasonable suspicion to stop Downs.  The officers seized Downs

based on a glimpse of a small object in Downs's hand from the window of their passing car.  The

officers' hunch, unaided by any effort to confirm that what they glimpsed was contraband, was

too unreliable, standing alone, to serve as a basis for a *Terry* stop.

        Moreover, whatever legal justification the officers might have had for the stop

---

[442]    *See id.* at 4116; PX 166 (CCRB file for Downs's complaint).

[443]    *See* 4/17 Tr.  at 3847–3850, 3852–3853, 3865, 3870 (Mahoney); *id.* at 3876–3879 (Giacona); Tr. 4/18 at 3895 (Giacona).  I refer to Sergeant Mahoney as Officer Mahoney because that was his rank at the time of the stop.

[444]    *See* Tr. 4/17 at 3849–3850 (Officer Mahoney); *id.* at 3875–3875 (Officer Giacona); Tr. 4/18 at 3892–3896 (Officer Giacona) ("According to CCRB I guess or whatever their investigation, they found that I did this stop that I don't remember or have any knowledge of. . . . So that's — I guess that's what I was disciplined for, not having memo book entries for the stop that I don't remember doing.").

[445]    *See* 4/19 Tr. at 4119 (Downs).

dissipated shortly after they approached Downs. The absence of any physical evidence, smoke

or marijuana smell, and Downs's explanation that he was talking on his mouthpiece, negated any

ground for reasonable suspicion. Just as an officer may not reach into the pocket of a suspect

after a frisk has negated the possibility that the pocket contains a dangerous weapon or

immediately perceptible contraband,[446] so an officer may not persist in stopping a person after

the suspicion giving rise to the stop has been negated.[447] Officers Mahoney and Giacona

violated Downs's rights under the Fourth Amendment by stopping him based on a hunch, and

continuing to detain him after it became clear that he had not been smoking marijuana.

The officers further violated the Fourth Amendment by frisking Downs without

any objective basis for suspecting that he was armed and dangerous. Nothing about the

suspected infraction — marijuana use — in combination with the facts summarized above

provides reasonable suspicion that Downs was armed and dangerous.

The officers further violated Downs's Fourth Amendment rights by searching his

pockets and wallet after the frisk. Such a search would only have been justified if the officers'

frisk of the outer surfaces of Downs's pockets gave rise to reasonable suspicion that his pockets

contained a dangerous weapon, or if the frisk made it *immediately apparent* that an object in his

pockets was a form of contraband. Nothing in Downs's pockets could have provided reasonable

suspicion that he was armed; nor could it have been immediately apparent from the patdown that

---

[446]   *See Dickerson*, 508 U.S. at 373, 377–78.

[447]   *See United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) ("Fourth Amendment intrusion 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop' and . . . the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion.") (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

Downs's pockets contained contraband.[448]

### b. Devin Almonor

### i. Findings of Fact

Devin Almonor is a sixteen-year-old black male high school student living in Manhattan. In 2010, Almonor was thirteen years old.[449] He was approximately five foot ten and weighed approximately 150 pounds.[450]

On March 20, 2010, a Saturday, around 8:45 p.m., Almonor left his house to walk his friend Levon Loggins to the bus stop at 145th Street and Amsterdam.[451] After Loggins boarded the bus, Almonor began to walk home along Hamilton Place toward a bodega where he planned to meet his brother Malik.[452] A group of males was standing outside the bodega and, after talking to friends outside, Almonor continued home with another individual.[453]

Around 10:00 p.m., Officer Brian Dennis and Sergeant Jonathan Korabel[454] were driving an unmarked vehicle in the vicinity of Hamilton Place in response to nine 911 calls describing a group of about forty youths fighting, throwing garbage cans, and setting off car

---

[448] Because Officers Mahoney and Giacona disclaim any memory of the incident, I cannot draw any inferences in their favor.

[449] *See* 3/18 Tr. at 111–114 (Almonor). Minor inconsistencies between Almonor's deposition and trial testimony, such as whether he began to walk his friend to the bus stop at 8 p.m. versus 8:45 p.m., *see id.* at 137, or whether the bodega was at 141st or 142nd Street, *see id.* at 140, do not undermine his credibility.

[450] *See id.* at 143–144.

[451] *See id.* at 115–117.

[452] *See id.* at 119–124. Malik texted Almonor that he was at the bodega.

[453] *See id.* at 134–135. Neither officer saw Almonor with a group of males.

[454] Korabel is now a Lieutenant, *see* 3/27 Tr. at 1068 (B. Dennis), but I will refer to him as Sergeant Korabel, as that was his title at the time of the stop.

alarms. A few calls indicated the possibility that weapons were involved.[455] The calls suggested that the youths were dispersing when marked cars arrived and then returning. When the officers arrived at Hamilton Place there were garbage cans in the middle of the street and car alarms still going off.[456] The only description they had of the individuals was that they were young black males.[457]

The officers briefly observed Almonor and another individual walking on Hamilton Place in the direction from which the calls originated.[458] The individuals crossed 141st Street.[459] The officers — two white males in plainclothes — pulled up alongside Almonor, at which point Almonor retreated onto the sidewalk.[460] After the officers exited the car and approached Almonor, Officer Dennis grabbed Almonor's arm and said: "Police."[461] Almonor pulled away and within moments, Officer Dennis pushed Almonor down on the hood of the police car because he was not "satisfied [that Almonor] did not have something in his waist."[462]

Together the officers handcuffed Almonor.[463] Without explanation, Officer

---

[455] *See id.* at 1085–1087, 1115. The officers arrived at Hamilton Place about twenty minutes after the last 911 call. *See id.* at 1096.

[456] *See id.* at 1117. *Accord id.* at 1189 (Korabel).

[457] *See id.* at 1086 (B. Dennis).

[458] *See id.* at 1117; *id.* at 1150 (Korabel).

[459] *See id.* at 1119.

[460] *See* 3/18 Tr. at 125–126 (Almonor).

[461] *See id.* at 127; 3/27 Tr. at 1069, 1087 (B. Dennis).

[462] 3/27 Tr. at 1088, 1121 (B. Dennis). Officer Dennis thought Almonor was twisting his body as if to keep his right side away from the officers — a behavior called "blading." *See id.* at 1144.

[463] *See id.* at 1121–1122. Sergeant Korabel testified that the reason for handcuffing Almonor was that his conduct rose to the level of disorderly conduct. *See id.* at 1162 (Korabel). However, he testified that he did not observe any disorderly conduct prior to the frisk. *See id.* at

Dennis patted Almonor down from his feet to his torso, during which Almonor was saying, "What are you doing? I'm going home. I'm a kid."[464]  The officers did not recover anything — Almonor only had a cell phone in his right front pocket and a few dollars.

The officers did not ask Almonor his name until after he was handcuffed.[465]  Almonor did not have ID but identified himself as "Devin Al."[466]  Almonor told the officers that he was thirteen years old and was going home, which was a few blocks away.[467]  At some point, though not initially, Almonor gave the officers his full address.[468]  The officers did not ask for Almonor's phone number or whether his parents were home — instead the officers put Almonor in the back of the patrol car, took him to the precinct, and placed him in the juvenile room because of the possibility that he was thirteen.[469]

---

1164, 1169.  Moreover, Officer Dennis testified that Almonor was *not* yelling or screaming when he was being questioned and frisked.  *See id.* at 1090 (B. Dennis).  While Almonor may have struggled in response to being grabbed by the arm and pushed up against a car, I do not find credible the assertion that Almonor's behavior constituted disorderly conduct.

[464]  *Id.* at 1089–1090.  Officer Dennis testified that he frisked Almonor *after* handcuffing him and that the basis for the frisk was that Almonor's "actions as he was walking down the street and as I continued to observe him by holding his waist, I suspected that he may have had a weapon at that point, and that's the area that I frisked."  *Id.* at 1093.  *See also id.* at 1161 (Korabel) (Officer Dennis frisked Almonor within a few seconds of exiting the car).  I do not find credible that Almonor was walking as if he had a weapon in his waist.

[465]  *See id.* at 1091 (B. Dennis).

[466]  *See id.* at 1205 (Korabel) (the name of the individual Sergeant Korabel tried to call was Ms. Al); 3/18 Tr. at 145–146 (Almonor) (acknowledging that he initially identified himself as Devin Al).

[467]  *See* 3/18 Tr. at 128–129.  Almonor's age was relevant because if he was sixteen or older, the officers could issue a summons for disorderly conduct, but if he was younger than sixteen, he would have to be released to his parents.  *See* 3/27 Tr. at 1123 (B. Dennis).

[468]  *See* 3/27 Tr. at 1090 (B. Dennis).

[469]  *See id.* at 1124.  *Accord* 3/18 Tr. at 130–131, 143 (Almonor).  Almonor disputes that he resisted efforts by the police to search, cuff or put him in the squad car.  *See id.* at 157 (Almonor).

After Almonor was released, Officer Dennis completed a handwritten UF 250 form and a juvenile report.[470] The suspected crime was criminal possession of a weapon, and the circumstances of the stop indicated on the form were "fits description" and "furtive movements." The "suspicious bulge" box was not checked and Officer Dennis testified that he did not see a suspicious bulge that night.[471] No contemporaneous document noted that Almonor was touching his waistband.[472] The juvenile report form indicated that Almonor was "resisting arrest," although Almonor was never arrested.[473] The next morning, Officer Dennis filled out a computerized UF-250 and another juvenile report worksheet, both of which noted a suspicious bulge.[474]

### ii. Mixed Findings of Fact and Law

Almonor was stopped when the officers approached him on the sidewalk, and Officer Dennis grabbed Almonor's arm and said: "Police." Even if credited, Almonor's alleged furtive movements — looking over his shoulder and jaywalking — in combination with the generic description of young black male does not establish the requisite individualized suspicion that Almonor was engaged in criminal activity.[475] The officers could have approached Almonor

---

[470]   *See* 3/27 Tr. at 1125 (B. Dennis).

[471]   *See id.* at 1070–1077.

[472]   *See id.* at 1103.

[473]   *Id.* at 1081.  Officer Dennis acknowledged that the officers did not have probable cause to arrest Almonor.  *See id.* at 1088.  I do not believe Sergeant Korabel's testimony that they had probable cause based on Almonor's alleged jaywalking in violation of New York laws. In any event, Sergeant Korabel acknowledged that the officers did not intend to arrest Almonor for jaywalking.  *See id.* at 1152–1155 (Korabel).

[474]   *See id.* at 1125–1126 (B. Dennis).  Officer Dennis acknowledged that he did not see a suspicious bulge on Almonor.  *See id.* at 1078–1079.

[475]   *See Lambert*, 98 F.3d at 1190–91 ("If the general descriptions relied on here can be stretched to cover [plaintiffs] then a significant percentage of [black] males walking, eating,

127

and asked him some questions, but instead chose to physically restrain and handcuff him first, and ask questions later. The circumstances did not justify any restraint of Almonor's liberty, much less immediate physical restraint and the use of handcuffs.[476]

       Even if the officers had possessed the requisite basis to stop Almonor — which they did not — they had no basis to frisk him. While some of the 911 calls suggested that some youths involved in the fighting may have had weapons, that alone does not establish individualized suspicion that Almonor was armed and dangerous. No contemporaneous document indicates a suspicious bulge, and Almonor was not in possession of anything that would have created a suspicious bulge. Almonor's actions did not indicate that he was armed.[477]

       Finally, not only were Almonor's Fourth Amendment rights violated at the inception of both the stop and the frisk, but the officers made no effort to minimize the intrusion on his liberty. Instead, they used the most intrusive methods at their disposal, thereby exacerbating the violation of his rights.[478]

### c. Cornelio McDonald

### i. Findings of Fact

Cornelio McDonald is a middle-aged black male who resides on Parsons

---

going to work . . . might well find themselves subjected to similar treatment.").

[476] *See El-Ghazzawy*, 636 F.3d at 457–58 (investigative stop unconstitutional where there was no indication that plaintiff was armed and dangerous, and officer "failed to conduct even the most basic investigation into the facts prior to handcuffing and frisking"); *Lambert*, 98 F.3d at 1188 (stating that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention") (quotations omitted).

[477] *See Singleton v. United States*, 998 A.2d 295, 302 (D.C. 2010) (A "generic bulge in a pocket can be explained by too many innocent causes to constitute 'reasonable' suspicion.").

[478] *See Terry*, 392 U.S. at 28–29 ("The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation.").

Boulevard, in a private co-op apartment building in Queens.[479]  McDonald often cares for his

mother who lives across the street from him in a New York City Housing Authority ("NYCHA")

complex called Pomonok Houses.[480]  Parsons Boulevard is a wide street with a concrete island

dividing two lanes and cars parked on both sides of each lane.[481]  The majority of residents on

McDonald's side of the block are white, while the majority of residents on his mother's side of

the block are black.[482]

On December 18, 2009, a Friday, McDonald spent approximately ten hours at his

mother's house and left her building around 1:00 a.m.[483]  Because the weather that night was

below freezing, McDonald was wearing a zipped-up jacket, with his hands in his pockets the

entire time he was crossing the street.  He had his cell phone in his left jacket pocket, his keys in

his right pants pocket, and his wallet in his back pocket.  McDonald turned his body sideways to

pass through the cars parked along the divider.[484]

McDonald had crossed the first lane of Parsons Boulevard and was standing

between two parked cars on the far side of the island, getting ready to cross the second lane,

when he saw an unmarked red van with plainclothes individuals inside make a u-turn and pull up

---

[479]     *See* 4/17 Tr. at 3677 (McDonald).  McDonald is employed at Cavalry Staffing where he drives cars.  *See id.*

[480]     *See id.* at 3678.

[481]     *See id.* at 3679–3680.

[482]     *See id.* at 3678–3679.  McDonald testified that about 80% of the residents on McDonald's side of the block are white, while about 80% of the residents on his mother's side of the block are black.  The basis for this testimony was McDonald's own perception rather than documented statistical information.  *See id.* at 3701.

[483]     *See id.* at 3679.  It was December 19 when he left.

[484]     *See id.* at 3681–3683, 3696.

in front of him, trapping him between two parked cars.[485]

The driver rolled down the window and, without identifying himself as police, asked McDonald where he was coming from, to which McDonald responded, "Why you stopping me for?"[486] At that point both officers in the van, one of whom was Officer Edward French, and both of whom were white,[487] stepped out of the car, identified themselves as police, and began to search McDonald without explanation.[488] Officer French told McDonald to remove his hands from his pockets, patted down the outside of McDonald's pockets, asked McDonald to take out his keys — which McDonald did — placed his hand inside McDonald's pocket, and removed a cell phone.[489] When McDonald asked why he was being frisked, the officer said he wanted to be sure McDonald did not have a weapon.[490]

After conducting the frisk, which failed to produce any contraband, Officer French asked McDonald for ID. McDonald obliged and then asked for the officers' identification. Only Officer French identified himself and gave his shield number.[491] McDonald was then permitted to leave. No summons was issued and the entire incident took seven to ten

---

[485] *See id.* at 3680–3681.

[486] *Id.* at 3683.

[487] Although French has been promoted to detective, I refer to him by his rank at the time of the stop. *See id.* at 3739 (French).

[488] *See id.* at 3685, 3709 (McDonald).

[489] *See id.* at 3686. *Accord id.* at 3750 (French) (testifying that he frisked the outermost jacket and the pocket in which he observed the suspicious bulge, including placing his hand inside the pocket, because once McDonald removed his hands from his pockets, there was still a suspicious bulge). I do not believe that a cell phone created a "suspicious" bulge.

[490] *See id.* at 3706–3707 (McDonald).

[491] *See id.* at 3687.

minutes.[492]

On the UF-250, Officer French listed McDonald's suspected crime as criminal possession of a weapon.[493]  Officer French did not believe he needed to include the reason he suspected a person of a crime in his memo book — he believed that the reason for stopping a person was enough.[494]  At trial, however, Officer French testified that his suspicion was based on crime patterns and a suspicious bulge.

Officer French testified about three crime patterns.  *First*, he made an arrest for armed robbery a month earlier in the general vicinity where he stopped McDonald.  *Second*, he was aware of a robbery pattern somewhere in Queens on the night he stopped McDonald — specifically, a black male holding up commercial establishments.  *Third*, he was aware that a black male had been burglarizing residential establishments in Queens, but could not be more specific about the location of the burglaries.[495]  The other explanation Officer French gave for his suspicion was his observation that McDonald had his hands in his pockets and was leaning to one side, and had a "suspicious bulge" in his left front pocket.[496]  I do not believe that Officer French saw a *suspicious* bulge.[497]

McDonald believes that he was stopped based on his race because other, non-

---

[492]     *See id.* at 3689.

[493]     *See id.* at 3726 (French).

[494]     *See id.* at 3737.

[495]     *See id.* at 3726, 3743.  The only suspect description was black male.  *See id.* at 3743.

[496]     *See id.* at 3747.

[497]     The testimony about a "suspicious bulge" appears to have been an after-the-fact justification and is unsupported by either contemporaneous documents or the objects McDonald had in his pockets.

black individuals — whites or Asians — were coming out of a bowling alley about twenty-five

feet from where he was stopped, and none of them were stopped.[498]

### ii.      Mixed Findings of Fact and Law

McDonald was stopped when two officers pulled up to him in a police van,

trapped him between two cars, and proceeded to question him.  The officers made a u-turn and

specifically targeted him in a manner that would not have made a reasonable person feel free to

simply walk away.

The only articulated bases for the stop were the existence of highly generalized

crime patterns involving black males — a month-old armed robbery, a robbery pattern

*somewhere* in Queens and a burglary pattern *somewhere* in Queens[499] — the fact that McDonald

was walking with his hands in his pockets in December and a supposedly suspicious bulge,

which turned out to be a cell phone.  "[P]resence in an area of expected criminal activity,

standing alone, is not enough to support a reasonable, particularized suspicion that the person is

committing a crime."[500]  Moreover, a crime area defined as the entire borough of Queens is far

too broad to contribute to a totality of the circumstances establishing reasonable suspicion, let

alone to form the sole basis.[501]  This, combined with the vague description of "black males" and

the entirely unsuspicious act of putting one's hands in one's pockets in the wintertime, is a far

cry from the *individualized* suspicion of wrongdoing that constitutes reasonable suspicion.

---

[498]      *See id.* at 3688–3689, 3701 (McDonald).  McDonald has brought several lawsuits based on racial discrimination in the past.  Specifically, he alleged that the postal service falsified the records of African Americans and sued a white male for racial discrimination.  *See id.* at 3691.

[499]      *See id.* at 3726.

[500]      *Wardlow*, 528 U.S. at 124 (citing *Texas*, 443 U.S. at 47).

[501]      *See* 4 LAFAVE § 9.5(h) ("the time and spatial relation of the 'stop' to the crime is an important consideration in determining the lawfulness of the stop") (collecting cases).

Absent any other justification, there was no basis for a *Terry* stop, and there was certainly no basis to believe that McDonald was armed and dangerous.

I also find that McDonald was stopped because of his race. The only suspect description was "black male," the street was racially stratified, and other non-black individuals were present and presumably behaving no differently than McDonald — yet only McDonald was stopped. In sum, McDonald was stopped, in violation of the Fourth and Fourteenth Amendments, because he was a black man crossing the street late at night in Queens.

### d.     Nicholas Peart — August 5, 2006

#### i.     Findings of Fact

Nicholas Peart is a twenty-four-year-old black resident of Harlem. He is the legal guardian of three younger siblings and works for a non-profit organization as an after-school program facilitator.[502] On August 5, 2006, around 5:00 a.m., Peart was with his cousin and a friend, both of whom are also black, after celebrating his eighteenth birthday at his sister's house.[503] It was dark out and Peart was wearing light blue basketball shorts and a white — or black and white — tank top. At least one of the men was wearing a hat.[504]

Peart and his companions were standing in the median at 96th and Broadway when three marked police cars pulled up on 96th Street.[505] Approximately five uniformed

---

[502]     *See* 3/19 Tr. at 300–302 (Peart).

[503]     *See id.* at 319–320.

[504]     *See id.* at 320, 347–348. Peart testified that he only recently found the shorts he was wearing that day while doing laundry. *See id.* at 320.

[505]     *See id.* at 320. Officer White, who has since been promoted to detective, was in a vehicle with Officer Fontanez. *See* 5/7 Tr. at 6211–6213 (White). On August 5, Officer White responded as backup to a radio run reporting crime in progress involving a man with a gun in the vicinity of 96th and Broadway. *See id.* at 6214. Three cars responded. *See id.* at 6215–6216.

officers exited the cars with their guns drawn.[506]  Officer White stated: "Police. Don't move. Let me see your hands" and, when the men did not immediately show their hands, ordered them to get down on the ground.[507]  Peart and his companions protested but eventually obeyed the order.[508]  Once Peart was on the ground, Officer White patted him down over his shorts and in the groin area and buttocks, without consent.[509]  Officer White also frisked the other two men.[510]

After frisking the men, Officer White told them to stand up and asked for ID.[511] In response to Peart's inquiries about why they were stopped, Officer White played the radio call three times to show that the men fit the description in the radio call.[512]  The dispatcher's report described a call coming from a payphone at 96th and Broadway about three black males — one carrying a firearm and wearing blue pants and a black shirt, and two others wearing blue and white tank tops, shorts and red hats — walking uptown on Broadway toward 98th Street.[513]

---

[506]     *See* 3/19 Tr. at 320–321 (Peart).  *Accord* 5/7 Tr. at 6224 (White).

[507]     5/7 Tr. at 6224 (White). Officer White testified that he ordered Peart and his companions to get on the ground because they did not initially comply with the order to raise their hands and because he believed one or more of them might be armed.

[508]     *See id.* at 6225 (Officer White stating that he had to ask two or three times before the men got on the ground, during which time they asked "Why? For what? What did I do? I didn't do nothing.").

[509]     *See* 3/19 Tr. at 322–323, 326–327 (Peart).

[510]     *See* 5/7 Tr. at 6226 (White).

[511]     *See id.* at 6227; 3/19 Tr. at 324–326 (Peart).

[512]     *See* 3/19 Tr. at 324–326 (Peart); 5/7 Tr. at 6256–6258 (White) (discussing the radio run description).  The officers asked central command to repeat the description several times in an effort to convince the three individuals that they were stopped was because they fit the suspect description and location provided in the call.  *See* 5/7 Tr. at 6219–6220, 6227 (White).

[513]     *See* DX Z8 (radio transmissions).

After hearing the radio run, Peart and his companions were free to leave.[514]  However, they continued to ask why they had been stopped, and stated their belief that the only reason they were stopped was because they were black.[515]

Following the stop, Peart filed a complaint with the CCRB.[516]  He declined to state his race in filing the complaint.[517]  Over a year later, Peart received a letter informing him that the officers had been exonerated.[518]

The officers who stopped Peart and his friends were responding to a radio run based on a report from an anonymous caller.[519]  The officers stopped the three men because they resembled the description relayed by the dispatcher and were in the same location from which the call had been made only minutes before.[520]  Based on the descriptions from the radio run, Officer White believed he had stopped the right people, although no weapons were found.[521]

Officer White completed three UF-250s after the stop.  He checked the boxes for

---

[514]     *See* 3/19 Tr. at 324–326 (Peart).

[515]     *See* 5/7 Tr. at 6227 (White).

[516]     *See* 3/19 Tr. at 326 (Peart).  In his formal interview with the CCRB on August 26, 2006, Peart said that he had received a laceration on his lip when he dropped to the ground in response to the officers' commands.  However, he corrected this testimony at trial, explaining that the reason he lied was that he was eighteen and wanted to be taken seriously.  *See id.*  I find this explanation plausible and it does not undermine Peart's generally credible trial testimony.

[517]     *See id.* at 370.

[518]     *See id.* at 345.  Peart did not file any CCRB complaints concerning his later stops because he did not feel that the CCRB would do anything, given that his initial complaint had not been substantiated.  *See id.*

[519]     *See* DX Z8; 5/7 Tr. at 6219 (White).

[520]     *See* 5/7 Tr. at 6219–6221.  Although Officer White could not recall exactly what the men were wearing, he testified that "[t]hey were wearing exactly what central had put over which [] was very unique."  *Id.* at 6222.

[521]     *See id.* at 6228.  The officers attempted to locate the caller but were unsuccessful. *See id.*

"fits description" and "suspicious bulge."[522]   As reasons for the frisk, he listed violent crime suspected, suspicious bulge, and refusal to comply with directions (relating to the command that the men show their hands and get on the ground).[523]   On each form Officer White noted that the "bulge in pocket" had in fact been a cell phone.  As additional circumstances, Officer White noted "report from victim witness" and "proximity to crime location."   However, nothing about the radio run suggested that the caller was a victim rather than a mere observer.[524]

### ii.      Mixed Findings of Fact and Law

Peart and his companions were stopped when the officers exited their car with guns drawn.  Although it is a close call, I am constrained by controlling Supreme Court law to find that the officers lacked reasonable suspicion to forcibly stop the men.  In *Florida v. J.L.*, the Supreme Court held that "an anonymous caller['s report] that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" did not establish reasonable suspicion for a stop and frisk.[525]   The Court held that "reasonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."[526]   The Court rejected an exception for reports of firearms, explaining that "[s]uch an

---

[522]     *See id.* at 6230.  Officer White acknowledged that he couldn't stop someone based on the description "male blacks with a gun," or solely based on an anonymous call reporting criminal conduct.  He explained that he would need additional contributing factors and that, in this case, those factors were the bulges in the waistband and proximity to the crime location.  *See id.* at 6234.

[523]     *See id.* at 6231.  Officer White did not check violent crime suspected on all three forms, which he attributed to "officer oversight."  *Id.* at 6231–6232.

[524]     *See id.* at 6232.

[525]     529 U.S. 266, 268 (2000).  The report described three black males, one of whom was wearing a plaid shirt.  *See id.*

[526]     *Id.* at 272 (explaining that "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in th[e] limited sense [that it] will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however,

136

exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun."[527] *Florida v. J.L.* makes clear that a suspect description from an anonymous caller cannot by itself justify the forcible stop and frisk of Peart and his companions. Although the Second Circuit held that a 911 call reporting that an assault (or any crime for that matter) was in progress would require less corroboration, the calls here did not indicate that an assault was in progress.[528]

The only additional factor cited as the basis for the stop was the bulges in the men's waistband area.[529] The only items recovered from the frisk were cell phones. Because the men were wearing minimal clothing, it would be difficult to mistake a cell phone for a firearm. Moreover, to conclude that the bulge created by the now ubiquitous cell phone can provide the additional corroboration necessary to justify an invasive stop and frisk would eliminate the corroboration requirement entirely.[530]

I do not find credible the assertion that the officers saw any *suspicious* bulges that would corroborate the anonymous caller's statement that the men stopped were armed. Rather, I find that they stopped the men solely on the basis of the description in the radio run. No other

---

does not show that the tipster has knowledge of concealed criminal activity"). Under the reasoning in *J.L.*, Officer White's belief that he stopped the right individuals, although they were not armed, does not establish reasonable suspicion.

[527]    *Id.*

[528]    *See Simmons*, 560 F.3d at 103.

[529]    *See* 5/7 Tr. at 6223 (White).

[530]    *Accord Singleton*, 998 A. 2d at 302 ("[A] generic bulge in a pocket can be explained by too many innocent causes to constitute 'reasonable' suspicion.") (distinguishing cases in which only a "noticeable bulge" was cited from cases in which the officer identified with specificity the characteristics that led him to believe it was a firearm).

137

factor establishes reasonable suspicion for the highly intrusive stop. Because there was no legally sufficient justification for the stop, the frisk was also unconstitutional.

### e. Nicholas Peart — April 13, 2011 Stop[531]

#### i. Findings of Fact

On April 13, 2011, around 11:00 p.m., Peart was walking on 144th Street between Lenox and Seventh Avenue — the block on which he resides — on his way to the corner store. Peart was wearing sneakers, jeans and a red hooded sweatshirt. He was sending a text message while walking when two uniformed officers appeared directly in front of him. One officer was white, shorter than Peart, and wore glasses ("Officer A"). The other officer was roughly Peart's height and had salt-and-pepper hair ("Officer B").[532]

One of the officers took Peart's cell phone and instructed Peart to put his hands up against the wall of a church. Officer A patted Peart down outside his clothing over his entire body and put his hands in his pockets. Officer B also put his hands in Peart's pockets, removed Peart's keys and wallet, and searched the wallet for ID. Officer B did not ask permission to search the wallet and Peart did not consent.[533] During the search Peart asked, "why is this happening?" In response to questions about what building he was coming from, he explained that he was coming from his apartment in the Frederick Samuel House, which is a NYCHA building.[534]

---

[531] No officers were identified in connection with the April 13, 2011 stop of Peart and no UF-250 or other form exists. My findings are based entirely on Peart's testimony, which was both detailed and consistent in identifying which officer did what.

[532] See 3/19 Tr. at 303–307. Peart was not certain of the second officer's race but testified that the officer was not black. See id. at 305.

[533] See id. at 307–311.

[534] See id. at 312, 397–398. The officers asked if he was coming from building 129, and he explained that he was coming from building 125. See id. at 409.

Officer A then grabbed Peart's sweatshirt with his fist near Peart's chest area and handcuffed him.[535] Officer B, who had Peart's keys, asked which key opened Peart's door, and Peart identified the key in order to prove that he lived where he said he did. He did not give Officer B permission to enter the apartment, but Officer B entered the building and remained for about five minutes.[536]

While Officer B was in the building, Officer A, who was still holding Peart's sweatshirt, placed Peart, still handcuffed, in the back of an unmarked police vehicle parked in front of the church. Officer A removed Peart's sneakers, patted down his socks and asked Peart if he had weed on him. Peart said he did not.[537] Eventually, Officer B came out of Peart's building. The officers opened the car, let Peart out, removed the handcuffs, and returned his keys, phone and wallet.[538] The officers explained that Peart fit the description of someone who had been ringing a doorbell at the Frederick Samuel House.[539] Peart was then free to go.

### ii. Mixed Findings of Fact and Law

Peart was stopped when the officers blocked his path and told him to put his arms against the wall. The stated reason for the stop was that he fit a suspect description of someone who was ringing doorbells in NYCHA housing. While I cannot know from Peart's testimony whether the description he allegedly fit was sufficiently detailed to form the basis for reasonable

---

[535]    *See id.*

[536]    *See id.* at 313–314.

[537]    *See id.* at 315–316, 399. Peart testified that he was upset and concerned that the other officer was inside the building with his younger siblings. *See id.* at 316.

[538]    *See id.* at 317–318.

[539]    *See id.* at 399–400. The door of Peart's building had recently been replaced, requiring all residents to obtain a new key, which was an involved process requiring proof of residency in the building. *See id.* at 391–394.

suspicion,[540] the stop the officers conducted was not justified by the circumstances.[541]   The officers had every right to ask Peart whether he lived in the Frederick Samuel House — a question he could have answered easily.  Instead, they forced him up against a wall and handcuffed him.

The officers violated Peart's Fourth Amendment rights by frisking him, going into his pockets and searching his wallet.[542]  The officers further abused their authority — and Peart's rights — when Officer B took Peart's keys and entered his apartment without permission while Officer A continued to search Peart and question him about drugs.

### f.    Ian Provost

### i.    Findings of Fact

Ian Provost is a forty-two-year-old black male who currently resides in North Carolina but lived in Queens from 1978 to 2011.[543]  On November 24, 2009, Provost was at his girlfriend's apartment in the Seth Low Houses at 365 Sackman Street in Brooklyn, which is a

---

[540]    *See* 4 LaFave § 9.5(h) (discussing requisite specificity for suspect descriptions).

[541]    *See El-Ghazzawy*, 636 F.3d at 457 (*Terry* stop must be conducted in a manner "'reasonably related in scope to the circumstances which justified the interference in the first place.'") (quoting *Terry*, 392 U.S. at 19–20);  *Allen v. City of Los Angeles,* 66 F.3d 1052, 1057 (9th Cir. 1995) ("'The relevant inquiry is always one of reasonableness under the circumstances.'" (quoting *United States v. Sanders,* 994 F.2d 200, 206 (5th Cir. 1993))).

[542]    *See Dickerson*, 508 U.S. at 378 ("The officer's continued exploration of [plaintiff's] pocket after having concluded that it contained no weapon was unrelated to the sole justification of the search under *Terry*: the protection of the police officer and others nearby.") (original alterations and quotations omitted). Because the initial frisk provided no evidence of a weapon or immediately perceptible contraband, it could not have justified a further search of his pockets or wallet.

[543]    10/10/12 Deposition of Ian Provost ("Provost Dep."), PX 584, at 17–19.  Provost did not testify at trial.  His testimony was received through his pretrial deposition.

NYCHA housing project with a high crime rate.[544]  Provost had a key to access the apartment

and the front door lock was broken.[545]  That day Provost had been doing odd jobs around his

girlfriend's apartment, which involved tools including a knife with a four-inch blade.[546]

Provost left his girlfriend's apartment around 2:15 p.m. to get food at a restaurant

across the street on Belmont Avenue.  He was wearing jeans, a hooded sweatshirt and a down

jacket, which did not cover his back pockets, and was carrying the knife in his right back

pocket.[547]  As he reached the corner of Belmont and Sackman, Provost saw two uniformed police

officers, since identified as Jonathan Rothenberg and David Furman.[548]  After he passed them,

Officer Rothenberg said "excuse me," and Provost stopped and turned around.[549]  The officers

asked if Provost was from around there, where he was going, and where he was coming from.

Provost responded that he was from Queens and that he was coming from a friend's house.[550]

When Officer Rothenberg asked where he was going, Provost responded that it was not the

officer's business which led to an argument about whether the officer had the right to question

Provost's comings and goings.[551]  Provost said, "you have no reason to stop me. This is

---

[544]     *See id.* at 33–36, 82–83.  Both Officer Rothenberg and Sergeant Houlahan
testified that crowds sometimes gathered and became violent in response to police activity in the
area.

[545]     *See id.* at 33–36.

[546]     *See id.* at 38–41.

[547]     *See id.* at 34–35, 39, 42.

[548]     *See id.* at 42–46.  Provost testified that he had seen the officers from the window
of his girlfriend's apartment before he left.  *See id.* at 44.  *See also* 1/8/13 Deposition of Sergeant
Daniel Houlahan ("Houlahan Dep."), DX Q14, at 41.

[549]     *See* Provost Dep. at 45–46.  *Accord* 4/17 Tr. at 3807 (Rothenberg).

[550]     *See* Provost Dep. at 46–48.

[551]     *See id.* at 49.

harassment."[552] Officer Rothenberg told Provost he was being stopped for criminal trespass.[553]

Provost tried to use his cell phone and Officer Rothenberg commanded him not to. When Provost asked why, Officer Rothenberg said that he did not like people using their cell phones when he was talking to them.[554] When Provost attempted to use his cell phone a second time, Officer Rothenberg grabbed his right hand, which was holding the cell phone, handcuffed him, and pushed him up against the fence.[555] As he was being handcuffed, Provost repeated Officer Rothenberg's name and badge number so he could remember it to file a complaint. Provost also yelled out to his girlfriend in hopes that she would hear him from her apartment.[556]

After Provost was handcuffed, Officer Rothenberg frisked him.[557] Provost informed Officer Rothenberg that he had a knife and told him which pocket it was in.[558] After retrieving the knife from Provost's pocket, Officer Rothenberg called Sergeant Houlahan.[559] Officer Rothenberg then searched Provost's person and looked through Provost's cell phone.[560]

---

[552]   4/17 Tr. at 3807 (Rothenberg).

[553]   *Id.* Officer Rothenberg claims that he was using suspicion of criminal trespass and questioning Provost about where he was going to divert attention from the fact that he knew Provost was carrying a knife. *See id.* at 3809. In fact, the officer had no basis to suspect that Provost had committed criminal trespass.

[554]   *See* Provost Dep. at 48–51. Provost could not recall whether his cell phone was in his hand or in his pocket but noted that he was not inclined to reach into his pockets while talking to police because he believed police had a tendency to shoot people who reach into their pockets and pull things out while being questioned. *See id.* at 51–52.

[555]   *See id.* at 58.

[556]   *See id.* at 59, 60.

[557]   *See id.* at 58.

[558]   *See id.*

[559]   *See id.* at 64–65.

[560]   *See id.* at 59.

When Sergeant Houlahan arrived, he felt it was unsafe to stay on the street where crowds sometimes gathered and became violent, so he instructed the officers to put Provost in his car and then drove him to the precinct.[561] After the officers determined that the knife was not a gravity knife, Provost was given a summons for carrying a knife with a blade exceeding four inches and a summons for disorderly conduct for being loud and boisterous.[562]

Officer Rothenberg's memo book entry for the stop reflected that he had stopped Provost for possible criminal trespass, but did not include any information about the circumstances leading to the stop.[563] Rothenberg had observed Provost going in and out of the Seth Low Buildings and did not observe him use a key, but Rothenberg acknowledged that he did not have reasonable suspicion to believe that Provost was engaged in criminal trespass.[564] Officer Rothenberg testified that he observed an inch or two of a knife handle sticking out of Provost's pocket when Provost approached the corner where he and another officer were standing, and that this was the reason for his stop.[565]

Provost filed a CCRB complaint after the incident and was interviewed. The complaint was not substantiated.[566] Provost does not believe that the officers saw the knife

---

[561]    *See* Houlahan Dep. at 46–49.

[562]    *See* 4/17 Tr. at 3814, 3832 (Rothenberg). Rothenberg admitted that Provost was not being disorderly prior to being stopped and that he was not engaging in "tumultuous behavior" as defined in the disorderly conduct statute.

[563]     *See id.* at 3802; PX 277 (memo book). Rothenberg testified that he mistakenly wrote criminal trespass because he was rushed. *See* 4/17 Tr. at 3833. *See also* Houlahan Dep. at 85–86 (stating that if Officer Rothenberg engaged Provost because of a knife in plain view, he should have recorded it in his activity log). Criminal possession of a weapon was also noted in the memo book but not as a basis for the stop and no further details were recorded. *See* PX 277.

[564]    *See* 4/17 Tr. at 3804.

[565]    *See id.* at 3805.

[566]    *See* Provost Dep. at 92–93.

before he informed them that he was carrying it, which occurred after the stop but before the frisk.[567]

### ii.    Mixed Findings of Fact and Law

Provost was stopped when Officer Rothenberg informed him that he was being stopped on suspicion of criminal trespass, and possibly earlier. Whether the stop was unlawful turns on whether I credit Officer Rothenberg's testimony that he stopped Provost because he saw the knife in his right back pants pocket. I do not. While it is plausible that an officer would delay handcuffing and frisking an individual suspected of possessing a gravity knife, the testimony suggests that Officer Rothenberg had not, in fact, seen the knife when he first stopped Provost. In particular, the fact that Officer Rothenberg wrote in his memo book — the only contemporaneous record of the stop — that he stopped Provost for possible criminal trespass rather than not possession of a weapon, suggests that the knife was not the original reason for the stop.[568]

In light of this conclusion, there was no basis to stop Provost on suspicion of criminal trespass. Going in and out of his girlfriend's building is not in and of itself suspicious behavior and, without more, does not rise to the level of reasonable suspicion. Handcuffing and then frisking Provost was also unreasonable. Although Officer Rothenberg's actions may have been influenced by the fact that he had been assaulted in the area on a prior occasion, nothing in Provost's actions — arguing about his right not to disclose where he was coming from, reaching for his cell phone while stating that he was reaching for his cell phone — suggested that he

---

[567]    *See id.* at 74.

[568]    As I have recognized, memo books, while imperfect, are the only contemporaneous documents by which a judge or supervisor can evaluate the basis for the stop — that is their primary purpose. Therefore, I have no choice but to credit them over after-the-fact testimony of what occurred, which often incorporates post hoc justifications for the stop.

presented a sufficient threat to warrant handcuffing him.  The frisk was unreasonable for the same reason, particularly in light of the fact that Provost was already handcuffed and could not have harmed Officer Rothenberg or anyone else.[569]

### g.    David Ourlicht — January 30, 2008 Stop

### i.    Findings of Fact

David Ourlicht is a twenty-five-year-old male of mixed black and white heritage who grew up and currently lives in Manhattan.  At the time of his testimony Ourlicht was applying for admission to law school.[570]  On January 30, 2008, Ourlicht was enrolled at St. John's University in Queens.  Around 2:00 p.m., he left school and walked his girlfriend to her job.  Ourlicht then began walking north on 164th Street to a deli near his dorm.  He was wearing a black down Marmot jacket, a sweatshirt, jeans and sneakers. The jacket had six pockets which held Ourlicht's keys, cell phone, wallet, passport, ipod, pens, and a five-subject notebook.  Most of the items were in the jacket's interior pockets, but the notebook lay flat in one of the front external pockets, with about twenty-five percent sticking out of the pocket.[571]

As Ourlicht was walking up 164th Street, he saw a uniformed officer, Christopher Moran,[572] on a police scooter drive past him from behind.  They made brief eye contact but Ourlicht kept walking.  When Ourlicht reached the intersection where Officer Moran's scooter was stopped, Officer Moran asked what Ourlicht was doing in the area and where he was

---

[569]    Because Provost was not arrested prior to Sergeant Houlahan's arrival, the search of Provost's person and cell phone cannot be justified as part of a search incident to arrest.  The stated purpose of calling Sergeant Houlahan was to determine whether or not Provost should be arrested.

[570]    *See* 4/19 Tr. at 4173–4177 (Ourlicht).

[571]    *See id.* at 4175–4176, 4185.

[572]    Moran was promoted to Sergeant in 2010, but I will refer to him by the position he held at the time of the stop.  *See* 4/18 Tr. at 4027 (Moran).

going.[573]  Ourlicht did not feel free to leave.[574]

    Officer Moran left the scooter and asked Ourlicht for ID, to which Ourlicht responded, "why are you stopping me?"  Officer Moran asked whether Ourlicht went to school around there, and Ourlicht said, "why are you asking me this?"  Officer Moran again asked for ID and Ourlicht asked, "why do you need to see ID? What did I do?" in an irritated way.  Officer Moran responded that it looked like Ourlicht had a gun on him, and proceeded to pat down his waist area.[575]  Officer Moran did not reach into Ourlicht's pockets.[576]

    As soon as Officer Moran told Ourlicht he suspected him of having a gun, Ourlicht asked if he could give him his ID, and then reached into the inside breast pocket of his jacket and handed Officer Moran his passport and his St. John's student ID.[577]  Officer Moran recorded Ourlicht's information at which point Ourlicht said, "now that you have my information do you mind if I take down yours?"  Officer Moran said sure, and Ourlicht made clear that he was going to reach into his pocket to get a pen and paper and began to write down Officer Moran's badge number, nameplate, and scooter number.[578]

---

[573] *See* 4/19 Tr. at 4177–4180 (Ourlicht); 4/18 Tr. at 4051, 4055 (Moran).

[574] *See* 4/19 Tr. at 4181 (Ourlicht) ("Q: Why didn't you just walk away when [the] officer started asking you questions? A: He was a police officer.  He had a gun.  I don't know anybody that would in that situation, walk away.").

[575] *See id.* at 4180–4181.  Ourlicht disputes that he was yelling or being hostile, *see id.*, while Officer Moran testified that Ourlicht was irate, screaming and using obscene language.  *See* 4/18 Tr. at 4059 (Moran).  Although I believe that Ourlicht may have used obscene language in response to receiving the summons, I credit Ourlicht's testimony that he was not disorderly during the initial stop. At most he became irate after being frisked.  *See id.* at 4069 (Moran) ("A: In the beginning I started to question — asked him a question.  Began a conversation.  I frisked him.  He became very irate.  He was yelling obscenities . . . He stated he wanted to fight me.").

[576] *See* 4/19 Tr. at 4183 (Ourlicht).

[577] *See id.*

[578] *See id.* at 4184.

Officer Moran had radioed for backup and a patrol car pulled up.[579]  Officer Moran then said, "okay now you're going to get the full treatment, get against the wall."[580]  Two uniformed police officers got out of the car.[581]  Ourlicht faced the wall with his hands behind his head and the officers proceeded to pull everything out of his jacket pockets and reached into his jeans pockets, which were empty.[582]  The officers instructed Ourlicht to sit on the ground, which he did, while Officer Moran returned to the scooter with Ourlicht's ID.[583]

Officer Moran returned and asked Ourlicht for his address, which Ourlicht provided, and Officer Moran accused him of lying.  Ourlicht then provided his mailing address, which was different from his residence — a college dorm.[584]  Moran wrote Ourlicht a ticket for disorderly conduct.  When Ourlicht learned what the ticket was for he said "that's fucked up" and "I'm going to fight this."  Ourlicht was then free to go.[585]  The summons was dismissed.  Ourlicht's mother filed a CCRB complaint regarding the stop.[586]

Officer Moran observed Ourlicht for no more than two minutes — as he approached Ourlicht on the scooter and after he passed him, from his rearview mirror.[587]  Officer

---

[579]    *See* 4/18 Tr. at 4081 (Moran).

[580]    4/19 Tr. at 4148 (Ourlicht).

[581]    *See id.* at 4185.  Moran testified that based on threats Ourlicht was making, "after [Officer Moran] had frisked him and found nothing, [he] reasonably suspected at that time that [Ourlicht] was hiding something else").  *See* 4/18 Tr. at 4070.

[582]    *See* 4/19 Tr. at 4186 (Ourlicht).

[583]    *See id.* at 4187–4188.

[584]    *See id.* at 4189–4190.

[585]    *See id.* at 4191; PX 248 (criminal court summons). Moran never handcuffed Ourlicht.

[586]    *See* 4/19 Tr. at 4192 (Ourlicht).

[587]    *See* 4/18 Tr. at 4079 (Moran).

147

Moran believed Ourlicht was "blading" the right side of his body in order to protect something in his right waist area that was preventing him from taking normal steps.[588]  Officer Moran claimed he saw an object running from Ourlicht's hip along his ribs.  Based on that and the way Ourlicht was walking, Officer Moran decided to stop him.[589]

Officer Moran completed a UF-250 in connection with the stop of Ourlicht.  He checked the "suspicious bulge" box but did not identify what the bulge ultimately was.[590]  Officer Moran noted in his memo book that he stopped a male around 2:15 p.m. based on a suspicious bulge, and issued a summons.  No other details about the stop were recorded.[591]

### ii.    Mixed Findings of Fact and Law

Ourlicht was stopped when Officer Moran confronted him on the sidewalk and began questioning him — and certainly when the men began to argue about Officer Moran's authority to demand information about Ourlicht's comings and goings. The only articulated basis for the stop was the "blading."  Even if Officer Moran saw Ourlicht walking strangely because he had a five-subject notebook in his pocket, that is insufficient to form a "reasonable, particularized suspicion that the person is committing a crime."[592]  Nothing else about the circumstances provided added basis for suspicion.  It was daytime and Ourlicht made eye contact with Officer Moran, and did not attempt to evade his presence.

I also do not find that Officer Moran reasonably believed that Ourlicht was armed and dangerous.  The five-subject notebook, the only item that could have been the object that

---

[588]    *See id.* at 4051–4052.

[589]    *See id.* at 4056.

[590]    *See id.*; PX 250 (UF-250 form).

[591]    *See* 4/19 Tr. at 4068 (Moran); PX 249 (Memo Book Entry).

[592]    *Wardlow*, 528 U.S. at 124 (citing *Texas*, 443 U.S. at 47).

supposedly caused Officer Moran to believe Ourlicht was armed, could not be confused for a gun, and, in fact, would be easily identifiable as a notebook.[593]  Therefore, I also find that the first frisk was unreasonable.

Even if the first frisk were justified, the search when the other officers arrived was not justified because Moran had already frisked Ourlicht and found nothing.  Nothing that Ourlicht did after the initial stop justified Moran's suspicion that Ourlicht was hiding "something," much less that he was hiding a weapon.  *Terry*'s authorization of "strictly circumscribed" protective searches contemplated that evidence of criminal conduct might be missed, but concluded that the Constitution did not permit a more intrusive search absent probable cause.[594]

### h.      Clive Lino — February 5, 2008 Stop

### i.      Findings of Fact

Clive Lino is a thirty-two-year-old black resident of the Bronx.  He works as a social worker at a non-profit faith-based organization.  Lino is about five foot ten and weighs about 175 pounds.[595]

---

[593]      I note that because Officer Moran's memo book and the UF-250 did not state what the suspicious bulge actually was, I conclude that it was either entirely fabricated, or was, in fact, the five subject notebook.

[594]      *Terry*, 392 U.S. at 25–26 (contrasting a search based on probable cause, which is justified on grounds other than protecting the arresting officer, including obtaining evidence of the crime, with "[a] search for weapons [which must] be strictly circumscribed. . . .").  Nor does *Terry* authorize stopping an individual, antagonizing him, and then conducting a more intrusive search based on post-stop allegations of disorderly conduct.  Even Moran doesn't contend that Ourlicht was being disorderly before he frisked him.  Ourlicht admits that he questioned the basis for the stop and the need for ID but not that he was being disorderly.  Because Officer Moran's memo book had no details and his memory is limited, I credit Ourlicht, who acknowledged that he used obscenity after receiving the summons and is generally more credible.

[595]      *See* 4/1 Tr. at 1728–1729, 1762 (Lino).

149

On February 5, Officer Brian Kovall, who is white, and Officer Edward Arias, who is black, learned during roll call of a robbery pattern involving two black males, one wearing a beige or yellow coat and the other wearing a blue or black coat, committing gunpoint robberies in the vicinity of a check-cashing location near 103rd Street and Lexington Avenue, a high crime area.[596]  The height range for the suspects was five foot six to six foot two, the weight range was 170 to 200 pounds, and the age range was mid-twenties.[597]  Officer Kovall watched a video of the two suspects running, which was taken around noon on January 30.[598]

Around 8:00 p.m. on February 5, Lino and his friend James went to pick up takeout from a Chinese restaurant at 103rd Street and Lexington Avenue.  At the time, Lino lived just two blocks from the restaurant.  Lino and James ordered food and were waiting outside the restaurant facing the street.[599]  Lino was wearing a tan State Property-brand jacket and James was wearing the same jacket in a greenish color.[600]

As Lino and James waited outside for their food, Officers Kovall and Arias approached and ordered Lino and James to take their hands out of their pockets, which they did after several requests.[601]  The officers asked the men what they were doing on the corner, where they were going, where they were coming from, where they lived, and if they had ID.  Lino said

---

[596]    *See* 4/16 Tr. at 3468–3471, 3485 (Arias).  *See also id.* at 3479 (there are higher crime rates near subways stations).

[597]    I note that this description is so generic as to cover the vast majority of young black males.

[598]    *See* 4/10 Tr. at 3045, 3063–3064 (Kovall).  Officer Kovall testified that the man running "looked like — I don't want to say a normal person, but of a medium stature, as [did] Mr. Lino and the other gentleman stopped." *Id.* at 3077.

[599]    *See* 4/1 Tr. at 1729–1730, 1752, 1765.

[600]    *See id.* at 1731–1732.

[601]    *See* 4/10 Tr. at 3050, 3069.

he did not have ID because he had just come from his apartment to get food and was going right back there.[602]  Lino and James were not free to leave.[603]

The officers informed Lino and James that they were stopped because they fit the description of armed robbery suspects.  Officer Arias stated that they had orders to stop anyone on that particular corner whenever they felt like it.[604]  Officer Arias frisked Lino's pockets and waist but did not reach inside his pockets.[605]  The officers obtained Lino and James's names and addresses.

The officers called their supervising Lieutenant to come down and confirm whether these men were the robbery suspects, which took five to ten minutes.[606]  During that time, Officer Kovall permitted Lino to enter the restaurant and get the food because Officer Kovall was "satisfied that there were absolutely no weapons on either individual."[607]

After Lino returned with the food, Lieutenant Gaglio and two other officers arrived in plainclothes.  Lino knew they were officers because "they spoke to the officers who were already there, and they were able to have access to us."[608]  After asking the same questions that Officers Kovall and Arias had asked,  Lieutenant Gaglio told Officer Kovall and Arias that

---

[602]     *See* 4/1 Tr. at 1732–1733, 1768 (Lino).

[603]     *See* 4/10 Tr. at 3048 (Kovall); 4/16 Tr. at 3473 (Arias).

[604]     *See* 4/1 Tr. at 1734 (Lino).  I credit this testimony both because Lino's recollection of the stop was generally credible and because Officer Arias testified that the particular corner of 103rd and Lexington was a high crime, high traffic area.  *See* 4/16 Tr. at 3468–3471, 3485, 3479 (Arias).

[605]     Lino conceded that neither officer checked his pockets.  *See* 4/1 Tr. at 1734–1735. The officers also frisked James.  *See id.*

[606]     *See* 4/10 Tr. at 3071 (Kovall).

[607]     *Id.*

[608]     4/1 Tr. at 1735–1736.  *Accord* 4/16 Tr. at 3491–3492 (Arias).

these were not the men.[609]  Lieutenant Gaglio told Officers Kovall and Arias to run the men's

names.  While they were doing so, one of the plainclothes officers frisked Lino again.[610]

Officers Kovall and Arias returned and reported a summons that Lino and James

had received in January.  The plainclothes officers left and Lino asked Kovall and Arias for their

badge numbers.  Officer Kovall provided his name and badge number, while Officer Arias just

walked away.[611]  Lino was then free to go.  He did not receive a summons and was not arrested.

Following the stop, Lino filed a complaint with the CCRB, which was

unsubstantiated.[612]  Lino believed he and James were stopped because of their race.[613]

The officers stopped the men because their coats matched the description in the

robbery pattern — one light coat and one dark coat.  In addition, the officers observed Lino and

James standing outside on a cold night in the vicinity of the robberies, and they were still there

after the officers circled the block and returned.[614]  Officer Arias frisked Lino because the

suspected crime was armed robbery.[615]

Officer Kovall filled out a UF-250 after stopping Lino.  Under circumstances that

led to the stop he checked "Fits Description";  "Area Has High Incidence Of Reported Offense

---

[609]     *See* 4/10 Tr. at 3072 (Kovall).

[610]     *See* 4/1 Tr. at 1735–1736 (Lino).  *But see* 4/16 Tr. 3492 (Arias); 4/10 Tr. at 3072
(Kovall) (testifying that they did not see the other officers frisk either man).  I credit Lino's
testimony that Kovall and Arias were sent to run the names because he said they returned and
reported that he had an outstanding summons.

[611]     *See* 4/1 Tr. at 1736–1737 (Lino).

[612]     *See id.* at 1738; 4/16 Tr. at 3492 (Arias).

[613]     *See* 4/1 Tr. at 1774 (Lino).

[614]     *See* 4/16 Tr. at 3486–3489 (Arias).

[615]     *See id.* at 3490.  Officer Arias did not fill out a UF-250 and did not follow the
requirements for filling out his memo book in connection with this stop.  *See id.* at 3475 (Arias);
PX 214.

Of Type Under Investigation"; and "Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity" because of "Ongoing Investigations, e.g. Robbery Pattern." As the reason for the frisk, Officer Kovall checked "Violent Crime Suspected" and "Knowledge Of Suspect's Prior Criminal Violent Behavior/Use of Force/Use of Weapon," to refer to the fact that he was looking for an armed robbery suspect. "Refusal To Comply With Officer's Directions" was also checked, in reference to Officer Kovall's initial instruction to Lino to remove his hands from his pockets.[616]

## ii. Mixed Findings of Fact and Law

Lino and James were stopped when the officers approached and told them to remove their hands from their pockets. Although it is a close question, I find that the officers lacked reasonable suspicion to forcibly stop Lino and James. The suspect description alone — two black men, of average height and weight, one wearing a light jacket and one wearing dark — is too generic to form the basis for reasonable suspicion, especially given the passage of time between the commission of the armed robberies and the stop of Lino and James.[617]

The act of standing outside in the cold near the check-cashing location for the amount of time it took the officers to circle the block does not raise the totality of the circumstances to reasonable suspicion justifying a forcible stop of Lino and James.[618] No other

---

[616]    *See* 4/10 Tr. at 3053–3054 (Kovall); PX 211.

[617]    *Contrast* 4 LAFAVE § 9.5(h) (5th ed.) (discussing *Hampleton v. United States*, 10 A.3d 137 (D.C. App. 2010) (finding reasonable suspicion where robbers were described only as "black males in dark clothing," but direction of flight and distance from the crime location fit, and defendant was stopped *in close time/space relationship to that event*, and "was the only one in the immediate area who fit the lookout description") and *United States v. Turner*, 699 A.2d 1125 (D.C. App. 1997) (reasonable suspicion where officers arrived at scene of crime within a minute and encountered only two persons fitting fairly general description).

[618]    While observing the men standing facing the street across from the check-cashing location with no apparent agenda for an *extended* period of time might give rise to the suspicion that they were casing a location for a robbery, several minutes is insufficient.

circumstances provided additional cause for suspicion. Furthermore, Officer Arias told Lino that the officers had orders to stop anyone on that corner whenever they felt like it. Such an order ignores the requirement of individualized, articulable suspicion, and Officer Arias' reference to it discredits the officers' assertions that they had the requisite suspicion in this instance. Thus, the initial stop of Lino violated his Fourth Amendment rights.[619]

I note that the officers could easily have observed for a few minutes longer to determine whether there was an innocent explanation for this conduct — namely obtaining the food — at no cost to their safety or law enforcement objectives.[620] Moreover, they would have been justified in approaching the men and asking them some questions — the equivalent of a *DeBour* level one stop. But the intrusion here was considerably more severe and included a frisk of the men's persons.[621] The second frisk by the plainclothes officers further violated Lino's rights, as there was clearly no threat at that point that the men were armed and dangerous.

### i. Lalit Clarkson

### i. Findings of Fact

---

[619] Lino's rights were further violated when he was detained for additional time by the plainclothes officers. By the time these officers arrived, Lino had dispelled any suspicion that he and James were engaging in criminal activity by showing that they were in fact waiting for Chinese food. *See Royer*, 460 U.S. at 500 (*Terry* stop must "last no longer than is necessary to effectuate the purpose of the stop").

[620] The Supreme Court held that the Fourth Amendment does not require police to use the least intrusive means possible to verify their suspicions, reasoning that such a rule would "unduly hamper the police's ability to make swift, on-the-spot decisions." *Sokolow*, 490 U.S. at 10-11. However, this deference only applies when the suspicion to be verified is sufficient to justify a *Terry* stop. *See id.* at 10 (holding that the circumstances gave rise to reasonable suspicion that the suspect was smuggling drugs, and only then turning to whether police were required to use least intrusive means possible to investigate). *See also El-Ghazzawy*, 636 F.3d at 457–58.

[621] I note that because the suspected crime was robbery at gunpoint, if the stop had been reasonable at its inception, the frisk would also have been justified, particularly in light of the men's hesitancy to remove their hands from their pockets, which occurred before the men were frisked.

154

Lalit Clarkson is a thirty-one-year-old black male who works as a union organizer and lives in New Jersey, but visits New York frequently.[622] When he was stopped in January, 2006, Clarkson worked as a teacher's assistant at Grand Concourse Academy, a school located at 169th Street in the Bronx. Clarkson was returning to the school after picking up lunch at a Subway around 1:00 p.m., wearing slacks, a tie, and a collared shirt.[623] Clarkson entered a bodega on the corner of 169th and Walton, across from the school, holding a clear Subway bag containing a sandwich. He saw two plainclothes officers, one white and one Hispanic, standing in the back of the bodega, and assumed they were police because of the way they were standing and his experience in the neighborhood. Clarkson did not interact with the officers in the bodega. He purchased a food item, put it in his pocket and left the store.[624]

As he was about to cross the street, he heard a voice say, "hey" and he turned around. The white officer said, "come over here, can I talk to you," and Clarkson went over. The officers showed their badges and identified themselves as police. The officers came closer to Clarkson so that eventually his back was against the bodega wall and the officers were standing between Clarkson and the street.[625]

The officers told Clarkson they had seen him walk past a building down the block that they knew to be a drug building. Clarkson had walked past the building because it was on the route he took back to school, but had not stopped or spoken to anyone. The officers asked

---

[622]     *See* 4/8 Tr. at 2634–2635 (Clarkson).

[623]     *See id.* Clarkson was not sure of the exact day he was stopped. No CCRB complaint was filed and no UF-250 or memo book entry was identified in connection with this stop. The officers who conducted the stop were never identified. Therefore, my findings regarding this stop are based entirely on Clarkson's testimony, which I find credible.

[624]     *See id.* at 2636–2637.

[625]     *See id.* at 2638–2641.

twice if Clarkson had any contraband on him, and he said he did not. Then they asked: "if I go in your pockets you don't have anything on you?" Again Clarkson said no. He did not consent to a search and the officers did not search him. The officers left after Clarkson said a third time that he had no contraband, and did not consent to be searched. The stop lasted a few minutes.[626] At no point did Clarkson feel free to leave.[627]

### ii. Mixed Findings of Fact and Law

Clarkson was stopped when the officers called him over and surrounded him with his back against the wall. Although merely blocking a means of egress may not constitute a seizure where the police do not actually prevent a person from leaving,[628] the act of surrounding an individual on the street against a wall is an intentional "assertion of authority to restrain a person's freedom of movement" sufficient to constitute a seizure.[629] Clarkson was not required to attempt to push past the officers in order to test whether or not he was, in fact, free to leave. Because the officers lacked reasonable suspicion to stop Clarkson where all he did was walk past a building known to be associated with drugs, this stop violated the Fourth Amendment.[630]

### 2. Unconstitutional Frisk Only

#### a. Dominique Sindayiganza

---

[626] *See id.* at 2641–2642.

[627] *See id.* at 2643.

[628] *Pinto-Montoya v. Mukasey*, 540 F.3d 126, 132 (2d Cir. 2008) (discussing *Delgado*, 466 U.S. at 218).

[629] *Id.* (citing *Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized . . . when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied.") (quotation marks and citations omitted)).

[630] *See Wardlow*, 528 U.S. at 124 (citing *Texas*, 443 U.S. at 47) (presence in high crime area insufficient).

###### i.      Findings of Fact

Dominique Sindayiganza is a middle-aged, black male who resides in Queens with his wife and two daughters. In 2010, Sindayiganza worked at a non-profit organization in Manhattan.[631] On February 12, 2010, Sindayiganza left his office at Lexington Avenue and 25th Street around 5:30 p.m. carrying a backpack and wearing dark blue rain pants and a green winter jacket. After running an errand in Union Square, he was walking along Broadway toward the F train at 14th Street and Sixth Avenue to go home. He entered Petco on the corner of Broadway and East 17th Street thinking it was a store that sold children's clothes. He quickly realized it was a pet store, and as he started to exit he heard someone say: "this is the guy." Four young white male uniformed officers, including Luke White and Sean Gillespie, surrounded him and forcibly escorted him out of the store.[632]

Once outside, the officers surrounded Sindayiganza on the sidewalk and aggressively questioned him about what he was doing there, where he came from, and whether he was armed. The officers told him that a lady had identified him as the man who was following her and asking her for money.[633] Sindayiganza replied that he was an educator, that he was buying supplies for a field trip and then going home to Queens, and that he had not followed

---

[631]    *See* 4/8 Tr. at 2586–2587 (Sindayiganza).

[632]    *See id.* at 2588–2592, 2598, 2606. Sindayiganza testified that the officers looked like they were in their mid-twenties and questioned him like rookie cops. *See id.* at 2597. *See also* 4/10 Tr. at 3087–3088 (White); 4/15 Tr. at 3420 (Gillespie) (both testifying that the majority of the officers in the impact squad to which they were assigned at the time of the stop were recent graduates of the police academy).

[633]    *See* 4/8 Tr. at 2592–2595 (Sindayiganza). Officer White spoke first with the Petco employee and then directly with the woman. The woman did not say that she was verbally threatened or touched and she did not identify herself when she initially spoke with Officer White. *See* 4/10 Tr. at 3093–3094 (White).

any lady.  He asked to see the woman so he could clear his name and was told he could not.[634]
At some point during this initial interaction, Officer White frisked Sindayiganza.[635]

Officer White asked Sindayiganza for ID and then went into Petco to see if the
woman could identify Sindayiganza as the harrasser.  The other officers continued to
aggressively question Sindayiganza.[636]  The woman identified Sindayiganza and stated that she
just wanted him to leave.[637]  Officer White went back outside and told Sindayiganza that he
could go but that he had to walk north up Broadway.  Sindayiganza asked if he could go to the 4
train or the F train, both of which were south, and was told he could not.  Sindayiganza asked
indignantly why, if he was free to go, he could not go to the train that would take him directly
home.[638]  He was speaking loudly at this point, but was not yelling.[639]

Officer White went back inside Petco and conferred with the woman who said she
wanted Sindayiganza arrested. Officer White then told Sindayiganza that he was going to teach
him a lesson and told him to put his hands against the wall, made him take off his backpack,
handcuffed him, and forced him to sit down on the sidewalk.[640]  Another officer looked through

---

[634]    *See* 4/8 Tr. at 2596–2597 (Sindayiganza).

[635]    *See* 4/10 Tr. at 3115–3116 (White) (testifying that although he may have frisked
Sindayiganza before arresting him, it was all part of a continuous event and acknowledging that
he testified in his CCRB report that he patted down Sindayiganza before the woman informed
him that she wanted to press charges).

[636]    *See* 4/8 Tr. at 2597–2599 (Sindayiganza); 4/10 Tr. at 3102 (White).  Officer
White clarified that he did not specifically point out Sindayiganza to the woman, but rather
asked her if she recognized anyone.  *See* 4/10 Tr. at 3105 (White).

[637]    *See* 4/10 Tr. at 3106–3107 (White).

[638]    *See* 4/8 Tr. at 2599–2600 (Sindayiganza).  *See id.* at 2616.  *Accord* 4/10 Tr. at
3108 (White).

[639]    *See* 4/10 Tr. at 3146 (White).

[640]    *See* 4/8 Tr. at 2600 (Sindayiganza).  Just before handcuffing Sindayiganza,
Officer White spoke to the woman who identified Sindayiganza and told her that Sindayiganza

Sindayiganza's backpack and removed items, and opened his jacket and searched his pockets, all without consent. When Sindayiganza asked why he was being arrested, the officers told him it was for "excessive panhandling." Sindayiganza was then taken in a police car to the precinct and given a summons for disorderly conduct, which was never prosecuted.[641] Sindayiganza submitted a CCRB complaint online a day or two after the event and provided a sworn statement seven months later.[642]

Officer White believed he had reasonable suspicion to stop Sindayiganza because he matched the woman's description — tall, light-skinned black male with dark hair, a big backpack, glasses, a green jacket, and green pants — and was in close proximity to the location of the incident.[643] Officer White believed he had probable cause to arrest Sindayiganza for aggravated harassment based on the woman's allegations and identification.[644] He further believed that once he handcuffed Sindayiganza, he had the right to search him incident to arrest.[645] No arrest report was filled out and only a summons for disorderly conduct was

---

was refusing to walk north, at which point she told Officer White that she wanted to press charges. Until she said this, Officer White had no intention of arresting Sindayiganza, although he believed he had probable cause to do so based on the witness's identification. *See* 4/10 Tr. at 3112 (White).

[641] *See* 4/8 Tr. at 2600–2602 (Sindayiganza).

[642] *See id.* at 2623–2624. Sindayiganza explained that he did not want to provide a sworn statement to the CCRB until his summons was resolved because he was unsure how legal proceedings worked. *See id.* at 2629.

[643] *See* 4/10 Tr. at 3104, 3143 (White).

[644] *See id.* at 3117.

[645] *See id.* at 3112–3113, 3120. One of the officers obtained the woman's personal identification prior to handcuffing Sindayiganza but Officer White threw it out once it was determined that Sindayiganza would not be arrested. *See id.* at 3123–3124.

issued.[646]

## ii.    Mixed Findings of Law and Fact

Sindayiganza was stopped when the police surrounded him and escorted him outside.  The police had reasonable suspicion to forcibly stop Sindayiganza for suspected harassment because he matched a specific description provided by an identified victim, and was in close proximity to the reported harassment just minutes after it allegedly occurred.[647]

There was, however, no basis to frisk Sindayiganza.  His stop was based on a woman's report that a man had been following her and asking her repeatedly for money, which caused her alarm.[648]  The woman never said she believed her harasser was armed, or that she had been physically threatened.

The frisk cannot be justified as a search incident to arrest that preceded the arrest.  As a preliminary matter, the officers almost certainly lacked probable cause under New York law to arrest Sindayiganza.  Based on the woman's allegations, Officer White at most had reasonable suspicion that Sindayiganza had committed harassment in the second degree, a violation under New York law.[649]  New York law prohibits arrest based on second–degree

---

[646]    *See id.* at 3121.  No UF-250 was filled out.  *See id.* at 3125. Officer White recorded the arrest in his memo book and noted that the arrest occurred about fifteen minutes after he stopped Sindayiganza.  *See id.* at 3131.

[647]    *See Williams*, 407 U.S. at 147 (holding that "when the victim of a street crime seeks immediate police aid and gives a description of [her] assailant," that may form the basis for reasonable suspicion and a forcible stop).

[648]    *See* Def. Findings ¶ 2 (describing Sindayiganza stop).

[649]    *See* PL § 240.26 (defining harassment in the second degree as "follow[ing] a person in or about a public place or places; or . . . engag[ing] in a course of conduct . . . which alarm[s] or seriously annoy[s] such other person and which serve[s] no legitimate purpose").  Although Officer White stated that he had probable cause to arrest Sindayiganza for *aggravated* harassment, nothing about the woman's statement suggested any fear of physical injury, much less any of the elements of aggravated harassment.  *See id.* § 240.30 (aggravated harassment, even in the second degree, involves use of the mails or telephone, or use of physical violence).

harassment that does not occur in the arresting officer's presence.[650]

Even if probable cause for an arrest had existed, when Officer White frisked Sindayiganza he had no intention of arresting him; rather he planned to let Sindayiganza leave, as long as he walked north. A frisk cannot be justified after the fact as a search incident to arrest, where there is no intent to arrest at the time the frisk is conducted.[651]

### b.   David Floyd — April 20, 2007 Stop[652]

### i.   Findings of Fact

David Floyd is a thirty-three-year-old black male who lived in the Bronx from

---

[650]   *See* CPL § 140.10 (commentary) ("Where [violations] are concerned . . . while an arrest, even for an offense punishable only by a fine, does not violate federal constitutional Fourth Amendment rights . . . , [New York law] bars an arrest based upon a report made to the officer about something that occurred outside the officer's presence."). *Accord People v. Solomon*, 817 N.Y.S.2d 819 (4th Dep't 2006) ("The warrantless arrest of defendant for a violation, i.e., harassment, that did not occur in the presence of the arresting officers was illegal."). Although arrest for the violation would not have violated Sindayiganza's Fourth Amendment rights *per se*, the fact that the officers lacked authority to arrest Sindayiganza under New York law forecloses using search incident to arrest as a basis for the stop.

[651]   The Second Circuit has upheld the constitutionality of the search incident to arrest conducted *prior* to an arrest where probable cause to arrest existed and an arrest was later effectuated. *See United States v. Wilson*, 94 Fed. App'x 14, 17 (2d Cir. 2004) ("Once probable cause was established, it is irrelevant whether the officers' searches of Wilson occurred prior or subsequent to his arrest."); *United States v. Jenkins*, 496 F.2d 57, 72–73 (2d Cir. 1974). However, these cases left open the question whether a search could be justified as a search incident to arrest where no arrest was ever made. *See Evans v. Solomon*, 681 F. Supp. 2d 233, 249 (E.D.N.Y. 2010). Although the court in *Evans* held that the search was justified even if no arrest was ultimately made, I decline to go a step further and hold that a search can be justified as incident to arrest where the officer has no *intention* of arresting the individual at the time the search is conducted.

[652]   No officers were ever identified in connection with this stop. I am satisfied that the defendant performed a thorough investigation to identify the officers who conducted this stop. *See* 4/30 Tr. at 5480 (Stipulation). Floyd was uncertain about the exact day that the stop occurred. *See* 3/18 Tr. at 196–197 (Floyd). However, I find Floyd's testimony generally credible and sufficiently detailed, and base my findings on that testimony.

2001 until 2010, when he left to attend medical school.[653]  On or around April 20, 2007, a Friday, Floyd was coming from the subway walking towards his home at 1359 Beach Avenue in the Bronx, wearing jeans and sneakers, and carrying his wallet, keys and cell phone in his pocket.[654] As he crossed East 172nd Street, Floyd saw two police officers about a block-and-a-half away interacting with another individual.  The officers then got into a van and Floyd continued walking down Beach Avenue toward his home.  Shortly thereafter, the van pulled up to Floyd and the officer in the driver's seat said, "Excuse me, may I speak to you, sir?"  Floyd immediately stopped walking.[655]

Three uniformed officers, one Latino male, one white male and one female, exited the vehicle and one asked Floyd for ID.[656]  Floyd asked whether he had to give ID, but did not feel free to refuse.[657]  After he produced the ID, Floyd reached into his pocket to get his cell phone or a pen to write down the officers' identification.  The white male officer jumped toward him and Floyd immediately stopped and put his hands up and said, "it's a cellphone."  The officer said that it made him nervous when people put their hands in their pockets.  The officer asked Floyd if he had a weapon, and Floyd said he did not and that he did not consent to being searched.  The officer proceeded to pat down Floyd's entire body including pushing the cell phone, a BlackBerry, up out of Floyd's pocket with his finger.[658]

---

[653]    3/18 Tr. at 160–161 (Floyd).

[654]    *See id.* at 161–162.

[655]    *See id.* at 164–166, 213.

[656]    *See id.* at 166.

[657]    *See id.* at 166–168.  *See also* 3/19 Tr. at 223 ("Q: [Y]ou knew that you were free not to give the ID to the police officer, correct? A: I did not feel like it would have been smart for me not to have given it to them.  So I did give it to them.").

[658]    *See* 3/18 Tr. at 170–172; 3/19 Tr. at 229, 253–254.

The frisk lasted about thirty seconds and then the officer holding Floyd's ID told him it was illegal for him not to have a New York City license — Floyd's ID was out-of-state. The officers then got back in the van. Floyd asked for names and badge numbers and two of the officers identified themselves as Rodriguez and Goodman and provided badge numbers. The officers then left.[659] Floyd did not file a CCRB complaint in connection with this stop.[660]

### ii. Mixed Finding of Fact and Law

Without testimony from the stopping officers, I have insufficient evidence to determine whether they had reasonable suspicion to approach Floyd and question him. However, I credit Floyd's testimony and find that there was no basis for the frisk. The officers did not appear to believe that Floyd was armed and dangerous when they approached him, because they did not immediately frisk him. Nothing in Floyd's behavior gave the officers reason to reconsider whether Floyd was "armed and dangerous." He reached for his cell phone and promptly identified it as such. The officer asked Floyd if he had a weapon and Floyd said he did not. I find that there was no credible basis for believing Floyd was armed and dangerous. Therefore, the frisk was unconstitutional.

### c. David Floyd — February 27, 2008 Stop

### i. Findings of Fact

On February 27, 2008, Floyd resided on Beach Avenue in a three-family home with a separate cottage. Floyd's Godmother owned the property and lived on the top floor, and tenants occupied the ground floor and the basement. Floyd lived in the cottage. Around 3:00 p.m., Floyd left the cottage carrying a backpack, with his wallet, cell phone, keys, and some

---

[659]  *See* 3/18 Tr. at 172–173. The badge numbers that Floyd identified did not belong to officers named Rodriguez or Goodman. *See id.* at 204–205.

[660]  *See* 3/19 Tr. at 232.

163

change in his pocket. Before Floyd got to the street, the basement tenant, also a black male, told Floyd that he was locked out of his apartment and asked for Floyd's assistance because Floyd had access to the spare keys.[661]

Floyd retrieved seven to ten keys on separate key rings from his Godmother's apartment and went to the door of the basement apartment with the tenant. Because the keys were not marked, both Floyd and the tenant tried five or six different keys for a minute or two.[662] At that point, three plainclothes officers, since identified as Officers Cormac Joyce and Eric Hernandez, and Sergeant James Kelly, approached and told Floyd and the tenant to stop what they were doing and put their hands up.[663] Floyd obeyed.[664] Officer Joyce patted Floyd down and searched Floyd's pockets without his consent.[665] He did not remove anything from Floyd's pockets.[666]

After frisking the men, the officers remained calm throughout the encounter.[667] The officers asked the men for ID, and Floyd showed his Louisiana drivers' license. The tenant did not have ID on him. After additional inquiries, Floyd produced an electric bill with his name and address on it, and the tenant went inside his apartment and got ID.[668] Floyd asked why he

---

[661]  *See* 3/18 Tr. at 174–177, 180.

[662]  *See id.* at 177–178; 3/19 Tr. at 237 (Floyd).

[663]  *See* 3/19 Tr. at 239–241 (Floyd); 3/28 Tr. at 1312 (Joyce).

[664]  *See* 3/28 Tr. at 1322 (Joyce) (testifying that the officers would not have permitted the men to leave).

[665]  *See* 3/18 Tr. at 179–180 (Floyd). Joyce admitted frisking Floyd but disputes that he put his hands in Floyd's pockets. *See* 3/28 Tr. at 1329, 1364 (Joyce).

[666]  *See* 3/19 Tr. at 244 (Floyd).

[667]  *See id.* at 247.

[668]  *See id.* at 244–246.

had been stopped and the officers informed him that there had been a pattern of burglaries in the area. Floyd asked for the officers' names and badge numbers and the officers provided them. The officers then left.[669]

Earlier that day the officers had been patrolling Beach Avenue in response to reports of robberies and burglaries of private homes in the area — specifically the area of the 43rd Precinct near the Cross-Bronx Expressway. Proximity to the Cross-Bronx Expressway was significant because it provided easy access for a vehicle to get away from the area quickly.[670] The majority of the burglaries in the pattern identified during trial occurred in January 2008, with the last occurring on February 2.[671]

The officers observed Floyd and the tenant for about two minutes before approaching them.[672] Sergeant Kelly observed them playing with the door knob, and also saw a bag on the ground next to Floyd.[673] When he approached the men, he saw that they were trying numerous keys, which was consistent with his belief that they might be burglars, because burglars sometimes have master keys.[674] The basis for the frisk was the belief that Floyd and the tenant were in the process of committing a violent felony.[675]

---

[669] *See* 3/18 Tr. at 181; 3/19 Tr. at 245.

[670] *See* 3/28 Tr. at 1360, 1362. *Accord id.* at 1404–1406 (Hernandez) (testifying that many robberies and burglaries happened near the Cross-Bronx and that there was a specific burglary pattern in private homes in the northern part of the 43rd Precinct that day). *See also* DX K13 (mapping out burglary pattern).

[671] *See* 3/28 Tr. at 1411 (Hernandez); DX L4. Officer Hernandez could not confirm whether he saw the specific burglary pattern identified in DX L4, but testified that he was aware of patterns of burglaries and robberies in that area on the day he stopped Floyd.

[672] *See* 3/28 Tr. at 1319 (Joyce) (discussing UF-250 form).

[673] *See id.* at 1450 (Kelly).

[674] *See* 3/29 Tr. at 1480.

[675] *See id.* at 1363 (Joyce). *See also id.* at 1509 (Kelly).

Officer Joyce filled out a UF-250 in connection with this stop. He checked the box for Furtive Movements based on the jostling of the doorknob and the keys.[676] He also checked time of day corresponding to criminal activity.[677]

### ii.    Mixed Findings of Fact and Law

Floyd was stopped when the officers told him to stop what he was doing and raise his hands. The totality of the circumstances established reasonable suspicion to stop Floyd and his neighbor. The officers observed the men jostling the door knob and trying numerous keys in the door, and also observed a backpack on the ground. Beach Avenue is near the Cross Bronx Expressway, which makes it a target for burglary. The officers also had knowledge of a specific burglary pattern in the area of Beach Avenue. Although the last reported burglary was over three weeks before Floyd was stopped, the totality of the circumstances just recounted justified the officers' belief that the men might be in the process of committing a daytime burglary.

Furthermore, because burglary is often a violent crime, the officers were justified in promptly telling the men to put their hands up and frisking their outer garments for weapons before further investigating.[678] The stop was also reasonable in duration because Floyd's ID was out of state and the basement tenant did not have ID on him. Therefore, the officers were justified in continuing to investigate the possibility that the men were burglars. However, Officer Joyce did not testify that he felt anything that might be a weapon or anything that was

---

[676]    *See* 3/28 Tr. at 1327 (Joyce); DX X4 (UF-250 form). Officer Joyce also checked the box for "evasive, false or inconsistent response to officer's question," which he explained was based on the out-of-state ID, which was inconsistent with Floyd living on Beach Avenue. *See* 3/28 Tr. at 1330–1331 (Joyce). This is irrelevant, however, because it relates to events that occurred after the stop and frisk had already taken place.

[677]    *See* 3/28 Tr. at 1333–1334 (Joyce).

[678]    *See Terry*, 392 U.S. at 28 (frisk justified where "[t]he [suspects'] actions . . . were consistent with . . . a daylight robbery — which, it is reasonable to assume, would be likely to involve the use of weapons").

clearly contraband.  Therefore, Officer Joyce violated Floyd's Fourth Amendment rights when he felt inside his pockets.

### d. Clive Lino — February 24, 2011 Stop

#### i. Findings of Fact

On the night of February 24, 2011, Lino was at a party at his mother's apartment at 102nd Street and Third Avenue.  He left the apartment to take the subway home, wearing a red leather Pelle Pelle brand jacket and carrying a white plastic grocery bag full of Tupperware containing leftover food.[679]

Lino entered the subway at 103rd Street and Lexington Avenue and noticed two male police officers, since identified as Officer Daniel Leek, who is white, and Officer Edgar Figueroa, who is Hispanic.[680]  Lino went down to the uptown platform.[681]  As an uptown-bound train was pulling into the station, the officers entered the uptown platform.  Lino stepped back on the platform to let them pass but instead the officers surrounded him.[682]

Officer Figueroa immediately put his hand in Lino's right jacket pocket, and Lino pushed it away while stepping aside.  Lino asked what the problem was, to which the officers responded that he needed to wait with them.  Lino missed the train.  Lino asked why he was being stopped and stated his belief that his race was the reason.  Officer Leek said, "If you shut

---

[679]  *See* 4/1 Tr. at 1738–1739.  Lino's jacket was red leather, said "Pelle Pelle" on the front and had no white stripes or numbers on it.  Lino testified that it is a popular brand.

[680]  *See id.* at 1739 (Lino).  On February 24, Officers Leek and Figueroa were conducting a directed patrol in the subway station at 103rd Street and Lexington Avenue because it is a high pedestrian traffic, high crime area.  *See* 4/8 Tr. at 2695, 2725 (Leek).

[681]  *See* 4/1 Tr. at 1739 (Lino).

[682]  *See id.* at 1740.

the fuck up, we'll tell you why we stopped you."[683]

        The officers told Lino to put the bag of food on the platform, which he refused to do because it was filthy. Officer Figueroa said "just put the [fuck]ing bag down" and reached for the bag. Lino placed the bag on the bench. The officers asked for ID, which Lino produced.[684]

        Officer Leek asked Lino if he had anything on him that he shouldn't have and Lino said no. Officer Leek then said, "Do you mind if we check?"[685] While Lino may have initially consented, he clearly did not agree to be searched and at one point said, "you can't search me."[686] Yet Officer Leek patted his waist and front pockets, and Officer Figueroa reached into his back pockets. When Lino looked back at what Officer Figueroa was doing, Officer Figueroa asked if Lino had a "fucking problem." Lino said he did have a problem because the officer "was in his pockets."[687] He had not yet been told why he had been stopped. Officer Leek eventually informed Lino that he was being stopped because there were reports of a shooting suspect wearing a jacket similar to Lino's.[688]

        After frisking Lino, the officers forced Lino to go upstairs with them without explaining why. At no point was Lino free to walk away.[689] Outside the subway station, Officer

---

[683]     *See id.* at 1741–1742. *See also* 4/8 Tr. at 2737, 2773 (Leek).

[684]     *See* 4/1 Tr. at 1742 (Lino).

[685]     4/8 Tr. at 2754 (Leek).

[686]     *Id.* at 2759 (Figueroa). *See also* PX 216 (Officer Leek memo book) (stating that Lino gave permission for frisk when Leek asked him).

[687]     4/1 Tr. at 1743 (Lino). *Accord* 4/8 Tr. at 2760 (Figueroa) (testifying that Lino jerked his body around when he felt Officer Figueroa's hands on his back pockets, at which point Officer Figueroa asked if there was a problem).

[688]     *See* 4/1 Tr. at 1743 (Lino).

[689]     *See id.* at 1745–1746; 4/8 Tr. at 2734 (Leek) (investigative stop was not completed when the officers took Lino upstairs); *id.* at 2774 (Figueroa) (same).

Figueroa stayed with Lino while Officer Leek took Lino's ID to the police van where his

Sergeant was waiting. Officer Leek attempted, unsuccessfully, to locate the wanted poster

describing the shooting suspect. He did not run Lino's ID because Lino had not, to Officer

Leek's knowledge, committed a crime.[690] Officer Leek returned and the officers walked Lino

back down to the platform, without his having to pay another fare, and returned his ID.[691]

Lino never received a ticket or summons. The interaction lasted about twenty

minutes.[692] Following the interaction, Lino filed a complaint with the CCRB. The CCRB

complaint was substantiated with respect to the stop and charges were recommended against the

officers. The allegations regarding the search and the officers' use of rude or obscene language

were unsubstantiated.[693]

The officers stopped Lino because he matched a description of a homicide suspect

from a wanted poster given to them by their sergeant at the beginning of their tour that day. The

poster stated that the crime occurred on February 10, 2011, two weeks earlier, at 108th Street

and Madison Avenue, two avenues and five blocks away from where Lino was stopped. The

poster described a black male approximately five foot nine to six feet tall and showed a security

---

[690] *See* 4/8 Tr. at 2704–2706, 2735–2736 (Leek). Sergeant Shirvis never exited the van, and did not confirm whether Lino was the suspect.

[691] *See* 4/1 Tr. at 1746–1747 (Lino). Lino then pulled out his cell phone and Officer Leek said "Oh, no, you're not taking no fucking pictures of me." *Id.* at 1748. Lino asked Officer Figueroa for his information, and Officer Figueroa mumbled it. When Lino asked for his information again, Officer Figueroa said, "I already gave it to you, if you didn't get it the first time too bad." *Id.*

[692] *See id. Accord* 4/8 Tr. at 2706 (Leek).

[693] *See* PX 194. Lino received no additional follow up. *See* 4/1 Tr. at 1748–1749 (Lino). Officer Leek received a letter notifying him that the charges against him had been substantiated but received no reprimand or further training. *See* 4/8 Tr. at 2708 (Leek). Officer Figueroa was put on monitoring because it was the third CCRB complaint filed against him and the CCRB recommended that charges be brought. *See id.* at 2761 (Figueroa).

photo of the suspect leaving the shooting wearing a red leather Pelle Pelle jacket, and two stock photos of such a jacket.[694]  From the photo, Officer Leek discerned the suspect's height, weight, and an age range of eighteen to thirty.[695]

Officer Leek believed that Lino's jacket, height and complexion matched the crime scene photo.  In addition, he noticed that the jacket was loose-fitting and bulky.[696]  Officer Leek frisked Lino because he matched the description of a murder suspect, had a bulky jacket that could conceal a weapon, and was in a high crime area.[697]

### ii.    Mixed Findings of Fact and Law

Lino was stopped when the officers surrounded him on the subway platform. Although the murder was two weeks old, the distinctiveness of the red leather Pelle Pelle jacket, along with the three-inch height range — which was verifiable from the suspect photo —  and the suspect's race, "afford[ed] a sufficient basis for 'selective investigative procedures' vis-a-vis a universe made up of all [potential suspects] of the crime in question."[698]  It was reasonable to assume that the murder suspect might have lived in the neighborhood and remained or returned within an eight-block radius.

Murder is a violent crime that would justify a frisk.  Although the crime was two weeks old, it was reasonable to believe that the suspect in a shooting might still be armed and, if

---

[694]    *See* PX 187; 4/8 Tr. at 2698–2699, 2722 (Leek).

[695]    *See* 4/8 Tr. at 2723 (Leek).

[696]    *See id.* at 2726–2727.  *Accord id.* at 2756 (Figueroa).

[697]    *See id.* at 2731–2732 (Leek).

[698]    4 LaFave § 9.5(h) (quotations and citations ommitted).  *See also U.S. v. Marxen*, 410 F.3d 326, 330 (6th Cir. 2005) ("The mere passage of time [– eleven days –], however, does not negate the lawfulness of the stop under the circumstances presented.").

approached and questioned about the murder, would pose a danger to the officers.[699]  Because the jacket was loose and a train was approaching, the officers could not readily verify whether Lino was the right person or whether he was armed before stopping and frisking him.

Although both the stop and the frisk were justified at their inception, the frisk was not "reasonably related in scope to the justification for [its] initiation."[700]  Officer Figueroa immediately put his hands in Lino's pockets without Lino's consent, and the officers later conducted a search, to which they acknowledge Lino did not consent.  The frisk, particularly in combination with the abusive manner in which the stop was conducted, violated Lino's Fourth Amendment rights.

### e.    Deon Dennis

### i.    Findings of Fact

Deon Dennis was raised in Harlem and resides in South Carolina, but visits New York frequently.[701]  Around 8:00 p.m. on January 12, 2008, Dennis arrived at the apartment of his then-girlfriend at 122nd Street and Seventh Avenue to help set up for her birthday party, which was scheduled to begin at 11:00 p.m.[702]  While setting up he drank a beer and some brandy in a plastic cup.[703]  Later, Dennis went to smoke a cigarette on the sidewalk outside the building on Seventh Avenue, while his girlfriend went to the store.  The street was empty. Dennis was wearing a jacket and jeans, and had his cell phone, keys, wallet and cigarettes in his

---

[699]    *See Terry*, 392 U.S. at 27 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.").

[700]    *Id.* at 29 (citations omitted).

[701]    *See* 3/19 Tr. at 263 (D. Dennis).

[702]    *See id.* at 278–279.

[703]    *See id.* at 266.

pocket.[704]

    After Dennis finished his cigarette, an NYPD van pulled up and two uniformed officers, Angelica Salmeron and Luis Pichardo, both of whom are Hispanic, approached Dennis.[705]  Dennis was not free to leave.[706]  Officer Salmeron pointed to a cup several feet to the right of Dennis and asked if it was his cup.  Dennis said it was not.  Officer Pichardo asked if Dennis had been drinking, and Dennis said he had been drinking earlier.[707]  The officers claim that Dennis had a cup in his hands and was drinking from it when they approached him, and that there was a bottle of Hennessy on the sidewalk.[708]

    The officers asked Dennis for ID and he produced his driver's license from the wallet in his pocket.  Officer Salmeron took Dennis's ID to the van while Officer Pichardo stayed and searched Dennis's jacket and pants pockets without consent.  During the search, Dennis was standing with his wallet in his hand and his hands raised at chest level.[709]

    Officer Salmeron returned from the van having discovered an active warrant against Dennis.  The officers then handcuffed Dennis and put him in the back of the van based on the open container violation and the active warrant.[710]  Dennis's girlfriend returned and saw

---

[704]    *See id.* at 268, 286.

[705]    The officers were patrolling Seventh Avenue that night on assignment to enforce "quality of life" offenses.  *See* 3/22 Tr. at 852 (Salmeron).

[706]    *See* 4/27 Tr. at 1270 (Pichardo).

[707]    *See* 3/19 Tr. at 269–272 (D. Dennis).

[708]    *See* 3/22 Tr. at 853 (Salmeron).  The officers also claim that when they asked what he was doing Dennis replied that he was drinking some Hennessy, that it was a Saturday night and his girlfriend's birthday and that they were going out later. The officers claim that there was a bottle of Hennessy on the sidewalk next to Dennis.  *See id.*

[709]    *See* 3/19 Tr. at 272–274 (D. Dennis).

[710]    *See* 3/22 Tr. at 854–855, 872 (Salmeron); 3/27 Tr. at 1272 (Pichardo) ("So instead of giving him a summons you arrested him, correct? A. Yes[.]").

Dennis handcuffed.[711] No summons was issued and Dennis was never prosecuted for drinking in public. No alcohol was vouchered or put in evidence.[712] Neither officer recorded the incident in his or her memo book.[713] Dennis's girlfriend filed a CCRB complaint about Dennis's arrest, and Dennis spoke with a CCRB officer about the incident.[714] Dennis believes that he was stopped because of his race, because "only blacks and Hispanics get stopped in Harlem."[715]

### ii. Mixed Findings of Fact and Law

Based on the conflicting testimony about what the officers saw when they approached Dennis, and because plaintiffs bear the burden of proof, I cannot find by a preponderance of the evidence that the officers lacked reasonable suspicion that Dennis was violating New York's open container law.[716] However, even if the officers saw Dennis drinking from a plastic cup, they would only have had reasonable suspicion to approach him and investigate further.[717] They did not have reasonable suspicion to frisk or search Dennis.

The officers acknowledge that when they took Dennis's ID to the van, they intended to issue him a summons, not to arrest him. *Even assuming* the officers were justified in issuing Dennis a summons for violating open container laws, and even with knowledge of an

---

[711]     *See* 3/19 Tr. at 274–275 (D. Dennis).

[712]     *See* 3/27 Tr. at 1272–1273 (Pichardo); 3/19 Tr. at 275–276 (D. Dennis).

[713]     *See* 3/28 Tr. at 1286 (Pichardo).

[714]     *See* 3/19 Tr. at 276–277 (D. Dennis)

[715]     *Id.* at 295.

[716]     I do not, however, find that the officers had probable cause to arrest Dennis when they approached him.

[717]     *See People v. Mack*, 853 N.Y.S.2d 764, 765 (4th Dep't 2008) (holding that the viewing of three men, one of whom was drinking from a large bottle wrapped in a brown paper bag, established reasonable suspicion of violation of the open container ordinance).

active warrant, there was no basis for Officer Pichardo to frisk, let alone search, Dennis.[718]  The authority to conduct a protective frisk when issuing a summons for a violation is limited to occasions where officers have reason to believe that the suspect is armed and dangerous.[719]  Absent any indication that Dennis posed a threat to the officers' safety, there was no basis to conduct a frisk or search prior to arresting Dennis.  Officer Pichardo's search violated Dennis's Fourth Amendment rights.[720]

### 3.    Failure of Proof

#### a.    John Doe Stops of Nicholas Peart in Spring 2008 and February 2010 and David Ourlicht in February and June 2008

In the John Doe stops discussed below, plaintiffs' testimony did not provide sufficiently detailed credible information for me to find, by a preponderance of the evidence, that the stop and, in some cases, frisk, lacked reasonable suspicion.[721]  Nicholas Peart testified that he was stopped and frisked in the Spring of 2008 in Brooklyn, based on a burglary pattern.

---

[718]    *See People v. Muhammad*, 502 N.Y.S.2d 859, 860 (4th Dep't 1986) ("Even assuming, however, that defendant carried an open beer bottle or was drinking beer, the officer would not have been authorized to frisk or search defendant for a suspected violation of an ordinance.") (citations omitted).

[719]    *See, e.g.*, *People v. King*, 476 N.Y.S.2d 847, 849 (1st Dep't 1984) (officer has authority to conduct a search for safety purposes in circumstances that reveal only the commission of a violation where it was reasonable for an arresting officer to believe that the suspect might resist the officers efforts to arrest him or issue a summons to him).

[720]    *Compare Mack*, 853 N.Y.S.2d at 765 (holding, in the context of a stop for an open container violation, that, "[t]he disproportionately frightened reaction of defendant upon seeing the [officers], his refusal to remove his hand from his pocket despite the repeated demands of [the officer], his conduct in walking toward that officer with his hand in his pocket, and the fact that the area in which the incident occurred was one in which violent crimes and shootings were common provided the officers with reasonable suspicion [] that defendant posed a threat to their safety").

[721]    I find that the NYPD'a attempts to identify the officers involved in the stops of Ourlicht and Peart were sufficient.  *See* 4/30 Tr. at 5471–5476 (Stipulation) (discussing Ourlicht stops); *id.* at 5477–5480 (discussing Peart stops). Therefore, no adverse inference against the defendant is warranted.

Although the existence of a burglary pattern alone would not provide reasonable suspicion, I cannot conclude that there was not reasonable suspicion to stop and frisk Peart without knowing what additional information the officers had.[722]   Peart also testified that, in September of 2010, he was stopped and frisked at 144th Street, between Seventh and Eighth Avenues.  Because I have no information about the basis for this stop, I cannot find that the stop and frisk lacked reasonable suspicion.[723]

David Ourlicht testified that on February 21, 2008, he and a friend were stopped and frisked near the subway station at 168th Street in the Bronx.[724]  I do not fully credit Ourlicht's version of the events, and without the officers' version of what occurred, I cannot find that Ourlicht's Fourth or Fourteenth Amendment rights were violated.  Ourlicht also testified that in June 2008, he was stopped and frisked at an apartment complex at 115th Street and Park Avenue based on reports of a gun in the area.[725]  Without information about the officers' knowledge about the gun in the area, I cannot find that the stop and frisk lacked reasonable suspicion.

### b.    Kristianna Acevedo Stop

Kristianna Acevedo is a thirty-year-old Hispanic female resident of Staten Island and works as a recruiter of home health aides.  In 2007 she lived in Queens.[726]   On Tuesday, May 29, 2007, Acevedo was walking on 43rd Street in a desolate area when she noticed two

---

[722]    *See* 3/19 Tr. at 327–336 (Peart).

[723]    *See id.* at 337–342.

[724]    *See* 4/19 Tr. at 4193–4203 (Ourlicht).

[725]    *See id.* 4204–4209, 4265.

[726]    *See* 4/1 Tr. at 1693–1694 (Acevedo).

men, since identified as Detectives Louis DeMarco and Damian Vizcarrondo, in a minivan.[727] Detective DeMarco spoke to Acevedo to obtain information about drug activity.[728] Acevedo did not believe the men were police, so she kept walking and then began to run.[729]

Acevedo stopped at a UPS truck parked up the block.[730] The van reversed and stopped, and three officers — Detectives DeMarco, Vizcarrondo, and a female officer, Detective Michele Hawkins — got out, approached Acevedo, and identified themselves as police.[731] The officers wanted to assure Acevedo that she was not in danger because there had been recent media reports of individuals impersonating police officers.[732] The detectives did not stop Acevedo based on reasonable suspicion.[733] After a brief exchange, the officers left.

Acevedo called 911 to report what happened and filed a CCRB complaint.[734] The CCRB substantiated the charges that the detectives abused their authority by stopping Acevedo, and failing to record the incident in their memo books. As discipline, the officers were docked one vacation day. Detective DeMarco was exonerated of the charges relating to his questioning

---

[727] *See id.* at 1695–1696, 1698.

[728] *See* 4/8 Tr. at 2659, 2664, 2684 (DeMarco).

[729] *See* 4/29 Tr. at 5198 (Vizcarrondo).

[730] *See id.* at 5199.

[731] 4/1 Tr. at 1697–1698 (Acevedo); 4/30 Tr. at 5458 (Hawkins). All three detectives were in plainclothes. *See* 4/1 Tr. at 1698–1699 (Acevedo).

[732] *See* 4/8 Tr. at 2685 (DeMarco); 4/29 Tr. at 5199 (Vizcarrondo); 4/30 Tr. at 5456 (Hawkins).

[733] *See, e.g.*, 4/8 Tr. at 2659 (DeMarco); 4/30 Tr. at 5468 (Hawkins) (explaining that she did not record the stop in her memo book because she did not believe that the interaction ever rose to the level of a stop — rather, she perceived it to be a simple request for information).

[734] *See* 4/1 Tr. at 1704–1705 (Acevedo).

176

of Acevedo and the other charges were unsubstantiated.[735]

Acevedo clearly felt free to leave when the detectives first spoke to her because she continued walking and eventually ran.[736] What occurred after the detectives exited the van is unclear. Acevedo's version of the events is irreconcilable with the officers' testimony. Although the CCRB found that the officers stopped Acevedo, I did not find her story sufficiently credible to conclude by a preponderance of the evidence that a forcible stop or frisk occurred in violation of her Fourth Amendment rights.[737]

### c. Clive Lino — August 3, 2008

Lino testified about an August 3, 2008 interaction with Officers Jose Colon and Mohamed Hassan in the lobby of his apartment, a NYCHA building at 102nd Street and Third Avenue.[738] Lino's testimony about what occurred is incompatible with the officers' testimony.[739] Because I credit the officers' testimony, I do not find that Lino's Fourth or Fourteenth Amendment rights were violated by this interaction.

## V. CONCLUSIONS OF LAW

### A. The City Is Liable for Violations of Plaintiffs' Fourth Amendment Rights

---

[735] *See* PX 5.

[736] In fact, Acevedo did not believe the officers were police at all, so she cannot have been stopped based on their show of authority, and the officers did not use force.

[737] I also do not find that race played any role in this event. I note, moreover, that this stop is anomalous insofar as the officers do not assert that they possessed reasonable suspicion of any crime and never intended to conduct a stop at all. Thus, it is of limited value in assessing the central claims at issue in this case.

[738] *See* 4/1 Tr. at 1749–1750 (Lino).

[739] Lino testified that Officer Hassan received a phone call during the stop, and suggested that his ringtone, which was a rap song, would calm Lino down. *See* 4/1 Tr. at 1749–1750 (Lino). Officers Hassan and Colon deny that this ever occurred. *See* 4/18 Tr. at 4018 (Hassan); *see also id.* at 4024–4025 (Colon).

Plaintiffs established the City's liability for the NYPD's violation of their Fourth Amendment rights under two theories, either of which is adequate under *Monell*:  *first*, plaintiffs showed that senior officials in the City and at the NYPD were deliberately indifferent to officers conducting unconstitutional stops and frisks; and *second*, plaintiffs showed that practices resulting in unconstitutional stops and frisks were sufficiently widespread that they had the force of law.

### 1.     Deliberate Indifference

There is no dispute that the primary concern of a police department can and should be combating crime.  At the same time, section 1983 limits the *lack* of concern that any municipal agency may show toward constitutional violations by its employees.  The NYPD's senior officials have violated section 1983 through their deliberate indifference to unconstitutional stops, frisks, and searches.  They have received both actual and constructive notice since at least 1999 of widespread Fourth Amendment violations occurring as a result of the NYPD's stop and frisk practices.  Despite this notice, they deliberately maintained and even escalated policies and practices that predictably resulted in even more widespread Fourth Amendment violations.[740]  Moreover, while the NYPD is an acknowledged leader in the use of data collection and analysis to improve the *effectiveness* of policing, it has hindered the collection of accurate data concerning the constitutionality of its stops, and made no effective use of the limited data that is available. The NYPD has repeatedly turned a blind eye to clear evidence of unconstitutional stops and frisks.

Further evidence of deliberate indifference is found in the City's current positions as expressed at trial.  The City continues to argue that *no* plaintiff or class member was subjected to an unconstitutional stop or frisk — not Downs, Almonor, McDonald, Sindayiganza, or any of

---

[740]     These policies and practices are summarized *supra* Part IV.C.

the other plaintiffs.[741]  The City defends Officer Dang's stops in the third quarter of 2009 as unproblematic,[742] despite the fact that he stopped 120 black people and 0 white people during that period.  Officer Dang relied on a routine set of vague and unreliable stop justifications, and in only 5.5% of his stops made an arrest or summons.[743]  The City also defends the contents of the tape recordings quoted above, arguing that they "provide no basis whatsoever from which any reasonable inference can be drawn that . . . pressure for activity existed that drove officers to make unconstitutional stops."[744]  In addition, the City recognizes the impossibility of tracking unconstitutional stops through UF-250s,[745] but disclaims the need to develop a better, more adequate system of documentation and review.[746]  Indeed, the City continues to believe that there is no need to alter the status quo.[747]  Confronted with the persuasive statistical evidence that stops frequently lack reasonable suspicion, the City argues that even if "18% . . . of the 4.43 million stops" were legally unjustified, that "is not necessarily a widespread pattern," and would not require a remedy.[748]

Throughout the class period, the need for better supervision, monitoring, training,

---

[741]    *See* Def. Mem. at 2–4.

[742]    *See* Def. Findings ¶¶ 50–52.

[743]    *See* DX L14.

[744]    Def. Mem. at 11.  *Accord* Def. Findings ¶ 60 ("The recordings made by P.O.s Polanco and Serrano support" the conclusion that "[f]rom the Chief of Patrol down to officers straight out of the Police Academy, the message is clear:  address conditions, not 'numbers for numbers['] sake.'").

[745]    *See* Def. Mem. at 7.

[746]    *See id.* at 12 (presenting plaintiffs' criticisms of the NYPD's training, supervision, monitoring, and discipline as baseless); *id.* at 24 ("Plaintiffs failed to prove that the NYPD systems already in place . . . might require more than minor adjustments . . . .").

[747]    *See id.* at 24–25.

[748]    *Id.* at 8.

and discipline to protect against constitutional violations was obvious, but senior officials at the NYPD "'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs.'"[749] Even if "deliberate indifference" were not the standard for liability, it would still perfectly describe the attitude of senior officials at the NYPD toward the risk of officers conducting stops, frisks, and searches in violation of the Fourth Amendment.

## 2. Widespread Practice

Despite the NYPD's deliberate failure to collect accurate data regarding stops that violate the Fourth Amendment, there is sufficient evidence of such stops to establish *Monell* liability based on "practices so persistent and widespread as to practically have the force of law."[750] As described above, the likely number of stops lacking reasonable suspicion was far higher than the roughly 200,000 "apparently unjustified" stops identified by Dr. Fagan. In particular, this conclusion is supported by the number of UF-250s that do not identify a suspected crime (36% of all forms in 2009), the problems inherent in the two most commonly checked stop factors (Furtive Movements and High Crime Area), and the fact that only 6% of all stops result in an arrest for any crime.[751] The NYPD's practice of making stops that lack individualized reasonable suspicion has been so pervasive and persistent as to become not only a part of the NYPD's standard operating procedure, but a fact of daily life in some New York City neighborhoods.

---

[749] *Cash*, 654 F.3d at 334 (quoting *Reynolds*, 506 F.3d at 192).

[750] *Connick*, 131 S. Ct. at 1359.

[751] I was not persuaded, however, by plaintiffs' argument that "stopping people at random would more frequently uncover criminal activity," based on the 9% arrest rate for the suspicionless roadblocks in *Edmond*, 531 U.S. at 32. Pl. Mem. at 2. There may be a higher likelihood of finding contraband in a randomly stopped vehicle than on the person of a randomly stopped pedestrian. In addition, the police in *Edmond*, unlike the NYPD in this case, used narcotics-detection dogs. *See Edmond*, 531 U.S. at 35.

Likewise, the pervasiveness of unconstitutional frisks was established by the uncontested fact that over half of all people stopped are frisked, while only 1.5% of frisks reveal a weapon, as well as the institutional evidence of inaccurate training regarding when to frisk, testimony by officers who did not know the constitutional standard for a frisk, and anecdotal evidence of routine unconstitutional frisks in this case. "The security of one's privacy against arbitrary intrusion by the police — which is at the core of the Fourth Amendment — is basic to a free society."[752] Far too many people in New York City have been deprived of this basic freedom far too often.

**B.    The City Is Liable for Violations of Plaintiffs' Fourteenth Amendment Rights**

Plaintiffs have established the City's liability for the NYPD's violation of plaintiffs' Fourteenth Amendment rights under two theories, either of which is adequate under *Monell*. *First*, plaintiffs showed that the City, through the NYPD, has a *policy* of indirect racial profiling based on local criminal suspect data. *Second*, plaintiffs showed that senior officials in the City and at the NYPD have been *deliberately indifferent* to the intentionally discriminatory application of stop and frisk at the managerial and officer levels.

**1.    Policy of Indirect Racial Profiling**

Throughout this litigation the City has acknowledged and defended the NYPD's policy of conducting stops based in part on criminal suspect data, of which race is a primary factor. The NYPD implements this policy by emphasizing to officers the importance of stopping "the right people." In practice, officers are directed, sometimes expressly, to target certain racially defined groups for stops.

"The Constitution prohibits selective enforcement of the law based on

---

[752]    *Wolf v. Colorado*, 338 U.S. 25, 27 (1949).

considerations such as race."[753]  The Second Circuit has admonished that courts should "not

condone racially motivated police behavior" and must "take seriously an allegation of racial

profiling."[754]  Racial profiling constitutes intentional discrimination in violation of the Equal

Protection Clause if it involves any of the following: an express classification based on race that

does not survive strict scrutiny;[755] the application of facially neutral criminal laws or law

enforcement policies "in an intentionally discriminatory manner;"[756] or a facially neutral policy

that has an adverse effect and was motivated by discriminatory animus.[757]  The City's policy of

targeting "the right people" for stops clearly violates the Equal Protection Clause under the

second method of proof, and, insofar as the use of race is explicit, the first.

### a.  Intentionally Discriminatory Application of a Facially Neutral Policy

In order to establish an equal protection violation based on an intentionally

discriminatory application of a facially neutral policy, plaintiffs "must prove that the defendants'

actions had a discriminatory effect and were motivated by a discriminatory purpose."[758]  In this

---

[753]    *Whren*, 517 U.S. at 813.

[754]    *United States v. Davis*, 11 Fed. App'x 16, 18 (2d Cir. 2001) (citing *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992)).  *Accord, e.g.*, *Chavez*, 251 F.3d at 635 (noting that the use of "impermissible racial classifications in determining whom to stop, detain, and search" violates the Equal Protection Clause).

[755]    *See Melendres v. Arpaio*, No. 07 Civ. 02513, 2013 WL 2297173, at *67–68 (D. Ariz. May 24, 2013).

[756]    *Brown*, 221 F.3d at 337 (citing *Yick Wo*, 118 U.S. at 373–74).  *See also Whren*, 517 U.S. at 813 ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause.").

[757]    *See Brown*, 221 F.3d at 337.

[758]    *Chavez*, 251 F.3d at 635–36.  In some contexts, discriminatory effect may be presumed based on proof of discriminatory intent.  *See Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006) ("Once racially discriminatory intent infects the application of a neutral law or policy, the group that is singled out for discriminatory treatment is no longer

case, plaintiffs' statistical evidence of racial disparities in stops is sufficient to show a

discriminatory effect.[759]  In particular, plaintiffs showed that: (1) the NYPD carries out more

stops where there are more black and Hispanic residents, even when other relevant variables are

held constant; (2) NYPD officers are more likely to stop blacks and Hispanics than whites *within*

precincts and census tracts, even after controlling for other relevant variables; (3) NYPD officers

are more likely to use force against blacks and Hispanics than whites, after controlling for other

relevant variables; and (4) NYPD officers stop blacks and Hispanics with less justification than

whites.[760]  In addition to their statistical evidence of a racially disproportionate impact, plaintiffs

provided significant anecdotal evidence, such as the stark racial disparities in the UF-250s

prepared by Officers Dang and Gonzalez, and the fact that Officer French chose to stop

McDonald, rather than similarly situated non-blacks nearby, based in part on generalized crime

complaints about black males.

       To establish discriminatory intent, plaintiffs must show that those responsible for

the profiling did so "at least in part 'because of,' not merely 'in spite of,' its adverse effects

---

similarly situated to any other in the eyes of the law, so adverse effects can be presumed.").  The
terms "discriminatory purpose" and "discriminatory intent" are interchangeable.

[759]    *See supra* Parts IV.A and IV.B. *See also Chavez*, 251 F.3d at 638 (noting that the
Supreme Court has "repeatedly relied on statistics" to prove discriminatory effect, citing, for
example, *Hunter v. Underwood*, 471 U.S. 222, 227 (1985), and concluding that the Supreme
Court in *Armstrong* rejected statistical evidence of discriminatory effect "not because plaintiffs
can never use statistics to prove discriminatory effect, but because the particular statistics
presented to the Court did not address the relevant issue," *id.* at 639).  As the discussion of
benchmarking in Part IV.B makes clear, this Opinion assumes — unlike the presumption
criticized in *Armstrong* — that there are racial disparities in crime participation rates.

[760]    Evidence of a racial disparity in stop justifications included the following: (a) the
odds of a stop resulting in any further enforcement action are lower if the person stopped is black
than if the person stopped is white; (b) stops of blacks and Hispanics are less likely to result in
the seizure of a weapon than stops of whites; (c) officers are more likely to check Furtive
Movements as the basis for stopping blacks and Hispanics than for whites; and (d) the greater
the black population in a precinct, the less likely that a stop will result in a sanction. *See
generally supra* Part IV.A–B.

upon" the profiled racial groups.[761]  Plaintiffs are not required to prove that race was the sole, predominant, or determinative factor in a police enforcement action.[762]  Nor must the discrimination be based on "ill will, enmity, or hostility."[763]

   The NYPD has directed officers to target young black and Hispanic men because these groups are heavily represented in criminal suspect data — the reliability of which is questionable[764] — in those areas where the NYPD carries out most of its stops.  Under the NYPD's policy, targeting the "right people" means stopping people in part because of their race.  Together with Commissioner Kelly's statement that the NYPD focuses stop and frisks on young blacks and Hispanics in order to instill in them a fear of being stopped, and other explicit references to race discussed in the next section, there is a sufficient basis for inferring

---

[761] *Paterson*, 594 F.3d at 163 (quoting *Feeney*, 442 U.S. at 279 (citation and footnote omitted)) (some quotation marks omitted).

[762] Judge G. Murray Snow of the District of Arizona provides a useful summary:

> A government policy is presumed to be racially discriminatory when it is "based *in part* on reports that referred to explicit racial characteristics." *Flores v. Pierce*, 617 F.2d 1386, 1389 (9th Cir. 1980) (emphasis added) (Kennedy, J.).  In *Grutter* [*v. Bollinger*], the Supreme Court applied strict scrutiny to a policy which involved race as one factor among many even though plaintiff's expert conceded that "race is not the predominant factor" in the policy.  539 U.S. [306, 320 (2003)]; *see also Arlington Heights*, 429 U.S. at 263 (subjecting government action to equal protection review on "proof that a discriminatory purpose has been a motivating factor in the decision").

*Melendres*, 2013 WL 2297173, at *69 (holding that the Maricopa County Sheriff's Office violated the Equal Protection Clause through its use of Hispanic ancestry or race as a factor in forming reasonable suspicion of violating immigration laws, despite express policy against racial profiling).

[763] *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 & n.7 (11th Cir. 1999).

[764] The NYPD's use of local crime suspect data to target racially defined groups for stops is not only a form of racial profiling, it is also a deeply flawed way of identifying the criminal population.  *See supra* Part IV.B.3.b.

discriminatory intent.[765]

The fact that the targeted racial groups were identified based on crime victim complaints does not eliminate the discriminatory intent. Just as it would be impermissible for a public housing agency to adopt a facially race-neutral policy of disfavoring applications from any group that is disproportionately subject to tenant complaints, and then apply this policy to disfavor applications from a racially defined group, so it is impermissible for a police department to target its general enforcement practices against racially defined groups based on crime suspect data.

### b.    Express Classification

Plaintiffs have readily established that the NYPD implements its policies regarding stop and frisk in a manner that intentionally discriminates based on race. While it is a closer call, I also conclude that the use of race is sufficiently integral to the policy of targeting "the right people" that the policy depends on express racial classifications. When an officer is directed to target "male blacks 14 to 21" for stops *in general* based on local crime suspect data — a practice that the City has defended throughout this litigation — the reference to "blacks" is an express racial classification subject to strict scrutiny.[766] Chief Esposito's concession that the NYPD has targeted young blacks and Hispanics for stops confirms that explicit references to

---

[765]    Plaintiffs have presented other circumstantial evidence of discriminatory intent, such as the NYPD's longstanding indifference to evidence of racial discrimination in stops, discussed at greater length below. *See infra* Part V.B.2 (deliberate indifference); Pl. Mem. at 20–23.

[766]    "It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). In order to satisfy strict scrutiny, a racial classification must be "'narrowly tailored' to achieve a 'compelling' government interest." *Id.* (quoting *Adarand*, 515 U.S. at 227).

race are not limited to a few rogue supervisors.[767] The City has not attempted to defend — nor could it defend — the proposition that the targeting of young black males or any other racially defined group for stops is narrowly tailored to achieve a compelling government interest. Because the use of express racial classifications in the City's policy of indirect racial profiling cannot withstand strict scrutiny, the policy violates the Equal Protection Clause.[768]

This policy far exceeds the permissible use of race in stopping suspects as set forth in *Brown v. City of Oneonta, New York*. There, the Second Circuit held that when the police carry out stops as part of a "search[] for a particular perpetrator," the use of racial information from the victim's description of the suspect is not an express racial classification subject to strict scrutiny.[769] The court explained that the Oneonta police department's "policy

---

[767] *See* 4/10 Tr. at 3034 (Chief Esposito acknowledging that "the right people" are young black and Hispanic youths 14 to 20 for whom there is reasonable suspicion); *id.* at 3027–3029 (Chief Esposito acknowledging that stops are based on "who is doing th[e] shootings," specifically "young men of color in their late teens, early 20s"). Again, I note that this targeting is based on the inaccurate assumption that the characteristics of the criminal population can be applied to the non-criminal population. The policy assumes that *all* members of a racially defined group are "the right people" to target for stops because *some* members of that group committed crimes.

[768] To be sure, the policy's use of racial classifications only becomes *express* at the managerial level, when commanders and supervisors acting in accordance with the policy instruct officers to target racially defined groups for stops. I note, however, that four judges of the Second Circuit, including now-Associate Supreme Court Justice Sonia Sotomayor, concluded that even the use of race in *Brown* — where the police attempted to stop every black person in Oneonta as part of a search for a suspect described as a young black male with a cut on his hand — constituted an express racial classification requiring strict scrutiny. *See Brown v. City of Oneonta, New York*, 235 F.3d 769, 779–83 (2d Cir. 2000) (Calabresi, J., dissenting from denial of rehearing *in banc*). *Accord In re Cincinnati Policing*, 209 F.R.D. 395, 401 (S.D. Ohio 2002) (noting that "[i]t is difficult to comprehend how the use of race in routine policing — for example, in the description of a suspect when the police are not in hot pursuit — could satisfy" strict scrutiny).

[769] *Brown*, 221 F.3d at 338. The Second Circuit emphasized the narrowness of its holding:

> While we . . . believe that the conduct of the police in the circumstances presented here did not constitute a violation of the equal protection rights of

186

was to investigate crimes by interviewing the victim, getting a description of the assailant, and seeking out persons who matched that description" and, as such, "was race-neutral on its face."[770]

The NYPD's policy of targeting "the right people" for stops, by contrast, is not directed toward the identification of a specific perpetrator.[771] Rather, it is a policy of targeting expressly identified racial groups for stops *in general*. There is no dispute that it would violate equal protection for a police department to adopt an express policy of targeting members of one race for stops or other enforcement activities — such as an express policy of only pulling over speeding drivers who are Hispanic. Similarly, the following hypothetical police department policy would surely be subject to strict scrutiny, despite its failure to mention any *specific* race at the outset: "No one is to be stopped except the members of whatever race participated at the highest rate in violent crime during the previous month, based on suspect descriptions." Such a policy would be especially deserving of strict scrutiny if its drafters knew that the same race would be targeted every month, and managers implementing the policy were responsible for expressly directing officers to stop members of that race. The NYPD's policy of indirect racial

---

the plaintiffs, we do not establish any rule that would govern circumstances giving rise to liability that are not present in this case. Any such rule will have to wait for the appropriate case.

*Id.* at 339. As already noted, the Second Circuit has subsequently reiterated that it is concerned about allegations of racial profiling. *See Davis*, 11 Fed. App'x at 18.

[770]     *Brown*, 221 F.3d at 337.

[771]     The Second Circuit specifically distinguished the facts of *Brown* from the type of policy at issue here, stating: "Plaintiffs do not allege that . . . the police used an *established profile of violent criminals* to determine that the suspect must have been black. Nor do they allege that the defendant law enforcement agencies have a regular policy based upon racial stereotypes that all black Oneonta residents be questioned whenever a violent crime is reported." *Id.* Indeed, *Brown* may be strictly limited to its facts — the use of race in the search for a particular suspect in a particular crime who was identified in part by his race.

profiling is closer to this hypothetical policy than it is to the race-neutral policy in *Brown*.

### c. Conclusion

Whether through the use of a facially neutral policy applied in a discriminatory manner, or through express racial profiling, targeting young black and Hispanic men for stops based on the alleged criminal conduct of other young black or Hispanic men violates bedrock principles of equality. Two young men in the 81st Precinct who are similarly situated in every way, except that one is black and the other white, are similarly situated for the purposes of equal protection and must be treated alike. *Brown* establishes the common-sense principle that if a description of a specific criminal suspect includes the fact that the suspect is black, then the police need not focus equal attention on individuals of other races in pursuit of that suspect. But *Brown* specifically rejects the use of racial profiling as a basis for enforcement activity. The Equal Protection Clause does not sanction treating similarly situated members of different racial groups differently based on racial disparities in crime data. Indeed, such treatment would eviscerate the core guarantees of the Equal Protection Clause. If equal protection means anything, it means that individuals may not be punished or rewarded based on the government's views regarding their racial group, regardless of the source of those views.[772]

---

[772] Finally, the City argues, erroneously, that "plaintiffs failed to prove individual equal protection claims against known or unknown NYPD officers by proving discriminatory purpose against and discriminatory effect upon at least one of the *named* plaintiffs." Def. Mem. at 18 (emphasis added). Such proof is unnecessary. Even if named plaintiffs are unable to prove their claims at trial, the claims of an *unnamed* member of the class is sufficient for the purposes of Article III standing and may serve as a basis for liability. *See Sosna v. Iowa*, 419 U.S. 393, 402 (1975) ("The controversy [required by Article III] may exist . . . between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot."); *Whitlock v. Johnson*, 153 F.3d 380, 384 & n.1 (7th Cir. 1998) (noting that "[t]he reasoning of *Sosna* . . . applies with equal force" whether named plaintiffs' claims are terminated based on mootness or a failure on the merits); *Melendres*, 2013 WL 2297173, at *59 ("[W]hen the claims of named plaintiffs are not proven at trial, unnamed class members may be awarded relief so long as a 'controversy' still exists between the unnamed class members and the defendants."). As discussed above, Officer French treated McDonald, an unnamed class member, differently than the similarly situated whites or Asians leaving the

## 2.    Deliberate Indifference

In a case alleging that a municipality bears *Monell* liability based on senior officials' deliberate indifference to equal protection violations by subordinates, it is not necessary for plaintiffs to provide *direct* evidence that the senior officials were motivated by a discriminatory purpose.  Rather, it is sufficient if plaintiffs show that: (1) subordinates followed a course of action in part because of its adverse effects on an identifiable group, and (2) senior officials were deliberately indifferent to those adverse effects in such a way that a reasonable inference can be drawn that those officials *intended* those adverse effects to occur.[773]

Plaintiffs in this case *did* provide direct evidence of discriminatory intent, as discussed above.  But plaintiffs also showed that senior officials in the City and at the NYPD have been deliberately indifferent to the discriminatory application of stop and frisk at the managerial and officer level such that a reasonable inference of discriminatory intent can be drawn.  Despite frequent and ongoing notice of troubling racial disparities in stops,[774] the NYPD

_____

bowling alley nearby, and Officer French stopped McDonald in part because of his race, as a result of the NYPD's policy of indirect racial profiling.  *See supra* Part IV.C.3 (McDonald's stop as *illustration* of indirect racial profiling policy).

[773]    *See Cash*, 654 F.3d at 334.  *See also DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012) (noting that an equal protection claim against school officials can be based on their deliberate indifference to student-on-student racial harassment, even in the absence of direct proof of the officials' discriminatory intent, provided that the evidence of their "clearly unreasonable" response to "actually known" circumstances "give[s] rise to a reasonable inference that [the officials] intended for the harassment to occur").

[774]    Although the following sources lie outside the trial record and therefore play no role in my decision, I observe for the public record that notice of racial bias in NYPD stops has continued since the close of discovery.  For example, the Human Rights Committee of the United Nations recently asked the United States to "provide information on steps taken to address discriminatory and unlawful use of 'stop and frisk' practices by officers of the New York Police Department," as part of the Committee's preparation of the fourth periodic report on U.S. compliance with the International Covenant on Civil and Political Rights, ratified by the United States in 1992.  UN Human Rights Committee, List of issues in relation to the fourth periodic report of the United States of America (CCPR/C/USA/4 and Corr. 1), adopted by the Committee at its 107th session (11-28 March 2013) (4/29/13).  No other police department is

189

has long shown its lack of concern for racial profiling through the failure of NYPD officials and managers to discuss racial profiling among themselves or at Compstat meetings, and through the numerous failures of supervision, monitoring, training, and discipline discussed above.[775] In addition, senior NYPD officials such as Deputy Commissioner Farrell have adopted an attitude of willful blindness toward statistical evidence of racial disparities in stops and stop outcomes.[776]

---

mentioned. *See id.*

       In addition, as has been widely reported, a teenager named Alvin Cruz has made public an audio recording of his stop in Harlem on June 3, 2011. It appears to be the only known recording of a stop by a civilian. In the recording, the officers verbally abuse Cruz, threaten to break his arm, and appear to physically abuse him. After an officer asks Cruz if he wants to go to jail, Cruz asks why the officers are threatening to arrest him, and one replies: "For being a fucking mutt! You know that?" Ross Tuttle & Rein Schneider, *Stopped-and-Frisked: 'For Being a F\*\*king Mutt' [VIDEO]*, THE NATION, Oct. 8, 2012; 1/11/13 Letter from Darius Charney, Counsel for Plaintiffs, to the Court ("1/11/13 Charney Letter") at 2. An amicus brief from a caucus of the New York City Council states that during three heavily attended public hearings in October 2012, several constituents who had been stopped "compared their own experiences of needlessly aggressive policing" to the Cruz recording. 3/4/13 Brief of *Amicus Curi[a]e* the Black, Latino, and Asian Caucus of the Council of the City of New York at 4. Plaintiffs requested on January 11, 2013 that they be allowed to add Cruz as a trial witness, after first contacting Cruz in December 2012. *See* 1/11/13 Charney Letter at 2. I denied the request on the basis of prior scheduling orders and the imminent trial date. *See* 1/17 Tr. at 4–5.

    [775]    *See supra* Part IV.C; Pl. Findings ¶¶ 186–190 (collecting sources regarding lack of internal attention to racial profiling).

    [776]    *See supra* Parts IV.C.1, 4, 7. I note that the City's highest elected official, Mayor Bloomberg, has also defended the racial disparities in the NYPD's stops by invoking the crime suspect data benchmark. *See* April 30, 2013 Bloomberg Address at 3. On that basis, he has argued that the police "'disproportionately stop whites too much and minorities too little.'" Associated Press, *Bloomberg: Police Stop Minorities "Too Little,"* June 28, 2013. Echoing Chief Esposito's testimony, Mayor Bloomberg stated that "'[t]he cops' job is to stop (people in) *the groups* fitting the description. It's society's job to make sure that no one group is disproportionately represented as potential perpetrators.'" *Id.* (emphasis added).

       Similarly, Commissioner Kelly has embraced the use of *violent* crime suspect data as a benchmark, and on this basis has argued that "'really, African-Americans are being under-stopped.'" Lawrence Downes, *What Ray Kelly Said About Stop-and-Frisk*, TAKING NOTE: THE EDITORIAL PAGE EDITOR'S BLOG, N.Y. TIMES, May 3, 2013 (quoting May 1, 2013 interview with ABC News). Of course, using violent crime suspect data as a benchmark for measuring racial bias in the NYPD's stops is even less valid than using general crime suspect data as a benchmark. *See supra* Part IV.C.7 (discussing RAND Report's use of violent crime suspect data benchmark). I note that Commissioner Kelly has also promoted the use of a violent crime suspect benchmark for stops through yearly public reports released by the NYPD. *See, e.g.,*

During trial this indifference was further demonstrated by many officials' apparent belief that racial profiling is a myth created by the media,[777] as well as by the testimony describing and defending the targeting of "the right people" for stops.[778]

The City and the NYPD's highest officials also continue to endorse the unsupportable position that racial profiling cannot exist provided that a stop is based on reasonable suspicion.[779]  This position is fundamentally inconsistent with the law of equal protection and represents a particularly disconcerting manifestation of indifference.  As I have emphasized throughout this section, the Constitution "prohibits *selective* enforcement of the law based on considerations such as race."[780]  Thus, plaintiffs' racial discrimination claim does not depend on proof that stops of blacks and Hispanics are suspicionless.[781]  A police department that has a practice of targeting blacks and Hispanics for pedestrian stops cannot defend itself by showing that all the stopped pedestrians were displaying suspicious behavior.  Indeed, the targeting of certain races *within* the universe of suspicious individuals is especially insidious, because it will increase the likelihood of further enforcement actions against members of those

---

KELLY, CRIME AND ENFORCEMENT ACTIVITY, at 15 (presenting, without explanation, racial composition of stop subjects alongside racial composition of violent crime suspects).

[777]    *See supra* Part IV.C.7 (noting skepticism of NYPD officials toward reports of racial profiling, which they claim to have not personally heard).

[778]    *See supra* Part IV.C.3 (targeting "the right people").  The City finds nothing problematic in Inspector McCormack's instruction to Officer Serrano to target "male blacks 14 to 20, 21" for stops based on local crime suspect data.  *See* Def. Findings ¶ 65; PX 332T at 24.

[779]    *See, e.g.*, 4/9 Tr. at 2824 (Esposito); Def. Mem. at 19 ("Plaintiffs . . . have failed to prove a widespread pattern of suspicionless stops, and *consequently cannot* prove a widespread pattern of race-based stops." (emphasis added)).

[780]    *Whren*, 517 U.S. at 813 (emphasis added).

[781]    I note, however, that plaintiffs *have* offered evidence of a widespread pattern of suspicionless stops.  *See supra* Part V.A.

races as compared to other races, which will then increase their representation in crime statistics. Given the NYPD's policy of basing stops on crime data, these races may then be subjected to even more stops and enforcement, resulting in a self-perpetuating cycle.[782]

The Equal Protection Clause's prohibition on selective enforcement means that suspicious blacks and Hispanics may not be treated differently by the police than equally suspicious whites. Individuals of all races engage in suspicious behavior and break the law. Equal protection guarantees that similarly situated individuals of these races will be held to account equally.

## VI.    CONCLUSION

For the foregoing reasons, the City is liable for the violation of plaintiffs' Fourth and Fourteenth Amendment rights. In a separate opinion, I will order remedies, including immediate changes to the NYPD's policies, a joint-remedial process to consider further reforms, and the appointment of an independent monitor to oversee compliance with the remedies ordered in this case. I conclude with a particularly apt quote: "The idea of universal suspicion without individual evidence is what Americans find abhorrent and what black men in America must constantly fight. It is pervasive in policing policies — like stop-and-frisk, and . . . neighborhood

---

[782] The direction not to stop "a 48-year-old lady [who] was walking through St. Mary's Park when it was closed," is just one example of instructions not to stop *all* individuals for whom a justification for a stop exists, but only to stop the *right* people. PX 332T at 21. While this particular instruction seems benign, to the extent that the NYPD focuses its resources on blacks and Hispanics to the exclusion of whites generally, the result is deeply troubling. White people also carry guns and contraband, but if the NYPD declines to stop them, they will go undetected and unrepresented in crime statistics.

In addition, applying law enforcement tactics unequally between various racial groups is a recipe for abuse. "[N]othing opens the door to arbitrary action so effectively as to allow . . . officials to pick and choose only a few to whom they will apply [the law] and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Railway Express Agency*, 336 U.S. at 112 (Jackson, J., concurring). I note one poll shows that 76% of black *voters* disapprove of stop and frisk. *See* Quinnipiac University, *New Yorkers Back Ban on Take-Out Foam More Than 2-1*, at 8 (Feb. 28, 2013).

watch — regardless of the collateral damage done to the majority of innocents.  It's like burning down a house to rid it of mice."[783]

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      August 12, 2013
            New York, New York

---

[783]     Charles Blow, *The Whole System Failed Trayvon Martin*, N.Y. TIMES,  July 15, 2013.

# APPENDIX A
Blank UF-250



**STOP, QUESTION AND FRISK REPORT WORKSHEET**
PD344-151A (Rev. 11-02)

(COMPLETE ALL CAPTIONS)

Pct.Serial No.

Date | Pct. Of Occ.

Time Of Stop | Period Of Observation Prior To Stop | Radio Run/Sprint #

Address/Intersection Or Cross Streets Of Stop

☐ Inside ☐ Outside | ☐ Transit ☐ Housing | Type Of Location Describe:

Specify Which Felony/P.L. Misdemeanor Suspected | Duration Of Stop

**What Were Circumstances Which Led To Stop?**
(MUST CHECK AT LEAST ONE BOX)

☐ Carrying Objects In Plain View Used In Commission Of Crime e.g., Slim Jim/Pry Bar, etc.
☐ Fits Description.
☐ Actions Indicative Of "Casing" Victim Or Location.
☐ Actions Indicative of Acting As A Lookout.
☐ Suspicious Bulge/Object (Describe)
☐ Other Reasonable Suspicion Of Criminal Activity (Specify)

☐ Actions Indicative Of Engaging In Drug Transaction.
☐ Furtive Movements.
☐ Actions Indicative of Engaging In Violent Crimes.
☐ Wearing Clothes/Disguises Commonly Used In Commission Of Crime.

Name Of Person Stopped | Nickname/ Street Name | Date Of Birth

Address | Apt. No. | Tel. No.

Identification: ☐ Verbal ☐ Photo I.D. ☐ Refused ☐ Other (Specify)

Sex:☐ Male Race:☐ White ☐ Black☐ White Hispanic ☐ Black Hispanic
☐ Female ☐ Asian/Pacific Islander ☐ American Indian/Alaskan Native

Age | Height | Weight | Hair | Eyes | Build

Other (Scars, Tattoos, Etc.)

Did Officer Explain Reason For Stop ☐ Yes ☐ No | If No, Explain:

Were Other Persons Stopped/ Questioned/Frisked? ☐ Yes ☐ No | If Yes, List Pct. Serial Nos.

If Physical Force Was Used, Indicate Type:
☐ Hands On Suspect
☐ Suspect On Ground
☐ Pointing Firearm At Suspect
☐ Handcuffing Suspect
☐ Suspect Against Wall/Car
☐ Drawing Firearm
☐ Baton
☐ Pepper Spray
☐ Other (Describe)

Was Suspect Arrested? ☐ Yes ☐ No | Offense | Arrest No.

Was Summons Issued? ☐ Yes ☐ No | Offense | Summons No.

Officer In Uniform? ☐ Yes ☐ No | If No, How Identified? ☐ Shield ☐ I.D. Card ☐ Verbal

Was Person Frisked? ☐ Yes ☐ No IF YES, MUST CHECK AT LEAST ONE BOX
☐ Inappropriate Attire - Possibly Concealing Weapon
☐ Verbal Threats Of Violence By Suspect
☐ Knowledge Of Suspects Prior Criminal Violent Behavior/Use Of Force/Use Of Weapon
☐ Other Reasonable Suspicion of Weapons (Specify)
☐ Actions Indicative Of Engaging In Violent Crimes

☐ Refusal To Comply With Officer's Direction(s) Leading To Reasonable Fear For Safety
☐ Violent Crime Suspected
☐ Suspicious Bulge/Object (Describe)

Was Person Searched? ☐ Yes ☐ No IF YES, MUST CHECK AT LEAST ONE BOX
☐ Outline Of Weapon ☐ Other Reasonable Suspicion of Weapons (Specify)
☐ Hard Object ☐ Admission Of Weapons Possession

Was Weapon Found? ☐ Yes ☐ No If Yes, Describe: ☐ Pistol/Revolver ☐ Rifle/Shotgun ☐ Assault Weapon ☐ Knife/Cutting Instrument
☐ Machine Gun ☐ Other (Describe)

Was Other Contraband Found? ☐ Yes ☐ No If Yes, Describe Contraband And Location
Demeanor Of Person After Being Stopped
Remarks Made By Person Stopped

Additional Circumstances/Factors: (Check All That Apply)
☐ Report From Victim/Witness
☐ Area Has High Incidence Of Reported Offense Of Type Under Investigation
☐ Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity
☐ Suspect Is Associating With Persons Known For Their Criminal Activity
☐ Proximity To Crime Location
☐ Other (Describe)

☐ Evasive, False Or Inconsistent Response To Officer's Questions
☐ Changing Direction At Sight Of Officer/Flight
☐ Ongoing Investigations, e.g., Robbery Pattern
☐ Sights And Sounds Of Criminal Activity, e.g., Bloodstains, Ringing Alarms

Pct. Serial No. | Additional Reports Prepared: Complaint Rpt.No. | Juvenile Rpt. No. | Aided Rpt. No. | Other Rpt. (Specify)

REPORTED BY: Rank, Name (Last, First, M.I.) | Tax# | Command
Print
Signature

REVIEWED BY: Rank, Name (Last, First, M.I.) | Tax# | Command
Print
Signature

194

**- Appearances -**

**For Plaintiffs:**

Darius Charney, Esq.
Sunita Patel, Esq.
Baher Azmy, Esq.
Rachel Lopez, Esq.
Ghita Schwarz, Esq.
Chauniqua Young, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

Philip I. Irwin, Esq.
Eric Hellerman, Esq.
Gretchen Hoff Varner, Esq.
Kasey Martini, Esq.
Bruce Corey, Jr., Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

Jonathan Moore, Esq.
Jenn Rolnick Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0900

**For Defendant:**

Heidi Grossman
Brenda Cooke
Linda Donahue
Morgan Kunz
Joseph Marutollo
Suzanna Publicker
Lisa Richardson
Judson Vickers
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-3503

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

DAVID FLOYD, *et al.*,

                Plaintiffs,

       - against -

CITY OF NEW YORK,

             Defendant.

------------------------------------------------------- X


JAENEAN LIGON, *et al.*,

               Plaintiffs,

       - against -

CITY OF NEW YORK, *et al.*,

             Defendants.

------------------------------------------------------- X

**OPINION AND ORDER**

08 Civ. 1034 (SAS)


12 Civ. 2274 (SAS)


**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    BACKGROUND

       By letter dated August 27, 2013, defendants ("City") in the above-captioned actions moved for a stay of this Court's August 12 Orders pending appellate review.[1] On September 6, 2013, plaintiffs opposed the request for a

---

       [1]     *See* 8/27/13 Letter from Heidi Grossman and Linda Donahue, Assistants Corporation Counsel for the City, to the Court ("City Stay Ltr."). *See*

stay.[2]  Declarations in opposition to the stay were also received from City Council Speaker Christine Quinn; City Council Members Helen Foster and Robert Jackson; Joo-Hyun Kang, the Director for Communities United for Police Reform; and named plaintiff David Ourlicht.[3]  In addition, Public Advocate Bill de Blasio submitted an *amicus curiae* letter in opposition to the stay.[4]  On September 12, 2013, defendants filed a letter in reply to plaintiffs' opposition.[5]  For the following reasons, the request for a stay is DENIED.

The standard for obtaining a stay pending appeal is well-established, as is the burden of proof.  The court must consider:  "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether

---

*also Floyd v. City of New York*, No. 08 Civ. 1034, 2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013) ("Liability Opinion"); *Floyd v. City of New York*, No. 08 Civ. 1034, 2013 WL 4046217 (S.D.N.Y. Aug. 12, 2013) ("Remedies Opinion") (collectively, "August 12 Orders").

[2]    *See* 9/6/13 Letter from Jonathan C. Moore *et al.*, Counsel for *Floyd* Plaintiffs, to the Court ("*Floyd* Pl. Opp. Ltr."); 9/6/13 Letter from Alexis Karteron *et al.*, Counsel for *Ligon* Plaintiffs, to the Court ("*Ligon* Pl. Opp. Ltr.").

[3]    *See* Declarations of City Council Speaker Christine C. Quinn ("Quinn Decl."), City Council Member Helen D. Foster ("Foster Decl."), City Council Member Robert Jackson ("Jackson Decl."), *et al.*, Exhibits to *Floyd* Pl. Opp. Ltr.

[4]    *See* 9/6/13 Letter from *Amicus Curiae* Public Advocate Bill de Blasio to the Court ("Public Advocate Ltr.").

[5]    *See* 9/12/13 Letter from Heidi Grossman and Linda Donahue, Assistants Corporation Counsel for the City, to the Court ("City Reply Ltr.").

-2-

issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"[6]  "The degree to which a factor must be present varies with the strength of the other factors, meaning that more of one factor excuses less of the other."[7]  The party seeking the stay bears the burden of proving that a stay is necessary.[8]  The Second Circuit has noted that this is "a difficult burden."[9]  Finally, "a stay is not a matter of right, even if irreparable injury might otherwise result."[10]

## II.   DISCUSSION

### A.   The Relief Ordered

Contrary to statements by certain high-level city officials and pundits, this Court did *not* order an end to the practice of stop and frisk.  Rather, this Court ordered that such activity be conducted in accordance with well-established controlling law from both the United States Supreme Court and the Second Circuit Court of Appeals.

In furtherance of this goal, the immediate relief ordered by this Court

---

[6]      *Nken v. Holder*, 556 U.S. 418, 434 (2009).

[7]      *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quotation omitted).

[8]      *See Nken*, 556 U.S. at 433–34.

[9]      *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995).

[10]      *Nken*, 556 U.S. at 434 (quotation omitted).

in the Remedies Opinion consisted of (1) appointing a Monitor to ensure that the New York City Police Department ("NYPD") carries out its stop and frisk activities in a manner consistent with the mandates of the Fourth and Fourteenth Amendments to the United States Constitution; (2) appointing a Facilitator to meet with stakeholders in the community — including the NYPD, the Corporation Counsel, the Mayor, the City Council, the police unions, tenant associations, churches, schools, block associations, and any others that the Facilitator may identify — to suggest reforms that would accomplish the goal of conducting essential law enforcement activity in a constitutional manner; and (3) conducting a pilot project requiring the use of body-worn cameras by police officers on patrol in five select precincts, under appropriate terms and conditions to be recommended by the Monitor. The costs associated with the activities of the Monitor, the Facilitator, and their necessary staff must be borne by the City.

Long-range relief requires the NYPD to institute new mechanisms for the training, supervision, monitoring, and disciplining of officers with respect to stop and frisk activity. This relief includes revising the UF-250 form used to record stop activity, designing a tear-off form or card for police officers to give to the stopped person, improving the written records of stops and/or frisks in officer activity logs, improving training materials and classes, strengthening oversight by superior officers, and applying internal discipline where needed. The vast majority of these reforms will not be implemented until the Facilitator and the Monitor have

the opportunity to work with the community, the NYPD, and the other

stakeholders identified above to recommend appropriate reforms.

In short, the only activity at this stage is discussion between the

Monitor, the Facilitator, and the parties to develop the remedies described above.

No other specific relief is imminent, much less ordered.

## B.    Likelihood of Success on the Merits

The Supreme Court has held that the first two factors — likelihood of

success on the merits and irreparable harm — "are the most critical."[11]  Defendants

have presented no cogent argument that they are likely to succeed on their appeal

of this Court's Orders.  Defendants assert in a single conclusory paragraph in their

opening letter brief that the Court erred in finding violations of the Fourth

Amendment, violations in *Floyd* of the Fourteenth Amendment, and "any

actionable widespread pattern or practice, deliberate indifference or causation"

under *Monell v. Department of Social Services.*[12]  The City also asserts that the

injunctive relief ordered in *Floyd* is "not narrowly tailored or clear enough to

---

[11]     *Id.*

[12]     City Stay Ltr. at 2 (citing *Monell*, 436 U.S. 658 (1978)).  The City's
reply to plaintiffs' opposition letter effectively acknowledges that the City does not
attempt to carry its burden of establishing the likelihood of success on the merits.
In response to plaintiffs' argument that the City's opening brief "made no
showing" of likely success, *Floyd* Pl. Opp. Ltr. at 3, the City's reply "respectfully
refers the Court" to the totality of the legal and factual arguments submitted by the
City in "the years of litigation and substantive motion practice" prior to the August
12 Orders.  City Reply Ltr. at 6–7.

address found wrongs, particularly as it has no discernible end point or standards to measure success."[13]

Putting aside that the City made no convincing showing of a likelihood of success on appeal, the City's final point regarding the allegedly inappropriate injunctive relief is particularly troubling. The reason the relief is not yet "clear," that no end point is yet "discernible" and that "standards" have not yet been determined is because the remedial phase of the case is ongoing and no final order has yet issued. Plaintiffs identify this as a problem of "ripeness," "non-finality," "non-appealability," and lack of appellate jurisdiction.[14] Regardless of the legal basket in which the argument is placed, the result is the same. It takes time to fashion appropriate remedies. While the Court used the term "immediate" relief, this merely prioritized relief that should be implemented at the earliest practicable time,[15] as opposed to longer-range relief, which will not be implemented until after the completion of the Joint Remedial Process. The Remedies Opinion outlined the relief to be imposed in *Floyd* and — with more specificity — in *Ligon*. However, implementing remedies is a process — and a process that is still in its earliest stages. It is unlikely that any orders will issue for

---

[13]     City Stay Ltr. at 2.

[14]     *See Floyd* Pl. Opp. Ltr. at 2.

[15]     *See* Remedies Opinion, 2013 WL 4046217, at *5 (stating that the "Immediate Reforms" "will be developed and submitted to the Court as soon as practicable, and implemented when they are approved").

several months.  The only action required of the City to date is attendance at meetings with the Monitor.

### C.    Irreparable Harm

#### 1.    The City's Arguments

The City argues that irreparable harm is "imminent" for a number of reasons.  *First*, the City worries that communicating a summary of the Liability Opinion (through a FINEST message to all officers) will cause confusion if this Court's interpretation of the law is overturned.  Similarly, any retraining of officers on the legal aspects of stop and frisk, and then any changes in the practices of monitoring, supervision, and discipline that will implement that retraining, will also result in confusion should the Court's orders be overturned on appeal.

*Second*, the City argues that irreparable harm will result from the body-worn camera pilot project.  Specifically, the City argues that this pilot project will cause significant harm "in terms of time, resources and possible impingement on privacy rights of the public."[16]

*Third*, the City argues that this Court's orders violate principles of federalism, resulting in "constitutional harm which is always irreparable."[17]  The City claims that the constitutional harm arises from an "unjustified incursion into

---

[16]    City Stay Ltr. at 2.

[17]    *Id.*

the municipality's authority to police its citizens."[18]

## 2. The Response

The City's first argument is circular. The Court's orders simply require that the NYPD conform its policies and practices to well-established constitutional requirements. The City's argument here is merely a restatement of its argument regarding the likelihood of success on the merits. Because it believes the Court's decisions are based on an erroneous view of the law — despite repeated citations to Supreme Court and Second Circuit controlling law — it also believes that irreparable harm will result from basing any relief on those decisions. Thus, the City's argument conflates the first two factors and fails to prove either one.

With respect to the pilot project on body-warn cameras, it is undisputed that the project will require the expenditure of time and resources, but it is also clear that the Monitor will oversee the project to ensure that the privacy rights of both police officers and citizens are carefully protected. The purpose of the experiment is to ensure that both police and citizens benefit from the recording of stop and frisk encounters — which will provide a contemporaneous and presumptively incontestable record of what occurred during the encounter. Again, it does not appear that any irreparable harm will result from instituting a pilot

---

[18] *Id.*

project that will be carefully developed prior to implementation and that has been used by other police departments with apparent success.

The City's federalism argument is equally flawed. The City has the obligation and the right to police its citizens — but it must do so in compliance with the dictates of the United States Constitution.[19]   The Court's August 12 Orders require that all stops be based upon an objectively reasonable suspicion that a crime has been, is being, or will be committed,[20] and that all frisks be based on an objectively reasonable suspicion "that the person stopped is armed and dangerous.'"[21]   Requiring the City to follow these principles *cannot as a matter of law* improperly intrude on the City's authority to police its citizens.[22]

In sum, the City has failed to show that it will be irreparably harmed

---

[19]    *See Sibron v. New York*, 392 U.S. 40, 61 (1968) (holding that New York "may not . . . authorize police conduct which trenches upon Fourth Amendment rights").

[20]    *See generally Terry v. Ohio*, 392 U.S. 1 (1968).

[21]    *United States v. Lopez*, 321 Fed. App'x 65, 67 (2d Cir. 2009) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)).

[22]    Federal courts have a duty to remedy constitutional violations, even where the relief ordered involves municipal institutions.  *See Brown v. Plata*, 131 S. Ct. 1910, 1928–29 (2009) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."); *Allee v. Medrano*, 416 U.S. 802, 815 (1974) ("Where, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate."); *Association of Surrogates & Supreme Court Reporters Within City of N.Y. v. State of N.Y.*, 966 F.2d 75, 79, *opinion modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992) ("[S]tate budgetary processes may not trump court-ordered measures necessary to undo a federal constitutional violation[.]").

-9-

absent the imposition of a stay.

### D.  Harm to Plaintiffs If a Stay Is Issued

It is well-established that a violation of one's constitutional rights constitutes irreparable harm.[23]  A stay of this Court's orders would encourage the NYPD to return to its former practice of conducting thousands upon thousands of improper stops — including those based merely on a person entering or exiting a building in which he or she resides.  The recent reduction in the number of stops appears to have been a positive step toward remedying an improper practice without sacrificing the security of the community.[24]  Thus, in weighing the equities, the danger of granting a stay far outweighs any possible benefit of granting one.

### E.  The Public Interest

---

[23]  *See, e.g.*, *State of Conn. Dep't of Envtl. Prot. v. Occupational Safety &Health Admin.*, 356 F.3d 226, 231 (2d Cir. 2004).  The City suggests that any future violations of constitutional rights can be remedied by individual actions for damages, *see* City Stay Ltr. at 3, but I have already noted that such suits are "particularly ineffective as a remedy . . . where individuals often do not know what the basis for their stop was, and thus cannot know whether the stop lacked a legal basis or was influenced improperly by race."  Remedies Opinion, 2013 WL 4046217, at *3 n.21.

[24]  *Compare* City Stay Ltr. at 3 (noting that stops are down by more than 50% in the second quarter of 2013 compared to the second quarter of 2012), *with* Office of the Mayor of New York City, Weekly Update on Murders and Shootings in New York City (Aug. 27, 2013), Exhibit A to *Ligon* Pl. Opp. Ltr. (noting that the murder rate as of August 2013 had declined by 27% as compared to the same point in 2012 and that the number of murders committed with firearms had decreased by 30%).

The City's final argument is that the public interest favors a stay. The City dramatically declares that if this Court's orders are not stayed, the "long-standing record of crime reduction in this city" will be reversed.[25] The City goes on to say that "[i]f officers are required to be trained on erroneous principles of Fourth and Fourteenth Amendment law, the enforcement action that can no longer take place will certainly jeopardize potential crime victims."[26] Finally, the City states that public safety will suffer if police resources are spent on retraining and body-worn camera logistics instead of actual policing.[27]

The City offers no evidence to support the argument that the stop and frisk practices found unconstitutional in this Court's opinions are necessary to crime reduction. Indeed, the evidence cited by the City directly contradicts this argument. The City notes that the number of stops in the second quarter of 2013 is half what it was in the second quarter of 2012.[28] Despite the precipitous decline in the number of stops, the crime rate has continued to fall (or has certainly not increased).[29] The City presents no evidence that effective policing and

---

[25]    City Stay Ltr. at 3.

[26]    *Id.*

[27]    *See id.*

[28]    *See id.*

[29]    *See supra* note 24 (citing crime statistics). *See also* Public Advocate Ltr. at 6 (noting that while the use of stop and frisk has fallen more than 50% in New York City since last year, the overall crime rate has declined 2.7% during the

constitutional policing are incompatible.

There is little doubt that the decrease in stops from their zenith in 2011 to today is due, in part, to this Court's orders over the past several years, as well as the criticisms of the City's stop and frisk practices from diverse sources throughout the City. Ordering a stay now would send precisely the wrong signal. It would essentially confirm that the past practices, resulting in hundreds of thousands of stops — overwhelmingly of minorities — that resulted in little or no enforcement action or seizure of contraband were justified and based on constitutional police practices. It would also send the message that reducing the number of stops is somehow dangerous to the residents of this City. Because neither proposition is accurate, the granting of a stay is not in the public interest. By contrast, allowing a process of consultation with all stakeholders, and recommendations for measured reform, is in the public interest.

A number of elected City officials reached the same conclusion. They submitted statements opposing the City's request for a stay. Their statements contain frequent invocations of the public interest. For example, City Council Speaker Christine Quinn stated that she opposes the City's request for a stay

> because the joint remedial process is integral to repairing the damage in community relations caused by the current stop and frisk policies and to meaningfully move forward towards achieving reforms that balance the need for effective policing

---

same time period, including a 30% decline in murders).

-12-

policies with protections for the constitutional rights of every New York City's minority residents. . . . [T]he joint remedial process will facilitate a much-needed dialogue between the NYPD and the community. . . . [T]he public has a strong interest in beginning the remedial process immediately and ending the practice of unconstitutional stops. . . . [I]t is a *delay* in implementing important and necessary reforms . . . that would cause irreparable harm to the City and its residents.[30]

Similarly, Public Advocate Bill de Blasio stated:

A stay of the Remedies Order will result in irreparable harm to the citizenry of New York by allowing the unconstitutional stop and frisk violations of untold numbers of people to continue, especially and disproportionately in communities of color. . . . It is the irreparable harm to the constitutional rights of thousands of New Yorkers should the Remedies Order *not* be implemented that weighs decisively *against* granting a stay. . . . The violation of an individual's civil liberties and constitutional rights is *per se* irreparable harm that cannot justify staying an injunction crafted to cease and remedy the violation. . . . The City's continued stonewalling harms New York, and a stay would reward such obstinance. . . . It is well-past time for the City to cease the meritless scare tactic of contending that conforming the use of stop and frisk to constitutional standards will increase crime or make the public unsafe. There is simply no proof of the divisive proposition that the District Court Orders will harm the public.[31]

City Council Member Helen Foster wrote:

The stay is not in the public interest. Rather, starting the reform process through a dialogue between stakeholders and the NYPD will immediately pave the way for meaningful changes to the NYPD's stop and frisk policies. Such a dialogue will also ease

---

[30]    Quinn Decl. ¶¶ 7–10.

[31]    Public Advocate Ltr. at 1, 4, 5, 8.

tensions between the community and the NYPD . . . .[32]

Likewise, City Council Member Robert Jackson, the co-chair of the Council's

Black, Latino and Asian Caucus, wrote:

> The [Caucus] believes that this court-ordered dialogue will finally force the NYPD to meaningfully engage with communities of color and to confront the reality that current stop and frisk policies reinforce negative racial stereotypes and engender a distrust of the police. . . . The public has a strong interest in beginning the remedial process immediately and ending the practice of unconstitutional stops, with the dual goals of securing the liberties guaranteed by the Constitution, as well as fostering the kind of community trust in the NYPD that can ultimately contribute to its efforts to reduce crime.[33]

The submissions of these City officials are entitled to significant weight in

determining where the public interest lies. In short, adapting the words of Judge

Susie Morgan of the United States District Court of the Eastern District of

Louisiana, the "residents of [New York] will suffer substantial harm to their

interests in having a constitutional police force if the Court grants the City's

motion [for a stay]."[34]

## III. CONCLUSION

For the reasons set forth above, the City's request for a stay of this

Court's August 12 Orders is DENIED.

---

[32]    Foster Decl. ¶ 12.

[33]    Jackson Decl. ¶¶ 10, 13.

[34]    *United States v. City of New Orleans*, No. 12 Civ. 1924, 2013 WL 492362, at *4 (E.D. La. Feb. 8, 2013).

-14-

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      September 17, 2013
            New York, New York

**- Appearances -**

**For *Floyd* Plaintiffs:**

Jonathan C. Moore, Esq.
Jenn Rolnick Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0900

Darius Charney, Esq.
Sunita Patel, Esq.
Chauniqua Young, Esq.
Baher Azmy, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

Eric Hellerman, Esq.
Kasey L. Martini, Esq.
Bruce Corey, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

**For *Ligon* Plaintiffs:**

Alexis Karteron, Esq.
Christopher Dunn, Esq.
Daniel Mullkoff, Esq.
NY Civil Liberties Union Foundation
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

Mariana Kovel, Esq.
Scott Levy, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

J. McGregor Smyth, Jr., Esq.
NY Lawyers for the Public Interest
151 West 30th Street, 11th Floor
New York, NY 10001
(212) 244-4664

John A. Nathanson, Esq.
Jeffrey Resetarits, Esq.
Michael Grunfeld, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

-16-

**For *Floyd* and *Ligon* Defendants:**

Linda Donahue
Heidi Grossman
Assistants Corporation Counsel
Special Federal Litigation Division
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300

**For *Amicus Curiae* New York City
Public Advocate Bill de Blasio:**

Steven R. Newmark
General Counsel
Office of the Public Advocate
One Centre Street
New York, NY 10007
(212) 669-7200

John Siegal, Esq.
Fernando A. Bohorquez, Jr., Esq.
Jacqlyn R. Rovine, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
(212) 589-4245

# EXHIBIT D

```
        D4H8FLO1              Palmieri - redirect
 1       CORNELIO McDONALD,
 2            called as a witness by the plaintiffs,
 3            having been duly sworn, testified as follows:
 4                THE COURT:  State your full name, first and last,
 5       spelling both for the record.
 6                THE WITNESS:  Cornelio D. McDonald, C-O-R-N-E-L-I-O,
 7       M-C-D-O-N-A-L-D.
 8                THE COURT:  You are going to have to keep your voice
 9       up the whole time so we can all hear you.
10       DIRECT EXAMINATION
11       BY MR. COREY:
12       Q.  Good morning, Mr. McDonald.
13       A.  Good morning.
14       Q.  Mr. McDonald, where do you live?
15       A.  67-15 Parsons Boulevard, Fresh Meadows, New York.
16       Q.  That's in Queens?
17       A.  Yes.
18       Q.  How long have you lived at that address?
19       A.  About 19 years.
20       Q.  How long have you lived in the Fresh Meadows area?
21       A.  About 42 years.
22       Q.  Do you live with anyone else?
23       A.  Yes.
24       Q.  Who do you live with?
25       A.  My daughter and my fiance.
```

3677

D4H8FLO1                    McDonald - direct

1   Q.  Mr. McDonald, is English your first language?
2   A.  No.
3   Q.  What is your first language?
4   A.  Spanish.
5   Q.  Are you currently employed?
6   A.  Yes.
7   Q.  Where are you employed?
8   A.  Cavalry Staffing.
9           THE COURT:  What is Cavalry Staffing?
10          THE WITNESS:  That's a place where I drive cars
11  around.
12  Q.  Mr. McDonald, do you recall what you were doing on December
13  18, 2009?
14  A.  Yes.
15          MR. MARUTOLLO:  Objection, your Honor.  The stop
16  occurred on December 19, 2009, and anything happened the day
17  before I think is irrelevant.
18          THE COURT:  I don't know that.  It may lead to it.
19          MR. COREY:  It's not disputed that the stop occurred
20  the next day.  I am just trying to give the context.
21          THE COURT:  There may be context.  I just don't know.
22          What were you doing on the 18th?
23          THE WITNESS:  I was taking care of my moms.
24  Q.  What do you mean by taking care of your mom?
25  A.  Feeding her, giving her a shower, cleaning up the house for
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3678

D4H8FLO1                      McDonald - direct
1   her.
2   Q.  Is that something that you do regularly?
3              MR. MARUTOLLO:  Objection.
4              THE COURT:  I will allow it.
5              Go ahead.
6              THE COURT:  You do that regularly?
7              THE WITNESS:  Yeah.
8              THE COURT:  She lives alone?
9              THE WITNESS:  She used to.
10  Q.  Mr. McDonald, where did your mother live in December 2009?
11  A.  67-36 Parsons Boulevard, Fresh Meadows, New York.
12  Q.  What type of building did your mother live in at that time?
13  A.  City complex, city housing.
14             THE COURT:  New York City Housing Authority?
15             THE WITNESS:  Yes.
16  Q.  Did the building that your mother lived in, did it have a
17  name?
18  A.  Pomonok Houses.
19  Q.  Mr. McDonald, to your knowledge, what is the racial makeup
20  of the people who live on your mother's side of the block?
21  A.  80 percent black.
22  Q.  You said you lived at 67-15 Parsons?
23  A.  Yes.
24  Q.  Where is your house in relation to your mother's house?
25  A.  Across the street.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3679

D4H8FLO1                    McDonald - direct
1    Q.  What type of building do you live in?
2    A.  I live in a co-op, private home.
3    Q.  You say?
4    A.  Co-op apartments, private home.
5    Q.  It's private?
6    A.  Yes.
7    Q.  To your knowledge, what is the racial makeup of the people
8    who live on that side of the block?
9    A.  80 percent white.
10   Q.  So at some point did you leave your mother's house to go
11   home?
12   A.  Yes.
13            THE COURT:  This is still on the 18th.
14            THE WITNESS:  1:00 in the morning.
15            THE COURT:  OK.
16   Q.  How many hours were you at your mother's house?
17   A.  About ten hours, 12, 10.
18   Q.  Do you usually leave your mother's house so late?
19   A.  That was a Friday.  That was -- it was a Friday.  She was
20   expecting family members coming in.
21            THE COURT:  She was expecting family members?
22   Q.  What happened when you left your mother's house?
23   A.  I left my mom's house, walked down the steps.  I was
24   getting ready to cross the street.  I see a van make a U-turn,
25   and as I was getting ready to cross the second street, it
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

3680

D4H8FLO1                    McDonald - direct

1    stopped right in front of me.
2    Q.  So let's just back up for a second here.
3            Can you just briefly describe that stretch of Parsons
4    Boulevard?
5    A.  It's a long block.  It's like two blocks in one and it's
6    got a divider in between.
7    Q.  It's got a?
8    A.  A divider.
9    Q.  So are there cars parked along the divider?
10   A.  Yes, on both sides.
11   Q.  Where were you when you saw this van pull up in front of
12   you?
13   A.  I was getting ready to cross the street on one street off
14   the island.
15   Q.  So you were not on the island of the divider?
16   A.  No.
17   Q.  You were in between two parked cars?
18   A.  Yes.
19   Q.  Which side of the parked cars?  You said there are cars on
20   both side of the island.
21   A.  I was on the east side of the island.
22   Q.  Would that be the first set of parked cars or second set?
23   A.  Second set.
24   Q.  When the van pulled up in front of you, did you feel like
25   you could walk away from the van?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4H8FLO1                    McDonald - direct

1    A.  No.
2    Q.  Why is that?
3    A.  Because I was trapped in between parked cars and the van
4    and cars behind me.
5    Q.  So the van was parallel to the parked cars?
6    A.  Yes.
7              THE COURT:  Was this a marked van?
8              THE WITNESS:  No.
9              THE COURT:  Just a plain van.  You didn't know who was
10   in it?
11             THE WITNESS:  No.
12   Q.  Do you remember the color of the van?
13   A.  Yeah.  Red.
14   Q.  Could you tell how many people were in the van?
15   A.  Three.
16   Q.  Could you tell where they were sitting?
17   A.  Two in the front and one in the back.
18   Q.  Do you remember what the weather was like when you left
19   your mother's house?
20   A.  It was cold, between 20 and 30 degrees.
21   Q.  Were you wearing a jacket?
22   A.  Yes.
23   Q.  When the van pulled up in front of you, do you remember
24   where your hands were?
25   A.  Yes.

3682

D4H8FLO1                    McDonald - direct

1  Q.  Where were they?
2  A.  In my coat pocket.
3  Q.  Before that, when you were walking across Parsons, where
4  were your hands?
5  A.  In my coat pocket.
6  Q.  Did you ever remove your hands from your jacket pockets
7  when you were crossing the street?
8  A.  No.
9  Q.  Can you just describe the way you were walking across the
10 street?
11 A.  Normal walk.
12 Q.  Did you look behind you at any point?
13 A.  No.
14 Q.  Did you lean your body sideways?
15 A.  No.
16 Q.  What about when you passed through the west set of parked
17 cars in the island, can you describe how you passed through
18 them?
19 A.  Side, walking like sideways.
20 Q.  You said you were wearing a jacket, right?
21 A.  Yes.
22 Q.  Did you have anything in your jacket pockets?
23 A.  Yeah.
24 Q.  What did you have?
25 A.  I had my cell phone and my keys in my pocket.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
D4H8FLO1                        McDonald - direct
```

 1   Q.  What pocket was your cell phone in?
 2   A.  Left side.
 3   Q.  Left jacket pocket?
 4   A.  Yes.
 5   Q.  And your keys were where?
 6   A.  In my pants pocket.
 7   Q.  So what happened when the van pulled up in front of you?
 8   What happened next?
 9   A.  They stop in front of me and they asked me where I was
10   coming from.
11           THE COURT:  When you say they asked you, they were in
12   the car when they asked you?
13           THE WITNESS:  Yes.
14           THE COURT:  Called out through the window?
15           THE WITNESS:  Rolled down the window and asked me
16   where I was coming from.
17   Q.  You said there were three people in the car.  Which person
18   asked you where you were coming from?
19   A.  The driver.
20   Q.  So did you give them a response?
21   A.  Excuse me?
22   Q.  Did you give them a response?
23   A.  Yes.
24   Q.  What was it?
25   A.  Why you stopping me for?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

3684

D4H8FLO1                    McDonald - direct

1   Q.  Did they respond to you?
2   A.  Yes.
3   Q.  What did they say?
4   A.  You're a wise guy.
5           THE COURT:  Did you answer their question when they
6   said where are you coming from?
7           THE WITNESS:  After a while, yes.
8           THE COURT:  Not at first.  First you said, why are you
9   stopping me?
10          THE WITNESS:  Right.
11  Q.  Mr. McDonald, while you and the driver were speaking, were
12  you physically moving in any way?
13  A.  No.
14  Q.  You said the van had no markings or logos on it?
15  A.  Correct.
16  Q.  Were the men wearing uniforms?
17  A.  No.
18  Q.  Did either man ever identify himself as a police officer?
19  A.  Once they came out, they identified themself.
20          THE COURT:  When the man in the driver's seat first
21  said to you, where are you coming from, and you said, what are
22  you stopping me for, did you think they were police?
23          THE WITNESS:  No.  Because he didn't show a shield.
24          THE COURT:  When you said, what are you stopping me
25  for, what did you mean by stopping if you didn't think they
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D4H8FLO1                    McDonald - direct

1  were police?
2              THE WITNESS:  Because he ran in front of me.  I
3  thought he was going to go by, but he cut right in front of me.
4              THE COURT:  That's what you meant by, what are you
5  stopping me for, you didn't know who they were?
6              THE WITNESS:  No.
7              THE COURT:  You didn't think they were police then?
8              THE WITNESS:  No.
9              THE COURT:  Not right then?
10             THE WITNESS:  No.
11  Q.  So what happened next?
12  A.  Once I said, why you stopping me for, and they said, you're
13  a wise guy, they came out and they started searching me.
14             THE COURT:  I lost the order.  At that point, had they
15  told you they were police?
16             THE WITNESS:  No.  He stepped out.  Then he came up
17  out with his shield.  Then the other guy came out with his
18  shield.
19             THE COURT:  Before they searched you, they did show
20  you their shield?
21             THE WITNESS:  Yes.  And then he searched me.
22             THE COURT:  What did he do?
23             THE WITNESS:  Feel my pockets.
24             THE COURT:  Did he go in the pocket or just patted
25  from the outside?

3686

D4H8FLO1                    McDonald - direct
1              THE WITNESS:  Patted from the outside.  They wanted to
2    know what was in my pocket and told me to take out my keys.
3              THE COURT:  They didn't put their hand in your pocket?
4              THE WITNESS:  Not to my recollection.
5              THE COURT:  Then you took out your keys?
6              THE WITNESS:  Yeah, because he told me to take out my
7    keys.
8    BY MR. COREY:
9    Q.  Which man was touching you?
10   A.  The driver in the back.
11   Q.  Excuse me?
12   A.  Not the driver.  The one in the back, in the back seat.
13   Q.  Can you describe that man, the man who came out of the
14   back?
15   A.  Tall, about 6'3", 6'4", mustache, black hair.
16   Q.  What about the driver who also came out, can you describe
17   him, please?
18   A.  A little heavier, a little taller than me.
19             THE COURT:  Were these folks black or white?
20             THE WITNESS:  They was all white.
21   Q.  Mr. McDonald, did the men find any weapons on you?
22   A.  No.
23   Q.  Did they find any drugs on you?
24   A.  No.
25   Q.  While the man in the back was touching your body, were you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D4H8FLO1                    McDonald - direct

1   moving any part of your body?
2   A.  No.
3   Q.  So what happened after the man finished touching you?
4   A.  He asked me for identification.
5   Q.  Did you give it to him?
6   A.  Yes.
7   Q.  Then what happened?
8   A.  Then I asked for their information.
9   Q.  Did either man give it to you?
10  A.  Only one.
11  Q.  Which one?
12  A.  The driver.
13          THE COURT:  What did he give you?
14          THE WITNESS:  His information.  He said he was Officer
15  Anderson.
16  Q.  Then what happened?
17  A.  Then I went home.
18  Q.  Mr. McDonald, did either officer at any point say they saw
19  a suspicious bulge in your pocket?
20  A.  No.  They never spoke to me about that.
21  Q.  To your recollection, did you have any sort of bulge in
22  your pocket?
23  A.  Maybe my keys, but not no bulge.
24  Q.  Where were your keys?
25  A.  In my pants pocket.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3688

D4H8FLO1                    McDonald - direct

1   Q.  Did you refuse to comply with any of the instructions they
2   gave you?
3   A.  No.
4   Q.  Did you raise your voice at any point?
5   A.  No.
6   Q.  Did you do anything physically that you intended to be
7   physically threatened?
8   A.  No.
9            THE COURT:  How about the officers, were they polite
10  to you?
11           THE WITNESS:  Not exactly.
12           THE COURT:  In what way were they not polite?
13           THE WITNESS:  Once I asked them, you know, why you
14  searching me, then they said, you know, to protect themself.
15           THE COURT:  OK.
16  Q.  Mr. McDonald, do you believe you were stopped because of
17  your race?
18  A.  That night, yes.
19  Q.  Why is that?
20  A.  Because I was the only one out there, and they had people
21  coming from the bowling alley.
22  Q.  Were you the only one out there or were there other people
23  coming from the bowling alley?
24  A.  Other people out there from the bowling alley.
25  Q.  So just because there were other people out there in the

3689

D4H8FLO1                    McDonald - direct
1  bowling alley, why do you think that means you were stopped
2  because of your race?
3  A.  Well, they didn't bother with anybody coming from the
4  bowling alley.  They was bothering me, and I was going home.
5  Q.  Do you remember the race of anyone that was coming out of
6  the bowling alley?
7  A.  It could have been Asian, white.
8  Q.  Mr. McDonald, how did you feel after the encounter ended?
9  A.  Embarrassed, ashamed.
10 Q.  Why is that?
11 A.  Because there was no reason to stop me.  I didn't do
12 anything.
13             MR. COREY:  One moment, your Honor.
14             Nothing further at this point.
15             THE COURT:  How long did the whole thing take from the
16 time you first saw the red van pull up in front of you until
17 you went on your way home?
18             THE WITNESS:  About seven to ten minutes.
19             THE COURT:  Was it that long?
20             THE WITNESS:  Yeah.
21             THE COURT:  OK.
22             Mr. Marutollo.
23             THE COURT:  You understand this is one of the lawyers
24 from the city.  They get to ask you questions.
25             THE WITNESS:  Yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3690

D4H8FLO1                    McDonald - direct
1    CROSS-EXAMINATION
2    BY MR. MARUTOLLO:
3    Q.  Good morning, Mr. McDonald.
4    A.  Good morning.
5    Q.  You're a class member in this case, correct?
6    A.  Yes.
7    Q.  You just testified that you believe you were stopped by the
8    NYPD based upon your race?
9    A.  Yes.
10   Q.  This isn't the first time you believe that a governmental
11   entity has discriminated against you because of your race,
12   correct?
13              MR. COREY:  Objection.
14              THE COURT:  What is the basis?
15              MR. COREY:  I don't see the relevance.
16              THE COURT:  It could be animus, motive.
17              MR. COREY:  Was it against the NYPD?  If not, how is
18   that relevant?
19              THE COURT:  I think they are allowed to bring it out.
20   It may go to credibility.
21              Was this first time you complained about something
22   like this?
23              THE WITNESS:  About NYPD?
24              THE COURT:  No.  About race as a factor in something
25   that happened to you?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3691

D4H8FLO1                    McDonald - cross
1                THE WITNESS:  Yeah.
2                THE COURT:  It was the first time?
3                THE WITNESS:  Well, not with NYPD.
4                THE COURT:  What was the other time?
5                THE WITNESS:  I got job discrimination.
6                THE COURT:  OK.
7    Q.  You actually claim that the postal service fired you
8    because of your race, isn't that correct?
9    A.  Yes.
10   Q.  You believe that the U.S. -- you actually sued them for
11   unlawful racial discrimination, isn't that correct?
12   A.  It's in court right now.
13               THE COURT:  It's pending now?
14               THE WITNESS:  It's pending.
15               MR. MARUTOLLO:  Your Honor, it's actually been closed,
16   this case has been closed.  The case McDonald v. U.S. Postal
17   Service, 08 Cv. 4936, has actually been closed.  The complaint
18   is dismissed in its entirety.
19   Q.  In that complaint, you alleged that the postal service
20   falsified records of African-Americans, right?
21   A.  In that case?
22   Q.  Yes.
23   A.  The case is pending.
24               THE COURT:  He thinks it's closed.  You think it's
25   still pending?  Do you have a lawyer in that case?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

3692

D4H8FLO1                    McDonald - cross
 1              THE WITNESS:  No.  I am doing it pro se.
 2   Q.  Just to be clear, in that case, though, in that lawsuit,
 3   you did claim that the U.S. Postal Service falsified records of
 4   African-Americans, right?
 5   A.  I believe so.
 6              MR. COREY:  He has already elicited the fact he is
 7   suing the postal service for racist behavior.  I don't see why
 8   the details are at all relevant.
 9              THE COURT:  What was the civ. number?
10              MR. MARUTOLLO:  There are actually multiple lawsuits,
11   but the lawsuit I am referring to is 08 Cv. 4936.  And if you
12   look at docket entry number 22, there has been a clerk's
13   judgment indicating plaintiff's case is dismissed.  From
14   October 15, 2009.
15              THE COURT:  We will look at the whole docket sheet.
16   Q.  You have also filed a separate lawsuit against a white male
17   for racial discrimination, right?
18   A.  Yes.
19   Q.  And that lawsuit was also dismissed against you?
20   A.  That one was dismissed.
21   Q.  By the way, you have no recollection of how many lawsuits
22   you filed as a plaintiff, right?
23   A.  Not offhand.
24   Q.  Turning your attention to December 19, 2009, your encounter
25   with NYPD officers occurred between 1 a.m. and 2 a.m., correct?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3693
D4H8FLO1                    McDonald - cross
1   A.  Yes.
2   Q.  You claim that prior to your stop, you exited your mother's
3   home that night, correct?
4   A.  Yes.
5   Q.  And you claim that you were outside about five to seven
6   minutes from the time you left your mother's home until the
7   time you were stopped, is that right?
8   A.  About that.
9   Q.  You claim it was cold that night?
10  A.  Yes.
11  Q.  You were wearing jeans, a shirt, a hat and a jacket that
12  night, right?
13  A.  Yes.
14  Q.  I would like to show you Defendants' Exhibit B2.
15          MR. MARUTOLLO:  This is actually also Plaintiffs'
16  Exhibit 230.
17          THE COURT:  Can you see that picture on your screen?
18          THE WITNESS:  Yes.
19  Q.  While this is up here on the elmo, I want to show you these
20  four photos of a coat, and I will ask you questions about them
21  in a second.
22          MR. MARUTOLLO:  Again, this is Plaintiffs' Exhibit
23  230.
24  Q.  Now, at your deposition, you testified that you believed
25  that this was the jacket you were wearing on December 19, 2009,
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
     D4H8FLO1                    McDonald - cross
 1   is that correct?
 2   A.  Yes.
 3   Q.  That's you in the jacket, correct?
 4   A.  Yes.
 5   Q.  That was a jacket of yours taken at your deposition?
 6   A.  Yes.
 7   Q.  That was the jacket you actually wore to your deposition?
 8   A.  Yes.
 9   Q.  This jacket goes beyond the pockets of the pants you were
10   wearing, correct?
11   A.  Yes.
12   Q.  Now, you had your jacket zipped up that night, correct?
13   A.  Yes.
14   Q.  You claim you had your keys in your jacket pocket?
15           You had your keys in your jacket pocket, correct?
16   A.  No.  In pants pocket my keys.
17   Q.  I am going to hand you the deposition transcript which was
18   taken on December 21, 2012.  And this is the original copy of
19   your deposition transcript.
20           You were under oath during this deposition, correct?
21   A.  Yes.
22   Q.  You asked questions and you gave answers to questions at
23   your deposition?
24   A.  Yes.
25   Q.  I would like to turn your attention to page 41, line 17,
```

3695
D4H8FLO1                    McDonald - cross
1    through page 42, line 1.  So you can turn to that page.
2              Page 41, line 17:
3    "Q.  Now, did you have anything in that jacket on December 19,
4    2009?
5    "A.  No, but my keys.
6    "Q.  Which pocket did you have your keys in?
7    "A.  My right.
8    "Q.  Your right pocket?
9    "A.  Yes."
10             Did you give those answers to those questions?
11   A.  Yes.  Right pocket means my jean pocket.
12             (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

3696

D4h9flo2                    McDonald - cross
1  Q.  By the deposition I was asking you specifically about your
2  jacket pocket, right?
3  A.  I probably misunderstood you.  I'm sorry.
4  Q.  In any event you said that those keys on direct examination
5  could have caused a bulge, right?
6  A.  Well they told me to take it out.
7  Q.  I just wanted to clarify.  On direct examination you said
8  that they could have caused a bulge?
9        MR. COREY:  I think that's a mischaracterization of
10  his testimony.
11        THE COURT:  I think that's what he said, he doubted
12  it.
13  Q.  You also claim on the left side of your jacket pocket you
14  had your cellphone, correct?
15  A.  Yes.
16  Q.  And you claim also that you had your wallet in your jeans
17  pocket, right?
18  A.  Yes.  In my back pocket wallet.
19  Q.  You claim that you were stopped by NYPD officers while on
20  the concrete island on Parsons Boulevard?
21  A.  On the island.  On the street.  Yes.
22        THE COURT:  Which is it?  On the island?  Were you on
23  the island already?
24        THE WITNESS:  I was trying to cross the street.
25        THE COURT:  So you weren't on the island yet?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

3697

D4h9flo2                    McDonald - cross

1              THE WITNESS:  No.  I was on the street.
2   Q.  But the stop actually occurred when you were talking to the
3   officers on the island, correct?
4   A.  No.  It happened in the street.
5   Q.  I'd just like to turn your attention to page 45, line 1
6   through 18.
7   "Q.  When did you first see the police after you exited your
8   mother's home on December 19, 2009?
9   "A.  When I seen the police?"
10              There was then an objection about reading the question
11   back.  Then on line ten it says:
12   "Q.  You can answer.
13   "A.  When I was on the island.
14   "Q.  I'm sorry?
15   "A.  When I was on the island, they stopped me."
16              Did you give those answers to those questions?
17   A.  I was not on the island.  I was on the street when they
18   stopped me.
19   Q.  But you gave those answers to those questions, right?
20   A.  Yeah, because it was a little misleading.
21   Q.  The question of where you were stopped was misleading?
22   A.  Well, yeah, because when I said I was on the island I was
23   crossing the street between parked cars.
24              MR. MARUTOLLO:  By the way, your Honor, we ask that
25   Plaintiffs' Exhibit 230 be entered into evidence.  It is the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3698

D4h9flo2                    McDonald - cross
1   photographs that are currently on the ELMO.
2                THE COURT:  Yeah.  That's fine.
3                (Plaintiffs' Exhibit 230 received in evidence)
4   Q.  I'd also now like to show you through the monitor on your
5   screen Defendants' Exhibit L10.
6                Do you see that, Mr. McDonald?
7   A.  Yes.
8   Q.  And I'd just like to go through each of these photographs.
9                Let me first actually turn your attention to
10  NYC_20025824.
11               Is this the location of where you were stopped?
12  A.  That's not the location, no.
13  Q.  Where were you stopped then?
14  A.  Further down.
15  Q.  Well actually let me --
16               THE COURT:  Further down which way?  Looking toward --
17               THE WITNESS:  Right where the sanitation truck is.
18               THE COURT:  I think I see that.  Okay.
19               That's where you were stopped?
20               THE WITNESS:  Yes.
21               THE COURT:  And you were coming from the right-hand
22  side or the left-hand side?
23               THE WITNESS:  If he goes back to the first picture.  I
24  went behind the building so -- from there, I came around, and
25  walked down, there's little steps over there that I walked down
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
          D4h9flo2                McDonald - cross
 1    to.
 2    Q.  So actually just looking at each photograph in succession,
 3    this first photograph, what is this a photograph of?  This is
 4    Bates stamped number 2582 at the end.
 5    A.  That is like my mother's building.
 6    Q.  And then the next photograph?
 7    A.  (No response).
 8    Q.  That's -- this is again, 2583, this is as you're exiting
 9    your mother's building?
10    A.  No.  I didn't exit there.
11    Q.  This is across the street from your mother's building?
12    A.  Right.
13    Q.  I'm sorry.  25283.
14            And that -- on the photograph the building across the
15    street, is there a bowling alley over there?
16    A.  By where the sanitation truck is, yes.
17    Q.  The --
18            THE COURT:  Wait one second.  There's a bowling alley
19    where the sanitation truck is?
20            THE WITNESS:  Yeah.  That's the entrance over there.
21    You can see.
22            THE COURT:  I see.  Okay.  Thank you.
23    Q.  Can you go to the next photograph.
24            I'm sorry.  The next one after that as well.
25            I'm sorry.  The next after that.
```

3700

D4h9flo2                    McDonald - cross

1          You already talked -- is that the bowling alley right
2   there, the smaller building across the street?
3   A.  Yes.
4   Q.  Right where that sanitation truck is?
5   A.  Yes.  The entrance going down.
6   Q.  And that's Jib Lanes?
7   A.  Yes.
8   Q.  Now when you talked earlier about the demographics of the
9   racial make-up of your area, you indicated that the side of the
10  street that your mother's house was on was 80 percent black?
11  A.  Yes.
12  Q.  What's the basis for that statement?
13  A.  Excuse me?
14          THE COURT:  He's asking you how do you know that.
15          THE WITNESS:  Because they got sued to have minorities
16  move in.
17  Q.  Were you one of the litigants in that lawsuit?
18  A.  No.  That was -- no.
19  Q.  And are there -- are there a lot of buildings on your
20  mother's side of street?
21  A.  Just housing complex.
22  Q.  How many floors are in these housing complexes?
23  A.  Some are three.  Some are seven.
24  Q.  About how many housing buildings are on that street?
25  A.  You got me.  I don't know.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D4h9flo2                    McDonald - cross

1   Q.  More than 10 or 20?
2   A.  Could be more than 20.
3   Q.  On your side of the street, you testified that that's
4   80 percent white?
5   A.  Yes.
6   Q.  And what's your basis for that, that number?
7   A.  That's because most of them all electricians.
8   Q.  I'm sorry?
9   A.  Most of them are electricians and union members.
10  Q.  So that's your basis for saying there's 80 percent white
11  people on that side of the street?
12  A.  Well most of them is white lives over there.
13  Q.  And there are very few buildings on that side of the
14  street, correct?
15  A.  What do you mean, a few?
16  Q.  There are not as many buildings on the so-called 80 percent
17  white side of the street than on your mother's side of the
18  street; isn't that right?
19  A.  I don't know.
20  Q.  Now, going back to the stop, the bowling alley called Jib
21  Lanes, that was about 25 feet from where you were stopped by
22  the NYPD that night, right?
23  A.  About 25 feet?  Could be less, yeah.
24  Q.  So it could be less than 25 feet?
25  A.  Yeah.

3702

D4h9flo2                    McDonald - cross

1   Q.  And there are residences, your mother's home included,
2   about 50 yards from where you were stopped by the NYPD that
3   night, right?
4   A.  I don't understand what you mean by that.
5   Q.  So the night you were stopped --
6   A.  Yeah.
7   Q.  Where you were physically stopped was about 50 yards from
8   residences, the Pomonok houses?
9   A.  No.
10  Q.  So just turn again to page 45, lines 19 through 21.
11  "Q.  How far away was that island on Parsons Boulevard from
12  your mother's home?
13  "A.  About 50 yards."
14          Did you give that answer to that question?
15  A.  Yeah.
16  Q.  Now, in order to get to the island in the middle of the
17  street, you did not cross at the crosswalk, right?
18  A.  Correct.
19  Q.  You crossed in the middle of the street?
20  A.  Yeah.  There's a little cross thing over there.
21  Q.  Well, you didn't cross in the crosswalk?
22  A.  Well they consider that crosswalk, but they don't mark it
23  on the floor.
24  Q.  So how is it considered a crosswalk?
25  A.  Because it's got a slope for people with shopping carts to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3703

D4h9flo2                    McDonald - cross

1  come up when they cross the street.
2  Q.  So -- you said you were walking on the side during your
3  direct examination?
4  A.  What do you mean, on the side?
5  Q.  You said as you were walking past cars, you were walking on
6  the sideway?
7  A.  Yeah.  To go in between the cars.
8  Q.  And you were shifting your weight towards one side?
9  A.  Just moved my body a little.
10  Q.  So you were moving your body a little?
11  A.  Just to walk through the cars.
12  Q.  You claim that the -- one of the officers in the van put
13  down his window, correct?
14  A.  Yes.
15  Q.  Now you claim that on your direct examination that you
16  said:  Why are you stopping me, right?
17  A.  Correct.
18  Q.  And you asked that question even though you didn't know if
19  these were, in fact, police officers?
20  A.  Right.
21  Q.  So when random cars come up to you, you just assume you're
22  being stopped by the police?
23  A.  If they ask me questions it's different.
24  Q.  So the officer ultimately did identify himself as a police
25  officer, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4h9flo2                    McDonald - cross

1   A.  Not right away.
2   Q.  But at some point he did identify himself as a police
3   officer, correct?
4   A.  He had to.
5   Q.  And you claim that there were three individuals in the van
6   that night, right?
7   A.  Correct.
8   Q.  But you don't know that the third individual was a police
9   officer, do you?
10  A.  He never came out.
11  Q.  And you never saw his face, right?
12  A.  I seen half his face.
13  Q.  I want to turn your attention to page 52, lines 23 through
14  25.
15  "Q.  Can you describe the third individual who never left the
16  van?
17  "A.  No.  I never got a chance to see his face."
18          Did you give that answer to that question?
19  A.  Yeah, but you could see half his face.  I didn't see the
20  whole face.
21  Q.  Now you only interacted with two officers who came out with
22  silver badges, correct?
23  A.  My recollection, yes.
24  Q.  And you claim that the driver provided you with his name
25  Anderson and a shield number 30482; is that correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3705

D4h9flo2                    McDonald - cross

1   A.  Whatever I gave the attorneys, yes.
2   Q.  And that was the number you gave the attorneys, correct?
3   A.  If that's the number, yes.
4   Q.  Now you claim that the -- during the course of the search
5   the officer never put your hand in his pocket during your
6   direct examination, correct?
7   A.  He never put his hands in my pocket?
8   Q.  Yes.
9   A.  He told me to put my hands in my pocket, take out my keys.
10  Q.  But he never put his hand in your pocket?
11  A.  I can't remember all that.
12  Q.  What do you mean you can't remember all that?
13  A.  I can't remember if he put his hands in my pocket or not.
14  Q.  So when you testified earlier you said he didn't put his
15  hands in, is that incorrect?
16  A.  No.  He probably did.
17  Q.  So first during direct examination you said he didn't put
18  his hands in your pockets.  Now you're saying he probably did
19  put his hands in your pockets?
20          MR. COREY:  I think on direct he said he didn't
21  remember whether he put his hands in his pockets.
22          MR. MARUTOLLO:  I don't believe that's true.
23          THE COURT:  I don't recall.
24          I know he said that the officer patted down the
25  outside of the pocket.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3706

D4h9flo2                    McDonald - cross

1              Do you remember you said that, Mr. McDonald?
2              THE WITNESS:  Yes.
3              THE COURT:  And then I asked you whether he put his
4     hand in your pocket.  You said you weren't sure or you didn't
5     remember.
6              THE WITNESS:  Right.  I wasn't sure.
7              THE COURT:  And you aren't sure now?
8              THE WITNESS:  Right.
9              THE COURT:  I think that's the best we're going to
10    get.
11    Q.  Well as the second officer was interacting with you, the
12    officer said that he was trying to protect himself, right?
13    A.  Correct.
14    Q.  And, in fact, the officer said that the reason for the stop
15    was to protect himself, correct?
16    A.  The search, yes.
17    Q.  And you -- excuse me, your Honor.  I'm sorry.
18             The officers told you that they wanted to make sure
19    you didn't have a weapon; isn't that right?
20             THE COURT:  Did the officers say that, they wanted to
21    be sure you weren't carrying a weapon?
22             THE WITNESS:  I don't remember that.
23             THE COURT:  You don't remember that?
24             THE WITNESS:  No.
25             THE COURT:  By the way, I know I'm jumping ahead.  But
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D4h9flo2                    McDonald - cross

1   is there a 250 on this stop?
2           MR. MARUTOLLO:  Yes, your Honor.
3           THE COURT:  Any reason I can't see it now?  It's a
4   little ahead of it but I'd like to take a look at it.
5           MR. MOORE:  It's Plaintiffs' Exhibit 226, Judge.
6           THE COURT:  Can I get a copy of it for a minute?  I'm
7   sure it's going to be coming.
8           Thank you.  Appreciate it.
9   Q.  Well just to refresh your recollection, you just said you
10  didn't remember if they asked you whether or not you had a
11  weapon.
12          If you could turn to page 58 of your deposition.  If
13  you could read lines -- I'm sorry 58, line 25 through 59, line
14  6.  If you could just read that to yourself and tell me if that
15  refreshes your recollection.
16          MR. COREY:  Sorry which page?
17          MR. MARUTOLLO:  58, I'm sorry, 25 through 59, 6.
18  Q.  So does that refresh your recollection, Mr. McDonald?
19  A.  Yeah.
20  Q.  So the officers did, in fact, tell you they wanted to make
21  sure you didn't have a weapon, right?
22  A.  I didn't have any, so.
23  Q.  I'm sorry?
24  A.  I didn't have any.
25  Q.  Well that wasn't my question.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

3708

D4h9flo2                    McDonald - cross
1              The officers said to you that they wanted to make sure
2    you didn't have a weapon; isn't that right?
3    A.  They was trying to protect their self.  That's what I
4    remember.
5    Q.  Let me just again out loud in court then, on page 58,
6    again, 25 through 59, 6.
7    "Q.  Did the officers say they were looking for weapons?
8    "A.  They wanted to make sure I didn't have any.  That's what
9    they said.
10   "Q.  When you said they didn't have any --
11   "A.  They told me they were searching me to make sure I didn't
12   have a weapon on me."
13             Did you give those answers to those questions?
14   A.  I gave those answers, yeah.
15   Q.  And you were never handcuffed during this encounter, right?
16   A.  No.
17   Q.  You weren't issued a summons, right?
18   A.  No.
19   Q.  The officers didn't use profanity, right?
20   A.  No.
21   Q.  And you didn't file any complaints about this stop, right?
22   A.  No.
23   Q.  You didn't contact the civilian complaint review board
24   about this stop, right?
25   A.  No.

3709

D4h9flo2                    McDonald - cross
1   Q.  Or the internal affairs bureau of the NYPD?
2   A.  No.
3   Q.  Despite the fact that you filed a number of other lawsuits,
4   you've never sued anyone about this stop?
5   A.  Excuse me?
6           MR. COREY:  Your Honor, I object to the form of that.
7           THE COURT:  Go ahead.
8   Q.  You've never sued anyone about this stop, correct?
9   A.  No.
10  Q.  And, in fact, you consider it a stop every time an officer
11  says hello to you; isn't that right?
12  A.  I believe so.
13  Q.  And any time an officer asks you a question, you think
14  that's a stop too, don't you?
15  A.  He stop me from doing what I'm doing, yeah.
16  Q.  So any time an officer asks you how you're doing, you
17  consider that a stop?
18  A.  Which they never did.
19          MR. MARUTOLLO:  No further questions, your Honor.
20          THE COURT:  Thank you, Mr. Marutollo.
21          Mr. Corey.
22          Did the officers tell you why they stopped you?
23          THE WITNESS:  They never told me.
24          THE COURT:  Did you ask?
25          THE WITNESS:  I was just -- I wasn't in the mood to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3710

D4h9flo2                    McDonald - cross
1  hear anything from them.
2            MR. MARUTOLLO:  Your Honor, actually before, if we
3  could just enter L10 into evidence.
4            THE COURT:  There is no problem with that, right, Mr.
5  Corey?
6            MR. COREY:  No problem.  No objection.
7            THE COURT:  Okay.  L10 is received.
8            (Defendants' Exhibit  L10 received in evidence)
9  REDIRECT EXAMINATION
10 BY MR. COREY:
11 Q.  Mr. McDonald, do you think that the government in general
12 is racist?
13 A.  No.
14 Q.  Do you remember the city's lawyer asking you some questions
15 about the racial make-up of both sides of Parsons, the
16 racial -- how many whites and how many blacks lived on each
17 side of the block?
18            Do you remember that?
19 A.  Yes.
20 Q.  And you said that about 80 percent of your side is white?
21 A.  Correct.
22 Q.  And that's based on -- first of all, how long have you
23 lived there, at that address?
24 A.  Nineteen years.
25 Q.  So, is that 80 percent an estimate based on your own
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3711

D4h9flo2                    McDonald - redirect

1   experience?
2   A.  Yes.
3   Q.  Now, Mr. McDonald, is your mother's unit located directly
4   on Parsons or is it located in the interior of the block?
5   A.  Inside.  Interior.
6   Q.  When you stepped out of your mother's door, could you
7   describe the path that you usually take to get to your house?
8           MR. MARUTOLLO:  Objection, your Honor, to relevance.
9           MR. COREY:  I'll move on, your Honor.  Withdrawn.
10           THE COURT:  I don't know what was objectionable about
11   it.  But okay.  If you want to withdraw it, go ahead.
12   Q.  And so Mr. McDonald, you also testified just now that you
13   think that when a cop says hello it's a stop?
14   A.  Yes.
15   Q.  Did the cops on December 19 merely say hello?
16   A.  No.  They didn't say hello.
17   Q.  Did they do more than say hello?
18   A.  They just stopped me and questioned me and searched me.
19           MR. COREY:  Just one moment, your Honor.
20           (Pause)
21   Q.  Now, Mr. McDonald, I'm not clear -- at some point the
22   officers said they were trying to protect themselves?
23   A.  Yes.
24   Q.  So, did you understand that to be an explanation as to why
25   they were doing what they were doing?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3712

D4h9flo2                McDonald - redirect

1   A.  (No response).
2   Q.  Did it make any sense to you?
3   A.  No.  It did not make no sense.
4   Q.  The postal service suit, is that on appeal right now?
5   A.  Yes.
6            MR. COREY:  Thank you, your Honor.
7            THE COURT:  Anything further?
8            MR. MARUTOLLO:  Nothing, your Honor.
9            THE COURT:  All right.  You're all set.  Thank you.
10  You're done.
11           (Witness excused)
12           Who is next?
13           MR. COREY:  Your Honor, plaintiffs call Officer Edward
14  French.
15           THE COURT:  Are we going to have Brown today?
16           MS. BORCHETTA:  No, your Honor.  We've decided not to
17  call him.
18           THE COURT:  He's not going to be called at all?
19           MS. BORCHETTA:  Your Honor, if I may take this moment
20  to address a scheduling issue that it appears that we might be
21  running into today, which is that we had anticipated that the
22  integrity control officers would take longer than they did and
23  that they would take up more of the time today and because of
24  that it looks like at the pace we're moving that we -- we'll
25  see -- but that we might finish earlier today than expected.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# EXHIBIT E

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
---------------------------------------------------------------------- x

DAVID FLOYD, et al.,

                          Plaintiffs-Appellees,

-against-

CITY OF NEW YORK,

                        Defendant-Appellant.

---------------------------------------------------------------------- x

**DECLARATION
OF JAMES P. HALL**

Dkt. No. 13-3088

       **JAMES P. HALL**, declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

       1.    I am the Chief of Patrol Services for the New York City Police Department and am responsible for the planning, directing, and coordinating the development of the Department's uniformed members on patrol in the 77 precincts located in New York City. There are approximately 34,500 uniformed members of the NYPD. As of July 31, 2013, 19,800 members are on patrol in precincts, housing developments and transit districts throughout the City.

       2.    I submit this declaration in support of the City's motion for an order staying the opinion and order of the District Court for the Southern District of New York dated August 12, 2013. In that order, the District Court directed certain "Immediate Reforms Regarding Stop and Frisk." Specifically, the Court has directed that "as soon as practicable," the NYPD should transmit a FINEST message summarizing the Court's formulation of the basic constitutional standards for Stop, Question and Frisk ("SQF").

3.      SQF is an integral part of proactive policing to prevent crime as well as to detect crime.  SQF is based in large part on behavior observations and the experiential knowledge of officers.  "High crime area," "local crime patterns," "suspect data," "furtive movements" and "suspicious bulges" are not just "hunches."  Rather, they are the building blocks for an officer to assess whether reasonable suspicion supports a stop and frisk.

4.      The Court's decision devalues an officer's proven experience in determining whether to make a stop by calling into question an officer's right to rely on "furtive movements," "suspicious bulges" and the other building blocks referenced above. On patrol, an officer must be able to rely on what s/he sees, has learned in training and in the field, and on information developed and disseminated by the NYPD, including local crime data, crime patterns, and conditions.  Because the Court's decision apparently contradicts the officer's training and undermines confidence in information developed and provided by the NYPD, it will almost certainly cause him or her to second-guess whether a given stop or frisk is now permitted under the Fourth or Fourteenth Amendment, leading to hesitation and uncertainty in fast-developing high stakes street encounters.  This hesitation in certain situations, such as with an armed subject, poses an immediate threat to the safety of an officer or officers and to the public. It will also result in lost opportunities to apprehend criminals and to solve crimes.

5.      Further, the Court's opinion on the use of suspect data as a factor in reasonable suspicion and making stops is confusing and troubling.  The opinion appears to link the use of crime data with racial profiling.  Analysis of crime patterns yields valuable details to identify suspects and thereby reduce crime.  Until the Court's decision, no court has prohibited the proper use of crime data as a factor in conducting stops.

-2-

6.      NYPD's CompStat program analyzes and maps crime reports, and allows police officers to access real-time data on crime patterns and suspect descriptions. This data is key to the deployment of NYPD resources, the prioritization of resources and strategies, including staffing levels and the use of special teams. Unclear limitations and unprecedented changes in the ways in which the NYPD uses crime patterns and suspect data will impact the NYPD's discretion in the deployment of resources and the ability to effectively police.

7.      Pending appeal, the Department should not be required to propose a FINEST message summarizing the Court's standard, to revise training material, or to implement any retraining on SQF. The Court's decision is confusing and does not state concrete or discernible standards, making it difficult, if not impossible, to summarize the decision in a clear manner to officers. Moreover, should the City prevail on appeal, the officers will have to be retrained, causing even more confusion among the rank and file.

8.      Additionally, the other immediate reforms ordered by the Court – the pilot program involving body cameras, and the revision of the UF-250 forms – should be stayed pending the City's appeal. The use of body cameras raises a number of issues, including the privacy of members of the public. Unlike street cameras, officers will be wearing these body cameras when they enter people's homes in response to calls for police assistance. When responding to crime scenes or accident scenes, the cameras may capture the images of victims who have been injured or killed. Instructing the officer to turn the cameras off or on as appropriate will add another undue burden on the officer as he/she must evaluate and react to situations quickly. If an officer does not turn on the camera in time to capture the entire stop encounter, he/she will be prejudiced in any proceedings, criminal, civil or disciplinary, in which the recording is relevant. Thus, enormous amounts of time from many bureaus of the NYPD will

have to be diverted to consider the legal as well as operational obstacles in creating the operational guidelines for any pilot program.

9.      Further, before the body camera pilot program is implemented, the precinct in each borough with the highest number of stops will be designated to participate in the program. Such a designation may affect the confidence in the affected precinct since the public will perceive that precinct as one which needs monitoring, even though there is no correlation between the designation and improper police conduct in that precinct. The planning and implementation of the camera pilot program should be stayed pending appeal to avoid unnecessary allocation of resources and unwarranted negative perceptions of particular precincts.

10.      Revision of the UF-250 form to include two narrative sections, with one given to the person stopped, will significantly change the impact of a stop. This procedure will significantly prolong the encounter between the person stopped and the officer.      Writing narratives may also increase the hostility of the stop. The stopped person may disagree with or resent the descriptive language, escalating the encounter into a more confrontational situation. For this reason, the revision of the UF-250 form should be stayed until this Court decides the City's appeal.

Dated: New York, New York
       September *13*, 2013

_____
JAMES P. HALL

-4-

# EXHIBIT F

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

----------------------------------------------------------------------- x

DAVID FLOYD, et al.,

                                              **DECLARATION**
                        Plaintiffs-Appellees,   **OF JAMES O'KEEFE**

            -against-                         Dkt. No. 13-3088

CITY OF NEW YORK,

                        Defendant-Appellant.

----------------------------------------------------------------------- x

        **JAMES O'KEEFE**, declares under penalty of perjury, pursuant to 28 U.S.C.
§1746, that the following is true and correct:

        1.     I am currently the Deputy Commissioner for Training for the New York
City Police Department and serve as the primary advisor to the Police Department on all
education and training matters. My duties include coordinating the NYPD's various training
programs, and overseeing the development of curricula for Recruit Training, In Service Training,
Specialized Training, Civilian Training and Executive Development. I also hold a Ph.D. in
criminal justice and I am a tenured professor at St. John's University.

        2.     I submit this declaration in support of the City of New York's motion for
an order staying the opinion and order of the District Court for the Southern District of New
York dated August 12, 2013. In that order, the District Court directed certain "Immediate
Reforms Regarding Stop and Frisk." Specifically, the Court has directed that "as soon as
practicable", the NYPD should transmit a FINEST message summarizing the Court's
formulation of the basic constitutional standards for Stop, Question and Frisk ("SQF"). In

addition, the Court directed the NYPD to revise its training materials to reflect new standards articulated under its Liability decision in Floyd and Ligon.

3.    In my professional experience, re-educating police officers correctly, and in a way that changes behavior, requires taking them from patrol, housing developments, and transit districts throughout the City, resulting in fewer officers available for enforcement duties. Fewer officers on the streets may impact public safety and crime rates may rise. Currently, there are approximately 34,500 uniformed members of the NYPD. As of July 31, 2013, almost 19,800 members are on patrol in precincts, housing developments, and transit districts located throughout the City. Almost every one of these officers, from the newest recruit to the most senior, has been educated, trained and tested on the Fourth Amendment, the Terry standards, and the DeBour standards for SQF. These officers have been educated, I believe, correctly, on how to evaluate situations and apply these legal standards. There are, of course, alternative instructional methodologies to this type of labor intensive training initiative. For example, the Department could issue written directives to be read at all roll calls, produce a new training video to be shown at roll calls, and/or lecture large groups of officers in an auditorium format. While these alternative instructional methods are available, police officers will learn better by being actively engaged in the process and rather than being lectured on SQF.

4.    As discussed below, training is a modification of behavior and can best be accomplished with repetition. Re-education is more difficult because it changes the way officers think about the application of these behaviors. To re-educate all of these officers in the way they think about and apply Terry standards and DeBour standards to unfolding street situations is a massive task. This re-education program goes to the core of NYPD policing and should not be undertaken until the SQF legal standards are clarified and definite. Should the City prevail on

-2-

appeal, to have to re-educate approximately 34,500 officers again, will create even more confusion and doubt as to what are appropriate police actions. Confusion, doubt, and hesitancy about appropriate enforcement actions may result in dangerous situations for the public and for officers.

5.      The issuance of the FINEST message, as well as the revision of training materials that have been taught to generations of officers, to reflect the Court's formulation of standards for permissible stops and frisks at this juncture will cause confusion and unnecessarily disrupt the NYPD's training program.  First, the District Court failed to formulate a clear standard, and the way it differs from the existing standards, which can be transmitted in a FINEST message or be reduced into writing in training materials.  The Court's decision appears to reinterpret the law, and redefine an officer's right to rely on furtive movements, suspicious bulges, high crime areas,  and suspect descriptions that include race in unclear, confusing, and ambiguous terms.  Effective training of recruits and in service personnel, however, must be based on settled law and practices, as well as clearly understood terms and distinctions.

6.      In order to reeducate officers on the Court's standards for SQF, new curricula and reading materials would have to be developed for Instructor Training, Recruit Training, In-Service Training and Promotional Training.  The recruit training materials on SQF include, but are not limited to, the Police Student's Guide, Chapter 10: Policing Legally – Street Encounters,  and  related  lectures;  the  Police  Student's  Guide,  Chapter  2,  Patrol Operations/Vertical Patrols, and related lectures, SQF Workshops including lectures and role-plays; a SQF examination administered to all recruit officers, Advancing Community Trust Program, SQF immersion course role-plays; Knowledge Integration Workshops and SQF role playing scenarios at the Tactical Village.

7. In-Service Training curricula which would have to be developed include: participation in SQF scenarios at the Tactical Village; Command Level Training and SQF lesson plans and videos; and LEAD Training for sergeants and lieutenants, which includes lesson plans on encounters between police and the public, SQF racial profiling, DeBour and Terry standards.

8. If retraining on SQF were to have to be implemented immediately, the current recruit class, for example, would have to be held over for at least one week to be retrained or recalled to the Police Academy for one week, taking them off patrol duties throughout the City and probably causing considerable disruption.

9. The SQF Refresher course at the Tactical Village, with the role-playing scenarios which are critical to re-education, is a one-day In-Service course. To demonstrate how long the training cycle for the NYPD is for this training, the course is taught five days each week, two sessions each day, 25 officers attending each session. From April 30, 2012, through August 12, 2013, 8,231 officers attended the SQF Refresher course.

10. Additionally, even if the District Court opinion articulated clear standards, revising training based on the Court's formulation, which the City is challenging on appeal, would cause irreparable harm. If the City is successful on this appeal, the Department will have to revise all training materials and the FINEST message again, and will have to reeducate its officers. This will cause undue confusion among officers especially because the constitutional principles governing police/civilian encounters are already difficult for non-lawyers to understand and to apply. To effectively modify the behavior of police officers, SQF training focuses on changing the way that officers think about SQF and how they evaluate situations. Training and retraining will cause uncertainty and confusion, which may result in mistakes by officers. In policing, mistakes can cause members of the public and officers to be injured.

11. Thus, training officers on the Court's principles of SQF during the pendency of this appeal will irreparably harm the City if the City is successful on appeal because the confusion, disruption and uncertainty caused to the officers if they have to be trained again will not be easily or quickly remedied.

12. In addition to the training and FINEST message ordered by the Court, implementation of the other immediate reforms ordered by the Court, specifically the body cameras pilot program and the new UF250 forms, will also irreparably harm the NYPD in its mission to protect public safety and security and should also be stayed. The use of body cameras on routine patrol is a completely new training field for the NYPD. The entire curriculum, including role plays, will have to be developed, taking into consideration the type of camera selected and its capabilities. The instructors will have to test the cameras and the curriculum for effectiveness prior to teaching the officers who will use the cameras on patrol. This research and development will take time and is necessary for the pilot program to have validity.

13. There is also a resource factor to be considered. Planning and implementation of the training for the body cameras pilot program and the new UF250 form will necessitate reassignment of the Training Bureau staff from its general training duties, including preparing for a new recruit class, to develop specialized training that, ultimately, may not be used.

14. In conclusion, a stay of the Court's ordered reforms should be granted because (1) it will be impossible to properly revise the training materials and the FINEST message to comply with the Court's direction because the Court has not articulated a clear standard for permissible SQF encounters between the Police and the public; (2) if the City is successful on appeal, officers will have to be retrained, which will cause confusion, which may

lead to injury-causing mistakes; (3) if the City is successful on appeal, the Department's limited

resources, including taking officers off patrol, will have been diverted unnecessarily.

Dated:  New York, New York
        September 3, 2013

                        JAMES O'KEEFE, Ph.D.

Docket No. 13-3088-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

DAVID FLOYD et al.

v.

CITY OF NEW YORK

-----------------------------------------------

JAENEAN LIGON et al.

v.

CITY OF NEW YORK

**MOTION FOR A STAY PENDING APPEAL**

***MICHAEL A. CARDOZO***
*Corporation Counsel of the City of New York*
*Attorney for Defendant-Appellant*
*100 Church Street*
*New York, N.Y.  10007*
*Of Counsel:  Deborah A. Brenner*
*Tel:  (212) 356-0826 or 0827*